# Exhibit B

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 10-K/A

ANNUAL REPORT PURSUANT TO SECTIONS 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2014

Commission File No. 333-177532

KAYA HOLDINGS, INC.



(Exact name of registrant as specified in its charter)

| Delaware | 90-0898007 |
|---|---|
| (State of other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

305 South Andrews Avenue, Suite 209, Fort Lauderdale, Florida, 33301
(Address of principal executive offices) (Zip Code)

954/534-7895
(Registrant's telephone number, including area code)

Securities registered under Section 12(b) of the Exchange Act: None

Name of each exchange on which registered – Not applicable

Securities registered under Section 12(g) of the Exchange Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. [ ] Yes [x] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. [ ] Yes [ ] No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. [x] Yes [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). [ ] Yes [x] No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [ ] Accelerated filer [ ] Non-accelerated filer [ ] Smaller reporting company [x]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). [ ] Yes [x] No

The aggregate market value of the voting stock held by non-affiliates of the Registrant was approximately $4,713,667 as of March 31, 2015 based on the closing price of $0.08 of the Company's common stock on the Over-the-Counter Bulletin Board on March 31, 2015. For purposes of the foregoing computation, all executive officers, directors and 10% beneficial owners of the Registrant are deemed to be affiliates.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date. There were 85,989,325 shares of common stock outstanding as of April 15, 2015.

DOCUMENTS INCORPORATED BY REFERENCE: No documents are incorporated by reference into this Report except those Exhibits so incorporated as set forth in the Exhibit index.

**KAYA HOLDINGS, INC.**
**FORM 10-K INDEX**

| | | Page |
|---|---|---|
| Part I | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 6 |
| Item 2 | Properties | 12 |
| Item 3 | Legal Proceedings | 13 |
| Item 4 | Mine Safety Disclosures | 13 |
| | | |
| Part II | | |
| Item 5 | Market for Registrant's Common Equity and Related Stockholder Matters | 14 |
| Item 6 | Selected Financial Data | 15 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operation | 15 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 17 |
| Item 8 | Financial Statements and Supplementary Data | 17 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 18 |
| Item 9A | Controls and Procedures | 18 |
| Item 9B | Other Information | 19 |
| | | |
| Part III | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 20 |
| Item 11 | Executive Compensation | 21 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management | 22 |
| Item 13 | Certain Relationships and Related Transactions | 23 |
| Item 14 | Principal Accountant Fees and Services | 24 |
| | | |
| Part IV | | |
| Item 15 | Exhibits and Financial Statement Schedules | 25 |
| | | |
| Signatures | | |

PART I

**FORWARD LOOKING STATEMENTS**
**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Information contained in this Annual Report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements are contained principally in the sections titled " Item 1. Business " and " Item 1A. Risk Factors," and " Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations " and are generally identifiable by use of the words "may," "will," "should," "expect," "anticipate," "estimate," "believe," "intend" or "project" or the negative of these words or other variations on these words or comparable terminology.

The forward-looking statements herein represent our expectations, beliefs, plans, intentions or strategies concerning future events. Our forward-looking statements are based on assumptions that may be incorrect, and there can be no assurance that any projections or other expectations included in any forward-looking statements will come to pass. Moreover, our forward-looking statements are subject to various known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from future results, performance or achievements expressed or implied by any forward-looking statements.

Except as required by applicable laws, we undertake no obligation to update publicly any forward-looking statements for any reason, even if new information becomes available or other events occur in the future.

**ITEM 1. Business.**

**Background**

Kaya Holdings, Inc. ("KAYS", ""we", "us", "our" or the "Company") was incorporated in Delaware in 1993 under the name Gourmet Market, Inc. and has engaged in a number of businesses. Its name was changed on May 11, 2007 to Netspace International Holdings, Inc. ("Netspace"). Netspace acquired 100% of the capital stock of Alternative Fuels Americas, Inc., a Florida corporation in January 2010 in a stock-for-stock transaction and issued 100,000 shares of Series C convertible preferred stock to existing shareholders. A Certificate of Amendment to the Certificate of Incorporation was filed in October 2010 changing the Company's name from Netspace International Holdings, Inc. to Alternative Fuels Americas, Inc. (AFAI). A Certificate of Amendment to the Certificate of Incorporation was filed in March 2015 changing the Company's name from Alternative Fuels Americas, Inc, Inc. to Kaya Holdings, Inc and on April 6, 2015 FINRA approved the name and symbol change to "KAYS".

From 2010 -2014 the Company was engaged in seeking to develop a biofuels business. In January 2015 the Company determined that it was in the best interests of its stockholders to discontinue its biofuel development activities, and to instead leverage its agricultural and business development experience and focus all its resources on the development of legal medical and recreational marijuana opportunities in the United States and in select international markets.

In 2014, KAYS incorporated a subsidiary, Marijuana Holdings Americas, Inc. a Florida corporation ("MJAI"). Through MJAI, KAYS has focused on the development of opportunities within the legal recreational and medical marijuana sectors in the United States. In March 2014, MJAI, through an Oregon subsidiary, applied for and was awarded its first license to operate a MMD. The Company developed the Kaya Shack brand for its retail operations and on July 3, 2014 opened the Kaya Shack Medical Marijuana Dispensary in Portland, Oregon and became the first US publicly traded company to own and operate a MMD. Initial customer acceptance and media coverage was very positive, including many references to AFAI as the "Starbucks of Medical Marijuana" by television news stations, news print publications and online news sources.

In April 2015 KAYS announced that it has commenced with its own medical marijuana grow operations for the cultivation and harvesting of legal marijuana. The grow operation places KAYS as the first US publicly traded company to own a majority interest in a vertically integrated legal marijuana enterprise in the United States.

*Table of Contents*      1

Our corporate office is in Fort Lauderdale, Florida and our address is 305 South Andrews Avenue, Suite 209, Fort Lauderdale, Florida, 33301. Our website is www.kayaholdings.com. Information contained on our website does not constitute part of this Annual Report.

**General**

Following the successful introduction of legal recreational marijuana in Colorado and Washington, the Company incorporated its majority owned subsidiary Marijuana Holdings Americas, Inc. (MJAI) to operate as a grower, processor, distributor and/or retailer of legal recreational and/or medical marijuana in jurisdictions where it is legal in accordance with State law. After an evaluation of several factors including barriers to entry, costs and potential, the Company targeted Oregon as the first market within which to open a state licensed medical marijuana dispensary (MMD).

In March 2014, MJAI, through an Oregon subsidiary, applied for and was awarded its first license to operate a MMD. The Company developed the Kaya Shack brand for its retail operations and on July 3, 2014 opened the first Kaya Shack at 1719 SE Hawthorne Boulevard in Portland, Oregon. In April 2015 KAYS announced that it has commenced with its own medical marijuana grow operations for the cultivation and harvesting of legal marijuana.

**Market Overview**

To date, 23 U.S. states and the District of Colombia have laws permitting legal marijuana for medicinal uses, and 4 states, Washington, Colorado, Alaska and Oregon, as well as the District of Colombia have voter passed amendments permitting the use of marijuana for recreational purposes.

According to Arcview, a group active in tracking the legal marijuana industry, in 2013 the market for legal marijuana was $1.43 billion annually, expected to rise to $2.34 billion by the end of 2014, for a 64% increase in market size, and will exceed $18 billion in annual sales by 2018.

**Implementation**

Following the successful introduction of legal recreational marijuana use in Colorado and Washington, the Company incorporated its majority owned subsidiary Marijuana Holdings Americas, Inc. (MJAI) to operate as a grower, processor, distributor and/or retailer of legal recreational and/or medical marijuana in jurisdictions where it has been or is expected to be approved. After an evaluation of several factors including barriers to entry, cost factors and potential rewards for success, the Company targeted Oregon as the first market to open a state licensed medical marijuana dispensary (MMD).

**Oregon: Current and Future Operations**

*Table of Contents*                    2

**Kaya Shack Retail Medical Marijuana Dispensary Operations**



In March 2014, MJAI, through an Oregon subsidiary, applied for and was awarded its first license to operate a MMD. The Company developed the Kaya Shack brand for its retail operations and on July 3, 2014 opened the Kaya Shack Medical Marijuana Dispensary in Portland, Oregon and became the first US publicly traded company to own and operate a MMD.

After our first 9 months of operations, our current medical marijuana products available to patients at the flagship Portland facility feature over 30 popular strains of marijuana including our proprietary, high-grade "Kaya Kush" Marijuana grown exclusively for the Kaya Shack (independent testing performed on 11/10/2014 confirms a total THC/Cannabinoid content in excess of 25%), various smokable concentrates including butane hash oil (B.H.O.) and $CO_2$ oil extract (wax, shatter) which range in potency from approximately 40% to over 80% THC, high grade RSO Oil which is sought after for pain and cancer symptom alleviation, 2 high CBD – low THC strains (Critical Mass and Harlequin) and various marijuana infused tinctures and edibles including "Kaya Candies", "Kaya Caramels" and an assortment of cookies and cakes for patients who do not smoke.

*Table of Contents*                    3

**Kaya Farms Medical Marijuana Grow Operations**



On April 7, 2015, KAYS announced that it has commenced with its own medical marijuana grow operations for the cultivation and harvesting of legal marijuana. By forming the Kaya Farms Medical Marijuana Grow to feed the Kaya Shack supply chain, KAYS became the first US publicly traded company to own a majority interest in a vertically integrated legal marijuana enterprise in the United States.

On April 11-12, 2015 KAYS employees and contractors harvested the final round of our first medical marijuana crop rotations which yielded the company nearly 25 pounds of Oregon Connoisseur-Grade Medical Marijuana since January 1, 2015. The grow operation will rotate varieties within the perpetual harvest room to include more than 30 strains of marijuana. The Company expects to expand the grow operations throughout 2015, enlarging capacity and increasing the number of varieties grown.

While the Company intends to both maintain and increase operations within the medical marijuana market in Oregon through potential acquisition of existing MMDS and the formation of new medical grow operations pursuant to existing Oregon State Licensing Regulations, Management believes that the larger opportunity will be with the new recreational market that will be unfolding in Oregon with the passing of Measure 91 in November 2014 that involves vertical integration utilizing Producer, Processor, Wholesaler and Retailer licenses. Unlike the medical marijuana program, there are no restrictions or limitations with the Recreational Market regarding patient qualifications, and a much larger market will open up for retail demand, which the Company intends to aggressively exploit by leveraging their Oregon MMD experience and public company status.

*Table of Contents*                    4

**Florida**

KAYS has established a firm position in the emerging Florida market through founding and sponsoring of the Florida Cannabis Industry Association and alliances with other groups seeking passage of medical marijuana/recreational legislation in Florida. Judging from the experiences in other states, such as Colorado, Oregon and Nevada, the local Cannabis Industry Association is a leading force in the construction and passage of the legislation that decriminalizes marijuana and permits its legal cultivation, distribution, possession and sale for recreational and/or medicinal purposes. Through leadership efforts in the Florida Cannabis Industry Association and an alliance with the Drug Policy Alliance and the Drug Policy Alliance's lobbying affiliate, Drug Policy Action, the Company expects to be well positioned in helping to shape the legislation and obtain licenses if medical marijuana and/or recreational marijuana is eventually legalized in the highly coveted Florida market.

Although Florida's Amendment 2 for Medical Marijuana failed to secure the required 60% vote on the November 4, 2014 ballot to become law, the referendum did receive just under a 58% favorable vote (60% is required in Florida to pass a constitutional amendment). Sponsors of the effort are going to seek a legislative solution from the Florida State Legislature, and if not successful intend to pursue another effort in the 2016 general election (which may also include a companion amendment for recreational legalization).

**Other Markets**

The Company intends to seek additional licensing opportunities in various states and territories throughout the country which have legalized recreational and/or medical marijuana use, as well as select states and territories where legalization is pending or is otherwise under consideration through joint efforts with the Drug Policy Alliance and the Drug Policy Alliance's lobbying affiliate, Drug Action and other activists and lobbyists.

Potential future target markets include Alaska, Arizona, California, Colorado, Connecticut, Illinois, Michigan, Nevada, New Jersey, New York, Ohio, Pennsylvania, Texas, Vermont, Washington D.C., Washington State and others.

*Table of Contents*                                   5

The Company has established a well-defined strategy for entering and maintaining a strong presence in the legal marijuana sector. The cornerstones of this strategy include:

- All operations are to be conducted in accordance with state and local laws and regulations and guidance outlined in the U.S. Department of Justice "Cole Memo" dated August 29, 2013.
- The Company will seek to operate in a vertically integrated manner (grow, process and sell) wherever permitted by law. In states where vertical integration is not permitted, the Company plans to determine which of the permitted activities offers the most potential for growth and value creation.
- The Company will seek to engage, sponsor or lead local advocacy and lobbying groups that have a significant impact on the evolution and character of laws and the regulations under which legal marijuana operations are implemented in select markets.
- The Company plans to work with law enforcement and government officials to insure compliance with all regulations.

**Marketing and Sales**

The Company will only market its legal marijuana as required to be in compliance with State law.

The Company launched Kaya Shack's marketing campaign on January 1, 2015, prior to which the store's customer base was organically developed. The plan is comprised of 4 cornerstones:

- Promoting and establishing the Kaya Shack brand.
- A positive and active online presence.
- Daily specials and promotions.
- Quirky and fun holiday specials.

The core strategic marketing objectives include:

- *Establish the Kaya Shack Brand* – positioning the Company's brand to have positive and value related associations with all prospective and existing customers.
- *Operate Cooperatively* - cooperation, as a strategy, helps develop a network of suppliers and marketing channels able to promote Kaya Shack.
- *Deliver Value* - customer value is achieved when the perceived value of what we sell along with the value of the experience we deliver exceeds the price we charge.
- *Drive Customer Traffic* - the only two ways to increase store income is to sell more to our existing customers and attract new customers. Programs are in place to accomplish both tasks.

