# Exhibit D

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K/A

☒ **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2010**

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File No. 000-1321002

# CANNABIS MEDICAL SOLUTIONS, INC.

(Name of small business issuer in its charter)

| **Delaware** | **20-8484256** |
|---|---|
| (State or other Jurisdiction | (I.R.S. Employer |
| of incorporation) | Identification No.) |

**100 Myer Creek Road, Ashland, OR 97520**
(Address and Zip Code of Principal Executive Offices)

Registrant's Telephone Number: **(305) 396-9097**

**Securities registered under Section 12(b) of the Exchange Act:**
**None**

**Securities registered under Section 12(g) of the Exchange Act:**

**Common Stock, $0.01 par value per share**
**(Title of Class)**

Indicate by check mark whether the Registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days: Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. (Check one):

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

&bbsp;

| **Class** | **Outstanding at April 4, 2011** |
|---|---|
| Common stock, $0.01 par value | 362,102,240 |

The aggregate market value of voting stock held by non-affiliates of the registrant on December 31, 2010 was approximately $4,873,000. Solely for purposes of the foregoing calculation, all of the registrant's directors and officers as of December 31, 2010, are deemed to be affiliates. This determination of affiliate status for this purpose does not reflect a determination that any persons are affiliates for any other purposes.

Documents Incorporated By Reference

None

**CANNABIS MEDICAL SOLUTIONS, INC.**
**FORM 10-K/A/A ANNUAL REPORT**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2010**
**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| ITEM 1. | BUSINESS | 3 |
| ITEM 1A. | RISK FACTORS | 7 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 10 |
| ITEM 2. | PROPERTIES | 10 |
| ITEM 3. | LEGAL PROCEEDINGS | 10 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 10 |

**PART II**

| | | |
|---|---|---|
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 11 |
| ITEM 6. | SELECTED FINANCIAL DATA | 12 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 12 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 13 |
| ITEM 8. | CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 13 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 14 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 14 |
| ITEM 9B. | OTHER INFORMATION | 14 |

**PART III**

| | | |
|---|---|---|
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE. | 14 |
| ITEM 11. | EXECUTIVE COMPENSATION | 16 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 18 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 19 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 19 |

**PART IV**

| | | |
|---|---|---|
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 20 |
| | SIGNATURES | 21 |

CERTIFICATIONS

| | | |
|---|---|---|
| | Exhibit 31 – Management certification | |
| | Exhibit 32 – Sarbanes-Oxley Act | |

The Registrant's Chief Executive Officer has concluded that a previously issued Annual Report on Form 10-K for the fiscal year ended December 31, 2010 should no longer be relied upon because of an error in such report.

There were discrepancies found in the Executive Summary, and Strategic Agreements sections of the companies 10K for the period ending December 31, 2010.

The Registrant does not have an audit committee; however, the Chief Executive Officer discussed with the Registrant's auditors the matters which are the subject of this filing.

**Forward Looking Statements — Cautionary Language**

Certain statements made in these documents and in other written or oral statements made by Cannabis Medical Solutions, Inc. or on Cannabis Medical Solutions, Inc's behalf are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). A forward-looking statement is a statement that is not a historical fact and, without limitation, includes any statement that may predict, forecast, indicate or imply future results, performance or achievements, and may contain words like: "believe", "anticipate", "expect", "estimate", "project", "will", "shall" and other words or phrases with similar meaning in connection with a discussion of future operating or financial performance. In particular, these include statements relating to future actions, trends in our businesses, prospective products, future performance or financial results. Cannabis Medical Solutions, Inc. claims the protection afforded by the safe harbor for forward-looking statements provided by the PSLRA. Forward-looking statements involve risks and uncertainties that may cause actual results to differ materially from the results contained in the forward-looking statements. Risks and uncertainties that may cause actual results to vary materially, some of which are described in this filing. The risks included herein are not exhaustive. This annual report on Form 10-K/A/A, quarterly reports on Form 10-Q, current reports on Form 8-K and other documents filed with the SEC include additional factors which could impact Cannabis Medical Solutions, Inc.'s business and financial performance. Moreover, Cannabis Medical Solutions, Inc. operates in a rapidly changing and competitive environment. New risk factors emerge from time to time and it is not possible for management to predict all such risk factors. Further, it is not possible to assess the impact of all risk factors on Cannabis Medical Solutions, Inc's business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. In addition, Cannabis Medical Solutions, Inc. disclaims any obligation to update any forward-looking statements to reflect events or circumstances that occur after the date of the report.

PART I

**ITEM 1. DESCRIPTION OF BUSINESS.**

Except for historical information contained herein, the following discussion contains forward-looking statements that involve risks and uncertainties. Such forward-looking statements include, but are not limited to, statements regarding future events and the Company's plans and expectations. Actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include, but are not limited to, those discussed elsewhere in this Form 10-K/A/A or incorporated herein by reference, including those set forth in *Management's Discussion and Analysis or Plan of Operation.*

Unless otherwise noted, references in this Form 10-K/A/A to "Seraph," "Commerce Online, Inc.," the "Company," "we," "our" or "us" means Cannabis Medical Solutions, Inc., a Delaware corporation.

*Executive Summary*

Cannabis Medical Solutions, Inc. is a financial services company specializing proprietary merchant payment solutions, cash advance, vertical products and services to the health care and legalized medical marijuana sectors. The company has primarily focused on providing payment and banking solutions to medical dispensaries operating legally and licensed across sixteen (16) states. The Company maintains corporate offices in Oregon, West Palm Beach and Miami, Florida. As of March 4, 2010 Commerce Online, Inc. changed its name to Cannabis Medical Solutions, Inc.

On March 8, 2010, the company completed the acquisition of 800 Commerce, Inc., a Florida Corporation. 800 Commerce Inc., through its' corporate website www.800Commerce.com, provides merchant processing, prepaid debit cards, website design and hosting to retail businesses across the United States. The company issued 1,000,000 shares of common stock for all the issued and outstanding stock of 800 Commerce, Inc. 800 Commerce, Inc. is a payment processing and debit card issuance company with offices located in Miami, Florida.

3

Through partnerships with EMS bank, Applied Bank and Card Platforms, Cannabis Medical Solutions, Inc. provides alternative to cash payment solutions and merchant processing services to merchants within the healthcare and medical dispensary sectors. Clients of Cannabis Medical Solutions receive access to private label gateways for credit card processing, cash advance services, POS systems and terminals and patient smart debit cards branded as "MediPayment." The MediPayment card is an alternative payment solution to eliminate theft, fraud and provide patient tracking information. The Cannabis Medical Solutions, Inc. network will enable merchants to certify, secure and process all types of credit card payments, ACH, Checks pay-by-check verification/guarantee services via websites, retail stores, medical dispensaries, telephone order call centers, wireless terminals and hand held smart phone devices including BlackBerry.

In an effort to keep medical dispensaries and compassionate care centers within the guidelines f CA Proposition 215, SB 420 and HB 1284, Cannabis Medical Solutions presently offers merchant payment solutions and its' proprietary closed loop pre-paid stored value and loyalty card "MediPayment" as a unique cash alternative to licensed dispensaries for both operators and members of collectives. Cannabis Medical Solutions will seek to capitalize on this presently untapped and much needed solution, while managing and leveraging its' merchant relationships with medical dispensaries and wellness centers as a vertical pipeline and distribution channel for edibles and nutraceutical product lines. Like California—which was the first to approve medical marijuana in 1996—Colorado's marijuana infrastructure and culture are well ahead of the other 14 states that followed them. Alaska, Hawaii, Maine, Michigan, Montana, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont and Washington allow the practice, and are at various stages of the full licensing. Montana and Arizona are presently allowing the practice of medical marijuana care centers. Similar ballot measures or legislation allowing medical marijuana are pending in 14 other states this year: Alabama, Delaware, Illinois, Iowa, Kansas, Maryland, Massachusetts, Missouri, New York, North Carolina, Pennsylvania, South Dakota and Tennessee.

Medical marijuana is the most searched term on Google with over a million page views each month and Cannabis Medical Solutions is highly listed. We expect this sector to experience explosive growth, as recent momentum toward the legalization and tolerance of medical marijuana is now in effect within sixteen (16) states. Cannabis Medical Solutions has strategically placed itself as a well known partner to both legalized states and licensed professionals within the sector as the first public company which stands to directly benefit from the movement toward new legislation.

Cannabis Medical Solutions offers a complete line of merchant services for the medical marijuana dispensary business including, but not limited to, debit & credit card transaction processing, cash advance, gift/loyalty card programs and POS terminals through its' private banking network. Unfortunately, the banking industry is far behind recent legislation for legalization, making it extremely difficult for medical marijuana dispensaries to operate with alternate payment solutions other than cash transactions. In some cities and states, it is virtually impossible for these businesses to even open a corporate banking account, let alone take credit cards due to FDIC insurance and federal laws. Our private banking network understands the business, and by working exclusively with private banking institutions, Cannabis Medical Solutions can streamline the application process and have any legal medical dispensary accepting credit cards within 5 business days, helping to eliminate the issues of theft, fraud and criminal activity often associated with cash only transactions.

Presently, Cannabis Medical Solutions provides merchant services to multiple dispensaries and businesses throughout California, Colorado and Montana, with new agreements for agents and additional dispensaries each month.

Proprietary Payment Technology- "MediPayment"

The Cannabis Medical Solutions prepaid patient card " MediPayment" acts as a closed loop patient banking system that will soon prove itself to be the most secure and viable PCI compliant payment solution for medical marijuana dispensaries operating in licensed jurisdictions. The proprietary payment solution, acting as a prepaid medical card, has been designed to become the "PayPal" payment solution for this industry. MediPayment is a closed loop stored value and debit system allowing for card to card transactions between patients and dispensaries, virtually eliminating the need for cash and credit card transactions. Use of the MediPayment™ system is less expensive than an ATM transaction ($2.95 per transaction), credit cards and other loyalty card fees (ranging from 2.25% to 4% plus transaction fees, gateway fees), etc. The MediPayment system provides complete reporting, administrative functions, tracking of patient purchases, batching of licensing or state fees, marketing via text messaging and HTML emails to patients and bonus rewards. The system can be installed in minutes, provides unlimited reporting through live transactions, and virtually eliminates fraud and theft associated with cash only operations.

Cannabis Medical Solutions expects to begin installing the MediPayment™ system in Colorado, Montana and California dispensaries in April 2011 and estimates to have at least 15,000 to 40,000 patients on the system before year end. The fees and revenue to Cannabis Medical Solutions will be approximately $4.95 per patient per month and a .25 cent transaction fee. Cannabis Medical Solutions to seeks to make the MediPayment solution the most competitive alternative payment solution for the industry.

4

Cannabis Medical Solutions recently introduced its' wholly owned web property www.CannabisXchange.com, as the first online medical marijuana patient registry and wellness care directory. CannabisXchange.com will allow registered and approved patients to register within their state through a geographically targeted and encrypted registration software platform, browse medication strains, and join a licensed collective online. Purchases of medication must be "in location". The service for registered medical patients is free. Dispensaries, vendors and care centers will pay a monthly licensing and advertising fee for access to the platform, registration of their medical dispensary to the directory for patient searches and access to control medical strain listings, prescription alerts and information to their patient database. Listing fees will be priced at $599.00 annually or $69.99 dollars a month for each listing.

800 COMMERCE Inc., the wholly owned subsidiary of Cannabis Medical Solutions , (www.800commerce.com) including the Toll-Free Number 800-COMMERCE in designated metro areas, will be known as the first B2B and B2C social network business portal allowing business and client members to find and compare services and purchase all things commerce including turn-key merchant processing services for all major credit cards, web development, marketing, hosting services and branded prepaid debit cards/gift cards for businesses. The 800 commerce prepaid debit cards will target the unbankable population of over 60 million Americans.

