<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   EDIBLE IP, LLC, and EDIBLE        )  No. 20 C 5840,
     ARRANGEMENTS, LLC,                )
 4                                     )
                      Plaintiffs,      )
 5                                     )
                vs.                    )
 6                                     )
     MC BRANDS, LLC, and GREEN THUMB   )
 7   INDUSTRIES, INC.,                 )
                                       )
 8                      Defendants.    )
     ----------------------------------)
 9   MC BRANDS, LLC, and GREEN THUMB   )
     INDUSTRIES, INC.,                 )
10                                     )
             Counter-Plaintiffs,       )
11                                     )
                vs.                    )
12                                     )
     EDIBLE IP, LLC, and EDIBLE        )
13   ARRANGEMENTS, LLC,                )  Chicago, Illinois
                                       )  April 7, 2022
14           Counter-Defendants.       )  1:45 p.m.

15                   TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HON. SARA L. ELLIS
16
     APPEARANCES:
17
     For the Plaintiffs/
18   Counter-Defendants:   MR. JOHN M. BOWLER
                           MS. LINDSAY M. HENNER
19                         Troutman Pepper Hamilton Sanders, LLP,
                           600 Peachtree Street NE, Suite, 3000,
20                         Atlanta, Georgia  30308

21   For the Defendants/
     Counter-Plaintiffs:   MR. CAMERON M. NELSON
22                         Greenberg Traurig LLC,
                           77 West Wacker Drive, Suite 3100,
23                         Chicago, Illinois  60601

24
                  Patrick J. Mullen, Official Court Reporter
25                219 South Dearborn Street, Room 1412
                     Chicago, Illinois  60604
</pre>

1          (Telephonic proceedings on the record.)

2              THE CLERK:  2020 CV 5840, Edible IP, LLC, versus MC

3    Brands, LLC.

4              MS. HENNER:  Good afternoon, Your Honor.  This is

5    Lindsay Henner on behalf of plaintiffs, and I have with me my

6    colleague John Bowler.

7              MR. NELSON:  Good afternoon, Your Honor.  This is

8    Cameron Nelson on behalf of MC Brands and Green Thumb

9    Industries.

10             THE COURT:  All right.  Good afternoon.

11             Okay.  So I've got your status report, and then I have

12   the three motions to compel.  Are there going to be any

13   additional motions to compel?

14             MR. NELSON:  There may be, Your Honor.

15             THE REPORTER:  I'm sorry.  Who is talking?

16             MR. NELSON:  This is Cameron Nelson for the

17   defendants.

18             There may be an additional motion to compel.  I'm

19   drafting one now.  Whether it will ultimately be necessary, you

20   know, we still have to go through our meet-and-confers so it's

21   possible.

22             THE COURT:  Okay.  What would that one be about?

23             MR. NELSON:  We've been asking for documents, the

24   results of keyword searches, since November.  We've been told

25   that they're underway, but we just can't get a date certain by

1    which they're going to be produced.  We're told that there are

2    many, many, many responsive documents, so we haven't been able

3    to start depositions of defendants since we're waiting for

4    these documents.  We're told that this production will be

5    sizable, but we just can't seem to get a date by which this is

6    going to be complete.

7            THE COURT:  All right.

8            MS. HENNER:  Your Honor, could I respond to that?

9            THE COURT:  Yes.  I was going to ask you.  When do you

10   think -- well, where are you in terms of your keyword searches?

11           MS. HENNER:  Sure.  I'll start by saying that

12   information has been communicated to defendants' counsel, and

13   we, in fact, made a partial production of those documents this

14   week.  There are a number of additional documents, less than

15   3,000 remaining, that we are conducting a closer privilege

16   review of because our review software identified those

17   documents as hitting on potentially privileged terms.  So that

18   linear review is underway currently by a document review team,

19   and what we have already disclosed to defendants' counsel is

20   that we intend to produce those documents next week.

21           THE COURT:  Okay.  So you think by -- let's see.  So

22   you would think that by the 15th of April you'd be able to get

23   those done?

24           MS. HENNER:  Yes, Your Honor.

25           THE COURT:  Okay.  And does that work with the

 1    defendants?

 2          MR. NELSON:  We have a number of depositions to

 3    schedule, you know, so I'm eager to get started on those.  We

 4    need deposition dates after the 15th for -- I think we're at

 5    four or five witnesses that need to be set.  So some are

 6    employees, and some are not.  There's one who's sort of an

 7    ex-employee whose status is a little uncertain.  Counsel on

 8    both sides are trying to get ahold of him.  But, you know, a

 9    date certain is a good start.

