# Exhibit B

1           UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3               EASTERN DIVISION

4     ------------------------X

5   EDIBLE IP, LLC; and EDIBLE      :

6   ARRANGEMENTS, LLC,              :

7               Plaintiffs,   :    Case No.

8        v.                   :    1:20-cv-05 840

9   MC BRANDS, LLC; and GREEN THUMB :

10   INDUSTRIES INC.,               :

11               Defendants.   :

12     ------------------------X

13            VIDEOTAPED DEPOSITION OF

14                 TARIQ FARID

15            Monday, July 11, 2022

16                 Atlanta,GA

17                 9:24 a.m.

18

19

20

21   Job No.:  451897

22   Pages:  1 - 354

23   STENOGRAPHICALLY REPORTED BY:

24   GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, CSR

1              Deposition of TARIQ FARID, held at the

2     offices of:

3

4              Greenberg Traurig, LLP (Atlanta)

5              Terminus 200

6              3333 Piedmont Road NE

7              Suite 2500

8              Atlanta, GA 30305

9

10

11

12              Pursuant to agreement, before Giselle

13     Mitchell-Margerum, Registered Professional Reporter,

14     Certified Reporting Instructor, Licensed Court Reporter

15     (TN), Certified Court Reporter (GA), Certified Court

16     Reporter (NJ), Certified Court Reporter (WA), Certified

17     Shorthand Reporter (OR), Certified Shorthand Reporter

18     (CA), and Notary Public (Washington, D.C.).

19

20

21

22

23

24

```
1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF:

3            JOHN BOWLER, ESQ.

4            TROUTMAN PEPPER HAMILTON SANDERS LLP

5            600 Peachtree Street, N.E., Suite 3000

6            Atlanta, GA 30308

7            404.885.3000

8

9    ON BEHALF OF DEFENDANTS:

10           CAMERON NELSON, ESQ.

11           GREENBERG TRAURIG, LLP

12           77 West Wacker Drive, Suite 3100

13           Chicago, IL 60601

14           312.456.8400

15

16

17   ALSO PRESENT:

18           MATTHEW PETERS, ESQ.

19           JASON CARTER, ESQ.

20           ERVIN FARKAS, Videographer

21

22

23

24
```

Transcript of Tariq Farid
Conducted on July 11, 2022                                    14

| | | |
|---|---|---|
| 1 | used for years, and something is to be used for | 09:30:48 |
| 2 | marijuana -- a controlled substance -- it's a | 09:30:52 |
| 3 | concerning... | 09:30:55 |
| 4 | Q.  As of 2011, you didn't have a mark -- a | 09:30:59 |
| 5 | trademark in the word, "edible," did you? | 09:31:01 |
| 6 | ATTORNEY BOWLER:  Objection to form. | 09:31:04 |
| 7 | Foundation.  And asking for a legal conclusion. | 09:31:05 |
| 8 | THE WITNESS:  From what I was told, we had | 09:31:09 |
| 9 | different variations of the word, "edible."  And our | 09:31:11 |
| 10 | mark existed for a long time, "Edible Arrangements." | 09:31:13 |
| 11 | And I'm not really sure, as I sit here, exactly what | 09:31:17 |
| 12 | marks we had by then. | 09:31:20 |
| 13 | BY ATTORNEY NELSON: | 09:31:21 |
| 14 | Q.  Well, just to talk about regular usage, | 09:31:22 |
| 15 | then.  As of 2011, Edible Arrangements had not been | 09:31:24 |
| 16 | using the term, "Edible" alone.  Correct? | 09:31:27 |
| 17 | ATTORNEY BOWLER:  Objection to foundation. | 09:31:30 |
| 18 | Form. | 09:31:31 |
| 19 | THE WITNESS:  Customers were using | 09:31:32 |
| 20 | "Edibles" to refer to us. | 09:31:33 |
| 21 | BY ATTORNEY NELSON: | 09:31:35 |
| 22 | Q.  Do you have any evidence of that?  Any | 09:31:36 |
| 23 | documentary evidence? | 09:31:38 |
| 24 | A.  I'm sure there is sufficient evidence. | 09:31:39 |