**Government Regulation**

**General**

We are subject to general business regulations and laws, as well as regulations and laws directly applicable to our operations. As we continue to expand the scope of our operations, the application of existing laws and regulations could include matters such as pricing, advertising, consumer protection, quality of products, and intellectual property ownership. In addition, we will also be subject to new laws and regulations directly applicable to our activities.

Any existing or new legislation applicable to us could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, which could hinder or prevent the growth of our business.

Federal, state and local laws and regulations governing legal recreational and medical marijuana use are broad in scope and are subject to evolving interpretations, which could require us to incur substantial costs associated with compliance. In addition, violations of these laws or allegations of such violations could disrupt our planned business and adversely affect our financial condition and results of operations. In addition, it is possible that additional or revised federal, state and local laws and regulations may be enacted in the future governing the legal marijuana industry. There can be no assurance that we will be able to comply with any such laws and regulations and its failure to do so could significantly harm our business, financial condition and results of operations.

### Competition

The legal marijuana sector is rapidly growing and the Company faces significant competition in the operation of MMFs and Grow facilities. Many of these competitors will have far greater experience, more extensive industry contacts and greater financial resources than the Company. There can be no assurance that we can adequately compete to succeed in our business plan.

### Employees

As of the date of this Annual Report, the Company's Oregon subsidiary for the Kaya Shack Retail Medical Marijuana Dispensary and the Kaya Farms Grow Operation have a total of eleven (11) part time store employees including budtenders, trimmers, growers, and a store manager, inventory control supervisor and marketing coordinator. Additionally we engage several consultants to assist with daily duties and business plan implementation and execution. Additional employees and will be hired and other consultants engaged in the future as our business expands.

### ITEM 1A. Risk Factors

*We have a limited operating history with our current business.*

The Company was incorporated in 1993 and has engaged in a number of businesses as both a private and as a publicly held company, including the online sale of specialty foods, online marketing and website development.

KAYS's legal marijuana business, which it has focused on since 2014, has generated limited revenues to date. Operations are subject to all the problems, expenses, difficulties, complications and delays encountered in establishing new businesses. The Company does not know if it will become commercially viable, generate significant revenues or operate at a profit.

*The Company will require additional financing to become commercially viable.*

The Company's current marijuana business can be capital intensive.

For the period from January 2010 through December 31, 2013 the Company raised approximately $2,357,400 through a series of private of debt and equity offerings to finance operations for its Jatropha based biodiesel business. For the period from January 2014 through December 31, 2014 the Company raised approximately $900,000_through a series of private debt and equity offerings to finance operations for the development of opportunities within the legal recreational and medical marijuana sectors.

The Company incurred net losses of $11,76,013 and 1,382,186 for the years ended December 31, 2013 and 2014, respectively. At December 31, 2014, we had a total stockholders' deficit of $1,120,397, a working capital deficiency of $ 619,954 limited working capital and we are totally dependent on our ability to raise capital to fund operations.

*Table of Contents*                    7

Although the Company achieved revenues in the third quarter through the opening of their first Kaya Shack MMD and is no longer considered a Development Stage Company, the Company acknowledges that its Plan of Operations may not result in generating positive working capital in the near future. Although management believes that it will be able to successfully execute its business plan, which includes third party financing and the raising of capital to meet the Company's future liquidity needs, there can be no assurances. These matters raise substantial doubt about the Company's ability to continue as a going concern.

***We currently rely on certain key individuals, and the loss of one of these key individuals could have an adverse effect on the Company.***

Our success depends to a certain degree upon certain key members of our management. These individuals are a significant factor in our growth and success. The loss of the services of such members of management could have a material adverse effect on our Company.

The Company's success will be dependent in part upon its ability to attract qualified personnel and consultants.

The Company's success will be dependent in part upon its ability to attract qualified creative marketing, sales and development professionals. The inability to do so on favorable terms may harm the Company's proposed business.

***KAYS must effectively meet the challenges of managing expanding operations.***

The Company's business plan anticipates that operations will undergo significant expansion in 2015 and beyond. This expansion will require the Company manage a larger and more complex organization, which could place a significant strain on our managerial, operational and financial resources. Management may not succeed with these efforts. Failure to expand in an efficient manner could cause expenses to be greater than anticipated, revenues to grow more slowly than expected and could otherwise have an adverse effect on the business, financial condition and results of operations.

***Marijuana remains illegal in the United States under federal law.***

Notwithstanding its legalization for recreational and/or medical use by a number of states, the growing, transport, possession or selling of marijuana continues to be illegal under federal law. Although the Obama administration has made a policy decision to allow implementation of state laws legalizing recreational and/or medical marijuana use and not to federally prosecute anyone operating under state law, that policy could change at any time, which might render MJAI's planned operations illegal and adversely affecting KAYS's business, financial condition and results of operations.

***The marketing and market acceptance of marijuana may not be as rapid as KAYS expects.***

The market for legal marijuana is quickly evolving, and activity in the sector is expanding rapidly. Demand and market acceptance for legal marijuana are subject to uncertainty and risk, as changes in the price and possible adverse political efforts could influence and denigrate demand. KAYS cannot predict whether, or how fast, this market will grow or how long it can be sustained. If the market for legal marijuana develops more slowly than expected or becomes saturated with competitors, KAYS's operating results could be adversely impacted.

***KAYS's marijuana activities are part of an emerging industry.***

The Company intends to implement an aggressive plan of growth to enter the legal recreational and medical marijuana industry. The legal marijuana industry is new and emerging, and has yet to fully define competitive, operational, financial and other parameters for successful operations. By pursuing a growth strategy to enter a new and emerging industry, the Company's operations may be adversely impacted as the industry's competitive, operational, financial and other parameters take shape. Given the fluidity of the industry, the Company may make errors in implementing its business plan, thereby limiting some or all of its ability to perform in accordance with its expectations.

***Our business could be affected by changes in governmental regulation.***

Federal, state and local laws and regulations governing legal recreational and medical marijuana use are broad in scope and are subject to evolving interpretations, which could require us to incur substantial costs associated with compliance. In addition, violations of these laws or allegations of such violations could disrupt KAYS's planned business and adversely affect our financial condition and results of operations. In addition, it is possible that additional or revised federal, state and local laws and regulations may be enacted in the future governing the legal marijuana industry. There can be no assurance that KAYS will be able to comply with any such laws and regulations and its failure to do so could significantly harm our business, financial condition and results of operations.

***Our business will be subject to other operating risks which may adversely affect the Company's financial condition.***

Our planned operations will be subject to risks normally incidental to manufacturing operations which may result in work stoppages and/or damage to property. This may be caused by:

- breakdown of the equipment;
- labor disputes;
- imposition of new government regulations;
- sabotage by operational personnel;
- cost overruns; and
- fire, flood, or other acts of God.

***We will likely face significant competition.***

The legal marijuana industry is in its early stages and is attracting significant attention from both small and large entrants into the industry. KAYS expects to encounter significant competition as it implements its business strategy. The ability of KAYS to effectively compete could be hindered by a lack of funds, poor positioning, management error, and other factors. The inability to effectively compete could adversely affect our business, financial condition and results of operations.

***The successful operation of KAYS's business will depend in part upon the supply of marijuana and marijuana infused products from third party, non-affiliated suppliers and any interruption in that supply could significantly harm our business, financial condition and results of operations.***

In certain states within which KAYS expects to operate, the supply of marijuana and marijuana infused products must by law be provided by third-party, non- affiliated suppliers. The failure of these suppliers to provide us with sufficient quantities or the proper quality of marijuana and marijuana infused products could damage the Company's reputation and significantly harm our business, financial condition and results of operations.

*Table of Contents*                    9

RISKS RELATED TO OUR PUBLIC COMPANY STATUS AND OUR COMMON STOCK

***Our internal controls may be inadequate, which could cause our financial reporting to be unreliable and lead to misinformation being disseminated to the public.***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. As defined in Exchange Act Rule 13a-15(f), internal control over financial reporting is a process designed by, or under the supervision of, the principal executive and principal financial office and effected by the board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and/or directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

We do not have a sufficient number of employees to segregate responsibilities and may be unable to afford increasing our staff or engaging outside consultants or professionals to overcome our lack of employees. During the course of our testing, we may identity other deficiencies that we may not be able to timely remediate. In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time, we may not be able to ensure that we can conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("**Sarbanes Oxley**"). Moreover, effective internal controls, particularly those related to revenue recognition, are necessary for us to produce reliable financial reports and are important to help prevent financial fraud. If we cannot provide reliable financial reports or prevent fraud, our business and operating results could be harmed, investors could lose confidence in our reported financial information, and the trading price of our common stock, if a market ever develops, could drop significantly.

***The costs of being a public company could result in us being unable to continue as a going concern.***

As a public company, we are required to comply with numerous financial reporting and legal requirements, including those pertaining to audits and internal control. The costs of this compliance could be significant. If our revenues do not increase and/or we cannot satisfy many of these costs through the issuance of our shares, we may be unable to satisfy these costs in the normal course of business that would result in our being unable to continue as a going concern.

***Management and the Board of Directors may be Indemnified.***

The Certificate or Articles of Incorporation and Bylaws of each KAYS and MJAI provide for indemnification of directors and officers at the expense of the respective corporation and limit their liability. This may result in a major cost to the corporation and hurt the interests of stockholders because corporate resources may be expended for the benefit of directors and officers. The Company has been advised that, in the opinion of the SEC, indemnification for liabilities arising under federal securities laws is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

***The market for the KAYS Shares is extremely limited and sporadic and there is no market for the MJAI Shares and none is expected to develop following the completion of this Offering or in the foreseeable future.***

*Table of Contents*                    10

KAYS's common stock is quoted on the OTCQB exchange. The market KAYS's common stock is limited and sporadic. Trading in stock quoted on the OTCQB is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects. This volatility could depress the market price of KAYS's common stock for reasons unrelated to operating performance. Moreover, the trading of securities in the OTCQB is often more sporadic than the trading of securities listed on a quotation system like NASDAQ, or a stock exchange like the New York Stock Exchange. There is no market for MJAI's common stock and none is expected to develop following the completion of this Offering or in the foreseeable future. Accordingly, investors in this Offering may have difficulty in liquidating their investment in the Company.

***KAYS's common stock is a penny stock. Trading of KAYS's common stock may be restricted by the SEC's penny stock regulations and FINRA's sales practice requirements, which may limit a stockholder's ability to buy and sell our common stock.***

KAYS's common stock is a penny stock. The SEC has adopted Rule 15g-9 which generally defines **"penny stock"** to be any equity security that has a market price (as defined) less than $5.00 per share or an exercise price of less than $5.00 per share, subject to certain exceptions. KAYS's common stock is covered by the penny stock rules, which impose additional sales practice requirements on broker-dealers who sell to persons other than established customers and accredited investors. The term "**accredited investor** " refers generally to institutions with assets in excess of $5,000,000 or individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 jointly with their spouse. The penny stock rules require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document in a form prepared by the SEC which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information must be given to the customer orally or in writing prior to to effecting the transaction and must be given to the customer in writing before or with the customer's confirmation. In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from these rules; the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. These disclosure requirements may have the effect of reducing the level of trading activity in the secondary market for the stock that is subject to these penny stock rules. Consequently, these penny stock rules may affect the ability of broker-dealers to trade our securities. We believe that the penny stock rules discourage investor interest in, and limit the marketability of, KAYS's common stock.

In addition to the penny stock rules promulgated by the SEC, FINRA (the Financial Industry Regulatory Authority) has adopted rules that require when recommending an investment to a customer, a broker- dealer must have reasonable grounds for believing that the investment is suitable for that customer. Prior to recommending speculative low -priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status, investment objectives and other information. Under interpretations of these rules, the FINRA believes that there is a high probability that speculative low-priced securities will not be suitable for at least some customers. FINRA's requirements make it more difficult for broker-dealers to recommend that their customers buy KAYS's common stock, which may limit investor ability to buy and sell KAYS's common stock.

***The market for penny stocks has experienced numerous frauds and abuses that could adversely impact KAYS's common stock.***

*Table of Contents*                                    11

Company management believes that the market for penny stocks has suffered from patterns of fraud and abuse. Such patterns include:

- control of the market for the security by one or a few broker-dealers that are often related to a promoter or issuer;

- manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases;

- boiler room practices involving high pressure sales tactics and unrealistic price projections by sales persons;

- excessive and undisclosed bid-ask differentials and markups by selling broker-dealers; and

- wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, along with the inevitable collapse of those prices with consequent investor losses.

The board of directors of KAYS has the authority, without stockholder approval, to issue preferred stock with terms that may not be beneficial to common stockholders and with the ability to adversely affect common stockholder voting power and rights upon liquidation.

KAYS's Certificate of Incorporation allows us to issue shares of preferred stock without any vote or further action by our stockholders. Our board of directors has the authority to fix and determine the relative rights and preferences of preferred stock. As a result, our board of directors could authorize the issuance of a series of preferred stock that would grant to holders of preferred stock the rights to our assets upon liquidation, the right to receive dividend payments before dividends are distributed to the holders of common stock and the right to the redemption of the shares, together with a premium, prior to the redemption of our common stock.

***The ability of our principal stockholders, including our CEO, to control our business may limit or eliminate minority stockholders' ability to influence corporate affairs.***

The CEO of KAYS and the principal holder of KAYS common stock hold 26,267,010 shares of common stock, combined. Additionally, the CEO owns 50,000 shares of KAYS Series C Convertible Preferred Stock and the principal holder of KAYS have $500K of Convertible promissory Notes which are convertible into 50,000 shares of Series C Convertible Stock. These preferred shares and convertible promissory notes can be converted into a total of 43,329,970 shares of KAYS common stock which, added to the common shares of KAYS held by both parties gives them majority voting control. Because of their stock ownership, they are in a position to significantly influence membership of our board of directors as well as all other matters requiring stockholder approval, as well as control the affairs of MJAI, as a majority-owned subsidiary of KAYS. The interests of our principal stockholders may differ from the interests of other stockholders with respect to the issuance of shares, business transactions with or sales to other companies, selection of other officers and directors and other business decisions. The minority stockholders have no way of overriding decisions made by our principal stockholders. This level of control may also have an adverse impact on the market value of our shares because our principal stockholders may institute or undertake transactions, policies or programs that result in losses and/or may not take any steps to increase our visibility in the financial community and/or may sell sufficient numbers of shares to significantly decrease our price per share.