The company will strive to nurture and supply the best practices, technology, resources and talent of technology partners and share them broadly to create value for our customers, shareholders, partners and employees. Although we have not generated any significant revenues for the year to date, we continue to explore new opportunities that will result in new revenue streams within the financial services sector catering to medical and health industries.

We have historically maintained a low-operating-cost philosophy and continue to plan to do so. We employ a small staff, occupy modest office space, and seek to use technology to reduce operating costs generally whenever possible.

### *STRATEGIC AGREEMENTS*

As of June 18, 2009 **Commerce Online** has effected a reverse merger to go public on the Nasdaq OTC Exchange with Seraph Security Inc.

As of March 4, 2010 Commerce Online,Inc. changed its name to Cannabis Medical Solutions, Inc.

On March 8, 2010 the company completed the acquisition of 800 Commerce, Inc., a Florida Corporation. The company issued 1,000,000 shares of common stock for all the issued and outstanding stock of 800 Commerce, Inc. 800 Commerce, Inc. is a payment processing company with offices located in South Florida.

### Corporate History

Cannabis Medical Solutions, Inc., (referred to hereafter as "CMSI," or, the "Company"), was initially incorporated under the laws of the State of Delaware in February 1997 under the name Easy Street Online, Inc., as successor to each of Hobbes & Co., LLC ("Hobbes"), INET Communications Company, LLC ("INET") and Sara Girl & Co., LLC ("Sara Girl").

In August of 1997, the Company changed its name to Frontline Communications Corp. ("Frontline") and operated as a regional Internet service provider ("ISP") providing Internet access, web hosting, website design, and related services to residential and small business customers throughout the Northeast United States and, through a network partnership agreement, Internet access to customers nationwide. Frontline traded on the American Stock Exchange under the symbol "FNT.

On April 3, 2003, Frontline acquired Proyecciones y Ventas Organizadas, S.A. de C.V. ("Provo Mexico") and in December 2003 changed its name to "Provo International Inc." ("Provo"). Provo was organized into three distinct divisions: (1) Provo International, which was responsible for overseeing mergers, acquisitions, financing transactions and regulatory compliance activities (2) Provo US, a division of Provo, was responsible for the continued management of the Internet service business, which was its core business prior to its acquisition of (3) Provo Mexico, a wholly owned subsidiary of Provo International, which distributed prepaid calling cards and cellular phone airtime in Mexico.

In September 2008, Provo changed its name to Ebenefits Direct, Inc., which, through its wholly-owned subsidiary, L.A. Marketing Plans, LLC, ("LAMP"), is a company currently engaged in the business of direct response marketing. LAMP markets and sells non-insurance healthcare programs designed to complement medical insurance products and to provide savings for those who cannot afford or qualify for traditional health insurance products.
On October 14, 2008, Ebenefits Direct, Inc. changed its name to Seraph Security, Inc. and continues to operate the LAMP business, and eCommerce a credit and debit card processing company.

On May 20, 2009, Seraph Security, Inc. changed its name to Commerce Online, Inc. to more accurately reflect its core business.

As of March 4, 2010 Commerce Online,Inc. changed its name to Cannabis Medical Solutions, Inc.

March 8, 2010 the company completed the acquisition of 800 Commerce, Inc., a Florida Corporation . The company issued 1,000,000 shares of common stock for all the issued and outstanding stock of 800 Commerce, Inc. 800 Commerce, Inc. is a payment processing company with offices located in Florida and Tennessee.

**Binding Letter of Intent - Asset Purchase Agreement**

On February 25, 2009, the Company entered into a Binding Letter of Intent (the "Agreement") with Commerce Online Technologies, Inc., a company to be organized in Delaware with the principal business of providing eCommerce software solutions on online brands in the form of internet B2B eCommerce portals, mobile entertainment applications and wireless entertainment products ("Purchaser"). Purchaser will be controlled by Michael Friedman, who, as stated in the Agreement, will be appointed as one of the Company's directors.

Pursuant the terms of the Agreement, the Company and Friedman intend to facilitate an asset acquisition, or other tax-free combinational transaction with the Company, with closing to occur on or before April 25, 2009. In consideration for 10 million shares of the Company's stock, Friedman shall contribute assets and intellectual property of his eCommerce Solutions, proprietary software applications, all reseller agreements and client base, and waive first year salaries for each of its current and prospective officers ("Transaction").

The Transaction is contemplated to be structured as a tax-free transaction under Section 351 of the Internal Revenue Code of 1986, and the regulations promulgated there under.

**Employees**

The Company's team currently consists of three (3) employees and several independent contractors. Each management hire has been carefully selected to address immediate needs in particular functional areas, but also with consideration of the Company's future needs during a period of expected rapid growth and expansion. Value is placed not only on outstanding credentials in specific areas of functional expertise, but also on cross-functionality, collegiality, a strong knowledge of content acquisition and distribution, along with hands-on experience in scaling operations from initial beta and development stage through successful commercial deployment

*Industry Overview*

The US credit card processing industry includes fewer than 500 companies with combined annual revenue under $10 billion. Major companies include First Data Corporation, Total System Services, Global Payments, and Bank of America's BA Merchant Services. The industry is **highly concentrated** : the top four companies account for 40 percent of industry revenues. The industry handles a high volume of transactions. First Data processes around 20 billion merchant transactions yearly; Total System Services, about 10 billion. First Data had 400 million card accounts from 1,400 credit card issuers in a recent year, and accounts with 4 million merchants.

When it comes to consumer purchases, plastic is in, paper is out. Credit and debit cards, along with other electronic payment methods, are growing in popularity for their added convenience, greater security and ease of use compared to cash on-hand. Retailers must keep pace with these trends, while making sure to control costs and encourage sales by providing a range of electronic processing options. As a result the market for credit/debit card services is expected to grow from 49 Billion in 2006 to 85 billion in 2010. eCheck/ACH services are projected to rise from 13 Billion to 19 billion over the same time period. (Source: McKinsey & Co. Payments Practice; figures from 2010 are estimates.)

Compliance issues are of paramount importance in the banking and transaction processing industries, with specific challenges related to electronic and Internet-based payment solutions. The PCI DSS standard was developed by the major credit card companies as a guideline to help organizations that process card payments prevent credit card fraud, cracking and compromised data due to other vulnerabilities and threats. Any company processing, storing, or transmitting payment card data must be PCI compliant or risk losing their ability to process credit card payments, be audited and/or fined. Merchants and payment card service providers must validate their Companies periodically. The Commerce online partner Network is PCI DDS and PABP (Payment Application Best Practices) compliant, the latter developed by VISA. PABP-compliance helps merchants and agents mitigate compromises, prevent storage of prohibited data and support overall compliance with PCI DSS.

According to the November 2008 Nilson Report, VISA debit cards had the highest market share (34.5%) of consumer and commercial card-based purchase transactions at merchants.

**Competitive Landscape**

Demand is driven by consumer spending. The profitability of individual companies depends on efficient operations, as services are sold largely based on cost. Large companies have big economies of scale in processing and can provide more services; small companies can compete by specializing in industries and providing custom services. The business is highly automated and not capital-intensive.

**1. Products & Services**

Cannabis Medical Solutions, Inc. and 800 commerce Inc.'s electronic payment processing and additional services enables our merchants to accept all major credit cards as well as debit and ATM cards for payment whether you are a retail, service, mail-order or Internet merchant. As an industry leader we are dedicated to delivering comprehensive services from merchant account activation, gateway connections and product development.

**ITEM 1A - Risk Factors**

*An investment in our common stock involves a high degree of risk. You should carefully consider the following information about these risks, together with the other information contained in this Annual Report on Form 10-K/A/A, before investing in our common stock. If any of the events anticipated by the risks described below occur, our results of operations and financial condition could be adversely affected which could result in a decline in the market price of our common stock, causing you to lose all or part of your investment.*

**BECAUSE WE ARE QUOTED ON THE OTCBB INSTEAD OF AN EXCHANGE OR NATIONAL QUOTATION SYSTEM, OUR INVESTORS MAY HAVE A TOUGHER TIME SELLING THEIR STOCK OR EXPERIENCE NEGATIVE VOLATILITY ON THE MARKET PRICE OF OUR STOCK.**

Our common stock is traded on the OTCBB. The OTCBB is often highly illiquid, in part because it does not have a national quotation system by which potential investors can follow the market price of shares except through information received and generated by a limited number of broker-dealers that make markets in particular stocks. There is a greater chance of volatility for securities that trade on the OTCBB as compared to a national exchange or quotation system. This volatility may be caused by a variety of factors, including the lack of readily available price quotations, the absence of consistent administrative supervision of bid and ask quotations, lower trading volume, and market conditions. Investors in our common stock may experience high fluctuations in the market price and volume of the trading market for our securities. These fluctuations, when they occur, have a negative effect on the market price for our securities. Accordingly, our stockholders may not be able to realize a fair price from their shares when they determine to sell them or may have to hold them for a substantial period of time until the market for our common stock improves.

**FAILURE TO ACHIEVE AND MAINTAIN EFFECTIVE INTERNAL CONTROLS IN ACCORDANCE WITH SECTION 404 OF THE SARBANES-OXLEY ACT COULD HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS AND OPERATING RESULTS.**

It may be time consuming, difficult and costly for us to develop and implement the additional internal controls, processes and reporting procedures required by the Sarbanes-Oxley Act. We may need to hire additional financial reporting, internal auditing and other finance staff in order to develop and implement appropriate additional internal controls, processes and reporting procedures. If we are unable to comply with these requirements of the Sarbanes-Oxley Act, we may not be able to obtain the independent accountant certifications that the Sarbanes-Oxley Act requires of publicly traded companies.

If we fail to comply in a timely manner with the requirements of Section 404 of the Sarbanes-Oxley Act regarding internal control over financial reporting or to remedy any material weaknesses in our internal controls that we may identify, such failure could result in material misstatements in our financial statements, cause investors to lose confidence in our reported financial information and have a negative effect on the trading price of our common stock

Pursuant to Section 404 of the Sarbanes-Oxley Act and current SEC regulations, beginning with our annual report on Form 10-K/A for our fiscal period ending December 31, 2009 and 2010, we will be required to prepare assessments regarding internal controls over financial reporting and beginning with our annual report on Form 10-K for our fiscal period ending December 31, 2008, furnish a report by our management on our internal control over financial reporting. We have begun the process of documenting and testing our internal control procedures in order to satisfy these requirements, which is likely to result in increased general and administrative expenses and may shift management time and attention from revenue-generating activities to compliance activities. While our management is expending significant resources in an effort to complete this important project, there can be no assurance that we will be able to achieve our objective on a timely basis. There also can be no assurance that our auditors will be able to issue an unqualified opinion on management's assessment of the effectiveness of our internal control over financial reporting. Failure to achieve and maintain an effective internal control environment or complete our Section 404 certifications could have a material adverse effect on our stock price.

In addition, in connection with our on-going assessment of the effectiveness of our internal control over financial reporting, we may discover "material weaknesses" in our internal controls as defined in standards established by the Public Company Accounting Oversight Board, or the PCAOB. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The PCAOB defines "significant deficiency" as a deficiency that results in more than a remote likelihood that a misstatement of the financial statements that is more than inconsequential will not be prevented or detected.

In the event that a material weakness is identified, we will employ qualified personnel and adopt and implement policies and procedures to address any material weaknesses that we identify. However, the process of designing and implementing effective internal controls is a continuous effort that requires us to anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a system of internal controls that is adequate to satisfy our reporting obligations as a public company. We cannot assure you that the measures we will take will remediate any material weaknesses that we may identify or that we will implement and maintain adequate controls over our financial process and reporting in the future.

Any failure to complete our assessment of our internal control over financial reporting, to remediate any material weaknesses that we may identify or to implement new or improved controls, or difficulties encountered in their implementation, could harm our operating results, cause us to fail to meet our reporting obligations or result in material misstatements in our financial statements. Any such failure could also adversely affect the results of the periodic management evaluations of our internal controls and, in the case of a failure to remediate any material weaknesses that we may identify, would adversely affect the annual auditor attestation reports regarding the effectiveness of our internal control over financial reporting that are required under Section 404 of the Sarbanes-Oxley Act. Inadequate internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock.