10          THE COURT:  All right.  So then I know that defendants

11    were also putting together their supplemental answers to the

12    plaintiffs' interrogatories.  Have you -- I know that you

13    stated you were going to serve your answers by April 1st.  Have

14    you done that?

15          MR. NELSON:  We served them on Tuesday, the 5th.

16          THE COURT:  Okay.  All right.  Then how many

17    witnesses?  It looks like -- so it looks like in your status

18    report there are about eight or so depositions from the

19    defendants' side that the defendants have identified, and then

20    plaintiffs have two.  So that would put you at about ten

21    depositions.  Does that sound about right?

22          MR. NELSON:  It's about right.  We did complete one of

23    the defendants' depositions on the 30th, so there's one checked

24    off.

25          THE COURT:  Okay.  All right.  So if I extended fact

1  through June 17th, is that something that would work, or do you

2  need more time?

3          MR. NELSON:  For defendants?  As long as we can get

4  this document production and get the depositions rolling, I

5  think that should work.  I think my only fuzzy numbers right

6  now on dates are to the third party witnesses.  Mr. Abdullah

7  was served this week.  We're politely calling him to try to get

8  a sense for when he might actually be able to sit for a

9  deposition.  Mr. Sluben, my understanding is that both we,

10  defendants' and plaintiff's counsel, are trying to reach him

11  and get him to sit for a deposition as well.  I see no reason

12  why we would have any other scheduling challenges beyond those.

13          MS. HENNER:  And, Your Honor, from plaintiffs'

14  perspective, the two months sort of in a vacuum seem

15  sufficient, especially for the discovery that plaintiffs intend

16  to conduct during that period.

17          The one issue that we at least would flag to consider

18  depends in part on the outcome of the motions to compel that

19  are pending.  Whether plaintiffs have to do additional searches

20  and collections and review and production will, I expect,

21  impact that schedule, especially to the extent that, you know,

22  to date defendants' counsel has not wanted to take depositions

23  until all of the documents are, you know, produced and in their

24  hands.

25          So if it takes us several weeks to produce documents

1    and then, you know, defendants' counsel wants to review those

2    documents before taking depositions, then we're looking at all

3    these depositions sort of being jammed at the end of that

4    schedule.  So that's the only concern that we would raise with

5    the calendar.

6            THE COURT:  All right.  So what if I have discovery

7    close July 15th?

8            MR. NELSON:  No objection from defendants.

9            MS. HENNER:  No objection from plaintiffs, Your Honor.

10   Obviously we'll do our best to act quickly.

11           THE COURT:  All right.  So I'll have discovery close

12   July 15th.  The expert reports will be due August 19th.  Then

13   I'll have the rebuttal expert reports due September 16th, and

14   we'll have expert discovery close on November 18th.  Then I'll

15   set the dispositive motion briefing schedule.  Any motions for

16   summary judgment are due December 16th, responses are due

17   January 20th, and replies are due February 3rd.  Then I will

18   have you back for a ruling June 6th.

19           All right.  Then to turn to your motions to compel,

20   the first one I have is for the franchise agreement.  So what I

21   don't understand is this.  You know, I get that the plaintiff

22   doesn't want or that the plaintiffs don't want to put their

23   franchise agreement out there.  What I guess I'm having a

24   little bit of trouble with is why marking it highly

25   confidential or attorneys' eyes only wouldn't create sufficient

1    protection to just turning over the agreement.

2          MS. HENNER:  Your Honor, this is Lindsay Henner again

3    for plaintiffs.  I understand what Your Honor is saying.  I

4    can, you know, speak on behalf of the clients.  Having worked

5    with them for awhile, they feel very, very strongly about the

6    confidentiality of their franchise agreement, not just the

7    confidentiality of that agreement but the proprietary nature of

8    that agreement.  You know, it's a work in progress over years

9    and years and years, and I know that they engaged a specific

10   group of attorneys and have, you know, searched for specific

11   attorneys to work on this agreement and, you know, put it in

12   the best position to be competitive in this space.

13          So I think in this case there's a concern about,

14   number one, having to produce it in its entirety for, you know,

15   no other purpose than an interest in seeing irrelevant parts of

16   the agreement.  There's also a concern that defendants'

17   business model is one that is -- well, if not already a

18   franchise, it is set up to be a franchise.  In particular with

19   the expansion of, you know, legalization of the cannabis space

20   on the federal level as different states adopt the legalization

21   of cannabis, there's an opportunity for defendants to be a

22   franchise.