1    Q.   I haven't seen any documentary evidence of          09:31:41

2   -- in any of your production, of a consumer               09:31:42

3   referring to your business as "Edible" alone, as of       09:31:44

4   2011.                                                     09:31:48

5        Can you describe this evidence for me?               09:31:49

6    A.   I know --                                           09:31:52

7        ATTORNEY BOWLER:  Objection.  Asked and              09:31:52

8   answered.                                                 09:31:53

9        THE WITNESS:  Customers were referring to            09:31:55

10  us as "Edible" instead of "Edible Arrangements."          09:31:57

11  Instead of using the full name, they would just say       09:31:59

12  "Edible."                                                 09:32:02

13  BY ATTORNEY NELSON:                                       09:32:03

14   Q.   Do you have any evidence --                         09:32:03

15   A.   That was happening from the beginning.              09:32:03

16       ATTORNEY BOWLER:  He just gave you the               09:32:05

17  evidence.                                                 09:32:07

18  BY ATTORNEY NELSON:                                       09:32:08

19   Q.   Do you have any documentary evidence of             09:32:08

20  that?                                                     09:32:09

21   A.   I'm not really sure what documentary                09:32:10

22  evidence we would have.  I would have to refer to         09:32:11

23  the attorneys.                                            09:32:14

24   Q.   Okay.  Can you -- as you sit here today,            09:32:16

1    can you think of any document that will confirm what          09:32:17

2    you just said?                                                09:32:19

3            ATTORNEY BOWLER:  Asked and answered.                 09:32:21

4            THE WITNESS:  As I said earlier, I'm not              09:32:21

5    sure what was produced.  But you would have to                09:32:24

6    consult the attorneys for that.                               09:32:26

7    BY ATTORNEY NELSON:                                           09:32:27

8        Q.   How do you know that consumers were                  09:32:29

9    referring to Edible Arrangements as "Edibles" in             09:32:31

10   2011?                                                         09:32:34

11       A.   We would just hear it.  People would refer           09:32:40

12   to our company, or you would hear it in different --         09:32:43

13   be it programs or other things that would come up.           09:32:51

14   It would refer -- you know, people would refer to it         09:32:55

15   as "Edible."                                                  09:32:57

16       Q.   Can you describe any of these people?               09:32:59

17       A.   Not as I sit here.  No.                              09:33:03

18       Q.   Can you describe any specific circumstance          09:33:05

19   where you heard of a customer referring to Edible            09:33:07

20   Arrangements as "Edible," as of 2011?                        09:33:10

21       A.   Multiple times.  Before 2011.  It was just          09:33:12

22   a short for "Edible Arrangements."                           09:33:15

23       Q.   Would you describe the circumstances for            09:33:17

24   me that you heard that?                                       09:33:18

1    A.    Yeah.    A customer referring to, we have --    09:33:21

2    "We've got an Edible," if somebody showed up to    09:33:23

3    their door.    Or if they came in and they would refer    09:33:27

4    to it as, you know, "I got an Edible delivery."    09:33:30

5    Q.    What customers said that?    09:33:34

6    A.    Multiple customers.    09:33:35

7    Q.    Can you name one?    09:33:36

8    A.    No.    Not as I sit here.    No.    09:33:37

9    Q.    Okay.    Can you name -- can you identify    09:33:39

10   any human being in the world, that referred to your    09:33:41

11   business as "Edible," prior to 2011?    09:33:45

12        ATTORNEY BOWLER:    Objection as asked and    09:33:48

13   answered several times.    09:33:49

14        THE WITNESS:    I can't describe any person.    09:33:51

15   But, you know, you asked me if anybody referred to    09:33:52

16   it and I was stating that multiple people referred    09:33:54

17   to it.    09:33:58

18   BY ATTORNEY NELSON:    09:33:58

19   Q.    But you can't name a single one of them?    09:33:58

20   A.    I don't think anybody can.    But it was --    09:34:00

21   it was a common term being used by people --    09:34:03

22   customers at that time.    09:34:05

23   Q.    If it was a common term, surely, there    09:34:07

24   would be documents or some sort of evidence that    09:34:09

1  this is true.  Right?                                    09:34:12

2      A.   Well --                                         09:34:13

3           ATTORNEY BOWLER:  Objection as asked and        09:34:14

4  answered.  Also as to form.                              09:34:14

5           THE WITNESS:  You would have to consult         09:34:18

6  our attorneys for that.                                  09:34:19

7  BY ATTORNEY NELSON:                                      09:34:20

8      Q.   I'm asking you the question.                    09:34:20

9      A.   I answered.                                     09:34:22

10          ATTORNEY BOWLER:  He said --                     09:34:22

11          ATTORNEY NELSON:  My question was --             09:34:23

12          ATTORNEY BOWLER:  You're badgering --            09:34:25

13 you're badgering my witness.  He's answered this         09:34:26

14 question, Cameron -- Mr. Nelson, several times.          09:34:28

15 BY ATTORNEY NELSON:                                      09:34:31

16     Q.   My question was, if it's common, as you         09:34:31

17 just testified under oath that it was, then surely       09:34:34

18 there would be documents to confirm this.  Correct?      09:34:37

19          ATTORNEY BOWLER:  Objection to form.  And       09:34:39

20 foundation.  Badgering my witness.                       09:34:40

21          THE WITNESS:  I'm not sure what documents       09:34:43

22 exist.  But as someone who was running the business      09:34:45

23 at that time, interacting with customers, I can tell     09:34:46

24 you that multiple people referred to us with just        09:34:50

1    the name, "Edible."                                    09:34:53

2          Or -- and we had different companies             09:34:55

3    registered as "Edibles." And, you know, as they        09:35:00

4    referred to our stores as "Edibles."                   09:35:05

5    BY ATTORNEY NELSON:                                     09:35:08

6        Q.   Who?                                           09:35:09

7        A.   So that's all I can tell you right now.  I     09:35:09

8    couldn't give you any documents.  I don't have any      09:35:12

9    documents.                                              09:35:14

10       Q.   As you testified --                            09:35:16

11       A.   To present to you right now, as I sit          09:35:16

12   here.                                                   09:35:17

13       Q.   And you're telling me, under oath, that        09:35:18

14   you had companies named "Edible" alone, as of 2011?     09:35:19

15         ATTORNEY BOWLER:  My client has answered          09:35:23

16   the question.  And, also, Cameron, stop the             09:35:25

17   condescension.  My client knows he's under oath.        09:35:27

18   You've said this several times.                         09:35:28

19         You don't need to keep telling my client          09:35:31

20   he's under oath.  He knows -- he knows he took the      09:35:33

21   oath at the beginning of this deposition.               09:35:35

22         THE WITNESS:  I'm sorry.  Can you repeat          09:35:38

23   that?                                                   09:35:39

24   BY ATTORNEY NELSON:                                     09:35:39

1      Q.   I believe you just told me that there were          09:35:40

2   companies were named "Edible" alone, as of 2011.  Is       09:35:42

3   that true?                                                  09:35:46

4      A.   I'm not really sure of the date.  I know            09:35:46

5   there's companies named "Edibles."  Yeah.  Those           09:35:49

6   would be referred to as our stores.  As I mentioned        09:35:52

7   earlier, customers were referring to our stores, or        09:35:54

8   our stores -- franchisees would refer to the stores        09:35:56

9   as "Edibles."                                              09:36:00

10     Q.   My entire line of questioning was as of            09:36:02

11  2011.  Not what customers would be doing today.            09:36:04

12     A.   And I --                                           09:36:06

13     Q.   So --                                              09:36:06

14     A.   And I responded by saying I don't know the         09:36:06

15  exact date of when that happened.                          09:36:09

16     Q.   Would you be --                                    09:36:10

17     A.   I'd like to think it happened around or            09:36:10

18  before that.                                               09:36:12

19     Q.   Okay.  And so, there aren't any companies          09:36:13

20  named "Edible," or "Edibles," as of 2011.  Correct?        09:36:16

21     A.   That's not what I said.  I said I'm not            09:36:20

22  sure of the exact date.  I would have to refer to          09:36:22

23  something to find out the date.                            09:36:25

24     Q.   It's a new question.  There aren't any             09:36:27

1    companies named "Edible" or "Edibles," as of 2011,        09:36:29

2    are there?                                                09:36:32

3         A.   I'm not sure.                                   09:36:34

4         Q.   Okay.  You are the CEO of the business?         09:36:34

5         A.   Yes.                                            09:36:35

6         Q.   And who else in your business would be          09:36:36

7    able to confirm your statement that consumers             09:36:42

8    referred to Edible Arrangements as "Edibles," as of       09:36:47

9    2011?                                                     09:36:50

10        A.   Other employees.  Or other people that          09:36:53

11   were around at that time, that dealt with customers.      09:36:56

12        Q.   It was a "who" question.  Who?                  09:36:58

13        A.   Other employees.                                09:37:00

14        Q.   Who?                                            09:37:01

15        A.   I couldn't tell you exactly who.  We would      09:37:07

16   have to see who was around at that time.                  09:37:10

17        Q.   Okay.                                           09:37:13

18             So, if I understand your testimony              09:37:14

19   correctly, in support of your statement that              09:37:16

20   consumers referred to your company as "Edibles" as        09:37:19

21   of 2011, as you sit here today, you can't identify a      09:37:23

22   single document, customer, or employee, who can           09:37:26

23   support that statement?                                   09:37:29

24             ATTORNEY BOWLER:  Objection to form.  And       09:37:31

1   foundation.                                          09:37:33

2          THE WITNESS:  I've answered that already.     09:37:33

3   But it's a common practice in referring to           09:37:35

4   companies, like Dunkin before referred to -- Dunkin  09:37:38

5   Donuts being referred to as "Dunkin."                09:37:41

6          So, customers do that all the time.  I'm      09:37:44

7   sure you've done that where you don't call the       09:37:47

8   company by its full name.  And since the beginning   09:37:49

9   of our name is "Edible," people will commonly refer  09:37:51

10  to us as "Edible."                                   09:37:56

11  BY ATTORNEY NELSON:                                  09:37:56

12     Q.   As you sit here today, though, you can't     09:37:57

13  identify a single customer, document, or employee to 09:37:59

14  confirm that that happened as of 2011.  Correct?     09:38:02

15     A.   I wasn't asked to bring any of that.  So,    09:38:04

16  I couldn't tell you.  You would have to discuss with 09:38:07

17  our attorneys.                                       09:38:09

18     Q.   So the answer to my question is, yes.  You   09:38:10

19  cannot identify a single document, customer, or      09:38:13

20  employee, to confirm your testimony that someone     09:38:16

21  referred to your company as "Edibles," in 2011.      09:38:20

22          ATTORNEY BOWLER:  Objection as asked and     09:38:25

23  answered.  And mischaracterizing the witness'        09:38:26

24  testimony.                                           09:38:30

| | | |
|---|---|---|
| 1 | THE WITNESS:  As I sit here, I can't. | 09:38:31 |
| 2 | ATTORNEY NELSON:  Okay. | 09:38:35 |
| 3 | BY ATTORNEY NELSON: | 09:38:35 |
| 4 | Q.   Now, the document in front of you is a | 09:38:35 |
| 5 | trademark search that the defendants submitted with | 09:38:41 |
| 6 | their interrogatory responses, which lists companies | 09:38:46 |
| 7 | with the word "edible" in their name. | 09:38:48 |
| 8 | Why has Edible Arrangements filed suit | 09:38:52 |
| 9 | against GTI and not the hundreds of other companies | 09:38:56 |
| 10 | in this list? | 09:39:03 |
| 11 | ATTORNEY BOWLER:  Objection to form.  And | 09:39:04 |
| 12 | to the extent that it seeks a legal conclusion or | 09:39:09 |
| 13 | mental impressions of Edible's counsel. | 09:39:14 |
| 14 | THE WITNESS:  I rely on our attorneys and | 09:39:20 |
| 15 | in-house counsel to decide what to pursue, or how | 09:39:25 |
| 16 | they should go about our legal matters.  So I | 09:39:28 |
| 17 | couldn't tell you why. | 09:39:31 |
| 18 | BY ATTORNEY NELSON: | 09:39:32 |
| 19 | Q.   Who decided to file this lawsuit?  You or | 09:39:32 |
| 20 | your in-house counsel? | 09:39:34 |
| 21 | A.   It would have been a discussion with a | 09:39:36 |
| 22 | group of people, that would -- with the in-house | 09:39:38 |
| 23 | counsel being involved. | 09:39:42 |
| 24 | Q.   Okay.  Who else would have been involved | 09:39:44 |

| | | |
|---|---|---|
| 1 | But the other one I answered because it | 10:05:01 |
| 2 | had the word "bakery" in it. But this says | 10:05:03 |
| 3 | "chemistry." So I don't know what they do. I would | 10:05:07 |
| 4 | have to know more. | 10:05:11 |
| 5 | BY ATTORNEY NELSON: | 10:05:12 |
| 6 | Q. Okay. | 10:05:12 |
| 7 | A. To make a -- to even make an opinion. | 10:05:13 |
| 8 | Q. What information did you have about | 10:05:14 |
| 9 | Incredibles when you decided to file this lawsuit? | 10:05:18 |
| 10 | A. I knew of them. I saw what they were | 10:05:21 |
| 11 | doing. They were doing chocolate. And many of the | 10:05:23 |
| 12 | items that we were actually working on. And it was | 10:05:28 |
| 13 | the usage of the name. | 10:05:33 |
| 14 | And then, of course, most important -- | 10:05:37 |
| 15 | most important, we have in-house counsel that | 10:05:40 |
| 16 | actually goes out and performs certain actions to | 10:05:43 |
| 17 | determine the threat, or, you know -- and I think I | 10:05:50 |
| 18 | had discussions with them before. | 10:05:56 |
| 19 | So there was a lot that goes on. I don't | 10:05:57 |
| 20 | recall everything that happened in making that | 10:05:59 |
| 21 | decision. | 10:06:01 |
| 22 | Q. I want to make sure I have your complete | 10:06:04 |
| 23 | answer. My question was what information you had | 10:06:05 |
| 24 | about Incredibles before you decided to file this | 10:06:09 |