***We do not expect to pay cash dividends in the foreseeable future.***

Neither KAYS nor MJAI has paid cash dividends on their respective shares of common stock. Neither KAYS nor MJAI expects to pay cash dividends on its common stock at any time in the foreseeable future. The future payment of dividends depends upon future earnings, capital requirements, financial requirements and other factors that the companies' boards of directors will consider. Since they do not anticipate paying cash dividends on the common stock, return on investment, if any, will depend solely on an increase, if any, in the market value of the common stock.

*Table of Contents*                    12

*The conversion of KAYS's outstanding preferred stock by the CEO and convertible debt held by one insider would result in the issuance of 45,614,690 shares of KAYS's commons stock. Additionally, conversion of other convertible debt held by other shareholders listed herein would result in further dilution to KAYS shareholders. Accordingly such market overhang could adversely impact the market price of the common stock.*

KAYS has 55,120 shares of Series C Convertible Preferred Stock outstanding, 50,000 of which are held by our CEO. Additionally, KAYS has $500K of Convertible Notes outstanding held by our principal stockholder which are convertible into 50,000 shares of Series C Convertible Stock. These preferred shares and convertible promissory notes can be converted into a total of 43,329,970 shares of KAYS common stock. Additionally, the company has other convertible debt listed herein which would result in further dilution if converted Such market overhang could adversely impact the market price of KAYS's common stock as a result of the dilution which would result if such securities were converted into shares of KAYS common stock.

*Future sales of shares of KAYS common stock pursuant to Rule 144 under the Securities Act could adversely affect the market price of KAYS's common stock.*

KAYS currently has approximately 56,577,781 outstanding shares of its common stock which were issued pursuant to exemptions from registration under the Securities Act and applicable state securities laws, but which are now available for public sale pursuant to Rule 144 under the Securities Act and comparable exemptions under applicable state securities laws. The potential of such sales could adversely affect the market price of KAYS's common stock.

*Because we are not subject to compliance with rules requiring the adoption of certain corporate governance measures, our stockholders have limited protection against interested-director transactions, conflicts of interest and similar matters.*

Sarbanes-Oxley as well as rule changes proposed and enacted by the SEC, the NYSE/AMEX and the NASDAQ Stock Market as a result of Sarbanes-Oxley, require the implementation of various measures relating to corporate governance. These measures are designed to enhance the integrity of corporate management and the securities markets and apply to securities that are listed on those exchanges or the NASDAQ Stock Market. Because we are not currently required to comply with many of the corporate governance provisions and because we chose to avoid incurring the substantial additional costs associated with voluntary compliance, we have not yet adopted these measures.

We do not currently have independent audit or compensation committees. As a result, directors have the ability, among other things, to determine their own level of compensation. Until we comply with such corporate governance measures, regardless of whether such compliance is required, the absence of such standards of corporate governance may leave our stockholders without protections against interested- director transactions, conflicts of interest, if any, and similar matters and investors may be reluctant to provide us with funds necessary to expand our operations as a result thereof.

We intend to comply with all corporate governance measures relating to director independence as and when required. However, we may find it very difficult or be unable to attract and retain qualified officers, directors and members of board committees required to provide for our effective management as a result of Sarbanes-Oxley. The enactment of Sarbanes-Oxley has resulted in a series of rules and regulations by the SEC that increase responsibilities and liabilities of directors and executive officers. The perceived increased personal risk associated with these recent changes may make it more costly or deter qualified individuals from accepting these roles.

**ITEM 2. Properties.**

We do not own any real property. The Company moved offices and signed a new lease in March 2014 and now maintains office space at 305 South Andrews Avenue, Suite 209, Fort Lauderdale, Florida 33301, pursuant to the terms of a commercial office lease providing for rental payments of $2,544 per month. The term of the office lease expires on March 18, 2016.

We operate a Kaya Shack dispensary at 1719 SE Hawthorne Boulevard, Portland, Oregon 97214. We signed a lease on April 9, 2014. The term of the lease is five years. The initial monthly rent was $2,250.00 for the first 12 months, with an annual rental rate increase of 4% effective May of each subsequent year.

**ITEM 3. Legal Proceedings.**

On August 22, 2014, a complaint was filed in the Circuit Court of the 17 [th] Judicial Circuit in and for Broward County, Florida (CACE 14-016324) entitled *Neil Swartz vs. Alternative Fuels Americas, Inc.*

The complaint by Mr. Swartz (a former AFAI executive officer and director) alleges that 44,880 shares of AFAI's Series A Preferred Stock (which AFAI's SEC filings reflect were contributed back to the Company for cancellation) were, in fact, not returned, and are still the property of Neil Swartz. Additionally, the complaint alleges that 5,120 shares of AFAI's Series A Preferred Stock held by AFAI in book-entry form for Mr. Swartz should be released to Mr. Swartz.

The Company has in its possession what it believes to be substantial and irrefutable documentation that the 44,480 shares of AFAI's Series A Preferred Stock were returned to the Company by Mr. Swartz for cancellation. Additionally, the Company believes that it is justified in withholding the release of the remaining 5,120 shares of AFAI's Series A Preferred Stock to Mr. Swartz, pending resolution of claims against Mr. Swartz arising from unauthorized and inappropriate activities by Mr. Swartz both during his tenure as an executive officer of the Company, as well as during his subsequent association with the Company as a consultant.

AFAI filed a motion for dismissal of the suit, which was granted on October 1, 2014, with leave to amend. Mr. Swartz filed an amended complaint on October 2, 2014. The Company then filed a new motion to dismiss on October 13, 2014, which is awaiting a ruling by the Court. In the event that the pending motion for dismissal is not granted and the action proceeds, AFAI is prepared to aggressively bring counterclaims against Mr. Swartz and seek substantial damages from him.

AFAI has fully evaluated the action brought against it by Mr. Swartz and considers that the likelihood of an unfavorable outcome of this case to be unlikely. However, any decision against the Company could have a materially adverse impact on AFAI's financial statements.

**ITEM 4. Mine Safety Disclosures.**

Not applicable.

*Table of Contents*                    14

**PART II**

**ITEM 5. Market for Registrant's Common Equity and Related Stockholder Matters.**

Extremely Limited Market for Common Stock.

Our common stock is currently traded on the OTCQB under the symbol "KAYS". Such market is extremely limited. We can provide no assurance that our shares will be traded on the OTCQB or another exchange, or if traded, that the current public market will be sustainable.

The following table sets forth the range of high and low bid quotations, obtained from Yahoo Finance, for our common stock as reported each of the periods indicated. These quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

| Quarter ended | | High | | Low |
|---|---|---|---|---|
| March 31, 2013 | $ | — | $ | — |
| June 30, 2013 | $ | 0.45 | $ | 0.10 |
| September 30, 2013 | $ | 0.15 | $ | 0.05 |
| December 31, 2013 | $ | 0.22 | $ | 0.04 |
| March 31, 2014 | $ | 0.38 | $ | 0.02 |
| June 30, 2014 | $ | 0.28 | $ | 0.06 |
| September 30, 2014 | $ | 0.21 | $ | 0.07 |
| December 31, 2014 | $ | 0.15 | $ | 0.05 |

OTCBB quotations reflect inter-dealer prices without retail mark-up, mark-down or commission, and may not represent actual transactions.

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or quoted on the NASDAQ system, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. The penny stock rules require a broker-dealer, prior to a transaction in a penny stock, to deliver a standardized risk disclosure document prepared by the SEC, that: (a) contains a description of the nature and level of risk in the market for penny stocks in both public offerings and secondary trading; (b) contains a description of the broker's or dealer's duties to the customer and of the rights and remedies available to the customer with respect to a violation to such duties or other requirements of securities laws; (c) contains a brief, clear, narrative description of a dealer market, including bid and ask prices for penny stocks and the significance of the spread between the bid and ask price; (d) contains a toll-free telephone number for inquiries on disciplinary actions; (e) defines significant terms in the disclosure document or in the conduct of trading in penny stocks; and (f) contains such other information and is in such form, including language, type, size and format, as the SEC shall require by rule or regulation.

The broker-dealer also must provide, prior to effecting any transaction in a penny stock, the customer with (a) bid and offer quotations for the penny stock; (b) the compensation of the broker-dealer and its salesperson in the transaction; (c) the number of shares to which such bid and ask prices apply, or other comparable information relating to the depth and liquidity of the market for such stock; and (d) monthly account statements showing the market value of each penny stock held in the customer's account.

In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from those rules the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written acknowledgment of the receipt of a risk disclosure statement, a written agreement to transactions involving penny stocks, and a signed and dated copy of a written suitability statement.

These disclosure requirements may have the effect of reducing the trading activity in the secondary market for our stock if it becomes subject to these penny stock rules. Therefore, because our common stock is subject to the penny stock rules, stockholders may have difficulty selling those securities.

**Holders of Our Common Stock.**

As of December 31, 2014 we had 483 holders of record of our common stock. One of these holders is CEDE and company, which is the mechanism used for brokerage firms to hold securities in book entry form on behalf of their clients. As of March 4, 2015 there were 1,566 KAYS shareholders that consented to have their name and shareholding information released to KAYS, so as of this date there are over 2,000 holders of KAYS common stock.

**Securities Authorized for Issuance under Equity Compensation Plans**

At December 31, 2013, we had 2,500,000 shares of KAYS common stock reserved for issuance under our 2011 Incentive Stock Plan ("Plan"). During the year 2014, 2,500,000 shares were issued to Consultants of the Company and at December 31, 2014, we had no remaining shares of common stock reserved for issuance under our Plan.

On January 9, 2015 the Company filed "Post Effective Amendment No.1" to the Plan and registered another 7,500,000 shares of KAYS common stock. As of April 15, 2015 6,000,000 shares have been awarded to consultants under the terms of the Plan and there remains 1,500,000 shares of common stock reserved for issuance under our Plan.

**ITEM 6. Selected Financial Data.**

Not applicable.

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

We had $74,527 in revenue for the years ended December 31, 2014 and no revenue for the year ending 2013. Accordingly, management believes the most informative discussion is to present expenses and comment thereon.

| | 2014 | | 2013 | |
|---|---|---|---|---|
| **Operating expenses:** | | | | |
| Selling, general and administrative | $ 1,073,729 | 82.3% | $ 281,548 | 95.0% |
| Salaries | 18,826 | 17.7% | | 5.0% |
| Total operating expenses | $ 1,092,555 | 100.0% | $ 281,548 | 100.0% |

**Year ended December 31, 2014 compared to year ended December 31, 2013.**

Total operating expenses increased approximately $811,007 in 2014 as compared to 2013. As noted elsewhere, we have been operating at extremely low levels of liquidity since April 2011. This affected both our ability to raise capital and also necessitated close attention to expenses. Our increase in expenses is related to the opening of our retail location.

**Selling, general and administrative expenses**

Selling, general and administrative expenses increased approximately $785,519 in 2014 compared to 2013. The primary components of the increase result from a substantial increase in both the number of consultants and management professionals as well as their fees.

*Table of Contents* 16

**Interest expense**

The increase in interest expense is the result of increased debt principal and interest in 2014 compared to 2013.

**Liquidity and Capital Resources**

Since January 2014, the Company has raised a total of $900,000, in a series of private placements of debt and equity securities. Management recognizes the Company's current financial difficulties that, at December 31, 2014, include a working capital deficiency of $625,287 and limited cash. However, management believes that its Plan of Operations is strong. This plan recognizes the Company's need to generate working capital to successfully develop its operations towards the goal of successfully operating in the legal recreational and medical marijuana sectors.

However, we may not be successful in raising additional capital, and assuming that we raise additional funds, the Company may not achieve profitability or positive cash flow. If we are not able to timely and successfully raise additional capital and/or achieve profitability or positive cash flow, our business, financial condition, cash flows and results of operations may be materially and adversely affected.

**Critical Accounting Estimates**

The following are deemed to be the most significant accounting estimates affecting us and our results of operations:

**Fair value of financial instruments**

The Company follows the provisions of ASC 820. This Topic defines fair value, establishes a measurement framework and expands disclosures about fair value measurements. We apply these provisions to estimate the fair value of our financial instruments including cash, accounts payable and accrued expenses, and notes payable.

**Income Taxes**

The Company accounts for income taxes in accordance with ASC 740, Accounting for Income Taxes, as clarified by ASC 740-10, Accounting for Uncertainty in Income Taxes. Our deferred income taxes are determined based on the estimated future tax effects of differences between the financial statement and tax basis of assets and liabilities given the provisions of enacted tax laws. Deferred income tax provisions and benefits are based on changes to the assets or liabilities from year to year. In providing for deferred taxes, the Company considers tax regulations of the jurisdictions in which the Company operates, estimates of future taxable income, and available tax planning strategies. If tax regulations, operating results or the ability to implement tax-planning strategies vary, adjustments to the carrying value of deferred tax assets and liabilities may be required. Valuation allowances are recorded related to deferred tax assets based on the "more likely than not" criteria of ASC 740.

ASC 740-10 requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an audit. For tax positions meeting the "more-likely-than-not" threshold, the amount recognized in the financial statements is the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate settlement with the relevant tax authority.

**Recently Issued Accounting Pronouncements**

There are no recent accounting pronouncements issued by the Financial Accounting Standards Board ("FASB"), the American Institute of Certified Public Accountants ("AICPA"), and the Securities and Exchange Commission ("SEC") believed by management to have a material impact on the Company's present or future financial statements.

**Off-Balance Sheet Arrangements**

There are no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

**ITEM 7A. Quantitative and Qualitative Disclosures about Market Risk.**

Not applicable.