**RISKS RELATING TO OWNERSHIP OF OUR COMMON STOCK**

Although there is presently a market for our common stock, the price of our common stack may be extremely volatile and investors may not be able to sell their shares at or above their purchase price, or at all. We anticipate that the market may be potentially highly volatile and may fluctuate substantially because of:
- Actual or anticipated fluctuations in our future business and operating results;
- Changes in or failure to meet market expectations;
- Fluctuations in stock market price and volume

**WE DO NOT INTEND TO PAY DIVIDENDS**

We do not anticipate paying cash dividends on our common stock in the foreseeable future. We may not have sufficient funds to legally pay dividends. Even if funds are legally available to pay dividends, we may nevertheless decide in our sole discretion not to pay dividends. The declaration, payment and amount of any future dividends will be made at the discretion of the board of directors, and will depend upon, among other things, the results of our operations, cash flows and financial condition, operating and capital requirements, and other factors our board of directors may consider relevant. There is no assurance that we will pay any dividends in the future, and, if dividends are rapid, there is no assurance with respect to the amount of any such dividend.

**VOLATILITY IN OUR COMMON SHARE PRICE MAY SUBJECT US TO SECURITIES LITIGATION, THEREBY DIVERTING OUR RESOURCES THAT MAY HAVE A MATERIAL EFFECT ON OUR PROFITABILITY AND RESULTS OF OPERATIONS.**

As discussed in the preceding risk factors, the market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future. In the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may in the future be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.

**OPERATING HISTORY AND LACK OF PROFITS WHICH COULD LEAD TO WIDE FLUCTUATIONS IN OUR SHARE PRICE. THE PRICE AT WHICH YOU PURCHASE OUR COMMON SHARES MAY NOT BE INDICATIVE OF THE PRICE THAT WILL PREVAIL IN THE TRADING MARKET. YOU MAY BE UNABLE TO SELL YOUR COMMON SHARES AT OR ABOVE YOUR PURCHASE PRICE, WHICH MAY RESULT IN SUBSTANTIAL LOSSES TO YOU. THE MARKET PRICE FOR OUR COMMON SHARES IS PARTICULARLY VOLATILE GIVEN OUR STATUS AS A RELATIVELY UNKNOWN COMPANY WITH A SMALL AND THINLY TRADED PUBLIC FLOAT.**

The market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future. The volatility in our share price is attributable to a number of factors. First, as noted above, our common shares are sporadically and thinly traded. As a consequence of this lack of liquidity, the trading of relatively small quantities of shares by our shareholders may disproportionately influence the price of those shares in either direction. The price for our shares could, for example, decline precipitously in the event that a large number of our common shares are sold on the market without commensurate demand, as compared to a seasoned issuer which could better absorb those sales without adverse impact on its share price. Secondly, we are a speculative or "risky" investment due to our limited operating history and lack of profits to date, and uncertainty of future market acceptance for our potential products. As a consequence of this enhanced risk, more risk-adverse investors may, under the fear of losing all or most of their investment in the event of negative news or lack of progress, be more inclined to sell their shares on the market more quickly and at greater discounts than would be the case with the stock of a seasoned issuer. Many of these factors are beyond our control and may decrease the market price of our common shares, regardless of our operating performance. We cannot make any predictions or projections as to what the prevailing market price for our common shares will be at any time, including as to whether our common shares will sustain their current market prices, or as to what effect that the sale of shares or the availability of common shares for sale at any time will have on the prevailing market price.

Shareholders should be aware that, according to SEC Release No. 34-29093, the market for penny stocks has suffered in recent years from patterns of fraud and abuse. Such patterns include (1) control of the market for the security by one or a few broker-dealers that are often related to the promoter or issuer; (2) manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases; (3) boiler room practices involving high-pressure sales tactics and unrealistic price projections by inexperienced sales persons; (4) excessive and undisclosed bid-ask differential and markups by selling broker-dealers; and (5) the wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, along with the resulting inevitable collapse of those prices and with consequent investor losses. Our management is aware of the abuses that have occurred historically in the penny stock market. Although we do not expect to be in a position to dictate the behavior of the market or of broker-dealers who participate in the market, management will strive within the confines of practical limitations to prevent the described patterns from being established with respect to our securities. The occurrence of these patterns or practices could increase the volatility of our share price.

**OUR BUSINESS PLAN CALLS FOR EXTENSIVE AMOUNTS OF FUNDING AND WE MAY NOT BE ABLE TO OBTAIN SUCH FUNDING WHICH COULD ADVERSELY AFFECT OUR BUSINESS, OPERATIONS, AND FINANCIAL CONDITION.**

We will be relying on additional financing and funding. We are currently in discussions with potential sources of financing but no definitive agreements are in place. If we cannot achieve the requisite financing or complete the projects as anticipated, this could adversely affect our business, the results of our operations, prospects, and financial condition.

**SHOULD ONE OR MORE OF THE FOREGOING RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD THE UNDERLYING ASSUMPTIONS PROVE INCORRECT, ACTUAL RESULTS MAY DIFFER SIGNIFICANTLY FROM THOSE ANTICIPATED, BELIEVED, ESTIMATED, EXPECTED, INTENDED OR PLANNED.**

## FORWARD-LOOKING STATEMENTS

This Annual Report contains certain forward-looking statements regarding management's plans and objectives for future operations including plans and objectives relating to our planned marketing efforts and future economic performance. The forward-looking statements and associated risks set forth in this Annual Report include or relate to, among other things, (a) our growth strategies, (b) anticipated trends in our industry, (c) our ability to obtain and retain sufficient capital for future operations, and (d) our anticipated needs for working capital. These statements may be found under "Management's Discussion and Analysis or Plan of Operations" and "Business," as well as in this Annual Report generally. Actual events or results may differ materially from those discussed in forward-looking statements as a result of various factors, including, without limitation, the risks outlined under "Risk Factors" and matters described in this Annual Report generally. In light of these risks and uncertainties, there can be no assurance that the forward-looking statements contained in this Annual Report will in fact occur.

The forward-looking statements herein are based on current expectations that involve a number of risks and uncertainties. Such forward-looking statements are based on assumptions described herein. The assumptions are based on judgments with respect to, among other things, future economic, competitive and market conditions, and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond our control. Accordingly, although we believe that the assumptions underlying the forward-looking statements are reasonable, any such assumption could prove to be inaccurate and therefore there can be no assurance that the results contemplated in forward-looking statements will be realized. In addition, as disclosed elsewhere in the "Risk Factors" section of this prospectus, there are a number of other risks inherent in our business and operations which could cause our operating results to vary markedly and adversely from prior results or the results contemplated by the forward-looking statements. Management decisions, including budgeting, are subjective in many respects and periodic revisions must be made to reflect actual conditions and business developments, the impact of which may cause us to alter marketing, capital investment and other expenditures, which may also materially adversely affect our results of operations. In light of significant uncertainties inherent in the forward-looking information included in this prospectus, the inclusion of such information should not be regarded as a representation by us or any other person that our objectives or plans will be achieved.

Some of the information in this annual report contains forward-looking statements that involve substantial risks and uncertainties. Any statement in this prospectus and in the documents incorporated by reference into this prospectus that is not a statement of an historical fact constitutes a "forward-looking statement". Further, when we use the words "may", "expect", "anticipate", "plan", "believe", "seek", "estimate", "internal", and similar words, we intend to identify statements and expressions that may be forward-looking statements. We believe it is important to communicate certain of our expectations to our investors. Forward-looking statements are not guarantees of future performance. They involve risks, uncertainties and assumptions that could cause our future results to differ materially from those expressed in any forward-looking statements. Many factors are beyond our ability to control or predict. You are accordingly cautioned not to place undue reliance on such forward-looking statements. Important factors that may cause our actual results to differ from such forward-looking statements include, but are not limited to, the risk factors discussed herein.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable to small business issuers.

## ITEM 2. DESCRIPTION OF PROPERTY .

Our executive offices are located in Ashland, Oregon. The Company has additional offices located in Miami and Palm Gardens, Florida.

## ITEM 3. LEGAL PROCEEDINGS .

We are currently not involved in any litigation that we believe could have a materially adverse effect on our financial condition or results of operations with the exception of the Stephen J. Cole-Hatchard Frontline/Provo matter. This matter is currently being handled by the prior management of Provo. There is no action, suit, proceeding, inquiry, or investigation before or by any court, public board, government agency, self-regulatory organization, or body pending or, to the knowledge of the executive officers of our company or any of our subsidiaries, threatened against or affecting our company, our common stock, any of our subsidiaries, or of our company's or our company's subsidiaries' officers or directors in their capacities as such, in which an adverse decision could have a material adverse effect.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITIES HOLDERS

The dividend share distribution was voted on by Security Holders in May of 2010.

PART II

**ITEM 5. MARKET PRICE AND DIVIDENDS ON THE REGISTRANTS COMMON EQUITY AND OTHER SHAREHOLDER MATTERS** .

The Company's common stock is traded in the over-the-counter market, and quoted in the National Association of Securities Dealers over The Counter Bulletin Board under the symbol "CMSI."

The following table sets forth for the periods indicated the high and low bid quotations for our common stock. These quotations represent inter-dealer quotations, without adjustment for retail markup, markdown, or commission and may not represent actual transactions.

| Periods | High | | Low | |
|---|---|---|---|---|
| **Fiscal Year 2010** | | | | |
| First Quarter (January – March 2010) | $ | .022 | $ | .01 |
| Second Quarter (April – June 2010) | $ | .09 | $ | .01 |
| Third Quarter (July – September 2010) | $ | .035 | $ | .015 |
| Fourth Quarter (October – December 2010) | $ | .03 | $ | .014 |
| | | | | |
| **Fiscal Year 2009** | | | | |
| First Quarter (January – March 2009) | $ | 1.15 | $ | .05 |
| Second Quarter (April – June 2009) | $ | .60 | $ | .18 |
| Third Quarter (July – September 2009) | $ | .49 | $ | .15 |
| Fourth Quarter (October – December 2009) | $ | .33 | $ | .07 |

On January 6, 2011, the closing bid price of our common stock was $.012

Dividends

We may never pay any dividends to our shareholders. We did not declare any dividends for the year ended December 31, 2009. Our Board of Directors does not intend to distribute dividends in the near future. The declaration, payment and amount of any future dividends will be made at the discretion of the Board of Directors, and will depend upon, among other things, the results of our operations, cash flows and financial condition, operating and capital requirements, and other factors as the Board of Directors considers relevant. There is no assurance that future dividends will be paid, and if dividends are paid, there is no assurance with respect to the amount of any such dividend.

Transfer Agent

Our Transfer Agent and Registrar for the common stock is Island Stock Transfer.

Other Stock Matter

During the twelve months ended December 31, 2010, the Company issued shares to:

2,500,000 to Kyle Gotshalk and 2,500,000 to Cherish Adams for services rendered.

350,000 to Brad Hacker, 350,000 to Kyle Gotshalk, 350,000 to Michael Friedman and 350,000 to Cherish Adams all for services rendered.

4,400,000 - Ender Company Assets, Inc. ($100,000 Stock Purchase and Loan Agreement, of which $15,472 received to date and the remainder is a note receivable).

1,000,000 - Charm City Consultants ($35,000 Stock Purchase and Loan Agreement of which $17,500 received to date and the remainder is a note receivable).

940,000 - Spur Sherwood, LLC (Fees due for services rendered in the Ender/Charm City transactions)

312,887,016 dividend shares in June, 2010. The dividend shares were issued parapasue to all existing shareholders of the companies free trading and restricted common stock of record.

5,000,000 to B. Michael Friedman and 5,000,000 to Cherish Adams for Services rendered.