23          To the extent that, you know, their current counsel

24   advises them in this case and other cases and on business

25   matters, there's a concern that that knowledge, if held by, you

1   know, defendants' counsel, certainly there's no accusation that

2   they would intentionally disclose information that's protected

3   by a protective order, but to the extent that that informs

4   somehow subconsciously their strategy in the future, that's

5   something that our client feels very strongly about avoiding.

6          So in order to, you know, meet the needs, the stated

7   needs of defendants in this case, we've offered several

8   compromise positions, including allowing defendants' counsel to

9   look at the contents, the table of contents for that agreement,

10  and identify sections that they want to see.  They have not

11  accepted that offer.  They were not interested, I suppose, in

12  considering, you know, what the actual subject matter of the

13  agreement that they're asking for is, but we have, you know,

14  done everything in our power to offer something short of just

15  a, you know, flat turnover of the entire agreement that meets

16  the needs that defendants say that they have for it.

17         THE COURT:  All right.  What's defendants' position on

18  looking at the table of contents and determining what you think

19  is relevant?

20         MR. NELSON:  Your Honor, I'm just going to end up with

21  a list of more questions.  So, for example, a typical franchise

22  agreement, you're going to have terms in there about quality

23  control, the types of goods being supplied, how they're going

24  to be supplied, advertising obligations, franchise fees.

25         So assuming the table of contents has a heading that

1    matches these subjects, there are things that -- so, for

2    example, you can have a 60-page franchise agreement which in

3    the final paragraph says:  Oh, by the way, all the fees

4    mentioned in here, we're not actually charging you because this

5    is a new concept.

6            So how would I know that exists by looking at the

7    headings?  I'm not bringing that example up out of thin air.

8    There is a franchise agreement.  In the deposition we completed

9    a few days ago, that's pretty much what was disclosed to us in

10   the deposition, that there were no fees paid.  So that's just

11   one example of how, you know, looking at a table of contents is

12   not going to give us the full picture and that trying to draw

13   lines about this, you know, that this is an IP paragraph and

14   this is not an IP paragraph, well, advertising and marketing

15   and image, all those things are relevant to whether Edible

16   Arrangements really is, you know, investing in its marks the

17   way that it says it is.

18           Also, if I can address the idea that our client might

19   be a franchise in the future, that is purely speculative.

20   Green Thumb is not a franchise.  You know, it makes a nice

21   story to say that a franchise agreement is proprietary, but,

22   you know, I think trademark lawyers typically see dozens of

23   these things throughout their careers.  I'm not sure what could

24   possibly be proprietary about it, especially given that some

25   earlier version of it is already available in public dockets

1    from about eight years ago.  It sounds nice, but I'm highly
2    skeptical that that's actually true.
3            THE COURT:  All right.
4            MS. HENNER:  Your Honor, I'll just offer up that I
5    have a response to some of the things that the defendants'
6    counsel offered.
7            THE COURT:  Sure.  Go ahead.
8            MS. HENNER:  So I would first note that, you know, a
9    lot of the discussion was about things that aren't known, and
10   I'm not sure how defendants could know that the table of
11   contents won't be helpful to them without seeing it first.  I
12   would also point to the fact that, you know, the specific
13   citation of the sections that was provided, that's more
14   information than we've had to date about what defendants
15   actually want to see in the franchise agreement.
16           I would also offer that it speaks to, you know, the
17   non-relevance of some of these portions of the agreement
18   because, you know, the amount paid for a franchise fee is not
19   relevant to the issues in this case.  The example that
20   defendants' counsel provided about, you know, a franchise
21   agreement not being paid, that agreement was not a franchise
22   agreement.  That was a deal between an entity that was not
23   operating as a franchisee on behalf of a third party company
24   that is not a plaintiff in this case.  You know, what was
25   disclosed in that deposition was not, you know, whether a

1  franchise fee for a franchise agreement was being paid.

2          I would still proffer that there's at least more
3  conversation to be had, you know, whether Mr. Nelson has
4  questions or not, about the table of contents.  If he has
5  questions, fine.  We're happy to entertain them.  But I don't
6  think that, you know, the fact that he hasn't looked at the
7  table of contents and he guesses that it won't be helpful means
8  that the entire franchise agreement should be produced
9  unredacted.