1   lawsuit.                                                   10:06:13

2           My understanding of your answer is that           10:06:14

3   you knew that they were doing chocolate.  You             10:06:16

4   knew -- you said use of the name.  What does that         10:06:19

5   mean?                                                     10:06:24

6       A.   So, we have a trademark, "Incredible."           10:06:26

7   The different "Incredible" marks, with the word,          10:06:34

8   "incredible" and the word "edible," or "edibles" in       10:06:37

9   it.  I think it was the usage of their mark.  Usage       10:06:40

10  of the font.                                              10:06:43

11          It was the design of the mark.  And then,         10:06:45

12  of course, the products that were competing.  And         10:06:46

13  how they were using of the mark in reference to           10:06:51

14  their products.                                           10:06:58

15          So, it would be a variety of things.  So,         10:07:00

16  I couldn't tell you all the -- you know, all the          10:07:02

17  factors that were put in front of me to make that         10:07:05

18  decision.                                                 10:07:07

19      Q.   So you were aware that Incredibles -- the         10:07:08

20  Incredibles brand was on chocolate.  Right?               10:07:13

21      A.    I think they are on gummies; chocolate; a       10:07:15

22  variety of candies, and other things.                     10:07:19

23      Q.   Okay.  And did you have samples of all of        10:07:20

24  those things?                                             10:07:24

| | |
|---|---|
| 1  A.  I did not have samples. | 10:07:24 |
| 2  Q.  Did you have photos or images of all those | 10:07:25 |
| 3 things? | 10:07:29 |
| 4  A.  I went to different places where I saw the | 10:07:29 |
| 5 product? | 10:07:31 |
| 6  Q.  You went to dispensaries? | 10:07:33 |
| 7  A.  Yes. | 10:07:35 |
| 8  Q.  Which dispensaries did you go to? | 10:07:36 |
| 9  A.  I'm not really sure where.  I think I saw | 10:07:37 |
| 10 their product in Massachusetts.  At a dispensary in | 10:07:40 |
| 11 Massachusetts. | 10:07:43 |
| 12  Q.  When was this? | 10:07:44 |
| 13  A.  I'm not sure of the exact date.  It would | 10:07:45 |
| 14 be around the time of the letter that was sent or | 10:07:47 |
| 15 the filing of the action. | 10:07:51 |
| 16  Q.  Why did you go to this dispensary in | 10:07:54 |
| 17 Massachusetts? | 10:07:55 |
| 18  A.  Just to see it for myself. | 10:07:57 |
| 19  Q.  So you'd heard of Incredibles before, and | 10:07:59 |
| 20 then you chose to go to a dispensary to see the | 10:08:02 |
| 21 product? | 10:08:04 |
| 22  A.  No.  I think I had -- there was some | 10:08:05 |
| 23 exchange of letters back and forth, or some | 10:08:09 |
| 24 communications.  And then I heard the product. | 10:08:11 |

1   Because somebody told me that they experienced our     10:08:15

2   product at a dispensary.  They thought it was our      10:08:20

3   product.                                               10:08:22

4        And then they mentioned it to me, I think         10:08:24

5   it was in South Hampton -- South Hampton, Mass.  And   10:08:28

6   it went something like, "Oh, I saw -- I saw your       10:08:31

7   Incredible Edibles at -- displayed at a dispensary."   10:08:36

8        And that's when I went to look at it.             10:08:40

9   Q.   Do you have any documentary evidence of           10:08:42

10  this consumer who says that they saw your product at   10:08:44

11  a dispensary?                                          10:08:47

12       ATTORNEY BOWLER:  Objection to form.  And         10:08:51

13  foundation.                                            10:08:51

14       THE WITNESS:  No.  It was someone who just        10:08:53

15  mentioned it to me.                                    10:08:55

16  BY ATTORNEY NELSON:                                    10:08:56

17  Q.   Who?                                              10:08:56

18  A.   I don't -- I don't recall.  It was -- it          10:08:59

19  would have been either a customer or a friend.         10:09:01

20  Dispensaries had just opened in Massachusetts, and I   10:09:04

21  think somebody went there and saw it.                  10:09:07

22       And then, I went and took some pictures;          10:09:09

23  gathered some stuff; and sent it to our in-house       10:09:11

24  counsel.                                               10:09:14

1        Q.   So you had a conversation with a person.          10:09:15

2   You can't tell me if it was a customer or a friend.         10:09:16

3   Can you tell me where this conversation took place?         10:09:20

4        A.   It would have been in Connecticut.                10:09:23

5        Q.   Okay.  Over the phone?  In person?                10:09:25

6        A.   I'm not sure exactly how it happened.             10:09:28

7        Q.   Okay.  Well how -- if it wasn't -- if you         10:09:29

8   -- could it have been over the phone and the person         10:09:33

9   was in California?  How do you know -- when you say          10:09:34

10  it would have been in Connecticut, what do you mean          10:09:38

11  by that?                                                     10:09:39

12       A.   Well, because they referenced the                 10:09:40

13  Massachusetts dispensary.                                    10:09:42

14       Q.   So that also confuses me.  Because you            10:09:44

15  said it would have been in Connecticut, but you're          10:09:46

16  referencing a Massachusetts dispensary.                     10:09:46

17       A.   I said a person in Connecticut.  I was in         10:09:47

18  Connecticut.  You said where was I.  You asked             10:09:49

19  where -- where this happened.  I was in Connecticut.        10:09:52

20       Q.   Right.  I'm asking -- I asked where the          10:09:54

21  conversation took place.                                    10:09:56

22       A.   I'm not sure exactly where the                   10:09:57

23  conversation -- exactly where the conversation took         10:09:58

24  place.                                                       10:10:00

| | |
|---|---|
| 1    Q.   Okay.  So, you don't know who the | 10:10:01 |
| 2  conversation was with.  You can't tell me when it | 10:10:06 |
| 3  was.  You can't tell me where it was? | 10:10:08 |
| 4    A.   Well -- | 10:10:11 |
| 5        ATTORNEY BOWLER:  Objection to form.  And | 10:10:11 |
| 6  foundation. | 10:10:12 |
| 7        THE WITNESS:  I told you -- | 10:10:13 |
| 8        ATTORNEY BOWLER:  And mischaracterizing | 10:10:14 |
| 9  the witness' testimony. | 10:10:15 |
| 10       THE WITNESS:  I told you when it was.  I | 10:10:16 |
| 11 said it was around the time when the letter would | 10:10:18 |
| 12 have been sent, or action would have been taken. | 10:10:20 |
| 13 Because that's when the shock would have been. | 10:10:25 |
| 14       Second, where it was.  I was in | 10:10:28 |
| 15 Connecticut.  So I did answer where it was. | 10:10:30 |
| 16       But who exactly?  I don't know.  It could | 10:10:32 |
| 17 have been just a generic customer, or someone | 10:10:35 |
| 18 calling.  But I do remember -- I'm not sure exactly | 10:10:38 |
| 19 who the friend was. | 10:10:43 |
| 20       I do remember somebody who mentioned it to | 10:10:44 |
| 21 me.  That they saw our product -- the conversation | 10:10:48 |
| 22 went something like, "I saw your product at the | 10:10:52 |
| 23 Massachusetts dispensary." | 10:10:54 |
| 24 BY ATTORNEY NELSON: | 10:10:58 |