**ITEM 8. Financial Statements and Supplementary Data.**

**KAYA HOLDINGS, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets at December 31, 2014 and 2013 | F-2 |
| Consolidated Statements of Operations for the Years Ended December 31, 2014 and 2013 | F-3 |
| Consolidated Statements of Changes in Net Capital Deficiency for the Years Ended December 31, 2014 and 2013 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2014 and 2013 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

*Table of Contents*                    19



7951 SW 6th St., Suite. 216
Plantation, FL    33324
Tel:   954-424-2345
Fax:   954-424-2230

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders
Kaya Holdings, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of Kaya Holdings, Inc. and Subsidiaries ("the Company") as of December 31, 2014 and the related consolidated statements of operations, stockholders' deficit, and consolidated cash flows for the years ended December 31, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of their internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by the management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2014, and the results of its operations, changes in stockholders' deficit and cash flows for the years ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has insufficient working capital, a stockholders' deficit and recurring net losses, which raises substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters also are described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Bongiovanni & Associates, PA
Bongiovanni & Associates, PA
Certified Public Accountants
Plantation, Florida
The United States of America
April 15, 2015

www.ba-cpa.net

*Table of Contents*                                    F-1

**Kaya Holdings, Inc and Subsidiaries**
**FKA (Alternative Fuels Americas, Inc.)**
**Consolidated Balance Sheet**

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and equivalents | $ 35,194 | $ 185 |
| Inventory - Net of Allowance | 5,267 | |
| Prepaid license fee | 1,667 | — |
| Total Current Assets | 42,128 | 185 |
| | | |
| OTHER ASSETS: | | |
| Property and equipment, net | 57,379 | 2,821 |
| Deposits | 16,200 | — |
| | 73,579 | 2,821 |
| Total Assets | 115,707 | 3,006 |
| | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY) | | |
| CURRENT LIABILITIES: | | |
| Accounts payable and accrued expense | 215,174 | 514,926 |
| Accounts payable and accrued expense - related parties | 20,019 | — |
| Accrued interest | 8,705 | |
| Convertible Notes Payable | 25,000 | 25,000 |
| Convertible Note Payable - net of Discount | 189,993 | |
| Derivative liabilities | 8,434 | |
| Current portion of installment agreement | — | 5,000 |
| Notes payable | 200,000 | 771,900 |
| Total Current Liabilities | 667,415 | 1,316,826 |
| | | |
| LONG TERM LIABILITIES: | | |
| Convertible Note Payable - related party - Net of Discount | 303,213 | |
| Note Payable - Related Party | 270,809 | — |
| Total Long Term Liabilities | 574,022 | — |
| Total Liabilities | 1,241,437 | 1,316,826 |
| | | |
| STOCKHOLDERS' EQUITY (DEFICIT): | | |
| Convertible Preferred Stock, 10,000,000 shares authorized; par value $.001: Series C, 55,120 and 55,120 issued and outstanding at December 31, 2014 and 2013 | 55 | 55 |
| Common stock , par value $.001; 250,000,000 shares authorized; 77,289,325 shares issued as of December 31, 2014 and 68,449,325 shares issued as of December 31, 2013 | 77,289 | 68,449 |
| Additional paid in capital | 4,436,217 | 2,956,948 |
| Subscriptions payable | 114,500 | |
| Accumulated Deficit | (5,519,469) | (4,339,272) |
| Non-controlling Interest | (234,323) | — |
| Net Stockholders' Equity/(Deficit) | (1,125,730) | (1,313,820) |
| Total Liabilities and Stockholders' Equity/(Deficit) | $ 115,707 | $ 3,006 |

The reported and accompanying notes are an integral part of these consolidated financial statements.

*Table of Contents*                                        F-2

**Kaya Holdings, Inc. and Subsidiaries**
**FKA (Alternative Fuels Americas, Inc.)**
**Consolidated Statements of Operations**

| | For the year ended December 31, 2014 | For the year ended December 31, 2013 |
|---|---|---|
| Net Sales | $ 74,527 | $ — |
| Cost of Sales | (49,038) | — |
| Gross Profit | (25,489) | — |
| Operating Expenses: | | |
| Salaries and wages | 18,826 | — |
| General and administrative | 1,073,729 | 281,548 |
| Total Operating Expenses | 1,092,555 | 281,548 |
| Operating Loss | (1,067,067) | (281,548) |
| Other Income(expense) | | |
| Interest expense | (417,883) | (60,540) |
| Derivative liabilities expense | (22,298) | — |
| Change in derivative liabilities expense | 38,864 | — |
| Other income | 20,369 | — |
| Amortization of debt discount | (25,000) | — |
| Loss on obligation settlement | — | (75,002) |
| Inventory allowance | (28,000) | |
| Forgiveness of debts | 86,495 | — |
| Total Other Income(Expense) | (347,453) | (135,542) |
| Net (Loss) Before Income Taxes | (1,414,520) | (417,090) |
| Provision for income taxes | — | — |
| Net (Loss) | (1,414,520) | (417,090) |
| Net (Loss) attributed to non-controlling interest | (234,323) | — |
| Net (Loss) attributed to Kaya Holdings, Inc. | (1,180,197) | (417,090) |
| Basic and diluted net loss per common share | $ (0.02) | $ (0.01) |
| Weighted average number of common shares outstanding | 74,825,644 | 68,882,197 |

The reported and accompanying notes are an integral part of these consolidated financial statements.

**Kaya Holdings, Inc. and Subsidiaries**
**FKA (Alternative Fuels Americas, Inc.**
**Consolidated Statement of Stockholders' Equity (Deficit)**

| | Preferred stock - Class C | | Common Stock | | Additional Paid in Capital | Subscribed shares not issued | Accumulated Deficit | Non-controlling Interest | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at December 31, 2012 | 55,120 | 55 | 68,049,325 | $68,049 | $2,929,348 | | $ (3,922,182) | | $ (924,730) |
| Issuance of common stock for cash | | | 200,000 | 200 | 9,800 | | | | 10,000 |
| Conversion of note payable | | | 200,000 | 200 | 17,800 | | | | 18,000 |
| Net Loss for the year ended December 31, 2013 | — | — | — | — | — | | (417,090) | | (417,090) |
| Balance at December 31, 2013 | 55,120 | 55 | 68,449,325 | $68,449 | $2,956,948 | | $ (4,339,272) | | $ (1,313,820) |
| Beneficial Feature of Convertible Debt | | | | | 728,109 | | | | 728,109 |
| Common stock issued for services at $0.04 per share | | | 1,400,000 | 1,400 | 54,600 | | | | 56,000 |
| Common stock issued for services at $0.04 per share | | | 100,000 | 100 | 3,900 | | | | 4,000 |
| Common stock issued for services at $0.085 per share | | | 1,000,000 | 1,000 | 78,000 | | | | 79,000 |

*Table of Contents*                                    F-4

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Common stock issued for services at $0.065 per share | | | 1,000,000 | 1,000 | 64,000 | | | | 65,000 |
| Common stock issued for services at $0.10 per share | | | 1,615,000 | 1,615 | 159,885 | | | | 161,500 |
| Common stock issued for cash at $0.10 | | | 3,100,000 | 3,100 | 306,900 | | | | 310,000 |
| Common stock issued as charitable contribution at $.085 per share | | | 500,000 | 500 | 42,000 | | | | 42,500 |
| Common stock issued for payment of inventory at $0.10 | | | 25,000 | 25 | 2,475 | | | | 2,500 |
| Common stock issued for payment of interest at $0.085 | | | 100,000 | 100 | 8,400 | | | | 8,500 |
| Imputed Interest | | | | | 31,000 | | | | 45,000 |
| Common stock for cash not issued | | | | | | 25,000 | | | 25,000 |
| Common stock for services not issued | | | | | | 70,000 | | | 70,000 |
| Common stock for services not issued | | | | | | 14,000 | | | 14,000 |
| Common stock for services not issued | | | | | | 5,500 | | | 5,5000 |
| Net Loss for the year ended December 31, 2014 | — | — | — | — | — | — | (1,180,197) | (234,323) | (1,414,520) |
| Balance at December 31, 2014 | 55,120 | 55 | 77,289,325 | 77,289 | 4,436,217 | 114,500 | (5,519,469) | (234,323) | (1,125,730) |

The reported and accompanying notes are an integral part of the consolidated financial statements.

*Table of Contents*                          F-5

Kaya Holdings, Inc. and Subsidiares
FKA (Alternative Fuels Americas, Inc.)
Consolidated Statement of Cashflows

| | | For the year ended December 31, 2014 | | For the year ended December 31, 2013 |
|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | |
| Net loss | $ | (1,180,197) | $ | (417,090) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Net Loss Attributable to non-controlling Interest | | (234,323) | | |
| Depreciation | | 10,172 | | 5,035 |
| Gain from restructure of stockholder loan | | (86,495) | | — |
| Derivative expense | | 22,298 | | — |
| Change in derivative liabilities | | (38,864) | | — |
| Amortization of debt discount | | 380,174 | | — |
| Imputed interest | | 31,000 | | — |
| Inventory allowance | | 28,000 | | — |
| Stock issued for services | | 455,000 | | — |
| Stock issued as contribution | | 42,500 | | |
| Loss from obligation settlement | | — | | 75,002 |
| Changes in operating assets and liabilities: | | | | |
| Prepaid expense | | (1,667) | | — |
| Inventory | | (2,767) | | — |
| Deposits | | (16,200) | | — |
| Accounts payable and accrued expenses | | (179,093) | | 213,759 |
| Net cash used in operating activities | | (770,461) | | (123,294) |
| **INVESTING ACTIVITIES:** | | | | |
| Purchase of property and equipment | | (64,730) | | — |
| Proceeds for equipment | | — | | (1,121) |
| Net cash used in investing activities | | (64,730) | | (1,121) |
| **FINANCING ACTIVITIES:** | | | | |
| Payments on installment agreement | | (5,000) | | (27,500) |
| Payments on related party debt | | (24,800) | | — |
| Proceeds from stockholder loans | | — | | 124,100 |
| Proceeds from convertible debt | | 365,000 | | — |
| Proceeds from note payable | | 200,000 | | — |
| Proceeds from sales of common stock | | 335,000 | | 28,000 |
| Net cash provided by (used in) financing activities | | 870,200 | | 124,600 |
| NET INCREASE IN CASH | | 35,009 | | 185 |
| CASH BEGINNING BALANCE | | 185 | | — |
| CASH ENDING BALANCE | $ | 35,194 | $ | 185 |

*Table of Contents*                    F-6

**SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:**

| | | |
|---|---:|---:|
| Taxes paid | — | — |
| Interest paid | — | — |

NON-CASH TRANSACTIONS AFFECTING OPERATING, INVESTING AND
FINANCING ACTIVITIES:

| | | |
|---|---:|---:|
| Value of shares issued for convertible debt | — | — |
| Value of convertible preferred shares of subsidiary issued | 96,000 | — |
| Value of shares issued to settle accrued expenses | 35,000 | — |
| Value of shares issued to settle accounts payable | 100,000 | — |
| Value of shares issued for inventory purchase | 2,500 | — |
| Value of shares issued to settle interest expenses | 8,500 | — |

The reported accompanying notes are an integral part of the consolidated financial statements

*Table of Contents*     F-7

**NOTE 1 – ORGANIZATION AND NATURE OF THE BUSINESS**

Organization

Kaya Holdings, Inc. FKA (Alternative Fuels Americas, Inc.) is a holding company. The Company was incorporated in 1993 and has engaged in a number of businesses. Its name was changed on May 11, 2007 to NetSpace International Holdings, Inc. (a Delaware corporation) ("NetSpace"). NetSpace acquired 100% of Alternative Fuels Americas, Inc. (a Florida corporation) in January 2010 in a stock-for-member interest transaction and issued 6,567,247 shares of common stock and 100,000 shares of Series C convertible preferred stock to existing shareholders. Certificate of Amendment to the Certificate of Incorporation was filed in October 2010 changing the Company's name from NetSpace International Holdings, Inc. to Alternative Fuels Americas, Inc. (a Delaware corporation). Certificate of Amendment to the Certificate of Incorporation was filed in March 2015 changing the Company's name from Alternative Fuels Americas, Inc. (a Delaware corporation) to Kaya Holdings, Inc.

The Company has three subsidiaries: Alternative Fuels Americas, Inc. (a Florida corporation) and Alternative Fuels Costa Rica AFA-CR, LTDA which are both wholly-owned, and as of 2014, Marijuana Holdings Americas, Inc. (a Florida corporation) which is a majority owned subsidiary.

*Nature of the Business*

The Company operates a subsidiary, Marijuana Holdings Americas, Inc., a Florida corporation, that pursues medical and/or recreational licenses for the growing, processing and/or sale of marijuana in jurisdictions where it is legal and permissible under local laws. The subsidiary was formed in March 2014.

In March 2014 Marijuana Holdings Americas, Inc. (through local Oregon subsidiaries) began the application process to obtain licenses to operate medical marijuana dispensaries in Oregon. On March 21, 2014 the Company received notice from the Oregon Health Authority that MJAI Oregon 1 had been granted provisional licensing approval to operate their first Medical Marijuana Dispensary in Portland, Oregon and subsequently received full licensing approval for the first "Kaya ShackTM" retail medical marijuana dispensary, which we began operating July 3, 2014.

In April 2015 KAYS announced that it has commenced with its own medical marijuana grow operations for the cultivation and harvesting of legal marijuana.

**NOTE 2 - LIQUIDITY AND GOING CONCERN**

The Company's consolidated financial statements as of and for the year ended December 31, 2014 have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company incurred a net loss of $1,180,197 for the year ended December 31, 2014 and $417,090 for the year ended December 31, 2013 At December 31, 2014 the Company has a working capital deficiency of $627,017 and is totally dependent on its ability to raise capital. The Company has a plan of operations and acknowledges that its plan of operations may not result in generating positive working capital in the near future. Even though management believes that it will be able to successfully execute its business plan, which includes third-party financing and capital issuance, and meet the Company's future liquidity needs, there can be no assurances in that regard. These matters raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements do not include any adjustments that might result from the outcome of this material uncertainty. Management recognizes that the Company must generate additional funds to successfully develop its operations and activities. Management plans include:

- the sale of additional equity and debt securities,
- alliances and/or partnerships with entities interested in and having the resources to support the further development of the Company's business plan,

- other business transactions to assure continuation of the Company's development and operations,
- development of a unified brand and the pursuit of licenses to operate medical marijuana facilities under the branded name.