600,000 to Spur Sherwood, LLC (Final payment for services rendered)

5,000,000 to Charm City Consultants for payment as contracted for in a Consulting Agreement.

3,850,000 to Richard Maher (Stock Purchase and Loan Agreement).

The common stock of the Company is held by 251 shareholders as of March 4, 2011.

**ITEM 6. SELECTED FINANCIAL DATA.**

Not required for smaller reporting Companies

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OR PLAN OF OPERATION.**

The following is management's discussion and analysis of certain significant factors that have affected our financial position and operating results during the periods included in the accompanying consolidated financial statements, as well as information relating to the plans of our current management. This report includes forward-looking statements. Generally, the words "believes," "anticipates," "may," "will," "should," "expect," "intend," "estimate," "continue," and similar expressions or the negative thereof or comparable terminology are intended to identify forward-looking statements. Such statements are subject to certain risks and uncertainties, including the matters set forth in this report or other reports or documents we file with the Securities and Exchange Commission from time to time, which could cause actual results or outcomes to differ materially from those projected. Undue reliance should not be placed on these forward-looking statements which speak only as of the date hereof. We undertake no obligation to update these forward-looking statements.

The following discussion and analysis should be read in conjunction with our consolidated financial statements and the related notes thereto and other financial information contained elsewhere in this Form 10-K/A.

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Our management periodically evaluates the estimates and judgments made. Management bases its estimates and judgments on historical experience and on various factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates as a result of different assumptions or conditions.

RESULTS OF OPERATIONS

Fiscal Year Ended December 31, 2010, Compared to Fiscal Year Ended December 31, 2009

Sales increased from $1,559 for the year ended December 31, 2009 to $31,717 for the year ended December 31, 2010, primarily as a result of revenue from its LA Marketing subsidiary.

Selling, general and administrative expenses decreased from $423,407 for the year ended December 31, 2009 to $136,216 for the year ended December 31, 2010 due to costs associated with the issuance of stock to officers and consultants for services in 2009.

Net income increased to $(104,499) for the year ended December 31, 2010 from net income of $(421,848) for the year ended December 31, 2009, due to the above analysis of Income and Expenses.

Liquidity and Capital Resources

We are financing our operations and other working capital requirements principally from the receipt of proceeds from private placements of our securities and from interest income.

It is probable the Company will require additional capital in order to operate its business and there are no assurances the Company will be able to raise that capital in the future.

**Critical Accounting Policies**

Accounting Policies and Estimates

The preparation of our financial statements in conformity with accounting principles generally accepted in the United States of America requires our management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Our management periodically evaluates the estimates and judgments made. Management bases its estimates and judgments on historical experience and on various factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates as a result of different assumptions or conditions.

As such, in accordance with the use of accounting principles generally accepted in the United States of America, our actual realized results may differ from management's initial estimates as reported. A summary of significant accounting policies are detailed in notes to the financial statements which are an integral component of this filing.

Revenue Recognition

The Company recognizes revenue in accordance with the Securities and Exchange Commission, Staff Accounting Bulletin (SAB) No. 104, "Revenue Recognition" ("SAB No. 104"). SAB 104 clarifies application of generally accepted accounting principles related to revenue transactions. The Company also follows the guidance in EITF Issue No. 00-21, Revenue Arrangements with Multiple Deliverables ("EITF Issue No. 00-21"), in arrangements with multiple deliverables.

The Company recognizes revenues when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery of products and services has occurred, (3) the fee is fixed or determinable and (4) collectability is reasonably assured.

The Company receives revenue for consulting services, video streaming services, equipment sales and leasing, installation, and maintenance agreements. Sales and leasing agreement terms generally are for one year, and are renewable year to year thereafter. Revenue for consulting services is recognized as the services are provided to customers. For upfront payments and licensing fees related to contract research or technology, the Company determines if these payments and fees represent the culmination of a separate earnings process or if they should be deferred and recognized as revenue as earned over the life of the related agreement. Milestone payments are recognized as revenue upon achievement of contract-specified events and when there are no remaining performance obligations. Revenues from monthly video streaming agreements, as well as equipment maintenance, are recorded when earned. Operating equipment lease revenues are recorded as they become due from customers. Revenues from equipment sales and installation are recognized when equipment delivery and installation have occurred, and when collectability is reasonably assured.

In certain cases, the Company enters into agreements with customers that involve the delivery of more than one product or service. Revenue for such arrangements is allocated to the separate units of accounting using the relative fair value method in accordance with EITF Issue No. 00-21. The delivered item(s) is considered a separate unit of accounting if all of the following criteria are met: (1) the delivered item(s) has value to the customer on a standalone basis, (2) there is objective and reliable evidence of the fair value of the undelivered item(s) and (3) if the arrangement includes a general right of return, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor. If all the conditions above are met and there is objective and reliable evidence of fair value for all units of accounting in an arrangement, the arrangement consideration is allocated to the separate units of accounting based on their relative fair values.

Explicit return rights are not offered to customers; however, the Company may accept returns in limited circumstances. There have been no returns through December 31, 2010. Therefore, a sales return allowance has not been established since management believes returns will be insignificant.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not applicable to smaller reporting Companies

**ITEM 8. FINANCIAL STATEMENTS**

The audited financial statements of the Company required pursuant to this Item 8 are included in the Annual Report on Form 10-K/A, as a separate section commencing on page F-1 and are incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

The Company has engaged the services of Mr. Malcolm L. Pollard, Inc. located at 4845 W Lake Rd., Erie PA 16505 as the Company's Auditor, and has accepted the resignation of Mr. Larry O'Donnell, P.C. of Aurora, Colorado.

**ITEM 9A. CONTROLS AND PROCEDURES**

Our management team, under the supervision and with the participation of our principal executive officer and our principal financial officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (Exchange Act), as of the last day of the fiscal period covered by this report, December 31, 2010. The term disclosure controls and procedures means our controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our principal executive and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2010.

Our principal executive officer and our principal financial officer, are responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f). Management is required to base its assessment of the effectiveness of our internal control over financial reporting on a suitable, recognized control framework, such as the framework developed by the Committee of Sponsoring Organizations (COSO). The COSO framework, published in *Internal Control-Integrated Framework*, is known as the COSO Report. Our principal executive officer and our principal financial officer, have has chosen the COSO framework on which to base its assessment. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2010.

This annual report on Form 10-K/A does not include an attestation report of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit us to provide only management's report in this annual report on Form 10-K/A.

There were no changes in our internal control over financial reporting that occurred during the last quarter of 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

None.

**PART III**

**ITEM 10 DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Set forth below is information regarding the Company's current directors and executive officers. There are no family relationships between any of our directors or executive officers. The directors are elected annually by stockholders. The executive officers serve at the pleasure of the Board of Directors.:

| Name | Age | Positions Held and Tenure |
|---|---|---|
| B. Michael Friedman | 45 | Acting CEO |
| Cherish Adams | 35 | Director and President |

On May 29, 2008, the Company accepted the resignation of Stephen Goldberg as its sole director, Chief Executive Officer and President of the Company. On this same day, to fill the vacancy created by the resignation of Mr. Goldberg as the Company's sole director and officer, the Company appointed Cherish Adams as Chief Executive Officer, President and a director and Mary Radomsky as Treasurer, Secretary and a Director of the Company.

On January 2, 2008, the Company's board of directors appointed Kyle L. Gotshalk as an officer and Chief a director of the Company.

On May 29, 2008, the Company accepted the resignation of Stephen Goldberg as its sole director, Chief Executive Officer and President of the Company. On this same day, to fill the vacancy created by the resignation of Mr. Goldberg as the Company's sole director and officer, the Company appointed Cherish Adams as Chief Executive Officer, President and a director and Mary Radomsky as Treasurer, Secretary and a Director of the Company.

On January 2, 2009, the Company's board of directors appointed Kyle L. Gotshalk as a director and Chief Executive Officer of the Company.

On January 2, 2009, Cherish Adams resigned as Chief Executive Officer. To fill the vacancy created by the resignation of Cherish Adams as the Company's Chief Executive Office, the Company appointed Kyle Gotshalk as its Chief Executive Officer. The Company also on this same day appointed Mr. Gotshalk as its Vice President. Cherish Adams continues to serve the Company in the capacity as its President and as a Director.

On January 3, 2009, Cherish Adams resigned as Chief Executive Officer. To fill the vacancy created by the resignation of Cherish Adams as the Company's Chief Executive Office, the Company appointed Kyle Gotshalk as its Chief Executive Officer. The Company also on this same day appointed Mr. Gotshalk as its Vice President. Cherish Adams continues to serve the Company in the capacity as its President and as a Director.

On August 24, 2009 the board of directors voted to remove Mary Radomsky as Treasurer, Secretary and member of the Company's board of directors. The duties of Secretary and Treasurer were appointed to Cherish Adams.

On October 1, 2009 the board of directors of the Company appointed Harold Rustigan as a board member.

On May 22, 2010 the board of directors of the Company accepted the resignation of Kyle L. Gotshalk as a board member.

On August 29, 2010 the board of directors accepted the resignation of Harold Rustigan as a board member.

Cherish Adams , 35, formerly our CEO, was elected on May 29, 2008 to serve as our President and Director of Cannabis Medical Solutions, Inc. Contemporaneous with Cannabis Medical Solutions, Inc. Mrs. Adams received her Bachelor of Science Degree in Business Administration with a Concentration in Hotel, Restaurant, and Resort Management from the University of Southern Oregon, in Ashland, Oregon in 1997.

B. Michael Friedman, *45, CEO*, brings a twenty year chronicle of success driving benchmark setting growth and expansion for globally focused Fortune 500, Turnaround, and Start-up Companies. Mr. Friedman's financial experience includes private equity, mergers & acquisitions and financial consulting to over fifty publicly traded companies. Mr. Friedman has worked within the investment banking industry for Bear Stearns, The Millennium Opportunity Fund, and First Level Capital. He has degrees in Finance from the University of Florida.

The Company and Cherish Adams and B. Michael Friedman have entered into employment/compensation agreements. Cherish Adams and B. Michael Friedman have not been named to any committees of the Company's Board of Directors and any committees of the Company's Board of Directors to which Cherish Adams and B. Michael Friedman may be named have not been determined as of the filing of this report.

**Audit Committee Financial Expert**

The Company does not have an audit committee or a compensation committee of its board of directors. In addition, the Company's board of directors has determined that the Company does not have an audit committee financial expert serving on the board. When the Company develops its operations, it will create an audit and a compensation committee and will seek an audit committee financial expert for its board and audit committee.

**Conflicts of Interest**

Members of our management are associated with other firms involved in a range of business activities. Consequently, there are potential inherent conflicts of interest in their acting as officers and directors of our company. Although the officers and directors are engaged in other business activities, we anticipate they will devote an important amount of time to our affairs.

15

Our officers and directors are now and may in the future become shareholders, officers, or directors of other companies, which may be formed for the purpose of engaging in business activities similar to ours. Accordingly, additional direct conflicts of interest may arise in the future with respect to such individuals acting on behalf of us or other entities. Moreover, additional conflicts of interest may arise with respect to opportunities which come to the attention of such individuals in the performance of their duties or otherwise. Currently, we do not have a right of first refusal pertaining to opportunities that come to their attention and may relate to our business operations.

Our officers and directors are, so long as they are our officers or directors, subject to the restriction that all opportunities contemplated by our plan of operation which come to their attention, either in the performance of their duties or in any other manner, will be considered opportunities of, and be made available to us and the companies that they are affiliated with on an equal basis. A breach of this requirement will be a breach of the fiduciary duties of the officer or director. If we or the companies with which the officers and directors are affiliated both desire to take advantage of an opportunity, then said officers and directors would abstain from negotiating and voting upon the opportunity. However, all directors may still individually take advantage of opportunities if we should decline to do so. Except as set forth above, we have not adopted any other conflict of interest policy with respect to such transactions.