10          THE COURT:  All right.  So I think in order to kind of
11  get this moving, I would like plaintiffs to present or provide
12  to the defendants the table of contents and have defendants go
13  through that and identify the sections that you believe are
14  relevant and that you would like to see.  Then once you've had
15  a chance to look at those, if you believe that those sections
16  cross-reference other sections that you didn't ask for, then
17  you can go ahead and ask the plaintiffs for those sections as
18  well once you've identified the ones that you want and you've
19  reviewed those.

20          If you have any issues, then what I want you to do is
21  provide me with the franchise agreement, and I'll review it and
22  then determine the -- you know, let me know which sections the
23  defendants have received, and then I'll look and see if there
24  are any additional relevant sections and order plaintiffs to
25  provide those to defendants.

1    MS. HENNER:  Understood, Your Honor.  Thank you.

2    THE COURT:  All right.  Then the next one is the

3 consumer complaints.  So what's the volume of the complaints?

4    MS. HENNER:  This is Lindsay Henner.  I can't answer

5 that with specificity, but I think that the reasons are set out

6 in our position statement in that it is not something that can

7 be identified, you know, just by a search term.  So I can't say

8 how many Edible has in total complaints.  There, you know,

9 could be thousands and thousands and thousands, but the

10 quantities that we do have are, you know, the ones that we have

11 offered as part of a compromise solution to defendants'

12 counsel, which combined with what's already been produced and

13 what we were willing to do as a compromise is more than a

14 hundred different complaints.

15    You know, to require Edible to look into its customer

16 service email account and identify all of the complaints in

17 there would ultimately require either, you know, an

18 email-by-email review substantively by a review team or just

19 sort of a wholesale throwing over the wall to defendants'

20 counsel everything in the email account.  While it may, you

21 know, save costs not doing a linear document-by-document

22 review, the volume of that information is itself expensive,

23 very expensive to process and produce.

24    Our position statement references -- and I can confirm

25 it with even more detail now -- that just the search term

1  collection and production for, you know, the previously agreed

2  search terms which were in all forms relatively narrow, you

3  know, costs thousands of dollars.  It's $10,000 just to load

4  them into our database, you know, a hundred dollars an hour per

5  person to do review, $10,000 or more just to, you know, do a

6  second level privilege review.

7      So there are a significant number of costs and time

8  that would need to be dedicated to conducting an additional

9  search specifically for complaints to meet defendants' request

10 solely based on wanting more of what it already has, and our

11 position is that what they want to use these complaints for is

12 not supported by the law.  That's not the way that complaints

13 are used in a trademark case.

14     Typically the way that complaints are used is if there

15 are complaints about the defendants' infringing products, those

16 complaints are relevant to establish harm to the plaintiffs,

17 but there are not cases -- and defendants haven't provided

18 any -- that say that just amassing a quantity of complaints in

19 discovery is going to tend to prove or disprove that there has

20 been harm to the plaintiffs from an injunction perspective.

21     In fact, in the time that we've had between the

22 paperwork and this hearing, I found a case, a Southern District

23 of New York case from just a few months ago that analyzes a

24 similar issue, and it says, in essence, the defendants are

25 arguing that there should be no injunctive relief because the

1   plaintiff's reputation is already damaged by negative reviews,

2   but the Court notes that there's no case law supporting that

3   proposition and that injury to a plaintiff's reputation and

4   goodwill is not something that requires a showing that the

5   plaintiffs' reputation is free from existing damage.

6        So the relevance argument here for defendants is not

7   one that's recognized by the law, and in view of that and the

8   burden to do an additional collection and the compromises

9   already offered that gives defendants, you know, more than 100

10  instances of complaints with plenty more available on social

11  media is just simply not proportional to the needs of this case

12  and not even proportional to the arguments that defendants want

13  to use the complaints for.

14       THE COURT:  So my question in reading this, the

15  question I got is that Edible does not have a way of separating

16  or keeping track of customer complaints.  Is that correct?

17       MS. HENNER:  There is not a tracking system.  So there

18  is an email account that is a customer service email account.

19  These emails come in and are dealt with by a customer service

20  team, but there's not a tracker for that information, you know.

21       THE COURT:  And my understanding is that it could be

22  anything from, you know, that the arrangement went to the wrong

23  address, to that it was late, to you sent the wrong thing, to I

24  talked to somebody in customer service and I want to give

25  them -- you know, I want to say what a great job they did.