1    Q.   And when you say around the time a letter          10:10:58

2   was sent, was this conversation -- this supposed         10:11:02

3   conversation, would it have been before or after a       10:11:05

4   letter was sent?                                         10:11:08

5    A.   This would have been before the legal              10:11:09

6   action.  I think there were some letters or              10:11:10

7   exchanges going on before that.                          10:11:13

8    Q.   Weeks before the legal action?  Months?            10:11:17

9   Years?                                                   10:11:20

10         ATTORNEY BOWLER:  Objection to form.  And         10:11:21

11  foundation.                                              10:11:22

12         THE WITNESS:  I'm not sure -- I'm not sure        10:11:24

13  the exact timing, as I sit here.                         10:11:26

14  BY ATTORNEY NELSON:                                      10:11:31

15   Q.   And are there any documents that would             10:11:31

16  help nail down that date?  Did you send a frantic        10:11:35

17  letter to your counsel, or to someone at the             10:11:39

18  company?                                                 10:11:41

19   A.   I would have sent some pictures, if I took         10:11:41

20  pictures.  Or if I bought the product, I would have      10:11:44

21  sent the product.                                        10:11:49

22   Q.   Well there were a lot of "ifs" in there.           10:11:50

23  Did you, in fact, send pictures or buy any product?      10:11:52

24   A.   Oh.  Yes.  I sent pictures and I did buy           10:11:55

1    some product.  Yes.                                    10:11:58

2        Q.   And when you say you sent pictures and        10:12:00

3    brought product, that's the visit to the dispensary    10:12:03

4    you're --                                              10:12:06

5        A.   That's right.                                 10:12:07

6        Q.   -- talking about?  Okay.                      10:12:07

7             I was still talking about the conversation    10:12:08

8    with the unnamed person.  Is there anything about --   10:12:09

9    any documentation that would verify that that          10:12:12

10   conversation took place?                               10:12:15

11       A.   I'm sure if there was something, you would    10:12:19

12   have gotten access to it.  But I don't remember any    10:12:20

13   documentation.                                         10:12:23

14       Q.   What did you do --                            10:12:27

15       A.   This could have been as part of -- I do       10:12:29

16   store visits.  So it could have been that I was        10:12:31

17   visiting a store and a franchisee mentioned it, or     10:12:33

18   someone mentioned it.                                  10:12:38

19            I just -- I don't -- as I sit here, I         10:12:38

20   don't remember exactly who I had the conversation      10:12:40

21   with, or who mentioned it.  It was a hot topic at      10:12:43

22   that point because dispensaries were opening in        10:12:45

23   Massachusetts.                                         10:12:50

24            And so, it would have been in reference to    10:12:50

1   that.                                              10:12:52

2        Q.   So, since -- you mentioned the word      10:12:53

3   "shock."  What did you do when you were shocked to 10:12:55

4   hear this?                                         10:13:00

5        A.   I think it was the usage of the logo; the 10:13:05

6   name; you know, taking a bite out of the box.  They 10:13:08

7   had -- they had kind of enhanced the logo and the  10:13:14

8   reference of it.  So I think the shock would be in 10:13:17

9   seeing how the product was displayed or being sold. 10:13:21

10            And it's Edibles.  It's infused with THC. 10:13:24

11  So, you know, it's more of a threat at that point,  10:13:30

12  as in to confusion with the customers, and other   10:13:33

13  things.                                            10:13:36

14            So that's probably more shock as a parent 10:13:36

15  or anyone like that.  That -- this product and the 10:13:38

16  confusion that it would cause.                     10:13:42

17       Q.   So was the shock in reaction to the      10:13:46

18  conversation you had with this unnamed person?  Or 10:13:48

19  was it in reaction to actually visiting the        10:13:50

20  dispensary?                                        10:13:52

21       A.   No I -- no.  I didn't get shocked when   10:13:53

22  they mentioned it.  They just said they saw the    10:13:56

23  product.  I wasn't sure what they were talking      10:13:59

24  about.  It could have just been chocolate covered  10:14:01

1    strawberries, or something.  So I wasn't sure what          10:14:04

2    they were talking about until I would go see it.            10:14:07

3        Q.   Okay.  Geographically, where was this              10:14:08

4    dispensary you visited?                                     10:14:11

5        A.   I visited multiple dispensaries in                 10:14:13

6    Massachusetts that were -- I visited dispensaries in        10:14:15

7    California.  I think I saw it for the first time in         10:14:18

8    South Hampton or -- I'm sorry, North Hampton or             10:14:21

9    South Hampton.                                              10:14:25

10           It's one of those towns.  That was the              10:14:26

11   first one that had opened in Massachusetts.                 10:14:29

12       Q.   Why did you visit multiple dispensaries in         10:14:33

13   Massachusetts and California?                               10:14:36

14       A.   Just to see where the product was being           10:14:36

15   carried.  Or if any other products with similar            10:14:38

16   naming conventions were existing.                          10:14:39

17       Q.   Just --                                            10:14:41

18       A.   If they were using our name; or trademark;        10:14:41

19   or anything.                                                10:14:44

20       Q.   When you say "the product," you mean              10:14:44

21   Incredibles products?                                       10:14:46

22       A.   Or others that they may have.                     10:14:47

23       Q.   When you say you visited multiple                 10:14:50

24   dispensaries in Massachusetts and California, was          10:14:52

| | | |
|---|---|---|
| 1 | that after this conversation with this unknown | 10:14:56 |
| 2 | person? | 10:14:58 |
| 3 | A.   No.  Even before that. | 10:14:58 |
| 4 | Q.   Okay. | 10:14:59 |
| 5 | A.   It was -- | 10:15:00 |
| 6 | Q.   So why were you visiting multiple | 10:15:01 |
| 7 | dispensaries before you had this conversation with | 10:15:03 |
| 8 | this unknown person about Incredibles? | 10:15:06 |
| 9 | A.   Just to learn about, one, the industry, | 10:15:08 |
| 10 | and how -- what type of product was out there.  And | 10:15:11 |
| 11 | what different brands were doing.  And we did not | 10:15:15 |
| 12 | find many brands using the word, "edible" or | 10:15:18 |
| 13 | "edibles" on their packaging or their name. | 10:15:21 |
| 14 | Q.   You realize there are hundreds of brands | 10:15:24 |
| 15 | using "edible" or "edibles" on their packaging in | 10:15:26 |
| 16 | the cannabis industry.  Right? | 10:15:28 |
| 17 | ATTORNEY BOWLER:  Objection to form. | 10:15:30 |
| 18 | THE WITNESS:  Not that I've -- | 10:15:32 |
| 19 | ATTORNEY BOWLER:  And foundation. | 10:15:33 |
| 20 | THE WITNESS:  Not that I've seen so far | 10:15:35 |
| 21 | with the dispensaries.  But maybe you have | 10:15:37 |
| 22 | something. | 10:15:39 |
| 23 | BY ATTORNEY NELSON: | 10:15:39 |
| 24 | Q.   Well, that list in front of you includes | 10:15:39 |

1    many of those brands that are using "edible" or          10:15:42

2    "edibles" as their trademark.                            10:15:44

3           Are you not familiar with any of those            10:15:46

4    brands in the cannabis industry?                         10:15:49

5           ATTORNEY BOWLER:  Objection to form.  And         10:15:50

6    foundation.                                              10:15:51

7           THE WITNESS:  I haven't seen products of          10:15:52

8    any of these brands that you've put in front of me.      10:15:55

9    BY ATTORNEY NELSON:                                      10:15:57

10       Q.   Okay.  Other than visiting multiple             10:15:58

11   dispensaries in Massachusetts and California, did        10:16:01

12   you take any other steps to educate yourself as to       10:16:03

13   the use of the term, "edible" or "edibles" in the        10:16:07

14   cannabis industry?                                       10:16:12

15       A.   Did I take any --                               10:16:16

16          ATTORNEY BOWLER:  Objection.  As a                10:16:17

17   mischaracterization of prior testimony.                  10:16:18

18          But the witness can answer.                       10:16:21

19          THE WITNESS:  I'm sorry.  Can you repeat          10:16:24

20   that?                                                    10:16:25

21   BY ATTORNEY NELSON:                                      10:16:25

22       Q.   Other than visiting multiple dispensaries       10:16:25

23   in Massachusetts and California, did you take any        10:16:27

24   other steps to educate yourself as to the use of the     10:16:29

| | | |
|---|---|---|
| 1 | term, "edible" or "edibles" in the cannabis | 10:16:32 |
| 2 | industry? | 10:16:36 |
| 3 |     A.   I would speak with our attorneys or other | 10:16:36 |
| 4 | law firms and consultants. | 10:16:38 |
| 5 |     Q.   Which consultants? | 10:16:41 |
| 6 |     A.   Whatever the law firms would put in front | 10:16:45 |
| 7 | of me, as to anybody who may have opinions or | 10:16:46 |
| 8 | writings. | 10:16:49 |
| 9 |     Q.   Are these non-legal opinions? | 10:16:52 |
| 10 |     A.   No -- | 10:16:56 |
| 11 |     ATTORNEY BOWLER:  Since I'm following the | 10:16:57 |
| 12 | line of questioning, I just caution the witness not | 10:16:58 |
| 13 | to reveal communications with counsel. | 10:17:00 |
| 14 |     THE WITNESS:  Mostly legal. | 10:17:06 |
| 15 | BY ATTORNEY NELSON: | 10:17:08 |
| 16 |     Q.   Did you look at any non-legal documents | 10:17:08 |
| 17 | pertaining to the use of "edible" or "edibles" in | 10:17:11 |
| 18 | the cannabis industry? | 10:17:14 |
| 19 |     A.   Well, I'm sure publications.  Yes. | 10:17:16 |
| 20 |     Q.   Can you identify any? | 10:17:19 |
| 21 |     A.   No.  Not as I sit here. | 10:17:20 |
| 22 |     Q.   Where would you have stored these? | 10:17:23 |
| 23 |     A.   I would have seen these on internet or | 10:17:25 |
| 24 | email messages, or things that would come in that | 10:17:28 |