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICES AND BASIS OF PRESENTATION**

**Basis of Presentation**

The accompanying consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP) under the accrual basis of accounting.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes.

Such estimates and assumptions impact both assets and liabilities, including but not limited to: net realizable value of accounts receivable and inventory, estimated useful lives and potential impairment of property and equipment, the valuation of intangible assets, estimate of fair value of share based payments and derivative liabilities, estimates of fair value of warrants issued and recorded as debt discount, estimates of tax liabilities and estimates of the probability and potential magnitude of contingent liabilities.

Making estimates requires management to exercise significant judgment. It is at least reasonably possible that the estimate of the effect of a condition, situation or set of circumstances that existed at the date of the financial statements, which management considered in formulating its estimate could change in the near term due to one or more future non-conforming events. Accordingly, actual results could differ significantly from estimates.

**Risks and Uncertainties**

The Company's operations are subject to risk and uncertainties including financial, operational, regulatory and other risks including the potential risk of business failure.

The Company has experienced, and in the future expects to continue to experience, variability in its sales and earnings. The factors expected to contribute to this variability include, among others, (i) the uncertainty associated with the commercialization and ultimate success of the product, (ii) competition inherent at large national retail chains where product is expected to be sold (iii) general economic conditions and (iv) the related volatility of prices pertaining to the cost of sales.

**Fiscal Year**

The Company's fiscal year-end is December 31.

**Principles of Consolidation**

The consolidated financial statements include the accounts of Alternative Fuels Americas Inc. and its subsidiary, Alternative Fuels Americas, Inc. (a Florida corporation) and Alternative Fuels Costa Rica AFA-CR, LTDA (located in Costa Rica) which are both wholly-owned, and as of 2014, Marijuana Holdings Americas, Inc. (a Florida corporation) which is a majority owned subsidiary. All inter-company accounts and transactions have been eliminated in consolidation.

**Non-Controlling Interest**

The company owns 55% of Marijuana Holdings Americas, Inc.

**Cash and Cash Equivalents**

Cash and cash equivalents are carried at cost and represent cash on hand, demand deposits placed with banks or other financial institutions and all highly liquid investments with an original maturity of three months or less. The Company had no cash equivalents

**Inventory**

Inventory will consist of finished goods purchased, which are valued at the lower of cost or market value, with cost being determined on the first-in, first-out method. The Company will periodically review historical sales activity to determine potentially obsolete items and also evaluates the impact of any anticipated changes in future demand. As of December 31, 31, 2014 the company determined that a valuation allowance of $28,000 was necessary due to market valuation.

**Property and Equipment**

Property and equipment is stated at cost, less accumulated depreciation and is reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

Depreciation of property and equipment is provided utilizing the straight-line method over the estimated useful lives, ranging from 5-7 years of the respective assets. Expenditures for maintenance and repairs are charged to expense as incurred.

Upon sale or retirement of property and equipment, the related cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in the statements of operations.

**Long-lived assets**

The Company reviews long-lived assets and certain identifiable intangibles held and used for possible impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating the fair value and future benefits of its intangible assets, management performs an analysis of the anticipated undiscounted future net cash flow of the individual assets over the remaining amortization period. The Company recognizes an impairment loss if the carrying value of the asset exceeds the expected future cash flows. In 2014 the Company terminated its agreement to purchase 40,000 Jatropha trees and will not be acquiring the trees or retaining those trees already purchased.

**Earnings Per Share**

In accordance with ASC 260, Earnings per Share, the Company calculates basic earnings per share by dividing net income (loss) by the weighted average number of common shares outstanding during the period. Diluted earnings per share are computed if the Company has net income; otherwise it would be antidilutive, and would result from the conversion of a convertible note.

**Income Taxes**

The Company accounts for income taxes in accordance with ASC 740, Accounting for Income Taxes, as clarified by ASC 740-10, Accounting for Uncertainty in Income Taxes. Under this method, deferred income taxes are determined based on the estimated future tax effects of differences between the financial statement and tax basis of assets and liabilities given the provisions of enacted tax laws. Deferred income tax provisions and benefits are based on changes to the assets or liabilities from year to year. In providing for deferred taxes, the Company considers tax regulations of the jurisdictions in which the Company operates, estimates of future taxable income, and available tax planning strategies. If tax regulations, operating results or the ability to implement tax-planning strategies vary, adjustments to the carrying value of deferred tax assets and liabilities may be required. Valuation allowances are recorded related to deferred tax assets based on the "more likely than not" criteria of ASC 740.

ASC 740-10 requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an audit. For tax positions meeting the "more-likely-than-not" threshold, the amount recognized in the financial statements is the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate settlement with the relevant tax authority.

**Fair Value of Financial Instruments**

The Company measures assets and liabilities at fair value based on an expected exit price as defined by the authoritative guidance on fair value measurements, which represents the amount that would be received on the sale of an asset or paid to transfer a liability, as the case may be, in an orderly transaction between market participants. As such, fair value may be based on assumptions that market participants would use in pricing an asset or liability. The authoritative guidance on fair value measurements establishes a consistent framework for measuring fair value on either a recurring or nonrecurring basis whereby inputs, used in valuation techniques, are assigned a hierarchical level.

The following are the hierarchical levels of inputs to measure fair value:

- Level 1 – Observable inputs that reflect quoted market prices in active markets for identical assets or liabilities.

- Level 2 - Inputs reflect quoted prices for identical assets or liabilities in markets that are not active; quoted prices for similar assets or liabilities in active markets; inputs other than quoted prices that are observable for the assets or liabilities; or inputs that are derived principally from or corroborated by observable market data by correlation or other means.

- Level 3 – Unobservable inputs reflecting the Company's assumptions incorporated in valuation techniques used to determine fair value. These assumptions are required to be consistent with market participant assumptions that are reasonably available.

The carrying amounts of the Company's financial assets and liabilities, such as cash, prepaid expenses, other current assets, accounts payable & accrued expenses, certain notes payable and notes payable – related party, approximate their fair values because of the short maturity of these instruments.

The Company accounts for its derivative liabilities, at fair value, on a recurring basis under level 3. See Note 6.

**Embedded Conversion Features**

The Company evaluates embedded conversion features within convertible debt under ASC 815 "Derivatives and Hedging" to determine whether the embedded conversion feature(s) should be bifurcated from the host instrument and accounted for as a derivative at fair value with changes in fair value recorded in earnings. If the conversion feature does not require derivative treatment under ASC 815, the instrument is evaluated under ASC 470-20 "Debt with Conversion and Other Options" for consideration of any beneficial conversion feature.

*Table of Contents*                              F-11

**Derivative Financial Instruments**

The Company does not use derivative instruments to hedge exposures to cash flow, market, or foreign currency risks. The Company evaluates all of it financial instruments, including stock purchase warrants, to determine if such instruments are derivatives or contain features that qualify as embedded derivatives. For derivative financial instruments that are accounted for as liabilities, the derivative instrument is initially recorded at its fair value and is then re-valued at each reporting date, with changes in the fair value reported as charges or credits to income For option-based simple derivative financial instruments, the Company uses the Black-Scholes option-pricing model to value the derivative instruments at inception and subsequent valuation dates. The classification of derivative instruments, including whether such instruments should be recorded as liabilities or as equity, is re-assessed at the end of each reporting period.

**Beneficial Conversion Feature**

For conventional convertible debt where the rate of conversion is below market value, the Company records a "beneficial conversion feature" ("BCF") and related debt discount.

When the Company records a BCF, the relative fair value of the BCF is recorded as a debt discount against the face amount of the respective debt instrument (offset to additional paid in capital) and amortized to interest expense over the life of the debt.

**Debt Issue Costs and Debt Discount**

The Company may record debt issue costs and/or debt discounts in connection with raising funds through the issuance of debt. These costs may be paid in the form of cash, or equity (such as warrants). These costs are amortized to interest expense over the life of the debt. If a conversion of the underlying debt occurs, a proportionate share of the unamortized amounts is immediately expensed.

**Original Issue Discount**

For certain convertible debt issued, the Company may provide the debt holder with an original issue discount. The original issue discount would be recorded to debt discount, reducing the face amount of the note and is amortized to interest expense over the life of the debt.

**Extinguishments of Liabilities**

The Company accounts for extinguishments of liabilities in accordance with ASC 860-10 (formerly SFAS 140) "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities". When the conditions are met for extinguishment accounting, the liabilities are derecognized and the gain or loss on the sale is recognized.

**Stock-Based Compensation - Employees**

The Company accounts for its stock based compensation in which the Company obtains employee services in share-based payment transactions under the recognition and measurement principles of the fair value recognition provisions of section 718-10-30 of the FASB Accounting Standards Codification. Pursuant to paragraph 718-10-30-6 of the FASB Accounting Standards Codification, all transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the performance is complete or the date on which it is probable that performance will occur.

*Table of Contents*                                                F-12

If the Company is a newly formed corporation or shares of the Company are thinly traded, the use of share prices established in the Company's most recent private placement memorandum (based on sales to third parties) ("PPM"), or weekly or monthly price observations would generally be more appropriate than the use of daily price observations as such shares could be artificially inflated due to a larger spread between the bid and asked quotes and lack of consistent trading in the market.

The fair value of share options and similar instruments is estimated on the date of grant using a Black-Scholes option-pricing valuation model. The ranges of assumptions for inputs are as follows:

- Expected term of share options and similar instruments: The expected life of options and similar instruments represents the period of time the option and/or warrant are expected to be outstanding. Pursuant to Paragraph 718-10-50-2(f)(2)(i) of the FASB Accounting Standards Codification the expected term of share options and similar instruments represents the period of time the options and similar instruments are expected to be outstanding taking into consideration of the contractual term of the instruments and employees' expected exercise and post-vesting employment termination behavior into the fair value (or calculated value) of the instruments. Pursuant to paragraph 718-10-S99-1, it may be appropriate to use the simplified method, i.e., expected term = ((vesting term + original contractual term) / 2), if (i) A company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate expected term due to the limited period of time its equity shares have been publicly traded; (ii) A company significantly changes the terms of its share option grants or the types of employees that receive share option grants such that its historical exercise data may no longer provide a reasonable basis upon which to estimate expected term; or (iii) A company has or expects to have significant structural changes in its business such that its historical exercise data may no longer provide a reasonable basis upon which to estimate expected term. The Company uses the simplified method to calculate expected term of share options and similar instruments as the company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate expected term.

- Expected volatility of the entity's shares and the method used to estimate it. Pursuant to ASC Paragraph 718-10-50-2(f)(2)(ii) a thinly-traded or nonpublic entity that uses the calculated value method shall disclose the reasons why it is not practicable for the Company to estimate the expected volatility of its share price, the appropriate industry sector index that it has selected, the reasons for selecting that particular index, and how it has calculated historical volatility using that index. The Company uses the average historical volatility of the comparable companies over the expected contractual life of the share options or similar instruments as its expected volatility. If shares of a company are thinly traded the use of weekly or monthly price observations would generally be more appropriate than the use of daily price observations as the volatility calculation using daily observations for such shares could be artificially inflated due to a larger spread between the bid and asked quotes and lack of consistent trading in the market.

- Expected annual rate of quarterly dividends. An entity that uses a method that employs different dividend rates during the contractual term shall disclose the range of expected dividends used and the weighted-average expected dividends. The expected dividend yield is based on the Company's current dividend yield as the best estimate of projected dividend yield for periods within the expected term of the share options and similar instruments.

- Risk-free rate(s). An entity that uses a method that employs different risk-free rates shall disclose the range of risk-free rates used. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods within the expected term of the share options and similar instruments.

Generally, all forms of share-based payments, including stock option grants, warrants and restricted stock grants and stock appreciation rights are measured at their fair value on the awards' grant date, based on estimated number of awards that are ultimately expected to vest.

The expense resulting from share-based payments is recorded in general and administrative expense in the statements of operations.

**Stock-Based Compensation – Non Employees**

*Equity Instruments Issued to Parties Other Than Employees for Acquiring Goods or Services*

The Company accounts for equity instruments issued to parties other than employees for acquiring goods or services under guidance of Sub-topic 505-50 of the FASB Accounting Standards Codification ("Sub-topic 505-50").

Pursuant to ASC Section 505-50-30, all transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the performance is complete or the date on which it is probable that performance will occur. If the Company is a newly formed corporation or shares of the Company are thinly traded the use of share prices established in the Company's most recent private placement memorandum ("PPM"), or weekly or monthly price observations would generally be more appropriate than the use of daily price observations as such shares could be artificially inflated due to a larger spread between the bid and asked quotes and lack of consistent trading in the market.

The fair value of share options and similar instruments is estimated on the date of grant using a Black-Scholes option-pricing valuation model. The ranges of assumptions for inputs are as follows:

- Expected term of share options and similar instruments: Pursuant to Paragraph 718-10-50-2(f)(2)(i) of the FASB Accounting Standards Codification the expected term of share options and similar instruments represents the period of time the options and similar instruments are expected to be outstanding taking into consideration of the contractual term of the instruments and holder's expected exercise behavior into the fair value (or calculated value) of the instruments. The Company uses historical data to estimate holder's expected exercise behavior. If the Company is a newly formed corporation or shares of the Company are thinly traded the contractual term of the share options and similar instruments is used as the expected term of share options and similar instruments as the Company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate expected term.

- Expected volatility of the entity's shares and the method used to estimate it. Pursuant to ASC Paragraph 718-10-50-2(f)(2)(ii) a thinly-traded or nonpublic entity that uses the calculated value method shall disclose the reasons why it is not practicable for the Company to estimate the expected volatility of its share price, the appropriate industry sector index that it has selected, the reasons for selecting that particular index, and how it has calculated historical volatility using that index. The Company uses the average historical volatility of the comparable companies over the expected contractual life of the share options or similar instruments as its expected volatility. If shares of a company are thinly traded the use of weekly or monthly price observations would generally be more appropriate than the use of daily price observations as the volatility calculation using daily observations for such shares could be artificially inflated due to a larger spread between the bid and asked quotes and lack of consistent trading in the market.