**Compliance With Section 16(A) Of The Exchange Act 9.A. Directors And Executive Officers, Promoters, And Control Persons:**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our executive officers, directors, and persons who own more than 10% of a registered class of our equity securities to file certain reports with the SEC regarding ownership of, and transactions in, our securities. Such officers, directors, and 10% shareholders are also required by the SEC to furnish us with all Section 16(a) forms that they file.

Based solely on our review of such forms furnished to us and written representations from certain reporting persons, we believe that all filing requirements applicable to our executive officers, directors, and more than 10% stockholders were not complied with during the fiscal year ended December 31, 2010.

**Code of Ethics**

We have adopted a code of ethics that applies to all of our executive officers, directors, and employees. Code of ethics codifies the business and ethical principles that govern all aspects of our business. This document will be made available in print, free of charge, to any shareholder requesting a copy in writing from the Company.

**ITEM 11 EXECUTIVE COMPENSATION.**

The following table sets forth for the year ended December 31, 2010 and 2009 compensation awarded to, paid to, or earned by, our Chief Executive Officer, and our other most highly compensated executive officers whose total compensation during the last fiscal year exceeded $100,000, if any.

| | | | Annual Compensation | | Other Annual | Long Term Compensation | | | All Other |
| | | | | | | Restricted Stock Options/LTIP | | | |
| Name | Title | Year | Salary | Bonus | Compensation | Awarded | SARs (#) | payouts ($) | Compensation |
|---|---|---|---|---|---|---|---|---|---|
| Cherish Adams Gotshalk | President | 2010 2009 | $ 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |

2,850,000 shares of common stock issued to Kyle Gotshalk
7,850,000 shares of common stock issued to Cherish Adams
5,350,000 shares of common stock issued to B. Michael Friedman

**Outstanding Equity Awards At Fiscal Year-End Table**

None.

**Option Exercises And Stock Vested Table**

None.

16

**PENSION BENEFITS TABLE**

None.

**Nonqualified Deferred Compensation Table**

None.

**All Other Compensation Table**

None.

**Perquisites Table**

None.

There are no existing or planned option/SAR grants.

**Employment Agreements**

Mrs. Adams entered into an employment agreement effective January 1, 2009 until December 31, 2011. The terms are as follows:

a) For the services of the Executive to be rendered under this Agreement, the Company shall pay the Executive an annual salary of 365,000 shares at a base value of $56,000.00 (the Base Salary"). This Base Salary shall be reviewed each year for the first two years to make sure it does not encumber the company providing the company is not generating revenue and profit and if the Board decides that it is too much of a liability, it will adjust the salary accordingly. However, if the Company is profitable, The Base Salary shall be increased each year by an amount equal to the cost of living increase based upon the Consumer Price Index calculated upon the commencement of each year of the Agreement using the prior month as the measuring month published by the Bureau of Labor Statistics (or similar successor index.

b) Signing Bonus – The Executive shall receive 2.5 Million shares of Common Stock.

c) Discretionary Bonus. The Executive shall be eligible to receive an annual bonus in an amount to be determined by the board of directors based on any criteria or factors the board of directors deems appropriate with each new company acquisition that the Executive consummates and with sales volume increases.

d) Stock Options. The Executive shall receive options to purchase 3,000,000 shares of the Company's common stock exercisable at $.25 per share, or 75% of the trailing 10-day bid price. The options shall vest over a three year period in equal increments each June 30 and December 31, subject to continued employment.

**Options/SAR Grants in Last Fiscal Year**

None.

**Aggregated Option Exercises and Fiscal Year-End Option Value Table**

None.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.**

The following table lists stock ownership of our Common Stock as of December 31, 2010. The information includes beneficial ownership by (i) holders of more than 5% of our Common Stock, (ii) each of our directors and executive officers and (iii) all of our directors and executive officers as a group. Except as noted below, to our knowledge, each person named in the table has sole voting and investment power with respect to all shares of our Common Stock beneficially owned by them.

| Name and Address | Number of Shares Beneficially Owned (1) | Percentage of Shares Beneficially Owned (1) |
|---|---|---|
| B. Michael Friedman 4400 PGA BLVD, SUITE 900 Palm Beach Gardens, FL 33410 | 67,010,000 | 18.50% |
| Cherish Adams 100 Myer Creek Road Ashland, OR 97520 | 53,475,980 | 14.76% |
| All directors and executive officers as a group (2 persons) | 120,485,980 | 33.26% |

(1)   Based on a total of an aggregate of 362,102,240 shares of capital stock, consisting of 362,102,240 issued and outstanding shares of common stock and warrants to purchase -0- shares of common stock.

**Changes in Control**

There were no significant changes in control for the period ending December 31, 2010.

**DESCRIPTION OF SECURITIES**

**General**

Our authorized capital stock consists of 500,000,000 shares of common stock, par value $ .01

**Common Stock**

The shares of our common stock presently outstanding, and any shares of our common stock issues upon exercise of stock options and/or warrants, will be fully paid and non-assessable. Each holder of common stock is entitled to one vote for each share owned on all matters voted upon by shareholders, and a majority vote is required for all actions to be taken by shareholders. In the event we liquidate, dissolve or wind-up our operations, the holders of the common stock are entitled to share equally and ratably in our assets, if any, remaining after the payment of all our debts and liabilities and the liquidation preference of any shares of preferred stock that may then be outstanding. The common stock has no preemptive rights, no cumulative voting rights, and no redemption, sinking fund, or conversion provisions. Since the holders of common stock do not have cumulative voting rights, holders of more than 50% of the outstanding shares can elect all of our Directors, and the holders of the remaining shares by themselves cannot elect any Directors. Holders of common stock are entitled to receive dividends, if and when declared by the Board of Directors, out of funds legally available for such purpose, subject to the dividend and liquidation rights of any preferred stock that may then be outstanding.

**Voting Rights**

Each holder of Common Stock is entitled to one vote for each share of Common Stock held on all matters submitted to a vote of stockholders.

**Dividends**

Subject to preferences that may be applicable to any then-outstanding shares of Preferred Stock, if any, and any other restrictions, holders of Common Stock are entitled to receive ratably those dividends, if any, as may be declared from time to time by the Company's board of directors out of legally available funds. The Company and its predecessors have not declared any dividends in the past. Further, the Company does not presently contemplate that there will be any future payment of any dividends on Common Stock.

**Amendment of our Bylaws**

Our bylaws may be adopted, amended or repealed by the affirmative vote of a majority of our outstanding shares. Subject to applicable law, our bylaws also may be adopted, amended or repealed by our board of directors.

**Transfer Agent**

Island Stock Transfer serves in the capacity of transfer agent.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDPENDENCE.**

No officer, director, promoter, or affiliate of Cannabis Medical Solutions, Inc. has or proposes to have any direct or indirect material interest in any asset held by Cannabis Medical Solutions, Inc. through security holdings, contracts, options, or otherwise.

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

**Fiscal 2009**

(1) Audit Fees

The aggregate fees billed by the independent accountants for the last fiscal year for professional services for the audit of the Company's annual financial statements and the review included in the Company's Form 10-Q and services that are normally provided by the accountants in connection with statutory and regulatory filings or engagements for those fiscal years were $7,500.

(2) Audit-Related Fees

The aggregate fees billed in each of the last two fiscal years for assurance and related services by the principal accountants that are reasonably related to the performance of the audit or review of the Company's financial statements and are not reported under Item 9 (e) (1) of Schedule 14A was NIL.

(3) Tax Fees

The aggregate fees billed in each of the last two fiscal years for professional services rendered by the principal accountants for tax compliance, tax advice, and tax planning was $1,000.

(4) All Other Fees

There were no other fees charged by the principal accountants other than those disclosed in (1) and (3) above.

**Fiscal 2010**

(1) Audit Fees

The aggregate fees billed by the independent accountants for the last fiscal year for professional services for the audit of the Company's annual financial statements and the review included in the Company's Form 10-Q and services that are normally provided by the accountants in connection with statutory and regulatory filings or engagements for those fiscal years were $11,250.

(2) Audit-Related Fees

The aggregate fees billed in each of the last two fiscal years for assurance and related services by the principal accountants that are reasonably related to the performance of the audit or review of the Company's financial statements and are not reported under Item 9 (e) (1) of Schedule 14A was NIL.

(3) Tax Fees

The aggregate fees billed in each of the last two fiscal years for professional services rendered by the principal accountants for tax compliance, tax advice, and tax planning was $1,000.

(4) All Other Fees

There were no other fees charged by the principal accountants other than those disclosed in (1) and (3) above.

Audit Committee's Pre-approval Policies

At the present time, there are not sufficient directors, officers and employees involved with Commerce Online to make any pre-approval policies meaningful. Once Commerce Online has elected more directors and appointed directors and non-directors to the Audit Committee it will have meetings and function in a meaningful manner.

Audit Hours Incurred

The principal accountants spent approximately 50 percent of the total hours spent on the accounting. The hours were about equal to the hours spent by the Company's internal accountant.

The Board of Directors has reviewed and discussed with the Company's management and independent registered public accounting firm the audited consolidated financial statements of the Company contained in the Company's Annual Report on Form 10-K/A for the Company's 2010 fiscal year. The Board has also discussed with the auditors the matters required to be discussed pursuant to SAS No. 61 (Codification of Statements on Auditing Standards, AU Section 380), which includes, among other items, matters related to the conduct of the audit of the Company's consolidated financial statements.

The Board has received and reviewed the written disclosures and the letter from the independent registered public accounting firm required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), and has discussed with its auditors its independence from the Company. The Board has considered whether the provision of services other than audit services is compatible with maintaining auditor independence.

Based on the review and discussions referred to above, the Board approved the inclusion of the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K/A for its 2008 fiscal year for filing with the SEC.

Pre-Approval Policies

The Board's policy is now to pre-approve all audit services and all permitted non-audit services (including the fees and terms thereof) to be provided by the Company's independent registered public accounting firm; provided, however, pre-approval requirements for non-audit services are not required if all such services (1) do not aggregate to more than five percent of total revenues paid by the Company to its accountant in the fiscal year when services are provided; (2) were not recognized as non-audit services at the time of the engagement; and (3) are promptly brought to the attention of the Board and approved prior to the completion of the audit.

The Board pre-approved all fees described above.

**PART IV**

**ITEM 15. EXHIBITS AND REPORTS.**

**Exhibits**

31.1    Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act. (2)

31.2    Certification of Principal Financial and Accounting Officer Pursuant to Section 302 of the Sarbanes-Oxley Act. (2)

32.1    Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act. (2)

32.2    Certification of Chief Accounting Officer Pursuant to Section 906 of the Sarbanes-Oxley Act. (2)

(2) Filed herein.

(a) (3) EXHIBITS

The exhibits require to be filed herewith by Item 601 of Regulation S-B, as described in the following index of exhibits, are incorporated herein by reference, as follows:

**Signatures**

In accordance with the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements of filing on Form 10-K/A and authorized this registration statement to be signed on its behalf by the undersigned, on the 7th day of March, 2011.

**Cannabis Medical Solutions, Inc.**

*/S/ Cherish Adams*
Cherish Adams
(President)

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Cherish Adams*<br>Name: Cherish Adams | President | April 5, 2011 |

21

PART F/S. FINANCIAL STATEMENTS.

CANNABIS MEDICAL SOLUTIONS, INC.