1    MS. HENNER:  That's correct, Your Honor.  I appreciate
2    the last example that you gave because the customer service
3    account is not one that is, you know, a 1-800 complaint line.
4    It has, you know, options for customers to write in about
5    changing an order or, you know, customers may write to that
6    account if they want to have a credit card payment reversed or
7    they want to change their delivery date or they want to cancel
8    an order.
9        So there are all different kinds of inquiries that
10   customers could make to the customer service account, and in
11   order to sort the complaints from the praise or just the
12   routine business communications would be a burden, especially
13   for this purpose.
14       THE COURT:  All right.  My understanding is that
15   Edible is willing to provide the 95 that you've identified.
16       MS. HENNER:  That's correct, Your Honor.
17       THE COURT:  All right.  Do defendants want to add
18   anything?
19       MR. NELSON:  I would like to, Your Honor.
20       THE COURT:  Sure.  Go ahead.
21       MR. NELSON:  On relevance, I would first point out
22   that their own complaint, these are quotes from their own
23   complaint:
24       "Edible's success is a direct result of its commitment
25   to providing a consistent high-quality and beautifully designed

1  product.  They consistently deliver high-quality confectionary.

2  Edible's business is predicated on the high quality of its

3  fruit confection and other food and gift related goods."

4         The plaintiffs themselves have made the quality of

5  their products relevant.  The other reason customer complaints

6  are relevant is because they are direct evidence of how the

7  consumers perceive the brand.  For example --

8         THE COURT:  Right, but I guess, just to short-circuit

9  you because we still have one more to go through and I have to

10  go do a change of plea at 3:00, you know, this information, you

11  know, can certainly come from the plaintiff, but this

12  information is also publicly available, right?

13         MR. NELSON:  No, it's not.

14         THE COURT:  You can go on the email.

15         MR. NELSON:  It's not the ones that went to their

16  email address.

17         THE COURT:  Perhaps, right?  But you also have Yelp,

18  right?  If you go on Yelp and you type in "Edible

19  Arrangements," you'll get a slew of complaints there that are

20  publicly available.

21         MR. NELSON:  Sure.  If plaintiffs are --

22         THE COURT:  Right?

23         MR. NELSON:  Sure.  If plaintiffs are sitting on

24  emails that say "you guys have no business being in the edible

25  cannabis business," then plaintiffs get to not produce that?

```
 1                THE COURT:  Well, no.
 2                MR. NELSON:  Because that's highly relevant to this
 3      case, and we've already identified some public comments like
 4      that.  So --
 5                THE COURT:  But here's the thing.  All right?
 6      Plaintiffs are going to provide you with the 95 that they have
 7      identified in going through their searches.  I'm just not
 8      willing to make them go through and look at all of these emails
 9      to determine which ones are complaints, and then what's the
10      significance of each individual complaint, right?
11                So there's a big difference between saying, for
12      example, "the quality of your product is garbage, and I would
13      never order from you again" to "hey, dummy, you sent it to the
14      wrong address" or "this isn't what I ordered" or "you charged
15      me twice."
16                MR. NELSON:  Right.
17                THE COURT:  Those are all different.
18                MR. NELSON:  Sure.
19                THE COURT:  "You charged me twice" doesn't go to
20      confusion or reputational harm.  "You sent this to the wrong
21      address" doesn't go to confusion or reputational harm.  "The
22      quality of your product is garbage and you should never get
23      into edible marijuana or edible anything ever," okay, that
24      would be relevant.  But this has to be proportional, and at
25      this point I don't think that the proportionality is there.
```

1        MR. NELSON:  Judge, I would just point out that they

2   could -- since these are communications from third parties and

3   there's no confidentiality, they could just throw them all over

4   the wall to us.  Of course, we would protect consumer

5   information under the local rules and protective order, but

6   there's no burden on them in doing that.  We can go dig through

7   and find the relevant ones.  It's just sort of the whole email

8   box of what came in from the outside.  That's easy to do.  Send

9   it over.

10       MS. HENNER:  Your Honor, if I could respond briefly to

11  that.

12       THE COURT:  Go ahead.

13       MS. HENNER:  I've already stated on this call today

14  why an over-the-wall production of our entire customer service

15  email account is a burden.  Regardless of whether it requires

16  contact attorneys to do a review for responsiveness or not, the

17  volume of that information, I mean, I can't understate it.

18  Edible sells millions of products and has sold millions and

19  millions of products over the course of its business.

20       So to say that, you know, it would be easy to collect

21  and produce an entire email account to the defendants because

22  they're interested in, you know, flipping through each and

23  every one of those to find complaints, it's a fishing

24  expedition, first of all, and it's a disproportionate demand

25  for a volume of information that is -- you know, as Your Honor

1    noted, there's plenty of instances online.