1   other people would send me.  But nothing that I can        10:17:30

2   recall, as I sit here, as to who they were from.           10:17:34

3       Q.   So other than speaking with your counsel          10:17:37

4   and visiting multiple dispensaries in Massachusetts        10:17:39

5   and California, have you done anything else to             10:17:41

6   educate yourself as to the use of the term, "edible"       10:17:44

7   or "edibles" in the cannabis industry?                     10:17:46

8       A.   Other than that, no.                              10:17:58

9       Q.   Okay.  So, you mentioned that you                 10:17:59

10  obtained -- that you took photos and obtained              10:18:03

11  samples during at least some of these visits.              10:18:08

12          Is that correct?                                   10:18:11

13      A.   That's right.                                     10:18:11

14      Q.   Did you do that during every visit to a           10:18:11

15  dispensary?                                                10:18:13

16      A.   If I saw a product that was concerning.           10:18:14

17  Yes.                                                       10:18:20

18      Q.   What did you do with those photos?                10:18:21

19      A.   Except for Incredibles, I don't remember          10:18:24

20  taking any other product that had any kind of              10:18:27

21  concerning language or usage of marks, or anything         10:18:31

22  on there.                                                  10:18:34

23          So, if I did, it would mostly be the               10:18:36

24  incredible product.                                        10:18:38

1      Q.   What did you do --                          10:18:39

2      A.   I was in -- so, if I got anything like      10:18:40

3   that -- I was just going to answer, if I had         10:18:43

4   anything like that, I would either take pictures or  10:18:45

5   send the product to our legal counsel.               10:18:48

6      Q.   In-house or outside counsel?                 10:18:50

7      A.   In-house.  And they would determine what     10:18:52

8   to do.                                               10:18:53

9      Q.   And you obtained samples of products?        10:18:54

10     A.   If -- if available.  Yes.                    10:18:57

11     Q.   Did you, in fact, obtain samples of          10:19:00

12  Incredibles products?                                10:19:02

13     A.   I believe in Massachusetts.  Yes.            10:19:03

14     Q.   And you provided those to in-house           10:19:07

15  counsel?                                             10:19:09

16     A.   I believe so.                                10:19:14

17     Q.   Did you get a receipt?                       10:19:15

18     A.   That's not the practice.                     10:19:20

19     Q.   Did you get a receipt?                       10:19:21

20     A.   Receipt from who?                            10:19:24

21     Q.   From the dispensary.                         10:19:25

22     A.   I'm sure there was a receipt.  Yes.          10:19:28

23     Q.   Okay.  Did you provide that to in-house      10:19:30

24  counsel?                                             10:19:32

1    A.    I may have.  I may have.                    10:19:34

2    Q.    You're not sure?                            10:19:36

3    A.    Not sure.                                   10:19:38

4    Q.    How long before you filed this lawsuit did  10:19:41

5    you do this?                                      10:19:43

6    A.    I have no idea, as I sit here.              10:19:44

7    Q.    And how many dispensaries did you take      10:19:47

8    photos?                                           10:19:48

9    A.    Only one.                                   10:19:49

10   Q.    And how many -- and how many dispensaries   10:19:50

11   did you obtain samples?                           10:19:52

12   A.    Only one.                                   10:19:53

13   Q.    Okay.  And that's a dispensary somewhere    10:19:54

14   in South Hampton?                                 10:19:58

15   A.    Somewhere near Springfield, Mass.           10:20:00

16   Q.    And do you remember the brand name of the   10:20:04

17   dispensary?                                       10:20:06

18   A.    Insa.                                       10:20:06

19   Q.    Can you spell that for the court reporter,  10:20:08

20   please?                                           10:20:10

21   A.    I-N-S-A.                                    10:20:10

22   Q.    Did this occur before or after you sent a   10:20:24

23   cease and desist letter to Rick and Bob Eschino?  10:20:27

24        ATTORNEY BOWLER:  Objection to foundation.   10:20:39

| | | |
|---|---|---|
| 1 | THE WITNESS:  I am not sure of the exact | 10:20:42 |
| 2 | date.  I couldn't tell you the timeline.  This was a | 10:20:44 |
| 3 | while ago. | 10:20:47 |
| 4 | BY ATTORNEY NELSON: | 10:20:47 |
| 5 | Q.  Just to be clear, I'm not asking you the | 10:20:48 |
| 6 | exact date.  I'm just asking you sequence. | 10:20:49 |
| 7 | A.  I would be guessing. | 10:20:52 |
| 8 | Q.  Okay.  You don't know? | 10:20:53 |
| 9 | A.  I would be guessing. | 10:20:59 |
| 10 | Q.  So, I think I need to go back.  I'm not | 10:21:01 |
| 11 | sure I understand.  Were you visiting dispensaries | 10:21:08 |
| 12 | in Massachusetts and California, just in general, to | 10:21:11 |
| 13 | see what was going on in the cannabis industry? | 10:21:15 |
| 14 | A.  No.  Mostly related to the edibles, where | 10:21:18 |
| 15 | the product was available, or if -- what was the | 10:21:25 |
| 16 | usage of the term.  But not about cannabis. | 10:21:28 |
| 17 | Q.  Okay.  And when you say mostly related to | 10:21:34 |
| 18 | the edibles, you mean any edibles?  Any brand of | 10:21:38 |
| 19 | edibles? | 10:21:42 |
| 20 | A.  Any kind of issues that may come up. | 10:21:42 |
| 21 | Q.  Okay.  Because you don't like that the | 10:21:48 |
| 22 | cannabis industry uses the term, "edibles?" | 10:21:51 |
| 23 | ATTORNEY BOWLER:  Objection to form.  And | 10:21:56 |
| 24 | foundation. | 10:21:57 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  I am concerned with the | 10:21:58 |
| 2 | cannabis industry using the word, "edibles" for -- | 10:22:00 |
| 3 | to getting people high.  I'm concerned with that. | 10:22:05 |
| 4 | Yes. | 10:22:08 |
| 5 | BY ATTORNEY NELSON: | 10:22:13 |
| 6 | Q.   Okay.  Now, how many dispensaries, total, | 10:22:13 |
| 7 | did you visit? | 10:22:15 |
| 8 | A.   Since? | 10:22:20 |
| 9 | Q.   Total.  Ever. | 10:22:21 |
| 10 | A.   I mean, ever? | 10:22:22 |
| 11 | Q.   Yeah. | 10:22:24 |
| 12 | A.   That would be impossible to answer. | 10:22:25 |
| 13 | Q.   More than 20? | 10:22:27 |
| 14 | A.   I'm sure. | 10:22:28 |
| 15 | Q.   Do you ever go visit dispensaries for | 10:22:32 |
| 16 | personal use? | 10:22:35 |
| 17 | A.   For personal use of? | 10:22:35 |
| 18 | Q.   Did you ever visit a dispensary to buy | 10:22:40 |
| 19 | something for yourself? | 10:22:42 |
| 20 | A.   Only if I am buying samples, or buying | 10:22:43 |
| 21 | something, I'm buying it for myself. | 10:22:47 |
| 22 | Q.   I mean for you to personally consume -- | 10:22:48 |
| 23 | A.   No. | 10:22:51 |
| 24 | Q.   -- as opposed to you doing more research? | 10:22:51 |