- Expected annual rate of quarterly dividends. An entity that uses a method that employs different dividend rates during the contractual term shall disclose the range of expected dividends used and the weighted-average expected dividends. The expected dividend yield is based on the Company's current dividend yield as the best estimate of projected dividend yield for periods within the expected term of the share options and similar instruments.

- Risk-free rate(s). An entity that uses a method that employs different risk-free rates shall disclose the range of risk-free rates used. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods within the expected term of the share options and similar instruments.

Pursuant to ASC paragraph 505-50-25-7, if fully vested, non-forfeitable equity instruments are issued at the date the grantor and grantee enter into an agreement for goods or services (no specific performance is required by the grantee to retain those equity instruments), then, because of the elimination of any obligation on the part of the counterparty to earn the equity instruments, a measurement date has been reached. A grantor shall recognize the equity instruments when they are issued (in most cases, when the agreement is entered into). Whether the corresponding cost is an immediate expense or a prepaid asset (or whether the debit should be characterized as contra-equity under the requirements of paragraph 505-50-45-1) depends on the specific facts and circumstances. Pursuant to ASC paragraph 505-50-40-1, a grantor may conclude that an asset (other than a note or a receivable) has been received in return for fully vested, non-forfeitable equity instruments that are issued at the date the grantor and grantee enter into an agreement for goods or services (and no specific performance is required by the grantee in order to retain those equity instruments). Such an asset shall not be displayed as contra-equity by the grantor of the equity instruments. The transferability (or lack thereof) of the equity instruments shall not affect the balance sheet display of the asset. This guidance is limited to transactions in which equity instruments are transferred to other than employees in exchange for goods or services. Section 505-50-30 provides guidance on the determination of the measurement date for transactions that are within the scope of this Subtopic.

Pursuant to Paragraphs 505-50-25-8 and 505-50-25-9, an entity may grant fully vested, non-forfeitable equity instruments that are exercisable by the grantee only after a specified period of time if the terms of the agreement provide for earlier exercisability if the grantee achieves specified performance conditions. Any measured cost of the transaction shall be recognized in the same period(s) and in the same manner as if the entity had paid cash for the goods or services or used cash rebates as a sales discount instead of paying with, or using, the equity instruments. A recognized asset, expense, or sales discount shall not be reversed if a share option and similar instrument that the counterparty has the right to exercise expires unexercised.

Pursuant to ASC paragraph 505-50-30-S99-1, if the Company receives a right to receive future services in exchange for unvested, forfeitable equity instruments, those equity instruments are treated as unissued for accounting purposes until the future services are received (that is, the instruments are not considered issued until they vest). Consequently, there would be no recognition at the measurement date and no entry should be recorded.

### Revenue Recognition

Revenue is recorded when all of the following have occurred: (1) persuasive evidence of an arrangement exists, (2) asset is transferred to the customer without further obligation, (3) the sales price to the customer is fixed or determinable, and (4) collectability is reasonably assured.

### Cost of Sales

Cost of sales represents costs directly related to the purchase of goods and third party testing of the Company's products.

### Related Parties

The Company follows subtopic 850-10 of the FASB Accounting Standards Codification for the identification of related parties and disclosure of related party transactions.

Pursuant to Section 850-10-20 the related parties include a. affiliates of the Company; b. Entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825–10–15, to be accounted for by the equity method by the investing entity; c. trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; d. principal owners of the Company; e. management of the Company; f. other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

*Table of Contents*                                              F-15

The consolidated financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include: a. the nature of the relationship(s) involved; b. a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c. the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and d. amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

**Contingencies**

The Company follows subtopic 450-20 of the FASB Accounting Standards Codification to report accounting for contingencies. Certain conditions may exist as of the date the consolidated financial statements are issued, which may result in a loss to the Company but which will only be resolved when one or more future events occur or fail to occur. The Company assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company evaluates the perceived merits of any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought therein.

If the assessment of a contingency indicates that it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates that a potentially material loss contingency is not probable but is reasonably possible, or is probable but cannot be estimated, then the nature of the contingent liability, and an estimate of the range of possible losses, if determinable and material, would be disclosed.

Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed. However, there is no assurance that such matters will not materially and adversely affect the Company's business, consolidated financial position, and consolidated results of operations or consolidated cash flows.

**Subsequent Events**

The Company follows the guidance in Section 855-10-50 of the FASB Accounting Standards Codification for the disclosure of subsequent events. The Company will evaluate subsequent events through the date when the financial statements are issued.

Pursuant to ASU 2010-09 of the FASB Accounting Standards Codification, the Company as an SEC filer considers its financial statements issued when they are widely distributed to users, such as through filing them on EDGAR.

**Recently Issued Accounting Pronouncements**

In April 2014, the FASB issued ASU No. 2014-08, Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity. The amendments in this Update change the requirements for reporting discontinued operations in Subtopic 205-20.

Under the new guidance, a discontinued operation is defined as a disposal of a component or group of components that is disposed of or is classified as held for sale and "represents a strategic shift that has (or will have) a major effect on an entity's operations and financial results." The ASU states that a strategic shift could include a disposal of (i) a major geographical area of operations, (ii) a major line of business, (iii) a major equity method investment, or (iv) other major parts of an entity. Although "major" is not defined, the standard provides examples of when a disposal qualifies as a discontinued operation.

The ASU also requires additional disclosures about discontinued operations that will provide more information about the assets, liabilities, income and expenses of discontinued operations. In addition, the ASU requires disclosure of the pre-tax profit or loss attributable to a disposal of an individually significant component of an entity that does not qualify for discontinued operations presentation in the financial statements.

The ASU is effective for public business entities for annual periods beginning on or after December 15, 2014, and interim periods within those years.

In May 2014, the FASB has issued ASU No. 2014-09, "Revenue from Contracts with Customers (Topic 606)". The guidance in this update supersedes the revenue recognition requirements in Topic 605, "Revenue Recognition." In addition, the existing requirements for the recognition of a gain or loss on the transfer of nonfinancial assets that are not in a contract with a customer (for example, assets within the scope of Topic 360, Property, Plant, and Equipment, and intangible assets within the scope of Topic 350, Intangibles—Goodwill and Other) are amended to be consistent with the guidance on recognition and measurement (including the constraint on revenue) in this Update. Under the new guidance, an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The amendments in ASU No, 2014-09 are effective for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. Early application is not permitted. We do not believe the adoption of this update will have a material impact on our financial statements.

Management does not believe that any other recently issued, but not yet effective accounting pronouncements, if adopted, would have a material effect on the accompanying financial statements.

### *Re-Classifications*

Certain amounts in 2013 were reclassified to conform to the 2014 presentation. These reclassifications had no effect on consolidated net loss for the periods presented.

The fair value of the warrants on the date of issuance and on each re-measurement date of those warrants classified as liabilities is estimated using the Black-Scholes option pricing model using the following assumptions: contractual life according to the remaining terms of the warrants, no dividend yield, weighted average risk-free interest rate of 2.17% at December 31, 2014 and weighted average volatility of 85.63%. For this liability, the Company developed its own assumptions that do not have observable inputs or available market data to support the fair value. This method of valuation involves using inputs such as the fair value of the Company's various classes of preferred stock, stock price volatility, the contractual term of the warrants, risk free interest rates and dividend yields. Due to the nature of these inputs, the valuation of the warrants is considered a Level 3 measurement. The warrant liability is recorded in other liabilities on the Company's Consolidated Balance Sheets. The warrant liability is marked-to-market each reporting period with the change in fair value recorded on the Consolidated Statement of Operations and Comprehensive Loss until the warrants are exercised, expire or other facts and circumstances lead the warrant liability to be reclassified as an equity instrument.

### NOTE 4 – NOTES PAYABLE

| | December 31, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| Loan payable - Stockholder, 8%, Due December 31, 2015, unsecured (3) | $ | 250,000 | $ | 737,100 |
| Loan payable - Stockholder, due on Nov 1, 2014, unsecured (1) | | 25,000 | | 10,000 |
| Loan payable - Stockholder, unsecured (2) | | -0- | | 24,800 |
| Note Payable - 10% due March 15, 2015 (5) | | 100,000 | | -0- |
| Note Payable - 10% due December 31, 2014 (4) | | 100,000 | | -0- |
| | $ | 475,000 | $ | 771,900 |

(1) On July 1, 2013 the company received $10,000 loan from a shareholder. In consideration for Payee making the loan to AFAI, AFAI extended to Payee an option (the "Option") to purchase Five Hundred Thousand (500,000) shares of common stock in AFAI for a price of $.10 per share (the "Exercise Price") for a period of three (3) years from the date of this note (the "Option Life"). In the event that AFAI completes a sale of stock at a price lower than $.10 per share during the Option Life (whether via a bona fide public offering, or a sale of restricted stock pursuant to rule 504 or any other form of exemption available to the company) then the Exercise Price of the option shall be adjusted to that price for the duration of the term of the Option Life. On October 31, 2013 the maturity date of the note was extended to November 31, 2014 with four quarterly payments of $2,500 due March 31, 2014, June 30, 2014, December 31, 2014 and November 30, 2014. Additionally, the option was surrendered to the company in exchange for 100,000 shares of AFAI stock as full payment for all interest due through November 30, 2014.

(2) In 3rd Qtr. of 2013 a stockholder of the company agreed to loan the company up to $25,000 for expenses on an as needed, non-interest bearing basis.

(3) At December 31, 2013 the Company was indebted to an affiliated shareholder of the Company for $840,955, which consisted of $737,100 principal and $103,895 accrued interest, with interest accruing at 10%. On January 2, 2014 the Company entered into a Debt Modification Agreement whereby the total amount of the debt was reduced to $750,000.00 and there is no accrued interest or principal due until December 31, 2015. $500,000 of the debt is convertible into 50,000 Series C Convertible Preferred Shares of AFAI, which if converted are subject to resale restrictions through December 31, 2015. The two-year note in the aggregate amount of $500,000 is convertible into the Company's preferred stock at a conversion rate of $10.00 per share of preferred. At a conversion rate of 433.9297 common shares to 1 preferred share, this would result in a total of 21,696,485 common shares issued if all debt was converted. The market value of the stock at the date of issuance of the debt was $0.04. The debt issued is a result of a financing transaction and contain a beneficial conversion feature valued at $367,859 to be amortized over the life of the debt. Total amortization for the year ended December 31, 2014 was $183,928. As of December 31, 2014, the balance of the debt was $500,000. The net balance reflected on the balance sheet is $303,213. The remaining $250,000 is not convertible. The company has imputed interest on both the convertible debt and the non-convertible debt. The company used an interest rate of 4% for calculation purposes. The net balance of $250,000 of the non-convertible portion is reflected on the balance sheet, plus imputed interest of $20,809

(4) On August 11, 2014 the Company received a total of $100,000 from an accredited investor in exchange for a senior promissory note due December 31, 2014 in the aggregate amount of $100,000. Interest rate is stated at 10%. As of December 31, 2014, this balance has not been paid.

(5) On November 25, 2014 the Company received a total of $100,000 from an accredited investor in exchange for a senior promissory note due March 31, 2015 in the aggregate amount of $100,000. Interest rate is stated at 10%. As of December 31, 2014, this balance has not been paid.

**NOTE 5 – CONVERTIBLE DEBT**

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Convertible note - related party, Due December 31, 2015 unsecured (2) | 500,000 | -0- |
| Convertible note - 10% due June 9, 2015 (3) | 50,000 | -0- |
| Convertible note - 10% due June 13, 2015 (4) | 25,000 | -0- |
| Convertible note - 10% due January 13, 2015 (5) | 160,000 | -0- |
| Convertible note - 10% due June 13, 2015 (6) | 100,000 | -0- |
| Convertible note - 10% due June 30, 2015 (7) | 30,000 | -0- |
| Convertible note - stockholder, 10%, due April 30, 2013, unsecured (1) | 25,000 | 25,000 |
|  | $ 890,000 | $ 25,000 |

(1) At the option of the holder the convertible note may be converted into shares of the Company's common stock at the lesser of $0.40 or 20% discount to the market price, as defined, of the Company's common stock. The Company is currently in discussions with the lender on a payment schedule.

The outstanding balance of this note is convertible into a variable number of the Company's common stock. Therefore the Company accounted for these Notes under ASC Topic 815-15 "Embedded Derivative." The derivative component of the obligation are initially valued and classified as a derivative liability with an offset to discounts on convertible debt. Discounts have being amortized to interest expense over the respective term of the related note. In determining the indicated value of the convertible note issued, the Company used the Black Scholes Option Model with a risk-free interest rate of ranging from 0.018% to .02%, volatility ranging from 160% of 336%, trading prices ranging from $.105 per share to $0.105 per share and a conversion price ranging from $0.084 per share to $0.40 per share.

Accrued interest on this note that was charged to operations for the year ended December 31, 2014 totaled approximately $7,760. Amortization of the discounts for the year ended December 31, 2014 totaled $25,000, which was charged to interest expense. The balance of the convertible note at December 31, 2014 including accrued interest and net of the discount amounted to $32,760.

A recap of the balance of outstanding convertible debt at December 31, 2014 is as follows:

| | | |
|---|---|---|
| Principal balance | $ | 25,000 |
| Accrued interest | | 7,760 |
| Balance maturing for the period ending: | | |
| December 31, 2014 | $ | 32,760 |

(1) The Company valued the derivative liabilities at December 31, 2014 at $8,504. The Company recognized a change in the fair value of derivative liabilities for the year ended December 31, 2014 of $38,864, which were charged to operations.. In determining the indicated values at December 31, 2014, the Company used the Black Scholes Option Model with risk-free interest rates ranging from 0.018% to 0.02%, volatility ranging from 160% to 336%, a trading price of $.105, and conversion prices ranging from $.084 per share.