Report of Independent Registered Public Accounting Firm                                      F-2

Consolidated Financial Statements:

Consolidated Balance Sheets as of December 31, 2010 and 2009                                   F-3

Consolidated Statements of Operations for the years ended December 31, 2010 and 2009          F-4

Consolidated Statements of Cash Flows for the years ended December 31, 2010 and 2009          F-5

Consolidated Statements of Stockholders' Equity for the years ended December 31, 2010 and 2009  F-6

Notes to Consolidated Financial Statements                                                    F-7

F-1

***MALCOLM L. POLLARD,* Inc .**
**4845 W. LAKE ROAD, # 119**
**ERIE, PA 16505**
**(814)838-8258**
**FAX (814)838-8452**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders of:
Cannabis Medical Solutions, Inc.
Ashland, Oregon

We have audited the accompanying balance sheets of Cannabis Medical Solutions, Inc. as of December 31, 2010 and 2009 and, and the related statements of operations and members' deficiency, and cash flows for the years ended December 31, 2010 and 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conduct our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion

The Company has not generated significant revenues or profits to date. This factor, among others, raises substantial doubt about its ability to continue as a going concern. The Company's continuation as a going concern depends upon its ability to generate sufficient cash flow to conduct its operations and its ability to obtain additional sources of capital and financing. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company at December 31, 2010 , the results of its operations, changes in stockholders' equity, and its cash flows for the years ended December 31, 2010 and 2009, in conformity with U.S. generally accepted accounting standards.

*/s/ Malcolm L. Pollard, Inc.*

Malcolm L. Pollard, Inc.
Erie, Pennsylvania
April 4, 2011

F-2

**CANNABIS MEDICAL SOLUTIONS, INC.**
**Consolidated Balance Sheets**

|  | December 31, 2010 | December 31, 2009 |
|---|---|---|
| ASSETS |  |  |
| Current Assets: |  |  |
| Cash and Cash Equivalents | $ 282 | $ 1,508 |
| Notes Receivable | 121,182 | - |
| Total Current Assets | 121,464 | 1,508 |
| Other Assets | 122,364 | 112,364 |
| TOTAL ASSETS | $ 243,827 | 113,872 |
| LIABILITIES AND STOCKHOLDERS' EQUITY |  |  |
| CURRENT LIABILITIES |  |  |
| Accounts payable and accrued expenses | $ - | $ 57,668 |
| Due to related party | - | 82,286 |
| Notes payable | - | 7,316 |
| Total Current Liabilities | - | 147,270 |
| STOCKHOLDERS' EQUITY |  |  |
| Common stock, $.01 par value; 500,000,000 shares authorized, 347,652,240 and 19,707,678, issued and outstanding at December 31, 2010 and December 31, 2009 | 3,476,522 | 197,076 |
| Additional paid in capital | 371,755 | 140,607 |
| Dividends issued | (3,128,870) | - |
| Accumulated deficit | (475,580) | (371,081) |
| Total Stockholders' Equity | 243,827 | (33,398) |
| Total Liabilities & Stockholders' Equity | $ 243,827 | $ 113,872 |

**See accompanying notes to the Consolidated Financial Statements**

F-3

**CANNABIS MEDICAL SOLUTIONS, INC.**
**Consolidated Statements of Operations**

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Sales | $ 31,717 | $ 1,559 |
| Cost of Sales | -- | -- |
| Gross Profit | 31,717 | 1,559 |
| Selling, General and Administrative Expenses | 136,216 | 423,407 |
| Income From Operations | (104,499) | (421,848) |
| Loss from Continuing Operations Before Income Taxes | (104,499) | (421,848) |
| Income Taxes Provision | — | — |
| Net Loss From Continued Operations | (104,499) | (421,848) |
| Income From Discontinued Operations Net of Income Tax Benefit of $0 in 2009 | — | — |
| | $ (104,499) | $ (421,848) |
| Net Loss | | |
| Loss Per Share- | | |
| Basic and Diluted Loss Per Share: | | |
| Continuing Operations | $ (0.00) | $ (0.00) |
| Discontinued Operations | $ (0.00) | $ (0.00) |
| Net Loss Per Share | $ (0.00) | $ (0.02) |
| Weighted Average Common Shares Outstanding - Basic and Diluted | 183,679,959 | 20,907,678 |

**See accompanying notes to the Consolidated Financial Statements**

F-4

**CANNABIS MEDICAL SOLUTIONS, INC.**
**Consolidated Statements of Cash Flows**

| | Years Ended December 31, | | | |
| --- | ---: | --- | ---: | --- |
| | 2010 | | 2009 | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Net loss | $ | (104,499) | $ | (421,848) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Stock issued for compensation and consulting services | | — | | 377,150 |
| Changes in operating assets and liabilities: | | | | |
| Increase/Decrease in: | | | | |
| Notes Receivable | | (121,182) | | |
| Other Assets | | (10,000) | | (21,220) |
| Accounts payable and accrued expenses | | (57,668) | | (29,443) |
| Due to related party | | (82,286) | | - |
| Notes payable | | (7,316) | | - |
| Net Cash Used In Operating Activities | | (382,951) | | (95,361) |
| Cash Flows From Investing Activities | | | | |
| Fixed Assets Purchased | | -- | | -- |
| Net Cash Provided By Investing Activities | | -- | | -- |
| Cash Flows From Financing Activities | | | | |
| Issuance of dividends | | (3,128,870) | | - |
| Proceeds from Related Party | | - | | 71,869 |
| Proceeds from Warrant s | | 3,510,594 | | 25,000 |
| Net Cash Provided by Financing Activities | | 381,724 | | 96,869 |
| | | | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | | (1,227) | | 1,508 |
| CASH AND CASH EQUIVALENTS, BEGINNING | | 1,508 | | 0 |
| | | | | |
| CASH AND CASH EQUIVALENTS, ENDING | $ | 282 | $ | 1,508 |

SUPPLEMENTAL DISCLOSURE OF CASH FLOWS INFORMATION:

**See accompanying notes to the Consolidated Financial Statements**

F-5

**CANNABIS MEDICAL SOLUTIONS, INC.**
**STATEMENT OF CHANGES IN SHAREHOLDER EQUITY**
**FOR THE YEAR ENDED DECEMBER 31, 2009 AND 2010**

| | Common Stock | | Additional Paid in | Dividends | Retained | Total |
|---|---|---|---|---|---|---|
| | Quantity | Amount | Capital | Issued | Earnings | Equity |
| **Balance at December 31, 2008** | 872,678 | $ 197,076 | $140,607 | $ - | $ (371,081) | $ (33,398) |
| Stock Issued for Acquisition | 16,195,000 | 16,195 | - | - | - | 16,195 |
| Stock Issued for services and compensation | 2,640,000 | - | - | - | - | - |
| | | | | | | - |
| Net Income | - | - | - | - | - | - |
| **Balance at December 31, 2009** | 19,707,678 | $ 213,271 | $ 140,607 | $ - | $ (371,081) | $ (17,203) |
| | | | | | | |
| Stock Issued for services and compensation | 15,057,546 | 134,381 | 231,148 | - | - | 365,529 |
| Stock Issued for Dividends | 312,887,016 | 3,128,870 | - | (3,128,870) | - | 0 |
| Stock issued for services rendered | - | - | - | - | - | - |
| Net Income | - | - | - | - | (104,499) | (104,499) |
| **Balance at December 31, 2010** | 347,652,240 | $3,476,522 | $ 371,755 | $(3,128,870) | $ (475,580) | $ 243,827 |

**See accompanying notes to the Consolidated Financial Statements**

F-6

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 - ORGANIZATION AND CAPITALIZATION

BUSINESS

Cannabis Medical Solutions, Inc., (referred to hereafter as "CMSI," or, the "Company"), was initially incorporated under the laws of the State of Delaware in February 1997 under the name Easy Street Online, Inc., as successor to each of Hobbes & Co., LLC ("Hobbes"), INET Communications Company, LLC ("INET") and Sara Girl & Co., LLC ("Sara Girl").

In August of 1997, the Company changed its name to Frontline Communications Corp. ("Frontline") and operated as a regional Internet service provider ("ISP") providing Internet access, web hosting, website design, and related services to residential and small business customers throughout the Northeast United States and, through a network partnership agreement, Internet access to customers nationwide. Frontline traded on the American Stock Exchange under the symbol "FNT."

On April 3, 2003, Frontline acquired Proyecciones y Ventas Organizadas, S.A. de C.V. ("Provo Mexico") and in December 2003 changed its name to "Provo International Inc." ("Provo"). Provo was organized into three distinct divisions: (1) Provo International, which was responsible for overseeing mergers, acquisitions, financing transactions and regulatory compliance activities (2) Provo US, a division of Provo, was responsible for the continued management of the Internet service business, which was its core business prior to its acquisition of (3) Provo Mexico, a wholly owned subsidiary of Provo International, which distributed prepaid calling cards and cellular phone airtime in Mexico.

In March 2009, Provo changed its name to Ebenefits Direct, Inc., which, through its wholly-owned subsidiary, L.A. Marketing Plans, LLC, ("LAMP"), is a company currently engaged in the business of direct response marketing. LAMP markets and sells non-insurance healthcare programs designed to complement medical insurance products and to provide savings for those who cannot afford or qualify for traditional health insurance products.

On October 14, 2008, Ebenefits Direct, Inc. changed its name to Seraph Security, Inc. and continues to operate the LAMP business, and eCommerce a credit and debit card processing company.

On May 20, 2009, Seraph Security, Inc. changed its name to Commerce Online, Inc. to more accurately reflect its core business.

As of March 4, 2010 Commerce Online,Inc. changed its name to Cannabis Medical Solutions, Inc.

March 8, 2010 the company completed the acquisition of 800 Commerce, Inc., a Florida Corporation. The company issued 1,000,000 shares of common stock for all the issued and outstanding stock of 800 Commerce, Inc. 800 Commerce, Inc. is a payment processing company with offices located in Florida and Tennessee.

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION

The consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP"). All material intercompany balances and transactions have been eliminated

USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amount of revenues and expenses during the reported period. Actual results could differ from those estimates.

CASH AND CASH EQUIVALENTS

The Company considers all highly liquid investments with an original term of three months or less to be cash equivalents.

F-7

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CONCENTRATION OF CREDIT RISK

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash. The Company maintains cash balances at one financial institution, which is t insured by the Federal Deposit Insurance Corporation ("FDIC"). The FDIC insured institution insures up to $250,000 on account balances. The amounts that are not insured by FDIC limitations are held in short-term securities. The company has not experienced any losses in such accounts.

ACCOUNTS RECEIVABLE

The Company extends credit to its customers in the normal course of business. Further, the Company regularly reviews outstanding receivables, and provides estimated losses through an allowance for doubtful accounts. In evaluating the level of established loss reserves, the Company makes judgments regarding its customers' ability to make required payments, economic events and other factors. As the financial condition of these parties change, circumstances develop or additional information becomes available, adjustments to the allowance for doubtful accounts may be required. The Company also performs ongoing credit evaluations of customers' financial condition. The Company maintains reserves for potential credit losses, and such losses traditionally have been within its expectations.

IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF

The Company accounts for the impairment of long-lived assets in accordance with Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" ("SFAS No. 144"). SFAS No. 144 requires write-downs to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amount.

For purposes of evaluating the recoverability of long-lived assets to be held and used, a recoverability test is performed based on assumptions concerning the amount and timing of estimated future cash flows reflecting varying degrees of perceived risk. Impairments to long-lived assets to be disposed of are recorded based upon the fair value of the applicable assets. Since judgment is involved in determining the fair value and useful lives of long-lived assets, there is a risk that the carrying value of our long-lived assets may be overstated or understated. Management believes that a change in any material underlying assumptions would not by itself result in the need to impair an asset.

If the long-lived assets are identified as being planned for disposal or sale, they would be separately presented in the balance sheet and reported at the lower of the carrying amount or fair value less costs to sell, and are no longer depreciated. The assets and liabilities of a disposed group classified as held for sale would be presented separately in the appropriate asset and liability sections of the balance sheet. As of December 31, 2010 this does not apply.