2           And just to add a finer point to it, I offered to

3    defendants to capture social media comments that contain

4    complaints as part of an additional collection just to put an

5    Edible Bates number on it and, you know, to produce it because

6    it's in our control, you know, to meet in the middle on that

7    point.

8           So it's not a straightforward, easy thing to do to

9    take an entire customer service account for millions of orders

10   and send it over to defendants to review, and it does not give

11   us an opportunity to, you know, catch any instances where

12   forwarded emails to counsel are included or something to that

13   effect.

14          So I just will never get to the end of discovery in

15   this case if defendants, as they have so far, just are waiting

16   to have in their possession and review each and every document

17   that could possibly be disclosed in discovery, and we certainly

18   would be waiting a long time for defendants to do their own

19   linear review.

20          MR. NELSON:  Your Honor, I know you've got other

21   things to do.  As one final point, I'm looking at their website

22   right now, and there's a drop-down that lets the customer

23   choose the quality of product as a complaint.  So this contact

24   form is feeding a database.  They certainly can sort and

25   produce the emails where the customer clicked that, and that

1    would be just the relevant category of documents we just

2    discussed.

3           MS. HENNER:  And I disagree.  I disagree with that,

4    Your Honor.  It assumes that everybody who uses that form

5    actually selects things appropriately, and I cannot say in the

6    email that's delivered to Edible that, you know, there's a

7    quality concern that is a complaint.  It's still overbroad and

8    requires a review, and to the extent that, you know, defendants

9    are now saying that the only complaint that they're concerned

10   about is quality, I've never heard about that before.  They're

11   not only concerned about quality complaints.  They want

12   literally every complaint about anything that's come into

13   Edible for millions of sales over years.

14          THE COURT:  All right.  So I'm going to have Edible

15   provide the 95 complaints that it already identified.  Edible

16   has said it can capture social media comments.

17          MS. HENNER:  That's right, Your Honor.  We can do

18   essentially a scrape of our social media account to try and

19   capture comments.

20          THE COURT:  All right.  So let's start with those.  If

21   defendants believe that that doesn't give you enough -- so in

22   order to make your argument, it's not necessarily that, you

23   know, more is better.  It's to establish:  Here's the harm, and

24   because of these complaints there is no harm.  What's said on

25   social media, you know, this is really the reputation of Edible

1   at large, so they're not being harmed.

2          Obviously, I would assume that the response to that

3   by Edible is not going to be:  Well, you know, these are only

4   95 complaints out of millions of communications that we

5   received.

6          Right?  Obviously, that's not a fair response.

7          MS. HENNER:  That's correct, Your Honor.

8          THE COURT:  So let's start there.  Then if there are

9   still issues, then come back to me.

10         Then the last one is for the production of enforcement

11   with regard to these other cases, these 28 cases.  So I don't

12   believe that defendants have necessarily told me what it is

13   that they're still looking for or why.  You know, the discovery

14   deposition transcripts, expert reports, and settlement

15   agreements, you know, that's essentially the entire case file,

16   right?

17          MR. NELSON:  Well, it's not discovery or document

18   production.  It's not pleadings.  I don't think that's the

19   entire case file, no.

20          THE COURT:  All right.  So here's the -- all right.

21   So, you know, you've got the complaint which you can pull off

22   because you were able to figure out these 28 cases.

23          MR. NELSON:  Yep.

24          THE COURT:  You know, so you didn't need to ask for

25   that because you can get that.  But, you know, the written

1    discovery, even if you don't get the production, that's still a

2    lot, as is the deposition transcripts and the expert reports.

3    You know, I guess what I was looking for was something that is

4    more targeted and that you are specific, you know, that you're

5    able to tell me that this is what you need and why.

6           MR. NELSON:  Well, Your Honor --

7           THE COURT:  And I didn't really get that from your

8    motion.

9           MR. NELSON:  Understood.  I think the issue is that

10   this seems like a lot of cases, but it's not.  I mean, it's not

11   defendants' issue that plaintiff is litigious.  These are all

12   trademark cases.  These are all trademark cases about the marks

13   that are at issue in this case.

14          So when we say expert reports, I'm expecting those

15   expert reports to be survey evidence and expert reports about

16   the strengths of the marks, et cetera, the marks that are at

17   issue in this case.  These are prior statements by the

18   plaintiffs about the facts at issue in this case.