1        A.    No.                                          10:22:55

2        Q.    Okay.  And you've done that at least 20      10:22:55

3   times?                                                  10:22:58

4        A.    No.  You asked how many times I may have     10:22:58

5   visits dispensaries.                                    10:23:00

6        Q.    Right?                                        10:23:02

7        A.    I mean, those are two different things.       10:23:02

8   Buying and visiting are two different things.           10:23:04

9        Q.    Okay.  You've visited dispensaries at         10:23:07

10  least 20 times?                                          10:23:10

11       A.    Yes.                                          10:23:11

12       Q.    And is it only on one occasion that you       10:23:11

13  saw Incredibles products?                                10:23:13

14       A.    On one occasion, I bought the Incredibles     10:23:19

15  products.  I may have seen it more than once.            10:23:21

16       Q.    Are you not sure?                             10:23:25

17       A.    I think I've seen it more than once.          10:23:26

18       Q.    Is it possible that the time you bought       10:23:28

19  them is the only time you've seen them?                  10:23:30

20       A.    What would you like the answer to be?         10:23:32

21       Q.    Well, I would like the answer to be the       10:23:35

22  truth.                                                   10:23:37

23       A.    But I said it.  That I bought it once.        10:23:37

24  But I've seen it multiple times.                         10:23:39

1    Q.   Okay.  You said "may have" earlier.  And    10:23:41

2    I'm just trying to --    10:23:43

3    A.   I didn't say "may have."    10:23:45

4    Q.   So, the -- where are the samples today    10:23:46

5    that you -- that you bought?    10:23:51

6    A.   I have no idea.    10:23:54

7    Q.   Where is the receipt?    10:23:55

8         ATTORNEY BOWLER:  He -- well, objection.    10:23:58

9    Foundation.    10:23:59

10        THE WITNESS:  I have no idea where the    10:24:03

11   receipt is.    10:24:04

12   BY ATTORNEY NELSON:    10:24:05

13   Q.   Where are the photos?    10:24:06

14   A.   I'm sure the photos are with the people    10:24:10

15   that I sent them to.    10:24:12

16   Q.   Other than conversations with your    10:24:28

17   counsel, have we exhausted the topic of what you've    10:24:30

18   done to research Incredibles products?    10:24:33

19   A.   Is there a question?  I mean, have I    10:24:40

20   exhausted?    10:24:44

21   Q.   In our discussion today, have we    10:24:44

22   exhausted -- is that everything you've done to    10:24:47

23   research Incredibles products?    10:24:50

24   A.   I'm not sure.    10:24:52

| | |
|---|---|
| 1 | Q. Okay. What would you need to look at to | 10:24:52 |
| 2 | be sure? | 10:24:56 |
| 3 | A. In reference to? | 10:25:03 |
| 4 | Q. Your efforts to research Incredibles | 10:25:04 |
| 5 | products. | 10:25:06 |
| 6 | A. I mean, the industry is still developing. | 10:25:10 |
| 7 | There is a lot going on. So, I mean, you know, I | 10:25:13 |
| 8 | continue to refer to things and I'm not really sure | 10:25:16 |
| 9 | what you mean. | 10:25:18 |
| 10 | I mean, it hasn't matured. So, I don't | 10:25:19 |
| 11 | know what you mean by have I exhausted. | 10:25:22 |
| 12 | Q. When -- my question was about Incredibles | 10:25:25 |
| 13 | products. GTI's products, specifically. So | 10:25:29 |
| 14 | those -- | 10:25:33 |
| 15 | A. That's not -- | 10:25:33 |
| 16 | Q. -- are Incredibles -- | 10:25:34 |
| 17 | A. That's not what you said a little while | 10:25:34 |
| 18 | ago. You said about edibles. But you didn't use | 10:25:36 |
| 19 | "Incredibles." But go ahead. I'll let you ask that | 10:25:39 |
| 20 | again. | 10:25:41 |
| 21 | Q. I did say that. I have the transcript | 10:25:42 |
| 22 | right here. But my question is, so, we've discussed | 10:25:43 |
| 23 | visits to dispensaries? | 10:25:48 |
| 24 | A. Yes. | 10:25:49 |

1     Q.   And we've discussed -- you said you've,          10:25:49

2   you know, conferred with counsel.  Is that              10:25:52

3   everything you've done to research Incredibles          10:25:54

4   products?                                               10:25:57

5     A.   Yes.                                             10:26:04

6     Q.   Okay.                                            10:26:04

7         ATTORNEY BOWLER:  Counsel, let's take a           10:26:05

8   short break.  We've been going about an hour.           10:26:06

9         ATTORNEY NELSON:  Okay.                           10:26:09

10        THE VIDEOGRAPHER:  We are going off the           10:26:11

11  record.  The time is 10:25 a.m..                        10:26:12

12        (Short break.)                                    10:26:14

13        THE VIDEOGRAPHER:  Going back on the              10:41:44

14  record at 10:41 a.m..  Please continue.                 10:41:44

15  BY ATTORNEY NELSON:                                     10:41:48

16    Q.   Mr. Farid, has Edible Arrangements ever          10:41:49

17  undertaken a comprehensive search for -- well,          10:41:51

18  applied for registered trademarks using the word,       10:41:55

19  "edible?"                                               10:41:58

20    A.   I'm sorry.  Can you repeat that,                 10:42:00

21  Mr. Nelson?  I didn't understand the question.          10:42:02

22    Q.   Has Edible Arrangements ever taken a             10:42:04

23  comprehensive search, or applied for registered         10:42:06

24  trademarks using the word "edible?"                     10:42:10

Transcript of Tariq Farid
Conducted on July 11, 2022                                    129

| | | |
|---|---|---|
| 1 | now. | 11:40:07 |
| 2 | BY ATTORNEY NELSON: | 11:40:07 |
| 3 |     Q.  You are not aware of any factual basis | 11:40:07 |
| 4 | beyond what's in the complaint? | 11:40:10 |
| 5 |         ATTORNEY BOWLER:  Objection as | 11:40:12 |
| 6 | mischaracterizing the witness' testimony. | 11:40:13 |
| 7 |         THE WITNESS:  It would have to be whatever | 11:40:14 |
| 8 | is in the complaint. | 11:40:16 |
| 9 | BY ATTORNEY NELSON: | 11:40:17 |
| 10 |     Q.  Are you aware of any factual basis beyond | 11:40:17 |
| 11 | what's in the complaint? | 11:40:19 |
| 12 |     A.  Not as I sit here.  Unless I refer to some | 11:40:23 |
| 13 | document or consult with our attorneys.  I couldn't | 11:40:25 |
| 14 | tell you. | 11:40:28 |
| 15 |     Q.  At the time Edible Arrangements filed a | 11:40:28 |
| 16 | complaint, was it aware that the Incredibles brand | 11:40:31 |
| 17 | had been around since 2010? | 11:40:35 |
| 18 |         ATTORNEY BOWLER:  Objection as asked and | 11:40:38 |
| 19 | answered several times. | 11:40:38 |
| 20 |         THE WITNESS:  I couldn't tell you what | 11:40:41 |
| 21 | exact timeline we had or how long it had been around | 11:40:42 |
| 22 | in -- whatever the date you're referring to when we | 11:40:46 |
| 23 | filed a complaint. | 11:40:52 |
| 24 |         I wouldn't know the state by then.  I know | 11:40:54 |

| | | |
|---|---|---|
| 1 | there were discussions going on before that.  I'm | 11:40:56 |
| 2 | sure we were aware. | 11:40:58 |
| 3 | BY ATTORNEY NELSON: | 11:40:59 |
| 4 | Q.   And you never asked anyone, "Hey, how can | 11:40:59 |
| 5 | we sue a company that's been in business in the | 11:41:01 |
| 6 | cannabis business for nearly 10 years when we just | 11:41:05 |
| 7 | started in the cannabis business?" | 11:41:08 |
| 8 | ATTORNEY BOWLER:  Objection as -- to form. | 11:41:10 |
| 9 | And foundation. | 11:41:11 |
| 10 | And I caution the witness -- the -- the | 11:41:12 |
| 11 | witness not to reveal communications or questions | 11:41:14 |
| 12 | that may or may not have been posed to his legal | 11:41:18 |
| 13 | counsel. | 11:41:22 |
| 14 | THE WITNESS:  I'd like to move a lot | 11:41:27 |
| 15 | quicker if I could.  But I have to rely on my | 11:41:29 |
| 16 | attorneys, you know, and whatever course -- the | 11:41:31 |
| 17 | legal course is, and rely on their opinions. | 11:41:35 |
| 18 | And, you know, in consulting with them, is | 11:41:37 |
| 19 | how whatever that lawsuit came about, whenever it | 11:41:41 |
| 20 | came about, it's a collaboration with lots of | 11:41:44 |
| 21 | attorneys and experts. | 11:41:54 |
| 22 | So, you know, what we knew before that, I | 11:41:55 |
| 23 | couldn't tell you.  Or what discussions that | 11:41:57 |
| 24 | happened, I couldn't tell you. | 11:41:58 |

| | | |
|---|---|---|
| 1 | BY ATTORNEY NELSON: | 11:41:59 |
| 2 | Q.   What happened between 2016 and 2020 -- | 11:42:00 |
| 3 | 2016 being when you -- your attorneys were | 11:42:04 |
| 4 | definitely aware of Incredibles -- the Incredibles | 11:42:07 |
| 5 | brand -- that caused Edible Arrangements to file | 11:42:09 |
| 6 | this lawsuit in 2020? | 11:42:12 |
| 7 | ATTORNEY BOWLER:  Objection to form.  And | 11:42:14 |
| 8 | foundation. | 11:42:15 |
| 9 | THE WITNESS:  I'm not sure, as I sit here, | 11:42:21 |
| 10 | what exactly happened.  If these are discussions | 11:42:22 |
| 11 | that happened internally, there's a lot of factors | 11:42:24 |
| 12 | that go in to making a determination as in to what | 11:42:27 |
| 13 | action to take, or what to pursue. | 11:42:30 |
| 14 | So I couldn't tell you what was the exact | 11:42:32 |
| 15 | determination.  But my outside counsel and my | 11:42:37 |
| 16 | in-house attorneys would actually give me an opinion | 11:42:39 |
| 17 | that this is what we should do. | 11:42:42 |
| 18 | And most times, I agree with it and pursue | 11:42:43 |
| 19 | it according to their, you know, instructions. | 11:42:47 |
| 20 | BY ATTORNEY NELSON: | 11:42:49 |
| 21 | Q.   At the time Edible Arrangements filed this | 11:42:51 |
| 22 | lawsuit in 2020, did it have any evidence that | 11:42:51 |
| 23 | consumers considered the cannabis industry, and the | 11:42:58 |
| 24 | fruit basket delivery business, to be similar? | 11:43:05 |