(2) At December 31, 2013 the Company was indebted to an affiliated shareholder of the Company for $840,955, which consisted of $737,100 principal and $103,895 accrued interest, with interest accruing at 10%. On January 2, 2014 the Company entered into a Debt Modification Agreement whereby the total amount of the debt was reduced to $750,000.00 and there is no accrued interest or principal due until December 31, 2015. $500,000 of the debt is convertible into 50,000 Series C Convertible Preferred Shares of AFAI, which if converted are subject to resale restrictions through December 31, 2015. The two-year note in the aggregate amount of $500,000 is convertible into the Company's preferred stock at a conversion rate of $10.00 per share of preferred. At a conversion rate of 433.9297 common shares to 1 preferred share, this would result in a total of 21,696,485 common shares issued if all debt was converted. The market value of the stock at the date of issuance of the debt was $0.04. The debt issued is a result of a financing transaction and contain a beneficial conversion feature valued at $367,859 to be amortized over the life of the debt. Total amortization for the year ended December 31, 2014 was $183,929. As of December 31, 2014, the balance of the debt was $500,000. The net balance reflected on the balance sheet is $303,213. The remaining $250,000 is not convertible. The company has imputed interest on both the convertible debt and the non-convertible debt. The company used an interest rate of 4% for calculation purposes. The net balance of $250,000 of the non-convertible portion is reflected on the balance sheet.

(3) On June 9, 2014 the Company received a total of $50,000 from an accredited investor in exchange for one year notes in the aggregate amount of $50,000. The note is convertible after December 9, 2014 and is convertible into the Company's common stock at a conversion rate of $0.04 per share. The market value of the stock at the date (December 9, 2014) when the debt becomes convertible was $0.09. The debt issued is a result of a financing transaction and contain a beneficial conversion feature. As of December 31, 2014, the balance was $50,000. The beneficial conversion feature in the amount of $50,000 is being expensed as interest over the term of the note. At December 31, 2014 the Company has recorded interest expense from amortization of beneficial conversion feature in the amount of $17,551.

(4) On June 15, 2014, the Company received a total of $25,000 from an accredited investor in exchange for one year notes in the aggregate amount of $25,000. The note is convertible after December 13, 2014 and is convertible into the Company's common stock at a conversion rate of $0.04 per share. The market value of the stock at the date (December 13, 2014) when the debt becomes convertible was $0.085. The debt issued is a result of a financing transaction and contain a beneficial conversion feature. As of December 31, 2014, the balance was $25,000. The beneficial conversion feature in the amount of $25,000 is being expensed as interest over the term of the note. At December 31, 2014 the Company has recorded interest expense from amortization of beneficial conversion feature in the amount of $13,767.

(5) On July 11, 2014 the Company received a total of $160,000 from an accredited investor in exchange for one year note in the aggregate amount of $160,000. The note is convertible after January 13, 2015 and is convertible into the Company's common stock at a conversion rate of $0.04 per share. The market value of the stock at the date (January 13, 2015) when the debt becomes convertible was $0.077. The debt issued is a result of a financing transaction and contains a beneficial conversion feature when the debt becomes convertible as of January 13, 2015. As of December 31, 2014, the balance was $160,000 The beneficial conversion feature in the amount of $160,000 is being expensed as interest over the term of the note. At December 31, 2014 the Company has recorded interest expense from amortization of beneficial conversion feature in the amount of $75,836.

(6) On September 19, 2014 the Company received a total of $100,000 from an accredited investor in exchange for a six month note in the aggregate amount of $100,000. The note is convertible after December 13, 2014 and is convertible into the Company's common stock at a conversion rate of $0.04 per share. The market value of the stock at the date (December 13, 2014) when the debt becomes convertible was $0.085. The debt issued is a result of a financing transaction and contain a beneficial conversion feature. As of December 31, 2014, the balance was $100,000. The beneficial conversion feature in the amount of $100,000 is being expensed as interest over the term of the note. At December 31, 2014 the Company has recorded interest expense from amortization of beneficial conversion feature in the amount of $56,906.

(7) On November 14, 2014 the Company received a total of $30,000 from an accredited investor in exchange for a six month note in the aggregate amount of $30,000. The note is convertible after December 15, 2014 and is convertible into the Company's common stock at a conversion rate of $0.07 per share. The market value of the stock at the date (December 15, 2014) when the debt becomes convertible was $0.085. The debt issued is a result of a financing transaction and contain a beneficial conversion feature. As of December 31, 2014, the balance was $30,000. The beneficial conversion feature in the amount of $8,250 is being expensed as interest over the term of the note. At December 31, 2014 the Company has recorded interest expense from amortization of beneficial conversion feature in the amount of $7,185.

**NOTE 6 – STOCKHOLDERS' EQUITY**

The Company has 10,000,000 shares of preferred stock authorized with a par value of $0.001, of which 100,000 shares have been designated as Series C convertible preferred stock ("Series C" or "Series C preferred stock"). The Board has the authority to issue the shares in one or more series and to fix the designations, preferences, powers and other rights, as it deems appropriate.

Each share of Series C has 433.9297 votes on any matters submitted to a vote of the stockholders of the Company and is entitled to dividends equal to the dividends of 433.9297 shares of common stock. Each share of Series C preferred stock is convertible at any time at the option of the holder into 433.9297 shares of common stock.

The Company has 250,000,000 shares of common stock authorized with a par value of $0.001. Each share of common stock has one vote per share for the election of directors and all other items submitted to a vote of stockholders. The common stock does not have cumulative voting rights, preemptive, redemption or conversion rights.

*Table of Contents*                                        F-20

In January 2014 the Company authorized the issuance of 2,400,000 shares of common stock to consultants. The shares were valued at $96,000, the fair value of the stock at the time. Also during January, 2014 Marijuana Holdings Americas, Inc. agreed to issue 55 shares of Convertible Preferred shares to the Company, and 15 shares each to the Company's president and BMN Consultants, a company controlled by a shareholder. These shares are convertible to a number of shares which once issued will provide the shareholder an ownership interest in the outstanding common shares of 55%, 15% and 15%, for the Company, its president and a shareholder, respectively. Although none of the preferred shares have been converted at the date of this filing, the Company maintains effective majority control over the subsidiary.

In the first six months of 2014, the Company raised funds $310,000 from the sale of units comprised of shares of the Company's stock and shares of its majority owned subsidiary, Marijuana Holdings Americas, Inc (MJAI). Total issuances of 3,100,000 shares of common stock of AFAI and 3,100,000 shares of common stock of MJAI.

In the first six months of 2014, the company issued 100,000 shares of common stock valued at $0.04 per share for a total value of $4,000 due a shareholder per loan modification agreement reached October 31, 2013 as detailed in Note 4, Item 2 above.

In the first six months of 2014 the company issued a charitable organization, 500,000 shares of common stock valued at $0.085 per share for a total value given of $42,500 and agreed to issue a consultant, 1,000,000 shares of common stock valued at $0.065 per share for a total value of $65,000 in settlement of all fees and compensation for management services rendered due through June 30, 2014. The shares have a three year restriction.

In the third quarter of 2014 the company authorized the issuance of 1,740,000 shares of common stock valued at $0.10 per share to consultants.

At the end of December 31, 2014 the company had authorized the issuance of 1,500,000 shares of common stock to be issued. 250,000 shares for cash received of $25,000 and the remaining 1,250,000 shares to be issued for consulting services. The consulting shares were approved to be issued on January 27, 2015 for the period ended December 31, 2014 and we valued at $0.07 per share for a total value of services rendered of $87,500. Total Stock subscriptions payable of $112,500

**NOTE 7 – LEASES**

The Company is obligated under operating lease agreements for its corporate office in Fort Lauderdale, which expires March 2016. The Company concluded an agreement in March 2014 terminating its obligations for leases held for land in Tempate, Costa Rica. The Company concluded the term of its lease agreement for offices maintained in Hollywood, Florida. The Company signed 2 new leases that started in May 2014 and June 2014.

Minimum future lease commitments are:

| Year | Amount |
|------|--------|
| 2015 | 56,880 |
| 2016 | 36,396 |
| 2017 | 30,360 |
| 2018 | 31,584 |

Rent expense was $65,162 for the year ended December 31, 2014, and $17,900 for the year ended December 31, 2013, respectively.

*Table of Contents*                    F-21

In April, 2014 MJAI, through its wholly owned subsidiary, MJAI Oregon 1, LLC (MJAI Oregon 1) Oregon company, entered into a lease for space to operate their first medical marijuana dispensary in Portland, Oregon. The five-year lease requires MJAI Oregon 1to pay a monthly rental fee of $2,255 the first year with annual lease payment escalations of 4% and a security deposit of $12,000. The dispensary is located are located at 1719 SE Hawthorne Boulevard, Portland, Oregon and will operate under the proprietary brand name of "Kaya Shack "TM.

**NOTE 8 – STOCK OPTION PLAN**

In 2011 the Alternative Fuels America, Inc. 2011 Incentive Stock Plan (the "Plan"), which provides for equity incentives to be granted to the Company's employees, executive officers or directors or to key advisers or consultants. Equity incentives may be in the form of stock options with an exercise price not less than the fair market value of the underlying shares as determined pursuant to the 2011 Incentive Stock Plan, restricted stock awards, other stock based awards, or any combination of the foregoing. The 2011 Incentive Stock Plan is administered by the board of directors. 2,500,000 shares of our common stock were reserved for issuance pursuant to the exercise of awards under the 2011 Incentive Stock Plan. In January, 2014 the Company's board of directors approved the issuance of 2,400,000 shares of our common stock to consultants of the company. The remaining 100,000 shares were approved for issuance to consultants in July of 2014

**NOTE 9 – RELATED PARTY TRANSACTIONS**

The Company has agreements covering certain of its management personnel. Such agreements provide for minimum compensation levels and are subject to annual adjustment.

The Company's Chief Executive Officer holds 50,000 shares of its Series C preferred stock. These shares can be converted into 21,696,485 shares of the Company's common stock at his option.

The Company's largest stockholder has from time to time provided unsecured loans to the Company. See Note 4 for the detail of the convertible and non-convertible debt with a face value of $750,000.

**NOTE 10 – INCOME TAXES**

The Company has a deferred tax asset as shown in the following:

|  | 2014 | | 2013 | |
| --- | --- | --- | --- | --- |
| Tax loss carryforward | $ | 1,864,283 | $ | 1,509,625 |
| Valuation allowance | | (1,864,283) | | (1,509,625) |
| | $ | — | $ | — |

A valuation allowance has been recognized to offset the deferred tax assets because realization of such assets is uncertain.

The Company has net operating loss carryforwards of approximately $4,264,300 at December 31, 2014 that expire beginning in 2025. However, utilization of these losses may be limited pursuant to Section 382 of the Internal Revenue Code due to a recapitalization in 2007 and subsequent stock issuances.

**NOTE 11 – COMMITMENTS AND CONTINGENCIES**

None.

**NOTE 12 – SUBSEQUENT EVENTS**

During January 2015 the company issued 8,200,000 shares of common stock valued in a range of $0.05 to $0.07 per share. Total cash received was $114,000. Total interest paid with shares was $1,500. Total value of debt paid was $30,000. Total value of assets acquired was $17,500. Total consulting services were $444,500.

On January 9, 2015, the Company filed Post Effective Amendment No.1 to the Company's Form S-8 Registration Statement. The purpose of this Amendment No. 1 to the Registration Statement on Form S-8, File No. 333-186566 (the " **Registration Statement** ") was to register an additional 7,500,000 shares of common stock, par value $0.001 per share of Alternative Fuels Americas, Inc. (the " **Company** "), which may be offered pursuant to the Company's 2011 Stock Incentive Plan (the " **Plan** "), as amended on November 24, 2014

During February 2015 the company issued convertible debt in exchange for $50,000 cash

During February 2015 the company issued convertible debt in exchange for $50,000 cash

During March 2015 the company issued convertible debt in exchange for $85,000 cash

In March a certificate of Amendment to the Certificate of Incorporation was filed changing the Company's name from Alternative Fuels Americas, Inc. to Kaya Holdings, Inc. and on April 6, 2015 FINRA approved the name and symbol change to "KAYS"

**ITEM 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**ITEM 9A. Controls and Procedures.**

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (our principal financial and accounting officer) to allow for timely decisions regarding required disclosure.

As of December 31, 2014, the end of our fiscal year covered by this report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States. Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2014. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. Our management has concluded that, as of December 31, 2013, our internal control over financial reporting was effective.

This annual report does not include an attestation report of our company&ssquo;s registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our Company's registered public accounting firm pursuant to rules of the SEC that permit our Company to provide only management's report in this annual report.

**Inherent limitations on effectiveness of controls**

Internal control over financial reporting has inherent limitations which include but is not limited to the use of independent professionals for advice and guidance, interpretation of existing and/or changing rules and principles, segregation of management duties, scale of organization, and personnel factors. Internal control over financial reporting is a process which involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. Internal control over financial reporting also can be circumvented by collusion or improper management override. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements on a timely basis, however, these inherent limitations are known features of the financial reporting process and it is possible to design into the process safeguards to reduce, though not eliminate, this risk. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal controls or in other factors that could affect these controls during the year ended December 31, 2014 that have materially or are reasonably likely to materially affect, our internal controls over financial reporting.

**ITEM 9B. Other Information**

None.

*Table of Contents*                    19

**PART III**

**ITEM 10. Directors, Executive Officers and Corporate Governance.**

**Directors and Executive Officers**

Our directors and executive officers and their respective ages and titles are as follows:

| Name | Age | Position(s) and Office(s) Held |
|------|-----|-------------------------------|
| Craig Frank | 54 | Chairman of the Board, President, Chief Executive Officer, Chief Finance Officer, Director |
| Carrie Schwarz | 54 | Director |
| Jordi Arimany | 37 | Director |

Set forth below is a brief description of the background and business experience of our directors and executive officers.