GOODWILL AND OTHER INTANGIBLE ASSETS

In June 2001, the FASB issued Statement No. 142 Goodwill and Other Intangible Assets. This statement addresses financial accounting and reporting for acquired goodwill and other intangible assets and supersedes APB Opinion No. 17, Intangible Assets. It addresses how intangible assets that are acquired individually or with a group of other assets (but not those acquired in a business combination) should be accounted for in financial statements upon their acquisition. This Statement also addresses how goodwill and other intangible assets should be accounted for after they have been initially recognized in the financial statements.

Goodwill and intangible assets with indefinite useful lives are not amortized. Intangible assets with finite useful lives are amortized generally on a straight-line basis over the periods benefited, with a weighted average useful life of 15 years.

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

In performing this assessment, management uses the income approach and the similar transactions method of the market approach to develop the fair value of the acquisition in order to assess its potential impairment of goodwill. The income approach is based on a discounted cash flow model which relies on a number of factors, including operating results, business plans, economic projections and anticipated future cash flows. Rates used to discount future cash flows are dependent upon interest rates and the cost of capital at a point in time. The similar transactions method is a market approach methodology in which the fair value of a business is estimated by analyzing the prices at which companies similar to the subject, which are used as guidelines, have sold in controlling interest transactions (mergers and acquisitions). Target companies are compared to the subject company, and multiples paid in transactions are analyzed and applied to subject company data, resulting in value indications. Comparability can be affected by, among other things, the product or service produced or sold, geographic markets served, competitive position, profitability, growth expectations, size, risk perception, and capital structure. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

REVENUE RECOGNITION

The Company recognizes revenue in accordance with the Securities and Exchange Commission, Staff Accounting Bulletin (SAB) No. 104, "Revenue Recognition" ("SAB No. 104"). SAB 104 clarifies application of generally accepted accounting principles related to revenue transactions. The Company also follows the guidance in EITF Issue No. 00-21, Revenue Arrangements with Multiple Deliverables ("EITF Issue No. 00-21"), in arrangements with multiple deliverables.

The Company recognizes revenues when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery of products and services has occurred, (3) the fee is fixed or determinable and (4) collectability is reasonably assured.

The Company receives revenue for consulting services, video streaming services, equipment sales and leasing, installation, and maintenance agreements. Sales and leasing agreement terms generally are for one year, and are renewable year to year thereafter. Revenue for consulting services is recognized as the services are provided to customers. For upfront payments and licensing fees related to contract research or technology, the Company determines if these payments and fees represent the culmination of a separate earnings process or if they should be deferred and recognized as revenue as earned over the life of the related agreement. Milestone payments are recognized as revenue upon achievement of contract-specified events and when there are no remaining performance obligations. Revenues from monthly video streaming agreements, as well as equipment maintenance, are recorded when earned. Operating equipment lease revenues are recorded as they become due from customers. Revenues from equipment sales and installation are recognized when equipment delivery and installation have occurred, and when collectability is reasonably assured.

In certain cases, the Company enters into agreements with customers that involve the delivery of more than one product or service. Revenue for such arrangements is allocated to the separate units of accounting using the relative fair value method in accordance with EITF Issue No. 00-21. The delivered item(s) is considered a separate unit of accounting if all of the following criteria are met: (1) the delivered item(s) has value to the customer on a standalone basis, (2) there is objective and reliable evidence of the fair value of the undelivered item(s) and (3) if the arrangement includes a general right of return, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor. If all the conditions above are met and there is objective and reliable evidence of fair value for all units of accounting in an arrangement, the arrangement consideration is allocated to the separate units of accounting based on their relative fair values.

Explicit return rights are not offered to customers; however, the Company may accept returns in limited circumstances. There have been no returns through December 31, 2010. Therefore, a sales return allowance has not been established since management believes returns will be insignificant.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for major betterments and additions are capitalized, while replacement, maintenance and repairs, which do not extend the lives of the respective assets, are currently charged to expense. Any gain or loss on disposition of assets is recognized currently in the statement of income.

F-9

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company's financial instruments consist primarily of cash, accounts payable and accrued expenses, and debt. The carrying amounts of such financial instruments approximate their respective estimated fair value due to the short-term maturities and approximate market interest rates of these instruments. The estimated fair value is not necessarily indicative of the amounts the Company would realize in a current market exchange or from future earnings or cash flows.

INCOME TAXES

The Company accounts for income taxes using SFAS No. 109, "Accounting for Income Taxes," which requires recognition of deferred tax liabilities and assets for expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax liabilities and assets are determined based on the difference between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. A valuation allowance is recorded for deferred tax assets if it is more likely than not that some portion or all of the deferred tax assets will not be realized.

The Company adopted Financial Accounting Standards Board ("FASB") Interpretation No. (FIN) 48, "Accounting for Uncertainty in Income Taxes." FIN 48 clarifies the accounting for uncertainty in income taxes recognized in financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 requires that the Company determine whether the benefits of the Company's tax positions are more likely than not of being sustained upon audit based on the technical merits of the tax position. The provisions of FIN 48 also provide guidance on de-recognition, classification, interest and penalties, accounting in interim periods, and disclosure. The Company did not have any unrecognized tax benefits and there was no effect on the financial condition or results of operations as a result of implementing FIN 48. The Company does not have any interest and penalties in the statement of operations for the years ended December 31, 2009 and 2008.

In May 2009, the FASB issued FASB Staff Position No. FIN 48-1, *Definition of Settlement in FASB Interpretation No. 48* ("the FSP"). The FSP provides guidance about how an enterprise should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. Under the FSP, a tax position could be effectively settled on completion of examination by a taxing authority if the entity does not intend to appeal or litigate the result and it is remote that the taxing authority would examine or re-examine the tax position. The Company does not expect that this interpretation will have a material impact on its financial position, results of operations, or cash flows.

EARNINGS (LOSS) PER SHARE

Earnings (loss) per share is computed in accordance with SFAS No. 128, "Earnings per Share". Basic earnings (loss) per share is computed by dividing net income (loss), after deducting preferred stock dividends accumulated during the period, by the weighted-average number of shares of common stock outstanding during each period. Diluted earnings per share is computed by dividing net income by the weighted-average number of shares of common stock, common stock equivalents and other potentially dilutive securities outstanding during the period. The outstanding warrants for the years ended December 31, 2010 and 2009, respectively are anti-dilutive and therefore are not included in earnings (loss) per share.

ACCOUNTING FOR STOCK-BASED COMPENSATION

The Company adopted SFAS No. 123R, "Accounting for Stock-Based Compensation". This statement requires a public entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award (with limited exceptions). That cost will be recognized over the period during which an employee is required to provide service.

In addition, a public entity is required to measure the cost of employee services received in exchange for an award of liability instruments based on its current fair value. The fair value of that award has been remeasured subsequently at each reporting date through the settlement date. Changes in fair value during the requisite service period will be recognized as compensation cost over that period.

For the year ended December 31, 2010 and 2009, the Company did not grant any stock options.

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

NON-EMPLOYEE STOCK BASED COMPENSATION

The cost of stock based compensation awards issued to non-employees for services are recorded at either the fair value of the services rendered or the instruments issued in exchange for such services, whichever is more readily determinable, using the measurement date guidelines enumerated in Emerging Issues Task Force Issue ("EITF") 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services" ("EITF 96-18").

COMMON STOCK PURCHASE WARRANTS

The Company accounts for common stock purchase warrants in accordance with the provisions of Emerging Issues Tack Force Issue ("EITF") issue No. 00-19 "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19"). Based on the provisions of EITF 00-19, the Company classifies as equity any contracts that (i) require physical settlement or net-share settlement, or (ii) gives the company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the company), or (ii) give the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement).

NOTE 3 - RECENT ACCOUNTING PRONOUNCEMENTS

In September 2006, the FASB issued SFAS No. 157, which is effective for fiscal years beginning after November 15, 2009 and for interim periods within those years. This statement defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements. This statement applies under other accounting pronouncements that require or permit fair value measurements. The statement indicates, among other things, that a fair value measurement assumes that the transaction to sell an asset or transfer a liability occurs in the principal market for the asset or liability or, in the absence of a principal market, the most advantageous market for the asset or liability. SFAS 157 defines fair value based upon an exit price model. Relative to SFAS 157, the FASB issued FSP FAS 157-1, FAS 157-2, and FAS 157-3. FSP FAS 157-1 amends SFAS 157 to exclude SFAS 13 and its related interpretive accounting pronouncements that address leasing transactions, while FSP FAS 157-2 delays the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis. FSP FAS 157-3 clarifies the application of SFAS 157 as it relates to the valuation of financial assets in a market that is not active for those financial assets. This FSP is effective immediately and includes those periods for which financial statements have not been issued. We currently do not have any financial assets that are valued using inactive markets, and as such are not impacted by the issuance of this FSP. We adopted SFAS 157 as of January 1, 2008, with the exception of the application of the statement to non-recurring nonfinancial assets and nonfinancial liabilities.

In February 2009, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities. SFAS No. 159 permits entities to choose to measure eligible financial instruments at fair value. The unrealized gains and losses on items for which the fair value option has been elected should be reported in earnings. The decision to elect the fair value options is determined on an instrument by instrument basis, it should be applied to an entire instrument, and it is irrevocable. Assets and liabilities measured at fair value pursuant to the fair value option should be reported separately in the balance sheet from those instruments measured using another measurement attribute. SFAS No. 159 is effective as of the beginning of the first fiscal year that begins after November 15, 2009. The Company has adapted SFAS No. 159 to its consolidated financial statements. The adoption of this standard has no material effect on the Company's consolidated financial statements.

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 3 - RECENT ACCOUNTING PRONOUNCEMENTS (CONTINUED)

In December 2009, the FASB issued SFAS No. 141 (revised 2009), "Business Combinations" (SFAS 141(R)), which replaces SFAS No. 141, "Business Combinations" (SFAS 141). SFAS 141(R) retains the underlying concepts of SFAS 141 in that all business combinations are still required to be accounted for at fair value under the acquisition method of accounting but SFAS 141(R) changed the method of applying the acquisition method in a number of significant aspects. Acquisition costs will generally be expensed as incurred; noncontrolling interests will be valued at fair value at the acquisition date; in-process research and development will be recorded at fair value as an indefinite-lived intangible asset at the acquisition date, until either abandoned or completed, at which point the useful lives will be determined; restructuring costs associated with a business combination will generally be expensed subsequent to the acquisition date; and changes in deferred tax asset valuation allowances and income tax uncertainties after the acquisition date generally will affect income tax expense. SFAS 141(R) is effective on a prospective basis for all business combinations for which the acquisition date is on or after the beginning of the first annual period subsequent to December 15, 2008, with the exception of the accounting for valuation allowances on deferred taxes and acquired tax contingencies. SFAS 141(R) amends SFAS No. 109, "Accounting for Income Taxes" (SFAS 109) such that adjustments made to valuation allowances on deferred taxes and acquired tax contingencies associated with acquisitions that closed prior to the effective date of SFAS 141(R) would also apply the provisions of SFAS 141(R). Early adoption is not permitted. Upon adoption, SFAS 141(R) will not have a significant impact on our consolidated financial position and results of operations; however, any business combination entered into after the adoption may significantly impact our financial position and results of operations when compared to acquisitions accounted for under existing U.S. Generally Accepted Accounting Principles (GAAP).

In December 2009, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51." This statement is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008, with earlier adoption prohibited. This statement requires the recognition of a noncontrolling interest (minority interest) as equity in the consolidated financial statements and separate from the parent's equity. The amount of net income attributable to the noncontrolling interest will be included in consolidated net income on the face of the income statement. It also amends certain of ARB No. 51's consolidation procedures for consistency with the requirements of SFAS 141(R). This statement also includes expanded disclosure requirements regarding the interests of the parent and its noncontrolling interest. We have evaluated this new statement and have determined that the statement will not have a significant impact on the reporting of our financial position and results of operations.