19          The deposition transcripts, I expect the deposition

20   transcripts to be about the strength of their marks and the

21   scope of their marks and the kinds of products they apply their

22   marks to and the consumer perception of their marks.  So those

23   are Edible Arrangements prior statements about the allegations

24   it's made in this case, right?  So, you know, here they're

25   making the same types of allegations.

1        So these cases are all trademark cases.  They're all

2   cases that, you know, they made the same kinds of allegations.

3   In a typical trademark case, you're going to have a survey

4   expert and you're going to have a damages expert if the case

5   went that far.  I doubt anywhere near all 28 of them went that

6   far.  Then you've got settlement agreements which are in effect

7   trademark licenses, so the settlement agreements for each of

8   these cases are going to be relevant to the damages analysis in

9   this case.

10        The plaintiffs have already abandoned a lost profits

11  theory.  They've elected not to produce to us any profit

12  information, which means that we're almost certainly going to

13  be exchanging expert reports on the issue of reasonable

14  royalty, and settlement reports are commonly and always, you

15  know, accepted as part of that process.  Plaintiffs always want

16  to minimize their impact and defendants always want them, but

17  typically they're produced and analyzed by the experts.

18        On the expert reports, this being a trademark case,

19  we're going to be doing the infringement surveys and the other

20  surveys.  To the extent those surveys on the marks that are

21  being asserted in this case exist in these other litigations,

22  then they're clearly highly relevant.

23        The deposition transcripts, you know, we're trying to

24  get depositions of the witnesses lined up, but I'm expecting

25  that there are other deposition transcripts of these same

1    witnesses on these same issues.  So these are all the same

2    issues.

3             THE COURT:  Okay.  So, you know, I hear you with

4    regard to, for example, the experts and that you could

5    certainly ask Edible about the experts that it has used in past

6    litigations and ask for their depositions in these past

7    litigations, the past litigations.  You know, yes, that would

8    be relevant and at some point, you know, when the expert has to

9    provide his or her expert report, that information needs to be

10   in there anyway.

11            But, you know, there are going to be, I would imagine,

12   depositions that were taken in this case that are unique to

13   this case and may not be relevant in any other case.  That

14   would be true of other cases.  Some of those depositions are

15   unique to those cases and are not necessarily relevant to this

16   case.

17            MR. NELSON:  That's entirely possible, Your Honor, but

18   we can't get simple things like lists to further that

19   discussion.  I can't get a list of who were the witnesses in

20   these cases, what depositions exist, are there expert reports.

21   We haven't been able to get the discussion to go that far.  We

22   couldn't even get them to give us a list of cases.

23            MS. HENNER:  Your Honor, if I could respond to that

24   briefly.

25            THE COURT:  Go ahead.

1          MS. HENNER:  I personally, I could be mistaken, but I

2     personally have no recollection of being asked to provide a

3     comprehensive list of trademark cases that Edible has been

4     involved in.  I would also say, you know, I'm surprised to hear

5     again on this call that all of these cases on this list are

6     trademark cases that involve the marks at issue here and the

7     issues that are in this case because there are a number that

8     are not.

9          The burden that defendants want to pass to plaintiffs

10    is to, you know, tell them which one of these cases on this

11    list are not relevant, but they're not even doing their own,

12    you know, basic due diligence to understand what they are

13    asking for today.

14         You know, it's easy to come into a hearing and say,

15    you know, expert reports are one example of what we need, but

16    included in the request that they're advocating right now are

17    RFP requests and responses, which no substantive, you know,

18    analysis of the issues is going to be in those discovery

19    requests.

20         So, you know, even further on the issue of expert

21    reports, other written discovery in this case has covered

22    surveys, analyses, research conducted directly related to the

23    asserted marks, and that's something that we agreed to search

24    for and produce to the extent that it exists.  So it doesn't

25    need to be compelled through this motion to get other, you

1    know, analyses of the associated marks.  Those were negotiated

2    in the context of different discovery.

3           To the extent that, you know, they say there's only 28

4    cases on this list, in fact, they had reached an agreement or

5    offered an agreement with the law firm that limited the scope

6    of the time period to, I believe, ten years.  That agreement

7    has not been offered to Edible.  So what they're asking for now

8    is to go back even further than the 2012 case that I believe

9    might be the oldest one on this list and, you know, collect

10   information from so long ago it can't be relevant anymore

11   because the circumstances have changed.