1    A.    Yes.                                              11:43:12

2    Q.    What evidence is that?                            11:43:12

3    A.    Well, we had people walking into our             11:43:13

4    stores in, be it California, or Colorado, asking if    11:43:15

5    we sell edibles.  Or if we sell THC, I should say,     11:43:19

6    more than edibles.  Because we always sold things      11:43:22

7    that were edible.                                      11:43:25

8         But they would be asking if we sell THC or        11:43:26

9    CBD-based products -- mostly THC-based products in     11:43:29

10   Colorado or California.  Or other areas.               11:43:32

11        And, as I had mentioned earlier, as soon          11:43:35

12   as somebody saw it at a dispensary, they thought it    11:43:37

13   was our product.                                       11:43:40

14   Q.    Do you have any documentary evidence of          11:43:41

15   any of these customer interactions you just            11:43:42

16   testified to?                                          11:43:46

17   A.    I don't have any documentary evidence as I       11:43:46

18   sit here right now.                                    11:43:49

19   Q.    I'm asking whether Edible Arrangements has       11:43:51

20   any.  I haven't seen any.                              11:43:53

21   A.    I'm not sure what we have.  But you asked        11:43:56

22   me for my opinion and I gave you my opinion of what    11:43:58

23   we were seeing and what we were hearing.               11:44:01

24   Q.    I was actually asking for facts in that          11:44:04

1    question.  So I just want to be clear.  I'm not          11:44:08
2    asking for your opinion about whether customers --        11:44:10
3    consumers might have walked into the store.              11:44:13
4           You testified as to whether or not --             11:44:13
5        A.   That's a fact.  I mean, that -- I had a          11:44:15
6    franchisee call me and tell me that "Hey, there is a      11:44:17
7    great opportunity.  There are people walking in           11:44:20
8    asking if we could do this."                             11:44:22
9           And I told him you can't, because it's a           11:44:22
10   controlled substance and it's a dispensary.  So,         11:44:25
11   I -- I personally had conversations with                 11:44:28
12   franchisees.  So if you're asking me, yes.               11:44:33
13       Q.   Can you name a single franchisee you had         11:44:35
14   this conversation with --                                11:44:37
15       A.   Richard -- I don't know his last name --         11:44:38
16   Folkman, out of Colorado.                                11:44:40
17       Q.   Can you spell that, please?                      11:44:42
18       A.   F-O-L-K-M-A-N.                                   11:44:44
19       Q.   How long have you been doing business with       11:44:47
20   Richard -- Mr. Richard Folkman?                          11:44:50
21       A.   Oh, he is not in our system anymore.  But        11:44:51
22   I remember him calling me once the dispensaries          11:44:53
23   started opening up in Colorado.                          11:44:56
24       Q.   Why is he not in your system anymore?            11:44:58

| | | |
|---|---|---|
| 1 | A.   He sold his store. | 11:45:01 |
| 2 | Q.   Where can I contact Mr. Folkman? | 11:45:02 |
| 3 | A.   You would have to discuss that with our | 11:45:05 |
| 4 | attorneys, I guess. | 11:45:10 |
| 5 | Q.   And is it your testimony that Mr. Folkman | 11:45:12 |
| 6 | called you and said a customer came into his store | 11:45:14 |
| 7 | and asked for THC edibles? | 11:45:17 |
| 8 | A.   Multiple franchisees did.  And I remember | 11:45:19 |
| 9 | having a discussion with Richard Folkman. | 11:45:21 |
| 10 | Q.   That discussion with Mr. Folkman? | 11:45:25 |
| 11 | A.   About the customers walking in or asking, | 11:45:29 |
| 12 | "When will you carry," or "Do you carry." | 11:45:31 |
| 13 | Q.   So let me ask my question again.  Because | 11:45:34 |
| 14 | you kind of danced around it -- | 11:45:36 |
| 15 | A.   Oh.  I'm not dancing around anything.  I'm | 11:45:38 |
| 16 | being truthful -- | 11:45:40 |
| 17 | ATTORNEY NELSON:  Did -- | 11:45:40 |
| 18 | ATTORNEY BOWLER:  I don't think -- | 11:45:42 |
| 19 | THE WITNESS:  It's actually not necessary. | 11:45:42 |
| 20 | Honestly, I've taken an oath.  I'm not going to | 11:45:43 |
| 21 | dance.  I'm going to give you the honest answers. | 11:45:47 |
| 22 | BY ATTORNEY NELSON: | 11:45:47 |
| 23 | Q.   Did Mr. Folkman tell you that a customer | 11:45:48 |
| 24 | walked into a store, asking for THC edibles? | 11:45:51 |

1       A.   I don't remember exactly the conversation.    11:45:53

2   But when legalization happened in Colorado, I         11:45:56

3   remember a discussion with Richard Folkman about       11:46:01

4   either carrying the product or people are asking --    11:46:10

5   they are walking in and asking, "Do you carry THC      11:46:12

6   product."                                              11:46:15

7       Q.   I am not asking you about general             11:46:15

8   discussions with the cannabis industry.  I am asking   11:46:17

9   you specifically, whether Mr. Folkman told you a       11:46:19

10  consumer came in to an Edible Arrangements store and   11:46:22

11  asked you if you carry THC products.                   11:46:25

12      A.   Mr. Nelson, I just gave you a name.  So       11:46:31

13  you should be jumping up and down right now.           11:46:34

14      Q.   No.                                           11:46:38

15      A.   You can go -- you know, you can -- you        11:46:38

16  asked me.  I'm under oath.  And I've told you of the   11:46:38

17  person I remember.  Because I do remember a            11:46:42

18  conversation with Richard Folkman.                     11:46:44

19          I don't remember the details of that          11:46:48

20  conversation.  I don't remember the details of that   11:46:50

21  conversation, but the conversation was similar to     11:46:52

22  what I said earlier.  That people are asking, do      11:46:53

23  you -- you know, "Do you carry THC-based products"    11:46:57

24  or, you know.                                          11:47:00

1    And I have other -- but I do not recall                11:47:05

2    names of other.  Because there was a lot of interest    11:47:07

3    at one time between our California stores, or           11:47:10

4    others.  Because we have a name outside, "Edible."      11:47:14

5    Some people will bump in thinking we carry the          11:47:16

6    product.                                                11:47:21

7        Q.   Other than your conversation with             11:47:21

8    Mr. Folkman, can you identify anyone else you had       11:47:22

9    this conversation with?                                 11:47:26

10       A.   No.                                            11:47:28

11       Q.   Specifically --                                11:47:28

12       A.   No, I can't.                                   11:47:28

13       Q.   And, again, I'm not asking --                  11:47:28

14       A.   Mr. Nelson, I identified --                    11:47:31

15       Q.   Let me ask my question.                        11:47:33

16       A.   Okay.                                          11:47:34

17       Q.   I'm not asking you about did you have a        11:47:34

18   general conversation about cannabis; or whether it's    11:47:37

19   a good idea; or whether this would be cool.             11:47:38

20       I'm asking you specifically whether you             11:47:41

21   are aware of conversations of a consumer entering a     11:47:43

22   store and specifically looking to buy THC edibles?      11:47:46

23       A.   Okay.  Repeat that.  Let me listen            11:47:51

24   carefully.                                              11:47:54

1    Q.   Are you aware -- can you identify anyone          11:47:55

2    else you've had a conversation with, relating a        11:47:56

3    story of a consumer entering a store, specifically     11:48:02

4    asking for THC edibles?                                11:48:04

5    A.   The only one that I recall the                    11:48:06

6    conversation with is Richard.  He is one of our        11:48:08

7    oldest franchisees out of Colorado.  Others called     11:48:12

8    me and I had those discussions with others.  I do      11:48:19

9    not recall who those franchisees were.                 11:48:21

10           I've had other CEOs or executives mention      11:48:24

11   to me, "You know, are you going to carry it?  Or do    11:48:28

12   you carry the product?  Or where it's available?"      11:48:31

13   You know, where would the -- the cannabis-infused      11:48:33

14   products be -- cannabis-infused CBD product or         11:48:37

15   others are available.                                  11:48:41

16           I have had discussions with many.  But I       11:48:41

17   do not recall, beyond Richard, having -- because       11:48:46

18   there was a deep discussion with him.  He owns         11:48:50

19   multiple stores in Colorado.                           11:48:52

20           So, I do not recall anyone else, as I sit      11:48:54

21   here.                                                  11:48:56

22   Q.   Okay.                                             11:49:00

23   ATTORNEY NELSON:  Now is a good time for a             11:49:01

24   lunch break.  I have a call I need to make, so I'm     11:49:03

Transcript of Tariq Farid
Conducted on July 11, 2022                                    233