Craig Frank became Chairman of the Board, President, Chief Executive Officer and a Director of the Company in January 2010. For the past 15 years, Mr. Frank has served as Chairman and CEO of Tudog International Consulting, a Florida-based company with business advisory, business development, market research, training, and merchant banking divisions. During his tenure at Tudog, Mr. Frank has worked with more than 200 companies from 19 countries. In addition, in such capacity, he developed the business plan for a biofuels company based in Central America, and is the co-founder of the Company's predecessor, which we acquired in January 2010. He remains Tudog's Chairman. Mr. Frank is a widely published author with articles on business matters featured in magazines and newsletters internationally, including publications of the Guatemala America Chamber of Commerce, the Israel Export Institute, the Romania Chamber of Commerce, and the World Association of Small and Medium Sized Enterprises. He is also an in-demand speaker at international conferences, including the Florida Sterling Council, the International Project Management Association, The Central American Center for Entrepreneurship, the Israel Center for Entrepreneurial Studies, and the Pino Center for Entrepreneurship at Florida International University. The Company believes that Mr. Frank's consulting and entrepreneurial experience brings significant value to our management team.

Carrie Schwarz, who became a director in January 2010, has served as the Managing Partner of Athena Assets Management, a New York based hedge fund specializing in investments of special situation publicly traded securities since 2002. Ms. Schwarz has also been a Portfolio Manager at Metropolitan Capital, a New York based hedge fund. From 1999 to 2001 Ms. Schwarz was an executive at Bank of America Securities, where she built and managed a proprietary Risk Arbitrage Department. From 1991 to 1999 she founded and managed Athena Investment Partners, L.P., a hedge fund that focused on special situations. Prior thereto, she was with American Porters, L.P., a hedge fund that focused on risk arbitrage, which she joined as a junior analyst in 1995 and ultimately rose to become Head of Research and a partner. Ms. Schwarz serves on the board of directors of the American Friends of the Weizmann Institute of Science. We believe that her financial industry experience makes her a valuable member of the board of directors.

Jordi Arimany, who became a director in January 2010, has served as Vice President of Business Development of First Diversity Management Group, a Cleveland, Ohio-based human capital services company since 2008. From 2007 to 2008 he served as Associate to the Executive Vice President of Bunco Industrial, in Guatemala City, one of the largest private banks in Central America. From 2000 to 2007 he was National Business Development Manager to LAFISE (Latin American Financial Services), a Miami, Florida-based financial services firm operating throughout Latin America. Mr. Arimany has a Bachelor's degree in Business Administration from John Brown University and a Master's degree in Business Administration from Regent University. We believe that his Latin American financial and business experience makes him a valuable member of the board of directors.

**Terms of Office**

Our directors are appointed for a one-year term to hold office until the next annual meeting of our stockholders and until a successor is appointed and qualified, or until their removal, resignation, or death. Executive officers serve at the pleasure of the board of directors.

**Board Committees**

Two of our three directors are independent within the scope of the rules adopted by the NASDAQ Stock Market and the SEC: Ms. Schwarz and Mr. Arimany. However, our board of directors does not currently have an audit committee, a compensation committee, or a corporate governance committee. We plan to establish such committees in the near future.

**Board of Directors Role in Risk Oversight**

Members of the board of directors have periodic meetings with management and the Company's independent auditors to perform risk oversight with respect to the Company's internal control processes. Our board is currently comprised of a majority of independent directors. The Company believes that the board's role in risk oversight does not materially affect the leadership structure of the Company.

**Code of Ethics**

We adopted a Code of Business Conduct and Ethics ("Ethics code") on February 28, 2013 that includes provisions ranging from conflicts of interest to compliance with all applicable laws and regulations. All officers, directors and employees are bound by this Ethics code, violations of which may be reported to any independent member of the Board of Directors.

**ITEM 11. Executive Compensation**

**Summary Compensation Table**

The table below summarizes all compensation awarded to, earned by, or paid to our officers for our last two completed fiscal years for all services rendered to us. No other executive officer was paid in excess of $100,000 during any such fiscal years.

**Summary Compensation Table**

| Name and Principal Position | Year | Salary | Bonus | Stock Awards | Option Awards | Nonequity incentive Plan Compensation | Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Craig Frank, | 2014 | $  — | $  — | $  — | $  — | $  — | $  — | $  84,000 | $  84,000 |
| CEO/CFO/President (1) | 2015 | — | — | — | — | — | — | 180,000 | 180,000 |
| Samuel Stern, COO (2) | 2014 | — | — | — | — | — | — | 60,000 | 60,000 |
| Ronen Ben Harush, CFO (3) | 2014 | — | — | — | — | — | — | 10,500 | 10,500 |

(1)  Mr. Frank's compensation was paid as follows:
    2014 - $7,000 accrued monthly consulting fees
    2013 - $145,000 through issuance of common stock and $35,000 accrued for payment in a future period.

(2)  Mr. Stern's compensation was paid as follows: $5,000 in accrued monthly consulting fees.

(3)  Mr. Ben Harush's compensation was paid as follows: $3,500 in accrued fees per quarter.

Mr. Frank's compensation was paid to Tudog International Consulting, Inc., of which Mr. Frank is the Chairman and a principal.

Mr. Frank has been awarded preferred shares in the Company's subsidiary, Marijuana Holdings Americas, Inc., that, upon conversion represent 15% of the total outstanding common shares.

*Table of Contents*                    21

**Employment and Consulting Agreements**

The Company is currently not a party to any employment agreement with its executive officers. The Company has consulting agreements with Tudog International Consulting, of which firm Mr. Frank is Chairman and a Principal, for the services of Mr. Frank as CEO and CFO.

**Outstanding Equity Awards at Fiscal Year-End**

NONE.

**Compensation of Directors Table**

The table below summarizes all compensation paid to our nonemployee directors for 2014.

Director Compensation:

| Name | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Nonequity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Carrie Schwarz | — | 10,000 | — | — | — | — | 10,000 |
| Jordi Arimany | — | 10,000 | — | — | — | — | 10,000 |

**Narrative Disclosure to the Director Compensation Table**

Our nonemployee directors are compensated with common stock. All such directors received 100,000 shares of common stock for their service.

**2011 Incentive Stock Plan**

Our 2011 Incentive Stock Plan provides for equity incentives to be granted to our employees, executive officers or directors or to key advisers or consultants. Equity incentives may be in the form of stock options with an exercise price not less than the fair market value of the underlying shares as determined pursuant to the 2011 Incentive Stock Plan, restricted stock awards, other stock based awards, or any combination of the foregoing. The 2011 Incentive Stock Plan is administered by the board of directors.

At December 31, 2013, we had 2,500,000 shares of KAYS common stock reserved for issuance under our 2011 Incentive Stock Plan ("Plan"). During the year 2014, 2,500,000 shares were issued to Consultants of the Company and at December 31, 2014, we had no remaining shares of common stock reserved or awards outstanding for issuance under our Plan.

**ITEM 12. Security Ownership of Certain Beneficial Owners and Management.**

The following table sets forth the beneficial ownership of our common stock by each director and executive officer, by all directors and executives officers as a group and by each other person known by us to beneficially own 5% or more of our common stock as of April 2015.

| Name and Address of Beneficial Owner | Number of Shares of Common Stock | Percentage of Shares |
|---|---|---|
| Directors and executive officers: | | |
| Craig Frank, Hollywood, FL (1) | 2,350,144 | 3.43% |
| Samuel Stern, Hollywood, FL(2) | 3,748,234 | 4.36% |
| Carrie Schwarz, Hollywood, FL * | 364,000 | 0.42% |
| Jordi Arimany, Hollywood, FL * | 437,500 | 0.51% |
| All directors and executive officers, as a group (four) | 5,848,378 | 8.53% |
| Other 5% or greater stockholders: | | |
| Ilan Sarid, Westmont, Quebec | 22,966,833 | 27.74% |

    * Less than 1%

(1)  Includes shares beneficially owned by Tudog International Consulting and Drora Frank.

(2)  Dr. Sam Stern resigned as a Director of KAYS effective July 1, 2014

The persons named above have full voting and investment power with respect to the shares indicated. Under the rules of the SEC, a person (or group of persons) is deemed to be a "beneficial owner" of a security if he or she, directly or indirectly, has or shares the power to vote or to direct the voting of such security, or the power to dispose of or to direct the disposition of such security. Accordingly, more than one person may be deemed to be a beneficial owner of the same security. A person is also deemed to be a beneficial owner of any security, which that person has the right to acquire within 60 days, such as options or warrants to purchase our common stock.

**Securities Authorized for Issuance under Equity Compensation Plans**

At December 31, 2013, we had 2,500,000 shares of KAYS common stock reserved for issuance under our 2011 Incentive Stock Plan ("Plan"). During the year 2014, 2,500,000 shares were issued to Consultants of the Company and at December 31, 2014, we had no remaining shares of common stock reserved or awards outstanding for issuance under our Plan.

**ITEM 13. Certain Relationships and Related Transactions.**

**Related Party Transactions**

At December 31, 2014 the Company was indebted to an affiliated shareholder of the Company for $840,955, which consisted of $737,100 principal and $103, 895 accrued interest, with interest accruing at 10%. On January 2,2014 the Company entered into a Debt Modification Agreement whereby the total amount of the debt was reduced to $750,000.00 and there is no interest until December 31, 2015. $500,000 of the debt is convertible into 50,000 Series C Convertible Preferred Shares of KAYS, which if converted are subject to resale restrictions through December 31, 2015. The remaining $250,000 is not convertible.

**Review, Approval and Ratification of Related Party Transactions**

Given our small size and limited financial resources, we have not adopted formal policies and procedures for the review, approval or ratification of transactions with our executive officers, directors and significant shareholders. However, all matters relating to the compensation and stock awards for such persons were approved by the Board of Directors prior to implementation.

**ITEM 14. Principal Accountant Fees and Services**

**Audit Fees**

The following is a summary of the fees billed to us by De Meo, Young and McGrath and Bongiovanni and Associates, CPA for professional services rendered for the years ended December 31, 2014 and 2013, collectively.

|  | | 2014 | | 2013 |
|---|---|---|---|---|
| Audit fees | $ | 52,265 | $ | 28,773 |
| Audit-related fees | | 15,240 | | 2,067 |
| Tax fees | | — | | — |
| All other fees | | — | | — |
| | $ | 67,505 | $ | 30,840 |

Audit fees consist of billings for the audit of the Company's consolidated financial statements included in our annual reports on Form 10-K and reviews of the consolidated financial statements included in the quarterly reports on Form 10-Q.

Audit-related fees includes billings related to the Company's filing of Form S-8 in 2014.

The Company does not have an Audit Committee. It is the Company's policy to have its CEO and CFO preapprove all audit and permissible nonaudit services provided by the independent public accountants, subject to approval by the Board of Directors. These services may include audit, audit-related, tax and other services. Pre-approval is generally for up to one year, is detailed as to the particular service or category of services, and is generally subject to a specific budget. Unless there are significant variations from the pre-approved services and fees, the independent public accountants and management generally are not required to formally report to the Board of Directors regarding actual services and related fees.

*Table of Contents*                24

PART IV

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

  a) The following documents are filed as part of this Annual Report:

    1. Financial Statements – The following Consolidated Financial Statements of the Company are contained in Item 8 of this Annual Report on Form 10-K:

      • Report of Independent Registered Public Accountants

      • Consolidated Balance Sheets at December 31, 2013 and 2014

      • Consolidated Statements of Operations for the years ended December 31, 2013 and 2014

      • Consolidated Statements of Stockholders' Deficit for the years ended December 31, 2013 and 2014

      • Consolidated Statements of Cash Flows for the years ended December 31, 2013 and 2014

      • Notes to the Consolidated Financial Statements.

    2. Financial Statement Schedules were omitted, as they are not required or are not applicable, or the required information is included in the Consolidated Financial Statements.

    3. Exhibits – The following exhibits are filed with this report or are incorporated herein by reference to a prior filing, in accordance with Rule 12b-32 under the Securities Exchange Act of 1934.

  b) Exhibits

| Description | |
| --- | --- |
| 3.1 | Certificate of Incorporation, as amended |
| 10.1 | 2011 Stock Incentive Plan + |
| 10.2 | Agrarian Parcel Lease Agreement by and between Agr Unito S.A. and Kaya Holdings, Inc.. |
| 10.3 | Lease Agreement and Sale of Plantation by and between Registrant and Tempate S.A. |
| 10.4 | Form of 8% Convertible Promissory Note |
| 10.5 | Consulting Agreement between Registrant and Tudog International Consulting, Inc. + |
| 10.6 | Office Lease for premises located at 305 South Andrews Avenue, Suite 209, Fort Lauderdale, FL 33301 |
| 10.7 | Letter Agreement effective December 1, 2011 between Registrant and Ilan Sarid |
| 10.8 | Amendment to Consulting Agreement between Registrant and Tudog International Consulting, Inc. + |
| 10.9 | Amendment to Consulting Agreement between Registration and The Tudog Group + * |
| 23.1 | Consent of De Meo, Young, McGrath, Independent Certified Public Accountants * |
| 31.1 | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to Rule 130-14 of the Securities Exchange Act of 1934, as amended, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 31.2 | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to Rule 130-14 of the Securities Exchange Act of 1934, as amended, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 * |
| 32.1 | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002 * |
| 32.2 | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002 * |

  + Management compensation arrangement.
  * Filed herewith.

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: April 16, 2015

<div style="margin-left:40%">

Kaya Holdings, Inc..

By:   /s/ Craig Frank
        Name: Craig Frank
        Title: Chairman of the Board, President, Chief Executive Officer and Director (Principal Executive)

By:   /s/ Craig Frank
        Name: Craig Frank
        Title: Acting Chief Financial Officer (Principal Financial Executive)

</div>

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, this Amendment No. 1 to its Annual Report on Form 10-K has been signed below by the following persons on behalf of the Company and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Carrie Schwarz<br>Carrie Schwarz | Director | April 16, 2015 |
| /s/ Jordi Arimany<br>Jordi Arimany | Director | April 16, 2015 |

By: /s/ Craig Frank
Title: Craig Frank, Chairman of the Board, President,
Chief Executive Officer and Director (Principal Executive)

By: /s/ Craig Frank
Name: Craig Frank
Title: Acting Chief Financial Officer (Principal Financial Executive)