In December 2009, the Securities and Exchange Commission (SEC) issued Staff Accounting Bulletin (SAB) No. 110. This guidance allows companies, in certain circumstances, to utilize a simplified method in determining the expected term of stock option grants when calculating the compensation expense to be recorded under Statement of Financial Accounting Standards (SFAS) No. 123(R), *Share-Based Payment* . The simplified method can be used after December 31, 2009 only if a company's stock option exercise experience does not provide a reasonable basis upon which to estimate the expected option term. Through 2009, we utilized the simplified method to determine the expected option term, based upon the vesting and original contractual terms of the option. On January 1, 2008, we began calculating the expected option term based on our historical option exercise data. This change did not have a significant impact on the compensation expense recognized for stock options granted in 2008.

In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133" (SFAS 161). This statement is intended to improve transparency in financial reporting by requiring enhanced disclosures of an entity's derivative instruments and hedging activities and their effects on the entity's financial position, financial performance, and cash flows. SFAS 161 applies to all derivative instruments within the scope of SFAS 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133) as well as related hedged items, bifurcated derivatives, and nonderivative instruments that are designated and qualify as hedging instruments. Entities with instruments subject to SFAS 161 must provide more robust qualitative disclosures and expanded quantitative disclosures. SFAS 161 is effective prospectively for financial statements issued for fiscal years and interim periods beginning after November 15, 2008, with early application permitted. We are currently evaluating the disclosure implications of this statement; however, the new statement will not have an impact on the determination of our financial results.

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 3 - RECENT ACCOUNTING PRONOUNCEMENTS (CONTINUED)

In April 2008, the FASB issued FSP No. FAS 142-3, "Determination of the Useful Life of Intangible Assets." This FSP amends the factors that should be considered in developing renewal or extension assumptions used to determine the useful life of a recognized intangible asset under SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS 142). The objective of this FSP is to improve the consistency between the useful life of a recognized intangible asset under SFAS 142 and the period of expected cash flows used to measure the fair value of the asset under SFAS 141(R), and other principles of GAAP. This FSP applies to all intangible assets, whether acquired in a business combination or otherwise, and shall be effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years and applied prospectively to intangible assets acquired after the effective date. Early adoption is prohibited. We have evaluated the new statement and have determined that it will not have a significant impact on the determination or reporting of our financial results.

In May 2008, the FASB issued SFAS No. 162, "The Hierarchy of Generally Accepted Accounting Principles" (SFAS 162). This statement identifies the sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in accordance with GAAP. With the issuance of this statement, the FASB concluded that the GAAP hierarchy should be directed toward the entity and not its auditor, and reside in the accounting literature established by the FASB as opposed to the American Institute of Certified Public Accountants (AICPA) Statement on Auditing Standards No. 69, "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles." This statement is effective 60 days following the SEC's approval of the Public Company Accounting Oversight Board amendments to AU Section 411, "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles." We have evaluated the new statement and have determined that it will not have a significant impact on the determination or reporting of our financial results.

In May 2008 the FASB issued FASB Staff Position (FSP) APB 14-1, "*Accounting for Convertible Debt Instruments That May Be Settled in Cash upon Conversion (Including Partial Cash Settlement).* " APB 14-1 requires the issuer to separately account for the liability and equity components of convertible debt instruments in a manner that reflects the issuer's nonconvertible debt borrowing rate. The guidance will result in companies recognizing higher interest expense in the statement of operations due to amortization of the discount that results from separating the liability and equity components. APB 14-1 will be effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. The Company is currently evaluating the impact of adopting APB 14-1 on its consolidated financial statements.

In June 2008, the FASB issued FSP No. EITF 03-6-1, "Determining Whether Instruments Granted in Share-Based Payment Transactions Are Participating Securities". This FASB Staff Position (FSP) addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the earnings allocation in computing earnings per share (EPS) under the two-class method described in paragraphs 60 and 61 of FASB Statement No. 128, Earnings per Share. This FSP provides that unvested share-based payment awards that contain non forfeitable rights to dividends or dividend equivalents (whether paid or unpaid) are participating securities and shall be included in the computation of EPS pursuant to the two-class method. The provisions of FSP No. 03-6-1 shall be effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those years. All prior-period EPS data presented shall be adjusted retrospectively (including interim financial statements, summaries of earnings, and selected financial data) to conform with the provisions of this FSP. Early application is not permitted. The provisions of FSP No. 03-6-1 are effective for the Company retroactively in the first quarter ended March 31, 2009. The Company is currently assessing the impact of FSP No. EITF 03-6-1 on the calculation and presentation of earnings per share in its' consolidated financial statements.

Other accounting standards that have been issued or proposed by the FASB or other standards-setting bodies that do not require adoption until a future date are not expected to have a material impact on the consolidated financial statements upon adoption.

NOTE 4 - RECLASSIFICATIONS

Certain prior periods' balances have been reclassified to conform to the current period's financial statement presentation. These reclassifications had no impact on previously reported results of operations or stockholders' equity.

F-13

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 5- COMMON STOCK

The Company's board of directors believed it was in the best interest of the corporation to issue on March 2, 2009, Mr. Friedman and Phillip Johnston 8,000,000 and 1,000,000, respectively, and on February 3, 2009, to issue Kyle Gotshalk and Cherish Adams 2,500,000 and 2,500,000 shares of the Company's common stock, respectively, in consideration for eCommerce services to be performed on behalf of the Company. Also during 2009 the Company issued to Mr. Friedman, Mr. Gotshalk and Ms. Adams 1,000,000 warrants each at an exercise price of $.10 per share.

In consideration for eCommerce services to be performed on behalf of the Company, Mr. Friedman and Phillip Johnston were issued 8,000,000 and 1,000,000 shares of the Company's common stock, respectively, on March 2, 2009. In consideration for services to be performed on behalf of the Company, Kyle Gotshalk and Cherish Adams were each issued 2,500,000 and 2,500,000 shares of the Company's common stock, respectively, on February 3, 2009.

Prior to these issuances, there was 872,678 shares of common stock outstanding held by 350 shareholders. Subsequent to these issuances, the common stock of the Company is now 20,907,678 held by 350 shareholders as of January 6, 2010.

In addition the Company in exchange for $7,500 issued 2,000,000 warrants to two investors at an exercise price of $.10 per shares.

Company, and on February 3, 2009, to issue Kyle Gotshalk and Cherish Adams 2,500,000 and 2,500,000 shares of the Company's common stock, respectively, in consideration for eCommerce services to be performed on behalf of the Company, and for management services.

During the year ended December 31, 2010, the Company issued shares to:

2,500,000 to Kyle Gotshalk and 2,500,000 to Cherish Adams for services rendered.

350,000 to Brad Hacker, 350,000 to Kyle Gotshalk, 350,000 to Michael Friedman and 350,000 to Cherish Adams all for services rendered.

4,400,000 - Ender Company Assets, Inc. ($100,000 Stock Purchase and Loan Agreement, of which $15,472 received to date and the remainder is a note receivable

1,000,000 - Charm City Consultants ($35,000 Stock Purchase and Loan Agreement of which $17,500 received to date and the remainder is a note receivable.

940,000 - Spur Sherwood, LLC (Fees due for services rendered in the Ender/Charm City transactions)

312,887,016 dividend shares in June, 2010. The dividend shares were issued parapasue to all existing shareholders of the companies free trading and restricted common stock of record.

5,000,000 to B. Michael Friedman and 5,000,000 to Cherish Adams for Services rendered.

600,000 to Spur Sherwood, LLC (Final payment for services rendered)

5,000,000 to Charm City Consultants for payment as contracted for in a Consulting Agreement.

3,850,000 to Richard Maher (Stock Purchase and Loan Agreement).

During the first quarter of 2011 the Company issued Common stock to vendors for outstanding payables and related parties for advances made. These transaction were agreed to in 2010 and shares issued in 2011

The common stock of the Company is held by 251 shareholders as of March 4, 2011.

F-14

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 6 – INCOME TAXES

As of December 31, 2010 and 2009, the Company had approximately $200,000 of U.S. federal and state net operating loss carry forwards available to offset future taxable income which begin expiring in 2026, if not utilized. Deferred income taxes reflect the net tax effects of operating loss and tax credit carry forwards and temporary differences between carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which temporary differences representing net future deductible amounts become deductible. Due to the uncertainty of the Company's ability to realize the benefit of the deferred tax assets, the deferred tax assets are fully offset by a valuation allowance at December 31, 2010.

The table below summarizes the differences between the Company's effective tax rate and the statutory federal rate as follows:

|  | December 31, 2010 |
| --- | --- |
| Tax benefit computed at "expected" statutory rate | $ (175,000) |
| State income taxes, net of benefit | (25,000) |
| Other permanent differences | -0- |
| Increase in valuation allowance | 200,000 |
| Net income tax benefit | $ - |

In assessing the amount of deferred tax asset to be recognized, management considers whether it is more likely than not that some of the losses will be used in the future. Management expects that they will not have benefit in the future. Accordingly, a full valuation allowance has been established.

NOTE 7 - EMPLOYEE BENEFIT PLAN

The Company does not have a deferred profit-sharing or retirement plan. The company does not maintain an incentive compensation plan.

NOTE 8 - CONTINGENCIES AND COMMITMENTS

The Company is not aware of any legal proceedings against it as of December 31, 2010. No contingencies have been provided in the financial statements.

Employment Contracts

The Company has employment agreements with certain executive officers. These agreements may obligate the Company to a severance amount equal to one year's compensation should an executive leave the Company under certain terms of the agreement. The company will issue common stock in lieu of cash during year one of these agreements.

NOTE 9 - DEPARTURE OF DIRECTOR OR OFFICERS AND ELECTION OF DIRECTORS OR PRINCIPAL OFFICERS

On May 29, 2008, the Company accepted the resignation of Stephen Goldberg as its sole director, Chief Executive Officer and President of the Company. On this same day, to fill the vacancy created by the resignation of Mr. Goldberg as the Company's sole director and officer, the Company appointed Cherish Adams as Chief Executive Officer, President and a director and Mary Radomsky as Treasurer, Secretary and a Director of the Company.

On January 2, 2009, the Company's board of directors appointed Kyle L. Gotshalk as a director and Chief Executive Officer of the Company.

On January 2, 2009, Cherish Adams resigned as Chief Executive Officer. To fill the vacancy created by the resignation of Cherish Adams as the Company's Chief Executive Office, the Company appointed Kyle Gotshalk as its Chief Executive Officer. The Company also on this same day appointed Mr. Gotshalk as its Vice President. Cherish Adams continues to serve the Company in the capacity as its President and as a Director.

*Kyle Gotshalk,* 34 , was elected on January 2, 2009 to serve as an Officer and a Director and on January 3, 2009 to serve as CEO and Vice President of Commerce Online, Inc.

CANNABIS MEDICAL SOLUTIONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - DEPARTURE OF DIRECTOR OR OFFICERS AND ELECTION OF DIRECTORS OR PRINCIPAL OFFICERS

*Cherish Adams* , 33, formerly our CEO, was elected on May 29, 2008 to serve as our President and Director of Commerce Online, Inc. Contemporaneous with Commerce Online Inc., beginning March 2005 through present.

On May 22, 2010 the board of directors of the Company accepted the resignation of Kyle L. Gotshalk as a board member.

On May 23, 2010 the board of directors of the Company accepted Mr. B. Michael Friedman as acting CEO.

On August 29, 2010 the board of directors accepted the resignation of Harold Rustigan as a board member.

NOTE 10 - GOING CONCERN

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters has not been determined yet. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

NOTE 11 - SUBSEQUENT EVENTS

During the first quarter of 2011 the Company issued Common stock to vendors for outstanding payables and related parties for advances made. These agreements were approved in 2010 however the stock was issued in 2011. These transaction eliminate the entire accounts payable balance due and notes and/or advances due. The Company had no liabilities after these transactions. These transaction were agreed to in 2010 and shares issued in 2011

During the first quarter of 2011 the Company issued Common stock to vendors for outstanding payables and related parties for advances made. These transaction were agreed to in 2010 and shares issued in 2011

F-16