12          Not one of these cases invalidates Edible's marks;

13   otherwise, we wouldn't be asserting them in this case.  Most of

14   the cases that involve the Edible marks that are asserted in

15   this case don't have defenses raised against their validity,

16   and to the extent there were, you know, meaningful, substantive

17   challenges, you know, on the issues involved in the prior

18   cases, there is quite a bit of briefing on the public docket.

19          So in all of that context, I can't agree that this

20   information and certainly not the scope that's being requested

21   by defendant should be produced.

22          THE COURT:  All right.  So with this last one then,

23   you know, at this point I do think that the request still needs

24   to be narrowed like I asked.  The other observation that I'm

25   going to make is, you know, I think both sides are trying to

1    represent their clients very vigorously.  In not cooperating

2    with each other, I think you're each doing your client a

3    disservice.  The litigation in this case, even though your

4    client might be litigious, it doesn't need to be this hard or

5    complicated.

6              I think that it's entirely relevant and appropriate

7    for defendants to ask about how the plaintiffs have tried to

8    assert their marks over time, specifically the marks at issue

9    in this case.  What's not appropriate or okay is, you know, for

10   either side to make broad requests or to hide behind very

11   generic objections.

12             So what I'd like you to do is to go back and talk to

13   each other with the sense of mutual cooperation and try to

14   identify, if you can, you know, what the defendants need on the

15   particular topic of asserting its marks, having Edible assert

16   its mark, and what is reasonable for the plaintiffs to provide.

17             I don't necessarily see how discovery requests are

18   going to be relevant to this issue.  I could be way off base,

19   but I don't readily see the relevance there.  Now, you know,

20   when it comes to expert reports, I think that certainly those

21   would be relevant.  But again, if they're being asked in a

22   different context and coming through a different vehicle, as

23   long as you get it, it doesn't really matter.

24             So go back and talk to each other.  If you're still at

25   an impasse, come back to me.  But I need the motion to compel

1    to be a bit more specific, particularly on this issue.

2              MS. HENNER:  Understood, Your Honor.  Thank you.

3              MR. NELSON:  Thank you, Your Honor.

4              THE COURT:  All right.  So it looks like our next

5    ruling date will be July -- I'm sorry -- June 6th, 2023, for a

6    ruling on the summary judgment motions.  I haven't asked.  I'm

7    sure of the answer, but I'm going to ask anyway.  Have you had

8    any settlement discussions?  Is there any interest in

9    settlement at all?

10             MS. HENNER:  Your Honor, this is Lindsay Henner for

11   plaintiffs.  There have been settlement discussions.  The

12   parties have exchanged offers relatively recently, at least

13   within this calendar year.  There is, I think, a fundamental

14   disagreement in what would be required to settle the case, but

15   there have at least been, you know, positions exchanged.

16             THE COURT:  Would the parties be interested in a

17   referral to the magistrate judge for a settlement conference?

18             MR. NELSON:  I think the best time --

19             MS. HENNER:  We're --

20             MR. NELSON:  If I may.

21             MS. HENNER:  I'm sorry.  Go ahead.

22             MR. NELSON:  I think the best time to do that, Your

23   Honor, is after we've had a chance to take depositions.

24             THE COURT:  All right.  So this is what I'm going to

25   do.  I will enter the referral to the magistrate judge today.

1    You can then schedule the settlement conference for sometime

2    towards the close of discovery.  If we need to bump out the

3    expert schedule, that's fine.  Just let me know, but it would

4    probably make sense to try to have this settlement conference

5    before you spend money on experts.  You're not going to see

6    anybody for two months anyway, at which point you should be

7    towards the end of discovery.  Does that make sense?

8              MS. HENNER:  Yes, Your Honor.

9              MR. NELSON:  That works for defendants, Your Honor.

10             THE COURT:  All right.  Then I'll either see you on

11   June 6th, a year from now, for a ruling, or if you need to file

12   anything before then, just let me know.

13             MS. HENNER:  Thank you, Your Honor.

14             THE COURT:  All right.  Thank you.

15             MR. NELSON:  Thank you, Judge.

16        (Proceedings concluded.)

17                 C E R T I F I C A T E

18        I, Patrick J. Mullen, do hereby certify that the
     foregoing is a complete, true, and accurate transcript of the
19   proceedings had in the above-entitled case before the Honorable
     SARA L. ELLIS, one of the judges of said Court, at Chicago,
20   Illinois, on April 7, 2022.

21                        */s/ Patrick J. Mullen*
                        Official Court Reporter
22                      United States District Court
                        Northern District of Illinois
23                      Eastern Division

24

25