| | | |
|---|---|---|
| 1 | in it, it's got to be sold in a dispensary.  Right? | 02:43:35 |
| 2 | A.   No.  That's not true. | 02:43:38 |
| 3 | Q.   It's not? | 02:43:39 |
| 4 | A.   Minnesota just -- you can buy THC-based | 02:43:40 |
| 5 | edibles over the counter. | 02:43:44 |
| 6 | Q.   In a dispensary.  Right? | 02:43:46 |
| 7 | A.   No.  In CBD stores, or anywhere where CBD | 02:43:47 |
| 8 | is sold.  You can still buy THC. | 02:43:50 |
| 9 | Q.   In Minnesota? | 02:43:53 |
| 10 | A.   Minnesota. | 02:43:56 |
| 11 | Q.   At the time this was created, that wasn't | 02:43:57 |
| 12 | true.  Right? | 02:43:58 |
| 13 | A.   I'm not sure what was happening in | 02:43:59 |
| 14 | different states at that time, or where -- where | 02:44:00 |
| 15 | Incredibles was available. | 02:44:03 |
| 16 | Q.   The reality is in 2019, Edible | 02:44:04 |
| 17 | Arrangements didn't consider Incredibles to be a | 02:44:07 |
| 18 | competitive brand; did it? | 02:44:11 |
| 19 | ATTORNEY BOWLER:  Objection to foundation. | 02:44:14 |
| 20 | THE WITNESS:  I think it was -- | 02:44:16 |
| 21 | ATTORNEY BOWLER:  And, by the way, in | 02:44:17 |
| 22 | the -- I'd note for the line of questioning that | 02:44:18 |
| 23 | this is not a 30(b)(6) witness. | 02:44:26 |
| 24 | You asked -- you've a couple times asked | 02:44:28 |

1  him about the company's position, and he is here as          02:44:32

2  a percipient witness in his individual capacity.            02:44:37

3          That's -- objection to foundation.                  02:44:41

4  BY ATTORNEY NELSON:                                         02:44:46

5      Q.   The fact is in 2019, neither Edible                02:44:47

6  Arrangements nor its affiliate, Incredible Edibles,         02:44:50

7  considered Incredibles to be a competitive brand.           02:44:54

8  Right?                                                      02:44:57

9          ATTORNEY BOWLER:  Objection as to                   02:44:58

10 foundation.                                                 02:44:59

11         THE WITNESS:  I think they were on our              02:44:59

12 radar and we had issues with the confusion they were        02:45:01

13 causing by using our brand, or, you know, infringing        02:45:05

14 on our brand.                                               02:45:10

15         They are not referenced in here, but these          02:45:12

16 are major brands' chains throughout the country.            02:45:14

17 And I'm not sure how they were looked at at that            02:45:19

18 time.  But definitely on our radar, and a brand of          02:45:23

19 concern.                                                    02:45:27

20     Q.   You said confusion they were causing.  But        02:45:31

21 as far as I know, neither you nor your counsel have         02:45:34

22 produced a single document suggesting any actual            02:45:36

23 confusion.                                                  02:45:40

24         Are you aware of any actual confusion that          02:45:41

| | | |
|---|---|---|
| 1 | has arisen between Incredibles and Edible | 02:45:43 |
| 2 | Arrangements? | 02:45:47 |
| 3 | ATTORNEY BOWLER:  Objection to form.  And | 02:45:48 |
| 4 | foundation.  And to the extent it seeks a legal | 02:45:48 |
| 5 | conclusion. | 02:45:51 |
| 6 | THE WITNESS:  I actually stated earlier, | 02:45:52 |
| 7 | you know, I mean, the likelihood of confusion is | 02:45:56 |
| 8 | everywhere.  But I stated earlier how I was | 02:45:59 |
| 9 | contacted.  That someone saw our product in a | 02:46:03 |
| 10 | dispensary. | 02:46:06 |
| 11 | BY ATTORNEY NELSON: | 02:46:06 |
| 12 | Q.   That's right the guy that you can't name, | 02:46:06 |
| 13 | and the conversation you didn't document.  That you | 02:46:08 |
| 14 | don't have any actual proof of? | 02:46:10 |
| 15 | ATTORNEY BOWLER:  Objection. | 02:46:15 |
| 16 | THE WITNESS:  Well, I don't -- | 02:46:15 |
| 17 | ATTORNEY BOWLER:  He just gave his | 02:46:15 |
| 18 | testimony as proof.  And I object to the extent | 02:46:17 |
| 19 | you're mischaracterizing the witness' prior | 02:46:20 |
| 20 | testimony. | 02:46:23 |
| 21 | BY ATTORNEY NELSON: | 02:46:23 |
| 22 | Q.   You have no evidence of that conversation | 02:46:30 |
| 23 | ever occurring.  Right? | 02:46:32 |
| 24 | ATTORNEY BOWLER:  Other than the evidence | 02:46:34 |

1    he has given in this deposition?                      02:46:35

2            THE WITNESS:  I have stated clearly when      02:46:36

3    or how it happened.  There is no confusion in my      02:46:38

4    mind that it happened.  I actually followed up by     02:46:41

5    visiting that dispensary to find the product, to      02:46:45

6    send pictures of it to my team.  We took action.      02:46:47

7            So, if there wasn't actual, we wouldn't be    02:46:51

8    sitting here right now.  So...                        02:46:55

9    BY ATTORNEY NELSON:                                   02:46:56

10       Q.   You are not aware of a single document,      02:47:02

11   whether produced or not produced to us, that proves   02:47:04

12   anything you just said.  Right?                        02:47:07

13           ATTORNEY BOWLER:  Objection to form.  And     02:47:08

14   foundation.                                           02:47:10

15           THE WITNESS:  You asked me of my awareness    02:47:11

16   and I've told you of the incidents.                   02:47:13

17   BY ATTORNEY NELSON:                                   02:47:15

18       Q.   Are you familiar with the term, "hearsay?"   02:47:17

19       A.   No.                                          02:47:19

20           ATTORNEY NELSON:  Now, let's take a look      02:47:25

21   at Exhibit 16.                                        02:47:27

22       (Exhibit 16 marked for identification)            02:47:32

23   BY ATTORNEY NELSON:                                   02:47:49

24       Q.   So, once again, there is a cover email.      02:47:49

1                   C E R T I F I C A T E

2

3       I, Giselle Mitchell-Margerum, RPR, CRI, CCR, LCR,

4    CSR Certified Court Reporter, Georgia, do hereby

5    certify that the witness was first duly sworn by me and

6    that I was authorized to and did report said

7    proceedings.

8       I further certify that the foregoing transcript is

9    a true and correct record of the proceedings; that said

10   proceedings were taken by me stenographically and

11   thereafter reduced to typewriting under my supervision;

12   that reading and signing was requested; and that I am

13   neither attorney nor counsel for, nor related to or

14   employed by, any of the parties to the action in which

15   this deposition was taken; and that I have no interest,

16   financial or otherwise, in this case.

17

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand this 20th day of July      2022.

20

21

22

23

24   GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, CSR

1                          DISCLOSURE

2    STATE OF GEORGIA:

3    Deposition of TARIQ FARID

4

5         Pursuant to Article 8.B of the Rules and
     Regulations of the Board of Court Reporting of the
6    Judicial Council of Georgia, I make the following
     disclosure:
7
          I am a Georgia Certified Court Reporter.  I am
8    here as a representative of Planet Depos.

9         I was contacted by Planet Depos to provide court
     reporting services for this Deposition.  I will not be
10   taking this Deposition under any contract that is
     prohibited by O.C.G.A. 15-14-37 (a) and (b).
11
          I have no contract/agreement to provide reporting
12   services with any party to the case, any counsel in the
     case, or any reporter or reporting agency from whom a
13   referral might have been made to cover this Deposition.
     I will charge my usual and customary rates to all
14   parties in the case and a financial discount will not
     be given to any party to this litigation.
15

16        This, the 20th day of July, 2022.

17

18

19

20

21

22

23

24   GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, CSR

1

2                    CERTIFICATE OF DEPONENT

3

4    I, TARIQ FARID, hereby certify that I have read the
     foregoing pages, numbered 1 through 351, of my
5    deposition of testimony taken in these proceedings on
     Monday, July 11, 2022 and, with the exception of the
6    changes listed on the next page and/or corrections, if
     any, find them to be a true and accurate transcription
7    thereof.

8

9

10

11

12   Signed:  ........................

13   Name:    TARIQ FARID

14   Date:    ........................

15

16

17

18

19

20

21

22

23

24