# Exhibit E

# EXPERT REPORT OF HAL PORET IN MATTER OF EDIBLE IP, LLC AND EDIBLE ARRANGEMENTS LLC V. MC BRANDS, LLC AND GREEN THUMB INDUSTRIES, INC.

PREPARED BY:

Hal Poret
142 Hunter Ave
Sleepy Hollow, NY 10591

July 2022

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ------------------------------------------------- 3
AUTHORSHIP AND QUALIFICATIONS-------------------------------------- 5
STUDY DESIGN ----------------------------------------------------------------- 6
SUMMARY OF FINDINGS --------------------------------------------------- 28
METHODOLOGY ----------------------------------------------------------------- 29
     THE RELEVANT UNIVERSE OF INTEREST-------------------------- 29
     SAMPLING PLAN ------------------------------------------------------- 34
     DATA PROCESSING --------------------------------------------------- 37
     INTERVIEWING PROCEDURES----------------------------------------- 37
     INTERVIEWING PERIOD----------------------------------------------- 38
     DOUBLE-BLIND INTERVIEWING ------------------------------------ 38
     QUALITY CONTROL --------------------------------------------------- 38
DETAILED FINDINGS-------------------------------------------------------- 41

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEYS
APPENDIX D:   SURVEY DATA FILES
APPENDIX E:   IMAGES USED IN CONFUSION SURVEY

## *BACKGROUND AND PURPOSE*

Edible IP, LLC and Edible Arrangements LLC (collectively Plaintiff) use the terms Edible and Edibles in connection with fruit, confection, and other food and gift-related goods and services. Plaintiff claims trademark rights in the term EDIBLE and other EDIBLE-formative marks.

MC Brands, LLC and Green Thumb Industries, Inc. (collectively Defendant) use the mark INCREDIBLES in connection with cannabis-infused foods.

In connection with the above-captioned lawsuit, Plaintiff claims that Defendant's use of INCREDIBLES infringes Plaintiff's claimed rights in the mark EDIBLE or other EDIBLE-formative marks.

Counsel for Defendant retained me to design and conduct surveys to test: (1) the extent to which, if at all, Defendant's use of INCREDIBLES for its products creates a likelihood of confusion with respect to Plaintiff and its marks (Confusion Survey); and (2) the extent to which, if at all, the terms edible and edibles are generic for cannabis-infused foods (Genericness Surveys). This Report describes the design, methodology, execution, and results of the surveys I conducted. As discussed in greater detail below, the Confusion Survey showed that there is no likelihood of confusion. Specifically, there was a 0% rate of confusion between Defendant's INCREDIBLES products and Plaintiff or its claimed marks. The Genericness Surveys showed that the terms edible and edibles are generic for cannabis-infused foods. Specifically, a *Teflon* survey showed that 97% and 98% of relevant consumers identified the terms edible and edibles respectively to be generic terms in this context. In addition, a *Thermos* survey showed that 50% of relevant consumers volunteered the term edible or edibles when asked what term they would use to identify the category of

products consisting of cannabis-infused foods. Edible/edibles was by far the most commonly identified generic term, and the only term consistently identified by a large percentage of relevant consumers.

In connection with designing my survey and preparing this report, I reviewed the following materials: (1) Complaint; (2) Answer and Counterclaim; (3) Ediblearrangements.com website; (4) Gtigrows.com website; (5) Iloveincredibles.com website; (6) incredibleedibles.com; (7) Plaintiffs' Answers to Defendants' First Set of Interrogatories. I also did numerous online searches for cannabis-infused confection and food products and examined the results.

The fee charged for the surveys and preparation of this report is $60,000. This includes the fees paid to outside vendors I used to conduct the surveys and my time in connection with the preparation of the surveys, analysis and report. For any additional work in connection with this survey, I am being compensated at my ordinary hourly rate of $775. My fees are not contingent on the nature of my opinions or the outcome of any proceeding.

## *AUTHORSHIP AND QUALIFICATIONS*

This study was designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC. I have personally designed, supervised, and implemented well over 1,000 surveys regarding the perceptions and opinions of consumers. Over 500 have involved consumer perception with respect to trademarks, and over 500 have been conducted online. I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research (publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*) and the International Trademark Association. I routinely conduct market research surveys for a variety of small to large corporations and organizations. I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold a bachelor's and a master's degree in mathematics and a J.D. from Harvard Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## *STUDY DESIGN*

A total of 600 relevant consumers of cannabis-infused food products participated in one of three online surveys:[1]

> (1) 200 participated in a likelihood of confusion survey
>
> (2) 200 participated in a genericness survey using the *Thermos* format
>
> (3) 200 participated in a genericness survey using the *Teflon* format

### LIKELIHOOD OF CONFUSION SURVEY

The confusion survey followed the Eveready format, which is a highly standard and well-accepted survey format for assessing likelihood of confusion. In an Eveready survey, only use of the allegedly infringing mark is shown, and respondents are questioned to determine if they make a mistaken mental connection to the senior mark on their own. As detailed more fully below, the survey entailed exposing prospective purchasers of cannabis-infused food products to images of the allegedly infringing Incredibles products.

The Eveready survey is the ideal format for assessing likelihood of confusion in the present circumstances because it is the best replication of marketplace conditions. Plaintiff's products typically do not contain cannabis, and Plaintiff's products and services are offered through Plaintiff's own website and stores. On the other hand, the Incredibles products at issue are cannabis products, and are available only through licensed cannabis dispensaries, which do not offer Plaintiff's products or services. Accordingly, consumers who are considering purchase of the challenged Incredibles cannabis products would not also

---

[1] See Relevant Universe and Sampling Sections for detail on the qualifications and demographics of respondents who participated in the surveys.

encounter Plaintiff's products or services in close proximity. This makes the Eveready survey's presentation of only the Incredibles product on its own (without also showing Plaintiff's products/services in close proximity) the most realistic replication of the manner in which the products are encountered in the marketplace.

It is also worth noting that Plaintiff alleges that its claimed EDIBLE mark and products/services are widely recognized and well-known to the public.[2] This means that consumers should already have substantial opportunity to be exposed to Plaintiff's claimed marks in the marketplace, and there should be no need to show the claimed marks during the survey.

As detailed further below, all respondents were shown and questioned about the following images of Incredibles products:



---

[2] Complaint, Paragraph 15, 16, 24.








This fairly and realistically exposed respondents to the allegedly infringing products, as they would be encountered in a dispensary or displayed online. These images gave respondents an accurate depiction of the types of products at issue, while exposing them to 9 uses of the challenged Incredibles name, along with any other uses of the term "edible" on the packages. Respondents were

then asked a standard series of questions to test whether they made a mistaken connection to Plaintiff's claimed marks/products.

First, all 200 respondents were prompted:

> On the next screens you will be shown some cannabis-infused products. Please look at the products as you would if you were seeing them in a cannabis dispensary or online and were considering whether you might want to purchase any of the products.
>
> On later screens, you will be asked a few questions.  If for any question you do not know or have no opinion, please indicate so.  Please do not guess.

Next, respondents saw the following instruction above the first of three images.[3]

> Please use the green arrows that will appear to the side of the screen to view three images of the products we would like to ask you about.

---

[3] The order in which the three images were shown was randomized in the survey. All images appeared large and clearly visible on respondents' screens. Screenshots of how the images appeared in the survey are provided in Appendix C of this report. The image used for programming the survey are provided in Appendix E.



After viewing the first image for a minimum of ten seconds, an arrow appeared to the right of the image which respondents used to scroll to a second image:

  

After viewing the second image for a minimum of ten seconds, an arrow appeared to the right of the image which respondents used to scroll to the third image:

 

After viewing the third and final image for a minimum of ten seconds, the following instruction appeared on screen beneath the image:

> Before continuing with the survey, please indicate whether you have clearly viewed the product images.
>
> - I have clearly viewed the product images
> - I was unable to clearly view the product images

Respondents could scroll back and forth between the images as many times as they liked. After viewing each image for as long as desired, respondents confirmed they viewed the images clearly before continuing with the survey.

On the next screen, respondents were asked:

> What company or brand do you think makes or puts out the products we just showed you, if you have an opinion?

Respondents could type in any answer or select "Don't know."

Respondents who identified a company or brand were then asked:

> What makes you think the products we showed you are made or put out by [*the answer to the previous question was inserted into the question text here*]?

Respondents could type in any answer.

This first question series gave respondents the opportunity to identify Plaintiff if they mistakenly believed Plaintiff to be the source of the products.

Next, respondents were asked:

> Do you think the company that makes or puts out the products we just showed you also offers any <u>other</u> products or services that you are aware of?
>
> - Yes, I do
> - No, I do not
> - Don't know/Unsure

Respondents who answered affirmatively then saw the following question on the same screen:

> What other products or services?
>
> *Please identify the brand and type of any other product or service you are thinking of as specifically as possible.*
>
> *If you are thinking of more than one product or service, please identify each in a separate row below.  If you don't know, you may select that option.*

Respondents could list up to five products or services, or select, "Don't know."

Respondents who identified at least one product or service were then instructed:

> Any other product or service you identified is listed below. Next to each
> one, please tell us what makes you think the company that makes or puts
> out the products we showed you also offers the other product or service
> you identified.

Beneath the instruction, respondents were shown their answer(s) from the previous screen and next to any product or service they identified, they explained what makes them think the company that makes or puts out the products they were shown, also offers the product or service they identified.

This second question series gave respondents the opportunity to identify Plaintiff or the types of products/services offered by Plaintiff if they mistakenly believed Plaintiff to be the source of the products.

Next, all respondents were asked:

> Do you think the products we showed you are affiliated with, or
> sponsored or approved by, any other company or brand?
>
> - Yes, I do
> - No, I do not
> - Don't know/No opinion

Respondents who answered affirmatively then saw the following question on the same screen:

> What other company or brand?

*If you are thinking of more than one company or brand, please enter each one in a separate box below. Or if you don't know you may select that option.*

Respondents could list up to three companies or brands, or select, "Don't know."

Respondents who identified at least one company or brand were then instructed:

> Each company or brand you mentioned is listed below.
>
> For each one, please tell us your reasons for thinking that the products we showed you are affiliated with, or sponsored or approved by, that company or brand.
>
> Please be as specific and detailed as possible.

Beneath the instruction, respondents were shown their answer(s) from the previous screen and next to any company or brand they named, they explained why they think the products they were shown are affiliated with, or sponsored or approved by, the company or brand they named.

This third question series gave respondents the opportunity to identify Plaintiff if they mistakenly believed the products are affiliated with or sponsored or approved by Plaintiff.

A Control Group was initially contemplated for the survey. However, I ultimately determined that there was no reason to run a Control Group. The purpose of a Control Group would have been to determine to what extent any potential confusion shown in the Test Group should be dismissed or discounted as survey noise – i.e., guessing or otherwise providing answers for reasons unrelated to trademark similarity. A Control Group would measure the noise level in the survey. This "noise level" would then be <u>deducted</u> from the Test Group result to arrive at a net level of confusion that can be attributed

specifically to the trademark at issue.  However, given that the Test Group resulted in <u>zero confusion</u>, there was no reason to run a Control Group, which could only have resulted in <u>lowering</u> the net confusion level in the survey. The Test Group confusion rate of 0% is already so low that it shows no likelihood of confusion even without taking any potential noise into consideration.

The decision to not run a control group is only favorable to Plaintiff.  Not having a control group means I simply conceded that the control group would show the result <u>most favorable</u> to Plaintiff – zero noise.

*Thermos* Genericness Survey

A separate group of 200 respondents participated in a second survey, which followed the *Thermos* format for testing whether a term is used generically for a particular type of product.  The concept of the *Thermos* format is that respondents are asked in an open-ended question what words or words they would use to identify the relevant <u>type</u> of product.  If respondents on their own mention the term at issue (here edible or edibles), this is evidence that the term is used generically.  The *Thermos* format is well-accepted as a method for demonstrating that a mark has come to be used generically.[4]

The ultimate purpose of the survey was to measure the extent to which, if at all, respondents would volunteer the term "edible" or "edibles" on their own when asked what word or words they would use to identify the relevant <u>type</u> of product (cannabis-infused foods).  Specifically, respondents were asked what

---

[4] E. Deborah Jay (2012), "Genericness Surveys in Trademark Disputes," in <u>Trademark and Deceptive Advertising Surveys; Law, Science, and Design</u>, Diamond, S.S. & J. Swann (eds), American Bar Association, pp. 109-112.  The *Thermos* format is well-accepted to demonstrate that a term is used generically if respondents do volunteer the term on their own as a term to identify the relevant type of product.

word or words they would use to identify the following category or type of products:

| |
|---|
| **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.** |

This description did not use the word "edible" or any similar term, so as not to bias the responses. Respondents could only mention the term edible or edibles if this term came to their mind on their own when asked what word(s) they would use to identify this type of product.

The survey took careful measures to ensure that respondents understood that they were being asked to identify terms that they use <u>generically</u> rather than terms that are source-identifying.

Prior to being asked the ultimate question regarding the category of cannabis-infused foods, respondents were given instructions and two examples to illustrate the survey task. First, respondents were instructed as follows:

> For this survey, you will be asked about what word or words you would use to identify certain <u>categories</u> or <u>types</u> of products.
>
> But first, please carefully read the examples on the next screens of what we mean when we ask about words you would use to identify a <u>category</u> or <u>type</u> of product.

Respondents were then provided the following instruction and images:

For example, if we asked you what word or words you would use to identify the following type of product, you might answer that these products are…**<u>BICYCLES</u>** or **<u>BIKES</u>**.



This made clear that the survey task was to identify the <u>type</u> of product at issue – in the first example, <u>bicycle</u> or <u>bikes</u>.

Respondents were then provided a second example:

As another example, if we asked you what word or words you would use to identify the following category or type of product, you might answer that these products are…**ACTION FIGURES** or **DOLLS**.



Again, this made clear that the survey task was to identify the <u>type</u> of product at issue, rather than any trademark or brand.

In order to make absolutely sure that respondents understood the survey task, respondents were then given a test question prior to being asked about the product type at issue. Respondents were shown the following instruction and images:

> Now, please tell us what word or words you would use to identify the following <u>category or type</u> of product:



Respondents were required to answer with a generic term to demonstrate that they understood the instructions, such as hat, cap, or baseball cap. Any respondents who entered a brand name (such as Nike) or a non-responsive term were excluded from the final survey sample.[5] This ensured that every respondent included in the final survey accurately understood the survey instructions to be directing them to tell us what term they would use <u>generically</u> to identify the <u>type</u> of product at issue, rather than to identify a brand name.

---

[5] Such respondents were removed manually after having completed the survey.

Next, respondents were given the following instruction:

> Now please take a few moments to think about what word or words you would use to identify the following <u>category or type</u> of product:

> | **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.** |
> | --- |

Finally, respondents were asked the ultimate question:

> Now, please tell us what word or words you would use to identify the following <u>category or type</u> of product:

> | **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.** |
> | --- |

> If you are thinking of more than one word, you may enter each in separate boxes below.

> These products are…

Below these instructions, respondents were provided with text boxes to enter any answer or answers.

### *Teflon* Genericness Survey

A separate group of 200 respondents participated in a second survey, which followed the well-accepted *Teflon* format for testing whether a term is used generically for a particular type of product.[6]

---

[6] E. Deborah Jay (2012), "Genericness Surveys in Trademark Disputes," in <u>Trademark and Deceptive Advertising Surveys; Law, Science, and Design</u>, Diamond, S.S. & J. Swann (eds), American Bar Association, pp. 112-124.

Following the *Teflon* format, respondents were first trained on the difference between terms that identify the <u>brand</u> name of a product and terms that identify a <u>common</u> name, and then tested to ensure that they understood the distinction. Respondents were subsequently shown a series of terms, one at a time, (including the EDIBLE or EDIBLES term at issue) and asked to consider them in the context of cannabis/THC products. For each term, respondents were asked if they believe the term primarily identifies the <u>brand</u> name or a <u>common</u> name when thinking about cannabis/THC products.

To control for response-order bias, two versions of the survey were administered, and each was taken by half of all respondents. Version 1 of the survey first presented the concept of terms that identify a "brand name," followed by the concept of terms that identify a "common name." Meanwhile, Version 2 first presented the concept of terms that identify a "common name" followed by terms that identify a "brand name."

<u>Version 1</u>

After a series of initial screening questions, all respondents were prompted as follows:

> This survey is about **brand** names and **common** names. In a few moments you will be asked about a number of terms that you may or may not have seen or heard before. But first, please read the next two screens about what we mean by a ***<u>brand</u>*** name and what we mean by a ***<u>common</u>*** name.

On a new screen, respondents were then given the following instructions illustrating the concept of terms that identify brand names:

> Brand names are names that companies use to identify who a product comes from. Brand names primarily let the consumer know that a product comes from one specific company.
>
> For example, GENERAL MILLS, TOYOTA, NATURE MADE, and IPAD are all brand names. These terms primarily identify for a consumer who a product comes from.

Respondents were then given the following instructions illustrating the concept of terms that identify common names:

> Common names are words used to identify a type of product – in other words, what the product is, not who makes it. Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.
>
> For example, BREAKFAST CEREAL, CAR, VITAMINS, and TABLET COMPUTER are all common names. These terms primarily identify for the consumer what type of product a company is selling.

These instructions gave respondents a fair and appropriate sense of the difference between terms that identify a brand name and terms that identify a common name.

Respondents were then asked:

> Do you understand the difference between a brand name and a common name?
>
> - Yes
> - No
> - Don't know

Respondents confirmed they understood the difference between a brand name and a common name before continuing.  Those who indicated they did not understand or were unsure did not continue and did not ultimately count toward the final number of completed interviews.

Next, respondents' understanding of the two types of names was tested to further verify they understood the concepts. First, respondents were asked:

Which type of name would you say **MINUTE MAID** is?

- Brand name
- Common name
- Don't know

Respondents were also asked:

Which type of name would you say **ORANGE JUICE** is?

- Brand name
- Common name
- Don't know

Respondents who did not correctly answer both these questions were excluded from further participation and did not count toward the final number of completed interviews.

Respondents who correctly answered that MINUTE MAID is a brand name and that ORANGE JUICE is a common name were reassured with the following information before continuing with the survey:

Correct:
MINUTE MAID is a brand name because it is a name a company uses to let the consumer know that the product comes from one specific <u>source</u>.

ORANGE JUICE is a common name because it lets the consumer know the <u>type</u> of product.

Next, respondents were instructed as follows:

We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of <u>cannabis/THC products</u>.

For each term you are shown, please answer whether you think the term is a **_brand_** name or a **_common_** name in the context of cannabis/THC products.

Or if you don't know, you may select that option.

This properly set the context for the survey as cannabis/THC products.

One at a time, respondents were then shown five terms. As each term appeared on screen, respondents were asked:

Thinking about cannabis/THC products, do you think this is a ...

- Brand name
- Common name
- Don't know

The list of terms shown to respondents included the EDIBLE or EDIBLES term at issue. Half of all respondents in Version 1 saw:

# EDIBLE

Meanwhile, half of all respondents saw:

## EDIBLES

The list also included two trademark (i.e. brand name) terms for cannabis/THC products:

## WANA

## KIVA

The list also included two common names (i.e. generic terms) for cannabis/THC products:

## INFUSED

## RECREATIONAL

Asking respondents about all five of these terms provided multiple benchmarks against which to measure the proportion of respondents who perceive EDIBLE or EDIBLES as a brand name versus a common name for cannabis/THC products. Asking about an equal number of brand terms (2) and common names (2) creates a fair and balanced succession of terms that does not bias the result for EDIBLE or EDIBLES. Both the brand and common terms consisted of one-word terms, so there could have been no bias toward classifying EDIBLE or EDIBLES as either a brand or descriptive name on the basis of it consisting of one word.

To account for response bias due to the order in which the terms were asked, half of all respondents saw the EDIBLE or EDIBLES term first. The remaining four terms were then presented one at a time in randomized order. Meanwhile, the other half of respondents never saw the EDIBLE or EDIBLES term first. Instead, EDIBLE or EDIBLES was always seen after at least one of the other terms and the order in which it was presented with respect to any of the other terms was randomized along with the other terms.

This concluded the survey for respondents in Version 1.

<u>Version 2</u>

Respondents in Version 2 took an identical survey with the sole exception that the order of all references to terms that identify a "brand name" and "common name" was reversed so that discussions of "common name" came before "brand name." This consistently occurred in three locations throughout the survey.

First, the initial instructions mentioned terms that identify a "common" name first:

> This survey is about ***common*** names and ***brand*** names. In a few moments you will be asked about a number of terms that you may or may not have seen or heard before. But first, please read the next two screens about what we mean by a ***<u>common</u>*** name and what we mean by a ***<u>brand</u>*** name.

Next, respondents were shown the screen illustrating the concept of terms that identify a common name before the screen illustrating the concept of terms that identify a brand name.

In addition, any time respondents were provided response options, they were listed in the following order:

- Common name
- Brand name
- Don't know

Third, the order of the test questions was reversed, so that respondents were first asked about the common name ORANGE JUICE and subsequently asked about the brand name MINUTE MAID.

Aside from these changes to the order, all aspects of the survey between Version 1 and Version 2 were identical. Screenshots of the survey are provided in Appendix C.

The complete questionnaires for all three surveys are included as Appendix B and screenshots of the surveys are provided in Appendix C.

## *SUMMARY OF KEY FINDINGS*

<u>Likelihood of confusion</u>

No respondents out of 200 (0%) experienced any form of confusion between Defendant's Incredibles products and Plaintiff's claimed marks or products/services.

<u>Genericness</u>

In the *Thermos* survey, 50% of respondents (100 out of 200) volunteered the term "edible" or "edibles" on their own when asked what word or words they would use to identify cannabis-infused foods.  Edible/edibles was by far the most commonly cited generic term.  No other term was used by more than roughly 5% of respondents.

In the *Teflon* survey, 97.5% of respondents (195 out of 200) answered that the term EDIBLE or EDIBLES was a common name in the context of cannabis-infused foods, while only 2.5% answered that it is a brand name.

<u>Conclusions</u>

Based on these results, it is my opinion that Defendant's use of the name Incredibles creates no likelihood of confusion, and that the terms edible and edibles are generic in the context of cannabis-infused foods.

<u>See</u> Detailed Findings section below for additional information on results.  The full data is provided in Appendix D.

## *METHODOLOGY*

### <u>THE RELEVANT UNIVERSE OF INTEREST</u>

The universe for these surveys consisted of U.S. consumers age 21 and older who have purchased the following types of products containing cannabis/THC in the past twelve months, or are likely to do so in the next twelve months:

- Chocolates
- Gummies/chews
- Mints
- Tarts
- Other cannabis-infused confections/food products

This is the appropriate universe for the likelihood of confusion survey, because prospective purchasers of such products are prospective purchasers of the allegedly infringing cannabis-infused Incredibles products. This is also the appropriate universe for assessing perception of the term edible/edibles in the context of cannabis infused foods.

The following screening questions were employed to ensure the final survey samples were comprised of respondents from the appropriate sample universe.

First, after initial demographic questions, all potential respondents were asked:

In the <u>past</u> 12 months, which of the following types of products, if any, have you purchased?

Products containing…

*(Select all that apply)*

The following table displays the randomized options from which respondents could select as many as applied to them and the proportion of final respondents that selected each:

| In Past 12 Months Has Purchased Products Containing | | |
|---|---|---|
| N=600 | N | % |
| Cannabis/THC | 494 | 82.3% |
| CBD | 385 | 64.2% |
| Glucosamine/chondroitin | 98 | 16.3% |
| Nicotine | 281 | 46.8% |
| None of these | 38 | 6.3% |

Including options other than Cannabis/THC provided a variety of items from which respondents could select and aided in masking the topic of the survey.

Next, all potential respondents were asked:

> In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to purchase?
>
> Products containing…
>
> *(Select all that apply)*

The following table displays the proportion of the final respondents who selected each option:

| In Next 12 Months is Likely to Purchase Products Containing | | |
|---|---|---|
| N=600 | N | % |
| Cannabis/THC | 575 | 95.8% |
| CBD | 429 | 71.5% |
| Glucosamine/chondroitin | 132 | 22.0% |
| Nicotine | 274 | 45.7% |
| None of these | 4 | 0.7% |

Next, respondents who previously answered that they have purchased products containing Cannabis/THC in the past twelve months, were asked:

> In the <u>past</u> 12 months, which of the following types of products containing **<u>cannabis/THC</u>**, if any, have you purchased?
>
> *(Select all that apply)*

The following table displays the randomized options from which respondents could select as many as applied to them and the proportion of final respondents that selected each:

| Types of Cannabis/THC Products Purchased in Past 12 Months | | |
|---|---|---|
| N=600 | N | % |
| Loose flower | 263 | 43.8% |
| Pre-rolls | 208 | 34.7% |
| Tinctures/oils | 189 | 31.5% |
| Chocolates | 236 | 39.3% |
| Gummies/chews | 400 | 66.7% |
| Mints | 99 | 16.5% |
| Tarts | 50 | 8.3% |
| Other cannabis-infused confections/food products | 169 | 28.2% |
| None of these | 1 | 0.2% |
| Not asked/Not purchased Cannabis/THC products | 106 | 17.7% |

Respondents who previously answered that they are likely to purchase products containing Cannabis/THC in the next twelve months, were asked:

> In the next 12 months, which of the following types of products containing **cannabis/THC**, if any, are you likely to purchase?
>
> *(Select all that apply)*

The following table displays the proportion of final respondents that selected each:

| Types of Cannabis/THC Products Likely to Purchase in Next 12 Months | | |
|---|---|---|
| N=600 | N | % |
| Loose flower | 299 | 49.8% |
| Pre-rolls | 246 | 41.0% |
| Tinctures/oils | 249 | 41.5% |
| Chocolates | 347 | 57.8% |
| Gummies/chews | 497 | 82.8% |
| Mints | 175 | 29.2% |
| Tarts | 115 | 19.2% |
| Other cannabis-infused confections/food products | 285 | 47.5% |
| None of these | 0 | 0.0% |
| Not asked/Not Likely to purchase Cannabis/THC products | 25 | 4.2% |

Ultimately, respondents who selected at least one of the following options when asked what types of products containing cannabis/THC, if any, they have purchased or are likely to purchase were considered part of the relevant sample universe and qualified to participate in <u>one</u> of the main surveys:

- Chocolates
- Gummies/chews
- Mints
- Tarts
- Other cannabis-infused confections/food products

Qualified respondents were randomly assigned by the survey program to one of the main surveys.

As detailed above, neither the term edible nor edibles was used in any screening question, so as not to bias the main surveys.

Upon completion of the main survey, all respondents were asked a final question for classification purposes:

> Do you or does anyone in your household work for any of the following?
>
> *(Select all that apply)*

The following table displays the options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

| Related Field | | |
|---|---|---|
| N=600 | N | % |
| A company that makes, distributes, or sells cannabis/THC products | 16 | 2.7% |
| An advertising or market research company | 4 | 0.7% |
| None of these | 580 | 96.7% |

Excluding the negligible number of respondents (20) who work or have someone in their household who works in one of these fields would not impact the results of this study or my conclusions.

The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Prodege, LLC, a leading supplier of online sample for surveys. I have worked with Prodege on previous surveys and have found its procedures and panels to be highly reliable. Prodege has large and diverse panels consisting of millions of participants and is highly regarded as a reputable source of respondents for online surveys within the field of market research. Prodege utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Through the following techniques, Prodege employs specific process behavior, pattern analysis, statistics and algorithms to ensure top quality data:

- RelevantID to certify panelists by gathering a large number of data points from a respondent's computer to create a unique digital print in order to verify the participant is real, unique, and fraud free
- Device fingerprinting to connect online identities to real-world identity in order to gather continued knowledge of user's behavior.
- Verifying IP address against physical address
- Email verification and two-step (double opt-in) authentication process
- Device reputation ensuring respondents' devices have not been linked to fraudulent activity

- Mobile verification via unique mobile numbers ensuring respondents are who they say they are

Additionally, Prodege profiles its panelists and keeps up-to-date on standard demographics, such as age, gender, region, household demographic, interests and hobbies.

A sampling plan was carefully structured in order to represent the demographics of relevant customers – i.e. prospective purchasers of cannabis-infused food products. Throughout the data collection, I monitored the actual rate of qualification within each individual age and gender group for each survey. I then calibrated these individual incidence rates against U.S. Census data by age and gender and set revised age and gender quotas for the final sample size of 200 in each survey. The following table displays the final proportion of sample achieved by age and gender per survey:

| Final Number of Respondents by Age and Gender per Survey | | |
|---|---|---|
| N=200 per survey | N | % |
| Male 21 – 34 | 38 | 19.0% |
| Male 35 – 49 | 36 | 18.0% |
| Male 50 and older | 24 | 12.0% |
| Female 21 – 34 | 38 | 19.0% |
| Female 35 – 49 | 40 | 20.0% |
| Female 50 and older | 24 | 12.0% |

This methodology for producing a representative sample is well-accepted.

Survey invitations were sent across the U.S. in geographic proportion to Census data.  The following table displays the final proportion of sample achieved by region:

| Final Number of Respondents by Region | | |
|---|---|---|
| N=600 | N | % |
| Northeast | 124 | 20.7% |
| Midwest | 122 | 20.3% |
| South | 191 | 31.8% |
| West | 163 | 27.2% |

Since the confusion rate was 0% in all age, gender, and geographic groups, and edible/edibles was perceived to be a generic term for cannabis-infused foods in all age, gender, and geographic groups, the survey could be re-weighted based on any breakdown of consumers by age, gender, and geography, and the conclusions supported by the data would not change.

**DATA PROCESSING**

Data was collected by Prodege, LLC and made available to Hal Poret, LLC through an electronic portal on an ongoing basis.  The data set showing respondents' answers to all questions will be provided in electronic form.

**INTERVIEWING PROCEDURES**

The online surveys were programmed and hosted by Prodege, LLC, a company specializing in web survey programming and data collection and processing.  My staff and I thoroughly tested the programmed surveys prior to any potential respondents receiving the invitation to participate in the surveys.

**INTERVIEWING PERIOD**

Interviewing was conducted from June 2, 2021, through June 9, 2021.

**DOUBLE-BLIND INTERVIEWING**

The study was administered under "double-blind" conditions. That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the service involved in providing the sample and administering the online interviews (Prodege) was similarly "blind" with respect to the study's purpose and sponsorship.

**QUALITY CONTROL**

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent is a live person. The test employed in this survey is a CAPTCHA[7] program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender. This information was checked against the sample provider's (Prodege's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to any of the main surveys.

---

[7] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell computers and Humans Apart."

Additionally, respondents were then asked to select their age range. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the surveys.

These combined steps ensured that the surveys were being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select which social media services they have used in the past month. Respondents could select as many as applied to them from a list of ten options, including one fictional name: Trouba. Respondents who selected "Trouba" were identified as "yea-sayers" and unable to continue with the surveys.[8]

The following question was also asked and permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately:

> For quality assurance, please type the word "Survey" in the blank next to the "Other" box below and then click to continue.
>
> - Strongly agree
> - Agree
> - Neutral
> - Disagree
> - Strongly disagree
> - Other _____

---

[8] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

Respondents who selected "other" and typed a response in the blank continued with the surveys. A review was conducted of all answers to confirm all respondents properly followed instructions to the surveys.

Respondents were then also asked to carefully read these instructions:

*      Please take the survey in <u>one</u> session without interruption.
*      Please keep your browser maximized for the entire survey.
*      While taking the survey, please do not consult any other websites or other electronic or written materials.
*      Please answer all questions on your own without consulting any other person.
*      If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above instructions.  Only respondents who understood and agreed to the instructions then continued to the main section of the survey.

An initial phase of the surveys was first carried out and the data analyzed to test the reliability of the survey questionnaire and methodology, and to ensure that there were no problems with the surveys.  My analysis of the initial wave of results indicated no sign of any problems, and that the survey functioned properly.  Accordingly, no changes were made, and the surveys were completed as initially implemented.  The initial wave of interviews is included in the final data set.

## *DETAILED FINDINGS*

1. <u>**LIKELIHOOD OF CONFUSION SURVEY**</u>

No respondents out of 200 (0%) who were shown the Incredibles products identified Edible Arrangements or any of its products/services or marks in response to any of the confusion questions.

When first asked what company or brand makes or puts out the products, no respondents mentioned Edible Arrangements.

Two respondents (1.0%) answered Edibles. The following table shows these respondents' answers, including their reason for naming "edibles" in Q230:

| <u>ID</u> | <u>Q220</u> | <u>Q230</u> |
|---|---|---|
| 35 | Edibles | The packaging displayed the word edibles. |
| 3034 | edibles | the name of the product |

Neither of these answers contain any indication that respondents were thinking of Edible Arrangements. More importantly, both of these respondents answered "no" when next asked whether they think the company that makes or puts out the Incredibles products also offers any other products or services. This makes clear they could not have been referring to Edible Arrangements when they mentioned "edibles." These respondents also answered "no" and "don't know" respectively when asked if they think the Incredibles products are affiliated with or sponsored or approved by any other company or brand.

Two other respondents answered "Credible Edibles" as shown in the following table:

| ID | Q220 | Q230 |
|---|---|---|
| 602 | Credible Edibles | It said Credible Edibles on it I'm not sure who else would make it, it seemed like the right place to put the manufacturers name on the label |
| 4308 | Credible Edibles | That's what the logo said above the name of the candy, so it's either that or Incredibles |

Neither of these answers contain any indication that respondents were thinking of Edible Arrangements.  In addition, when next asked whether they think the company that makes or puts out the Incredibles products also offers any other products or services, respondent 602 identified only "Whole cannabinoid buds" and respondent 4308 answered "don't know."  This makes clear they could not have been referring to Edible Arrangements when they mentioned "edibles."

Four other respondents answered "Incredible edibles" as shown in the following table:

| ID | Q220 | Q230 |
|---|---|---|
| 3267 | Incredible Edibles | I read that on the label |
| 4338 | Incredible Edibles | Name on each of the packages/containers |
| 4718 | Incredible Edibles | The phrasing on the boxes |
| 4752 | Incredible Edibles | I believe that was the name on the packaging.  It was like Incredible Edibles  IncrEdibles  or something cute like that. |

None of these answers contain any indication that respondents were thinking of Edible Arrangements.  In addition, when next asked whether they think the company that makes or puts out the Incredibles products also offers any other products or services, respondent 4718 identified only "different types of chocolate edibles," "mints", and "soda" and the other three respondents answered "don't know."  This makes clear they could not have been referring to Edible Arrangements when they mentioned "edibles."

If anything, the "Credible Edibles" and "Incredible Edibles" answers are instances of "edibles" being used generically.

No other respondents gave any answer including the term "edible" or "edibles."

Ninety other respondents answered "Incredibles" or a misspelling of Incredibles.

The following table shows the answers of all other respondents who gave an answer when asked what company or brand makes or puts out the products:

| ID | Q220 | Q230 |
|---|---|---|
| 654 | Hersey | It looks like the tyope of stuff they would promote |
| 761 | not sure | I am not too sure who makes them |
| 1236 | greenleaf | I think they were well created and done. |
| 2773 | delta8 | that seems to be the new thing |
| 2825 | a cannabis company | because the survey is about thc / cbd products |
| 2871 | Canopy Growth | I know they are in this biz ! |
| 3022 | I really do not know | I wish I knew the company who does put these out. I would purchase them. They are seem very good. |
| 3116 | idk | im not sure |
| 3493 | greatmint | for cannabis products |
| 4328 | mars | looks like a good product |
| 4355 | Starburst | I am thinking of a series of products like by the Mars company: starbursts, chewy taffy like, chocolate like hersheys. |
| 4378 | not sure | i only see incredibles edible mints |
| 4614 | Gummy | the name on it |
| 4687 | infusables | the label |
| 4709 | Blasted Bites | I don't think they're made by BB, I noticed the name here was incredibles. |
| 4736 | sockerbit | the presentation of the product |

None of these answers contain any indication that respondents were thinking of Edible Arrangements.

The remaining eighty-seven respondents answered "don't know" when asked what company or brand makes or puts out the products.

When next asked whether they think the company that makes or puts out the Incredibles products also offers any other products or services, sixty-two respondents answered affirmatively. None of these respondents identified any products or services suggesting that they were thinking of Edible Arrangements. The following table shows all verbatim answers entered in response to this question:

| ID | Q250 Answers | | | |
|---|---|---|---|---|
| 97 | e cigarettes | | | |
| 157 | other edibles | | | |
| 346 | chocolate | | | |
| 536 | thc gummies | thc oils | | |
| 602 | Whole cannabinoid buds | | | |
| 690 | gummies | chocolates | | |
| 1133 | tarts | | | |
| 1245 | Tincture | Flower | | |
| 1274 | Tinctures/ oils | | | |
| 1643 | Gummies | | | |
| 2037 | Flowers | Oil | | |
| 2651 | herb | pre rolls | oils | creams |
| 2658 | CBD | | | |
| 2710 | other edible items | | | |
| 2763 | similar cbd products | | | |
| 2818 | browies | gummies | | |
| 2856 | Oils | Tincture | | |
| 2868 | gummies | | | |
| 2903 | drinks | | | |
| 2912 | I don't know if they sell any other brands but they | | | |

| | | | | |
|---|---|---|---|---|
| | definitely sell more flavors than the ones I was shown | | | |
| 2918 | regular candy | | | |
| 3064 | Tarts | | | |
| 3104 | chips | oils | | |
| 3190 | THC / CBD infused drinks | RSO | | |
| 3203 | Pain creams | | | |
| 3208 | CDB gummies | | | |
| 3493 | mint | | | |
| 3539 | cbd product | chocolate | | |
| 4323 | Pre rolls | Tinctures | Chocolates | |
| 4498[9] | brownies | | | |
| 4505 | thc infused sodas | cbd oils | | |
| 4586 | mints | | | |
| 4699 | gummy | | | |
| 4709 | Probably Chocolates | Maybe tinctures | | |
| 4718 | Different types of chocolate edibles | Mints | Soda | |

None of these answers contain any indication that respondents were thinking of Edible Arrangements.

The other twenty-seven respondents answered "don't know" when asked what other products or services are offered by the company that makes or puts out the Incredibles products shown.

Finally, when asked if they think the Incredibles products are affiliated with or sponsored or approved by any other company or brand, thirty-three respondents answered affirmatively. None of these respondents identified Edible Arrangements.

---

[9] When asked why this respondent named "brownies" this respondent answered: "These are typically the top selling cbd infused snacks."

The following table shows all verbatim answers entered in response to this question:

| ID | Q265 | Q270 |
|---|---|---|
| 152 | Herbal Healing | I have seen and purchased this brand at this particular dispensary. This makes me believe Herbal Healing and Incredibles have a distribution agreement. |
| 1133 | PRNewswire | Medically Correct LLC, the parent company of the incredibles brands, and was founded by Bob Eschino and Rick Scarpello to bring professional and consistent edibles to the cannabis marketplace. |
| 2886 | CBD | Has THC |
| 3038 | incredable | the name |
| 3069 | Incrediables | I have gotten products from them before |
| 3325 | founded 2010 | i think the foundation logo is supported |
| 4355 | Mars Company | Similar concepts or packaging |
| 4382 | mystic labs | Mystic labs is the brand of gummies that I currently have. |
| 4709 | I saw 2 guys heads in the corner | I saw 2 guys heads in the corner but couldn't read the brand name underneath; but it wasn't incredibles. |
| 4736 | brownie | it is a good products |

None of these answers contain any indication that respondents were thinking of Edible Arrangements.

The other twenty-three respondents answered don't know when asked what company or brand the products are affiliated with or sponsored or approved by.

Accordingly, the confusion rate was 0% across all 200 respondents.

## 2. *THERMOS* GENERICNESS SURVEY

When asked what word or words they would use to identify the relevant type of product, 50% of respondents (100 out of 200) volunteered the term "edible" or "edibles" on their own (or a misspelling of edible/edibles).

Edible/edibles was the <u>first</u> or only term mentioned by 45.0% of respondents (90 of 200).

Edible/edibles was the most commonly volunteered term by a huge margin. In fact, it was the <u>only</u> term that was consistently volunteered by a large percentage of respondents. No other term was volunteered by more than roughly 5% of respondents.[10]

As discussed earlier, all 200 respondents when previously asked about an image of hats/caps and asked the same question gave a generic answer, such as hats, caps, or baseball caps. This validates that respondents clearly understood the task as to identify the term(s) they would use <u>generically</u> to identify the <u>type</u> of product, and did not mistakenly believe they were identifying <u>brand</u> terms.

The fact that 50% of respondents used the term edible or edibles to identify the type of product at issue and that no other term was volunteered by a large percentage of respondents is a particularly strong demonstration that edible/edibles is generic for cannabis-infused foods.

---

[10] Other terms cited by five to ten respondents each include CBD, cookies, chocolates, gummies, medicine, food, goodies, marijuana, pot, snacks, sweets, treats, and weed. See Appendix D for all open-ended answers provided.

3. *TEFLON* GENERICNESS SURVEY

When asked in a closed-ended question whether they think the term EDIBLE or EDIBLES is a brand name or common name, 97.5% of respondents answered that it is a common name, as compared to only 2.5% that answered that it is a brand name:

| EDIBLE/EDIBLES | All |
|---|---|
| Total | N=200 |
| Brand name | 2.5% 5 |
| Common name | 97.5% 195 |
| Don't know | 0% 0 |

The following tables show the results for the two brand names that were asked about as benchmarks:

| WANA | All |
|---|---|
| Total | N=200 |
| Brand name | 78% 156 |
| Common name | 10.5% 21 |
| Don't know | 11.5% 23 |

| KIVA | All |
|---|---|
| Total | N=200 |
| Brand name | 84% 168 |
| Common name | 9% 18 |
| Don't know | 7% 14 |

As these tables show, respondents overwhelmingly correctly identified WANA and KIVA as brands, with only a small minority incorrectly answering that they are common names.

The following tables show the results for the two common names that were asked about as benchmarks:

| INFUSED | All |
|---|---|
| Total | N=200 |
| Brand name | 7% 14 |
| Common name | 88% 175 |
| Don't know | 6% 11 |

| RECREATIONAL | All |
|---|---|
| Total | N=200 |
| Brand name | 3% 6 |
| Common name | 95% 189 |
| Don't know | 3% 5 |

As these tables show, respondents overwhelmingly correctly identified INFUSED and RECREATIONAL as common names, with only a small minority incorrectly answering that they are brand names.

The results for these other terms validates that the survey properly classifies brand names as such and common names as such.  This further corroborates the reliability of the 97.5% common name and 2.5% brand name result for

EDIBLE/EDIBLES.

For the subgroup of respondents who were asked about EDIBLE, 3% answered that it is a brand name and 97% answered that it is a common name.

For the subgroup of respondents who were asked about EDIBLES, 2% answered that it is a brand name and 98% answered that it is a common name.

These results powerfully confirm the finding of the *Thermos* survey that edible/edibles is generic for cannabis-infused foods.

## CONCLUSIONS

Based on the survey results, it is my opinion that Defendant's use of the name Incredibles creates no likelihood of confusion with respect to Edible Arrangements and its claimed marks, and that the terms edible and edibles are generic in the context of cannabis-infused foods.


Hal Poret

Dated: July 9, 2022

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

---

*Education*

1998    Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995    S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993    Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research


*Employment*

2016 -    President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015    Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004    Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003    Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2022    **Chartwell Studio Inc. v. Team Impressions Inc.**
(Deposition)                 USDC Northern District of IL

2022    **Diageo** v. Deutsch
(Deposition and trial)          USDC Southern District of NY

2022    Stone Brewing v. **MillerCoors**
(Deposition and trial)          USDC Southern District of CA

2022    Gibson v. **Armadillo**
(Deposition and trial)          USDC Eastern District of TX

2022    **adidas** v. Fashion Nova
(Deposition)                 USDC District of OR

2022    Fishon v. **Premier Nutrition Corp.**
(Deposition and trial)          USDC Northern District of CA

2022    **Zuru LLC** v. Lego Juris
(Deposition)                 USPTO Cancellation

2022    American Eagle Outfitters, Inc. v. **Walmart**
(Deposition)                 USDC Western District of PA

2022    Hansen v. **Newegg.com Americas, Inc.**
(Deposition)                 Superior Court California

2021    Coachella v. **Coachillin Holdings**
(Deposition)                 USPTO Opposition

2021    **S&P Global, Inc.** v. S&P Data LLC
(Deposition and trial)          USDC Delaware

2021    **Wing Enterprises** v. Tricam Industries, Inc.
(Deposition and trial)          USDC District of MN

2021    **Advance Magazine Publishers** v. Goncharova
(Trial testimony)              USPTO Opposition

2021    Wildfang v. **Target Corporation**
        (Deposition)                          USDC District of OR

2021    **Orgain** v. Iovate
        (Deposition)                          USDC Central District of CA

2021    Edwards Life Sciences v. **Meril Life Sciences**
        (Deposition)                          USDC Northern District of CA

2021    Publix. v. **Pharmapacks**
        (Deposition)                          USPTO Opposition

2021    **Tory Burch LLC** v. Olem Shoe Corp.
        (Deposition)                          USDC Southern District of NY

2021    **Heaven Hill** v. Log Still Distilling
        (Deposition)                          USDC Western District of KY

2021    **Kamado Joe** v. Dansons US LLC
        (Deposition)                          USDC Northern District of GA

2021    **Kiva Health Brands, LLC** v. Kiva Brands Inc.
        (Deposition)                          USDC Northern District of CA

2021    **Elevations Credit Union** v. Elevate Credit Union
        (Deposition)                          USDC District of UT

2021    Sharpe v. **GT'S Living Foods**
        (Deposition)                          USDC Central District of CA

2021    Mirzoyan v. **Hershey**
        (Deposition)                          Superior Court of California

2021    Furniture Dealer.net v. **Amazon.com**
        (Deposition)                          USDC District of MN

2021    **Treehouse Foods, Inc.** v. Keurig Green Mountain, Inc.
        (Deposition)                          USDC Southern District of NY

2021    Brady v. **Bayer**
        (Deposition)                          Superior Court of California

2021    Capri Sun v. **American Beverage Corporation**

(Deposition)                                   USDC Southern District of NY

2020   **Universal Electronics, Inc.** v. Roku Inc. et al.
       (Deposition)                            International Trade Commission

2020   Enchante Accessories v. **Turko Textiles**
       (Deposition)                            USDC Southern District of NY

2020   Greater Orlando Aviation Authority v. **Melbourne Airport Authority**
       (Deposition)                            USDC Middle District of FL

2020   **New Orleans Saints** v. WDI
       (Trial)                                 American Arbitration Association

2020   Vanderbilt University v. **Scholastic**
       (Deposition)                            USDC Middle District of TN

2020   Pacific Packaging v. **Nutrisystem**
       (Deposition)                            USDC Central District of CA

2020   American Airlines v. **Delta Airlines**
       (Deposition)                            USDC Northern District of TX

2020   **FCA** v. Mahindra
       (ITC Modification trial testimony)      ITC Modification Proceeding

2020   Lontex Corporation v. **Nike**
       (Deposition and trial)                  USDC Eastern District of PA

2020   Koenig v. **Vizio, Inc.**
       (Deposition)                            Superior Court California (LA County)

2020   Roley v. **Google**
       (Deposition)                            USDC Northern District of CA

2020   **Snaplock Industries** v. Swisstrax Corp.
       (Deposition)                            USDC District of Nevada

2020   TeamSnap v. **Team Mates Pty. Ltd**,
       (Deposition)                            USDC District of CO

2020   Bluetooth SIG V. **FCA, USA**
       (Deposition)                            USDC Western District of Washington

2020   **Monster Energy** v. VPX
       (Deposition)                    USDC Southern District of FL

2019   **George Sink PA Injury Law Firm** v. George T. Sink, Jr.
       (Arbitration trial)            American Arbitration Association

2019   Cabrera v. **Bayer Corporation**
       (Deposition)                    USDC Central District of CA

2019   GDM Enterprises v. **Astral Health & Beauty**
       (Deposition)                    USDC Western District of MO

2019   **Yahoo** v. Mozilla
       (Deposition)                    Superior Court Santa Clara County, CA

2019   Scott Fetzer v. **John Henry, III**
       (Deposition)              Court of Common Pleas, Cuyahoga County, OH

2019   **Illinois Tool Works** v. Poly-America
       (Deposition and trial)         USDC Northern District of TX

2019   **Adidas** v. Forever 21
       (Deposition)                    USDC District of Oregon

2019   TRP v. **Simalasan**
       (Deposition)                    USDC District of NV

2019   Ironhawk Technologies v. **Dropbox Inc.**
       (Deposition)                    USDC Central District of CA

2019   Universal Standard v. **Target Corporation**
       (Deposition)                    USDC Southern District of NY

2019   **FCA** v. Mahindra
       (Deposition and ITC trial)     ITC and USDC Eastern District of MI

2019   DealDash v. **ContextLogic**
       (Deposition)                    USDC Northern District of CA

2019   **Sprint** v. AT&T Mobility
       (Deposition and trial)         USDC Southern District of NY

2019  Merck & Co v. **Merck KGaA**
      (Deposition)                          USDC District of NJ

2019  **Arbor Pharmaceuticals** v. ANI Pharmaceuticals
      (Deposition)                          USDC District of Minnesota

2019  **American Cruise Lines** v. American Queen Steamboat Company
      (Deposition and trial)               USDC District of DE

2018  MZ Wallace v. **Oliver Thomas**
      (Deposition and trial)               USDC Southern District of NY

2018  VonRosenberg v. **Lawrence**
      (Deposition)                          USDC District of SC

2018  Kjaer Weis v. **Kimsaprincess, Inc.**
      (Deposition)                          USDC Central District of CA

2018  In re: NCAA Grant-in-Aid Cap Litigation
      (Deposition; Trial)                  USDC Northern District of CA

2018  **Under Armour** v. Battle
      (Deposition)                          USDC District of Maryland

2018  Federal Trade Commission v. **D-Link Systems**
      (Deposition)                          USDC Northern District of CA

2018  Ezaki Glico v. **Lotte International**
      (Deposition)                          USDC District of NJ

2018  Car Freshener Corporation v. **American Covers/Energizer Holdings**
      (Deposition)                          USDC Northern District of NY

2018  **Combe** v. Dr. August Wolff
      (Deposition and trial)               USDC Eastern District of VA

2018  In Re GM Ignition Switch Litigation
      (Deposition)                          USDC Southern District of NY

2018  Zetor v. **Ridgeway**
      (Trial Testimony Deposition)         USDC Western District of AR

2018  Superior Consulting v. **Shaklee**

| | | |
|---|---|---|
| | (Deposition; Hearing; Trial) | USDC Middle District of FL |
| 2018 | Monster Energy Company v. **Integrated Supply Network**<br>(Deposition) | USDC Central District of CA |
| 2018 | Sandoz v. **GlaxoSmithkline**<br>(Deposition) | USPTO Opposition |
| 2018 | Variety Stores v. **Walmart Stores, Inc.**<br>(Trial) | USDC Eastern District of NC |
| 2018 | JB-Weld v. **Gorilla Glue Company**<br>(Deposition) | USDC Northern District of GA |
| 2018 | Bratton v. **The Hershey Company**<br>(Deposition) | USDC Western District of MO |
| 2018 | Leadership Studies v. **Blanchard Training & Development**<br>(Deposition) | USDC Southern District of CA |

### *Presentations*

The McCarthy Series: U.S.P.T.O. v. Booking.com: What the Recent SCOTUS Ruling Means for Trademark Law
(McCarthy Institute Webinar, July 29, 2020)

Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags
(INTA Annual Meeting, May 21, 2019)

Consumer Perception Surveys - A Primer from Survey Experts and NAD
(ASRC Conference, Dec 7, 2018)

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May 9, 2013)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

**Publications/Papers**

Commentary: Response to the Commentary Entitled "The Science of Proving Trademark Dilution", 111 TMR 778 (July-August 2021)

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks that are Not Top-Of-Mind, 109 TMR 935 (Nov-Dec 2019)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

<u>Recent Trends in Trademark Surveys</u> (paper for Virginia State Bar Intellectual Property conference, October 2009)

<u>Trademark Dilution Revision Act breathes new life into dilution surveys</u> (In Brief PLI website, June 2009)

<u>The Mark</u> (Survey Newsletter; three editions 2009)

<u>Hot Topics in Trademark Surveys</u> (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>The Mark</u> (Survey Newsletter, 2008)

<u>Trademark and Advertising Survey Report</u> (Summer 2007)

<u>Avoiding Pitfalls in Dilution Surveys under TDRA</u> (AIPLA Spring Conference, Boston, May 2007)

### *Commentary*

<u>Comment on Hotels.com case</u> (on TTABLOG.COM, July 24, 2009)

<u>Comment on Nextel v. Motorola</u> (on TTABLOG.COM, June 19, 2009)

<u>PLI All-Star Briefing Newsletter,</u> "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

### *Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

Appendix B: Questionnaire

---

SCREENER

---

**BASE: ALL RESPONDENTS**
Q99    Insert Captcha [HIDE "YOU ARE HUMAN" SCREEN]

**BASE: ALL RESPONDENTS**
Q100  Please enter your year of birth. **[PROGRAMMER: FORCE 4-DIGIT TEXT BOX. IF DOES NOT ENTER 4 DIGITS THEN SHOW ERROR MESSAGE INSTRUCTING RESPONDENT TO USE A 4-DIGIT FORMAT.  AFTER RESPONDENT ENTERS 4 DIGITS AND HITS CONTINUE, IF THEIR YEAR DOES NOT MATCH PANELIST'S PRELOAD THEN DISPLAY AN ERROR MESSAGE THAT READS,** "Please confirm you have entered your year of birth accurately." **IF RESPONDENT'S YEAR STILL DOES NOT MATCH PANEL DEMO THEN TERMINATE.]**

**ASK IF: HAS NOT TERMINATED**
Q105  Are you… **[CHECK AGAINST PANEL VARIABLE AND TERMINATE IF IT DOES NOT MATCH]**
   1. Male
   2. Female

**ASK IF: HAS NOT TERMINATED**
Q107  Which of these age ranges includes your age?
        **[TERMINATE IF UNDER 21 OR AGE RANGE NOT POSSIBLE BASED ON YEAR OF BIRTH ENTERED IN Q100.]**
        1. Under 21 **[TERMINATE]**
        2. 21-34
        3. 35-49
        4. 50+

Appendix B: Questionnaire

**BASE: ANY NON-TERMINATES**

Q109  Which of the following social media services, if any, have you used in the
past month?

*Please select all that apply*
[RANDOMIZE]
1. Snapchat
2. YouTube
3. TikTok
4. Instagram
5. Facebook
6. LinkedIn
7. Twitter
8. Tumblr
9. Pinterest
10. Trouba [**TERMINATE**]
11. None of these [**ANCHOR; EXCLUSIVE**]

[**Terminate if selects 109/10**]


**ASK IF: HAS NOT TERMINATED**

Q110  In what state do you live?
**[PROGRAMMER: Drop down menu of states plus D.C. Include an
option for "Other" and terminate if it is selected.]**

**ASK IF: HAS NOT TERMINATED**

Q120  In the <u>past</u> 12 months, which of the following types of products, if any,
have you purchased?

Products containing…

*(Select all that apply)*
[RANDOMIZE ORDER]
1. Cannabis/THC
2. CBD
3. Glucosamine/chondroitin
4. Nicotine
5. None of these [**ANCHOR; EXCLUSIVE**]

**ASK IF: HAS NOT TERMINATED**

Q130   In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to purchase?

Products containing…

*(Select all that apply)*
[SHOW SAME OPTIONS IN SAME ORDER AS 120]

**[MUST SELECT 120=1 and/or 130=1 TO CONTINUE; IF NOT, TERMINATE.]**

**ASK IF: 120=1**

Q140   In the <u>past</u> 12 months, which of the following types of products containing **cannabis/THC**, if any, have you purchased?

*(Select all that apply)*
[RANDOMIZE BUT KEEP TOGETHER 1-2 IN THAT ORDER AND KEEP TOGETHER 4-8 WITH 4-7 RANDOMIZED BUT 8 LAST]
1.   Loose flower
2.   Pre-rolls
3.   Tinctures/oils
4.   Chocolates
5.   Gummies/chews
6.   Mints
7.   Tarts
8.   Other cannabis-infused confections/food products [ANCHOR]
9.   None of these **[ANCHOR; EXCLUSIVE]**

**ASK IF: 130=1**

Q150   In the <u>next</u> 12 months, which of the following types of products containing **cannabis/THC**, if any, are you likely to purchase?

*(Select all that apply)*
[SHOW SAME CHOICES IN SAME ORDER AS 140]

**[MUST SELECT AT LEAST ONE OF 140=4-8 and/or 150=4-8 TO CONTINUE; IF NOT, TERMINATE.]**

Appendix B: Questionnaire

**ASK IF: HAS NOT TERMINATED**

Q160   For quality assurance, please type the word "Survey" in the blank next to the "Other" box below and then click to continue.

      1.   Strongly agree

      2.   Agree

      3.   Neutral

      4.   Disagree

      5.   Strongly disagree

      6.   Other _____ [DO NOT FORCE TEXT BOX]

[TERMINATE IF SELECTED 160/1-5 OR DOES NOT TYPE IN AN ANSWER.]

**ASK IF: HAS NOT TERMINATED**

Q170   You have qualified to take this survey.  Before continuing, please carefully read these instructions:

\*      Please take the survey in <u>one</u> session without interruption.

\*      Please keep your browser maximized for the entire survey.

\*      While taking the survey, please do not consult any other websites or other electronic or written materials.

\*      Please answer all questions on your own without consulting any other person.

\*      If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

      1.   I understand and agree to the above instructions

      2.   I do not understand or do not agree to the above instructions **[TERMINATE]**

**[PROGRAMMING NOTE: DISPLAY EACH QUESTION ON A SCREEN BY ITSELF.]**
**[EACH RESPONDENT CAN BE ASSIGNED TO ONLY ONE CELL. RANDOMIZE CELL ASSIGNMENT BUT PRIORITIZE BY LEAST-FILL AGE/GENDER QUOTAS PER CELL.]**

Appendix B: Questionnaire

---

**CELLS 1 AND 2 - LOC**

---

**ASK: ALL**

Q200  On the next screens you will be shown some cannabis-infused products. Please look at the products as you would if you were seeing them in a cannabis dispensary or online and were considering whether you might want to purchase any of the products.

On later screens, you will be asked a few questions.  If for any question you do not know or have no opinion, please indicate so.  Please do not guess.

**BASE: ALL**

Q210  Please use the green arrows that will appear to the side of the screen to view three images of the products we would like to ask you about.

**[PROGRAMMING: ONE AT A TIME, DISPLAY IMAGES 1001-1003 FOR CELL 1 OR IMAGES 2001-2003 FOR CELL 2. RANDOMIZE ORDER OF IMAGES.**
**PROGRAM GREEN ARROWS TO THE RIGHT OF EACH IMAGE ABOUT 1/3 FROM THE TOP OF THE IMAGES.**
**DO NOT SHOW GREEN ARROW TO MOVE TO THE NEXT IMAGE UNTIL 10 SECONDS HAVE PASSED.**
**AFTER THE 3RD IMAGE APPEARS ADD AN ARROW TO THE LEFT OF EACH IMAGE SO  RESPONDENTS CAN USE THE ARROWS TO GO BACK AND FORTH BETWEEN IMAGES MULTIPLE TIMES AND WITHOUT ANY DELAY.**
**DO NOT ENABLE RESPONDENTS TO GO TO THE NEXT QUESTION UNTIL ALL IMAGES HAVE BEEN VIEWED AND 10 SECONDS HAS ELAPSED WHILE FINAL IMAGE IS ON THE SCREEN.**
**WHILE THE CONTINUE BUTTON IS DISABLED, SHOW TEXT AT THE BOTTOM OF THE SCREEN:** *You will be able to continue after you have clicked the green arrows to view all three images for at least 10 seconds each.*
**AFTER 10 SECONDS HAS ELAPSED WITH FINAL IMAGE SHOWN, REPLACE THIS TEXT WITH THE FOLLOWING INSTRUCTION AND OPTIONS:]**

Before continuing with the survey, please indicate whether you have clearly viewed the product images.

1. I have clearly viewed the product images
2. I was unable to clearly view the product images [TERMINATE – DO NOT COUNT AS COMPLETE]

Appendix B: Questionnaire

**ASK: ALL QUALIFIED RESPONDENTS**
Q220   What company or brand do you think makes or puts out the products we just showed you, if you have an opinion?

**[SMALL TEXT BOX AND "No opinion/Don't know". FORCE TEXT BOX OR NO/DK BUT DO NOT ALLOW BOTH.]**

**ASK: ENTERED TEXT IN 220**
Q230   What makes you think the products we showed you are made or put out by___? **[insert & underline answer from 220]**

**[LARGE TEXT BOX. FORCE.]**

**ASK: ALL QUALIFIED RESPONDENTS**
Q240   Do you think the company that makes or puts out the products we just showed you also offers any <u>other</u> products or services that you are aware of?
1.  Yes, I do
2.  No, I do not
3.  Don't know/Unsure

**ASK: 240=1**
**[SHOW ON SAME SCREEN AS 240 AFTER 240 HAS BEEN ANSWERED & "CONTINUE" SELECTED.  DO NOT ALLOW ANSWER TO 240 TO BE CHANGED ONCE 250 APPEARS ON SCREEN.]**
Q250   What other products or services?

*Please identify the brand and type of any other product or service you are thinking of as specifically as possible.*

*If you are thinking of more than one product or service, please identify each in a separate row below.  If you don't know, you may select that option.*

**[DISPLAY FIVE TEXT BOXES & AN OPTION FOR "Don't know". RESPONDENTS MUST ENTER TEXT IN AT LEAST ONE BOX, OR SELECT DK, BUT DO NOT ALLOW BOTH.]**

**ASK: 250=ENTERED TEXT IN AT LEAST ONE BOX**

Q255   Any other product or service you identified is listed below. Next to each one, please tell us what makes you think the company that makes or puts out the products we showed you also offers the other product or service you identified.

**[PROGRAMMER: SHOW ONE ROW FOR EACH OF THE ITEMS ENTERED IN Q250 & NEXT TO EACH ITEM DISPLAY A TEXT BOX FOR AN ANSWER.]**

**ASK: ALL QUALIFIED RESPONDENTS**

Q260   Do you think the products we showed you are affiliated with, or sponsored or approved by, any other company or brand?

1. Yes, I do
2. No, I do not
3. Don't know/No opinion

**ASK IF: Q260=1**

Q265   **[SHOW ON SAME SCREEN AS 260 AFTER 260 HAS BEEN ANSWERED & "CONTINUE" SELECTED.  DO NOT ALLOW ANSWER TO 260 TO BE CHANGED ONCE 265 APPEARS ON SCREEN.]**
What other company or brand?

*If you are thinking of more than one company or brand, please enter each one in a separate box below.  Or if you don't know you may select that option.*

**[3 SMALL TEXT BOXES AND "Don't know". FORCE AT LEAST ONE TEXT BOX OR DK BUT DO NOT ALLOW BOTH.]**

**ASK IF: Q265=ENTERED TEXT IN AT LEAST ONE BOX**

Q270   Each company or brand you mentioned is listed below.

For each one, please tell us your reasons for thinking that the products we showed you are affiliated with, or sponsored or approved by, that company or brand.

Please be as specific and detailed as possible.

**[LIST EACH ANSWER ENTERED IN Q265 AND TO THE RIGHT OF EACH PROVIDE A LARGE TEXT BOX. ABOVE THE LARGE TEXT BOXES DISPLAY, "Reasons:"]**

| CELL 3 – GENERICNESS (THERMOS) |
| --- |

**ASK: ALL RESPONDENTS**

Q300   For this survey, you will be asked about what word or words you would use to identify certain <u>categories</u> or <u>types</u> of products.

But first, please carefully read the examples on the next screens of what we mean when we ask about words you would use to identify a <u>category</u> or <u>type</u> of product.

**ASK: ALL RESPONDENTS**

Q310   For example, if we asked you what word or words you would use to identify the following type of product, you might answer that these products are…**<u>BICYCLES</u>** or **<u>BIKES</u>**.



Appendix B: Questionnaire

**ASK: ALL RESPONDENTS**

Q320   As another example, if we asked you what word or words you would use to identify the following category or type of product, you might answer that these products are…**ACTION FIGURES** or **DOLLS**.



Appendix B: Questionnaire

**ASK: ALL RESPONDENTS**

Q330 Now, please tell us what word or words you would use to identify the
following <u>category or type</u> of product:



If you are thinking of more than one word, you may enter each in separate
boxes below.

These products are…

**[INCLUDE TEXT BOXES FOR UP TO 5 ANSWERS; FORCE
RESPONSE TO AT LEAST ONE BOX]**

**ASK: ALL RESPONDENTS**

Q340 Now please take a few moments to think about what word or words you
would use to identify the following <u>category or type</u> of product:

| |
|---|
| **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.** |

**[DO NOT ENABLE CONTINUE BUTTON FOR 10 SECONDS]**

**ASK: ALL RESPONDENTS**

Q350   Now, please tell us what word or words you would use to identify the following <u>category or type</u> of product:

> **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.**

If you are thinking of more than one word, you may enter each in separate boxes below.

These products are…

**[INCLUDE TEXT BOXES FOR UP TO 5 ANSWERS; FORCE RESPONSE TO AT LEAST ONE BOX]**

Appendix B: Questionnaire

| CELLS 4 (version 1) & 5 (version 2) – GENERICNESS (TEFLON) |
| --- |

**[PROGRAMMER: the only difference between version is if brand or common is shown first**
**Cell 4 = Version 1 – see <u>brand</u> first throughout survey**
**Cell 5 = Version 2 – sees <u>common</u> first throughout survey]**

Q410
**[IF VERSION 1 INSERT, *"brand"* FIRST & *"common"* SECOND IN THE FIRST & LAST SENTENCES.  IF VERSION 2 INSERT, *"common"* FIRST & *"brand"* SECOND.]**

This survey is about *(insert, without the quotes, "brand" or "common")* names and *(insert, without the quotes, "common" or "brand")* names.  In a few moments you will be asked about a number of terms that you may or may not have seen or heard before.  But first, please read the next two screens about what we mean by a *(insert & underline (without the "") "<u>brand</u>" or "<u>common</u>")* name and what we mean by a *(insert & underline (without the "") "<u>common</u>" or "<u>brand</u>")* name.

Q420  **[IF VERSION 1, SHOW Q420-1 FIRST. IF VERSION 2, SHOW Q420-2 FIRST.]**

420-1
<u>Brand names</u> are names that companies use to identify <u>who</u> a product comes from.  Brand names primarily let the consumer know that a product comes from one specific company.

For example, GENERAL MILLS, TOYOTA, NATURE MADE, and IPAD are all <u>brand</u> names. These terms primarily identify for a consumer <u>who</u> a product comes from.

420-2
<u>Common names</u> are words used to identify a <u>type</u> of product – in other words, <u>what</u> the product is, not who makes it.  Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.

For example, BREAKFAST CEREAL, CAR, VITAMINS, and TABLET COMPUTER are all <u>common</u> names. These terms primarily identify for the consumer what <u>type</u> of product a company is selling.

Appendix B: Questionnaire

**Q430** **[IF VERSION 1 INSERT, "*brand*" IN FIRST BLANK & "*common*" IN SECOND.  IF VERSION 2, VICE VERSA]**

Do you understand the difference between a _____ name and a \_\_\_\_ name?
1. Yes→ continue to 440
2. No→ *terminate*
3. Don't know → *terminate*

**Q440** **[IF VERSION 1, SHOW Q440-1 FIRST.  IF VERSION 2, SHOW Q440-2 FIRST]**

440-1 Which type of name would you say **MINUTE MAID** is?
**[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2]**
1. Brand name → *continue*
2. Common name→ *terminate*
3. Don't know → *terminate*

440-2 Which type of name would you say **ORANGE JUICE** is?
**[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2]**
1. Brand name → *terminate*
2. Common name→ *continue*
3. Don't know → *terminate*

**Q445 [IF VERSION 1 SHOWN MINUTE MAID LINE FIRST AND ORANGE JUICE SECOND. IF VERSION 2 SHOWN ORANGE JUICE LINE FIRST AND MINUTE MAID SECOND.]**
Correct:
MINUTE MAID is a brand name because it is a name a company uses to let the consumer know that the product comes from one specific <u>source</u>.

ORANGE JUICE is a common name because it lets the consumer know the <u>type</u> of product.

Q450
We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of cannabis/THC products.

**[IF VERSION 1, SHOW:]**
For each term you are shown, please answer whether you think the term is a ***brand*** name or a ***common*** name in the context of cannabis/THC products.
Or if you don't know, you may select that option.

**[IF VERSION 2, SHOW:]**
For each term you are shown, please answer whether you think the term is a ***common*** name or a ***brand*** name in the context of cannabis/THC products.
Or if you don't know, you may select that option.

**[FOR Q460 THERE ARE 2 ROTATIONS OF THE ORDER OF FIVE TERMS. RESPONDENTS WILL BE ASKED ABOUT EACH TERM ONE AT A TIME]**

- **ONE-HALF OF RESPONDENTS IN <u>EACH VERSION</u> SHOULD GET EACH OF THE 2 ROTATIONS.  FOR EACH VERSION/ROTATION, ONE-HALF OF RESPONDENTS SHOULD SEE THE TERM <u>EDIBLE</u> AND THE OTHER HALF <u>EDIBLES</u>**
- **<u>EDIBLE</u> OR <u>EDIBLES</u> IS <u>ALWAYS FIRST IN ROTATION 1</u> AND ORDER OF ALL OTHER TERMS IS RANDOMIZED**
- **<u>EDIBLE</u> OR <u>EDIBLES</u> IS <u>NEVER FIRST IN ROTATION 2</u>. RANDOMIZE LOCATION OF <u>EDIBLE</u> OR <u>EDIBLES</u> IN ANY OTHER SPOT AND THEN RANDOMIZE LOCATION OF ALL OTHER TERMS IN ORDERING.**
- **FOR EACH TERM, TRACK IF IT IS SEEN 1ST, 2ND, 3RD, 4TH OR 5TH**

| ROTATION 1<br>(½ OF EACH CELL GETS ROTATION 1) | ROTATION 2<br>(½ OF EACH CELL GETS ROTATION 2) |
|---|---|
| **EDIBLE or EDIBLES**<br>[ANCHOR FIRST:<br>½ SEE EDIBLE & ½ SEE EDIBLES &<br><u>ALWAYS</u> FIRST] | [½ SEE **EDIBLE** & ½ SEE<br>**EDIBLES**<br>BUT <u>NEVER</u> FIRST] |
| **WANA** | |
| **KIVA** | |
| **INFUSED** | |
| **RECREATIONAL** | |

Appendix B: Questionnaire

**[ASK Q460 FIVE TIMES FOR EACH RESPONDENT (ONE TIME FOR EACH TERM), FOR EACH OF THE FIVE TERMS, DISPLAY THE TERM IN UPPERCASE BOLD LETTERS BELOW THE QUESTION TEXT AND ABOVE THE ANSWER CHOICES.]**

Q460 Thinking about cannabis/THC products, do you think this is a …
> *[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2)*
> 1. Brand name
> 2. Common name
> 3. Don't know [**ANCHOR**]

---

**POST SURVEY CLASSIFICATION FOR ALL CELLS**

**ASK: ALL QUALIFIED RESPONDENTS**

Q500  Do you or does anyone in your household work for any of the following?

> *(Select all that apply)*
> [RANDOMIZE]
> 1.  A company that makes, distributes, or sells cannabis/THC products
> 2.  An advertising or market research company
> 3.  None of these [**ANCHOR; EXCLUSIVE**]

Appendix C: Screenshots

| SCREENER |
|---|

## Q99

I'm not a robot
reCAPTCHA
Privacy - Terms

Continue »

## Q100

Please enter your year of birth.
*Enter a number*

Continue »

## Q105

Are you...
*Please select one response*

O Male
O Female

Continue »

Appendix C: Screenshots

## Q107

### Which of these age ranges includes your age?

*Please select one response*

○ Under 21
○ 21-34
○ 35-49
○ 50+

Continue »

## Q109

### Which of the following social media services, if any, have you used in the past month?

*Please select all that apply*

☐ Pinterest
☐ Tumblr
☐ LinkedIn
☐ Twitter
☐ Facebook
☐ TikTok
☐ Instagram
☐ Snapchat
☐ YouTube
☐ Trouba
☐ None of these

Continue »

Appendix C: Screenshots

## Q110

In what state do you live?

Select one... ▾

Continue »

## Q120

In the <u>past</u> 12 months, which of the following types of products, if any, have you purchased?

*Select all that apply*

Products containing...

☐ Glucosamine/chondroitin
☐ Nicotine
☐ Cannabis/THC
☐ CBD
☐ None of these

Continue »

## Q130

In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to purchase?

*Select all that apply*

Products containing...

☐ Glucosamine/chondroitin
☐ Nicotine
☐ Cannabis/THC
☐ CBD
☐ None of these

Continue »

Appendix C: Screenshots

## Q140

In the <u>past</u> 12 months, which of the following types of products containing **cannabis/THC**, if any, have you purchased?

*Select all that apply*

- ☐ Tinctures/oils
- ☐ Loose flower
- ☐ Pre-rolls
- ☐ Gummies/chews
- ☐ Mints
- ☐ Tarts
- ☐ Chocolates
- ☐ Other cannabis-infused confections/food products
- ☐ None of these

Continue »

## Q150

In the <u>next</u> 12 months, which of the following types of products containing **cannabis/THC**, if any, are you likely to purchase?

*Select all that apply*

- ☐ Tinctures/oils
- ☐ Loose flower
- ☐ Pre-rolls
- ☐ Gummies/chews
- ☐ Mints
- ☐ Tarts
- ☐ Chocolates
- ☐ Other cannabis-infused confections/food products
- ☐ None of these

Continue »

Appendix C: Screenshots

## Q160

For quality assurance, please type the word "survey" in the blank next to the "Other" box below and then click to continue.

*Select one*

○ Strongly agree
○ Agree
○ Neutral
○ Disagree
○ Strongly disagree
○ Other [               ]

[Continue »]

## Q170

You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please keep your browser maximized for the entire survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

*Please select one response*

○ I understand and agree to the above instructions
○ I do not understand or do not agree to the above instructions

[Continue »]

Appendix C: Screenshots

## CELL 1 – LIKELIHOOD OF CONFUSION SURVEY

### Q200

On the next screens you will be shown some cannabis-infused products. Please look at the products as you would if you were seeing them in a cannabis dispensary or online and were considering whether you might want to purchase any of the products.

On later screens, you will be asked a few questions. If for any question you do not know or have no opinion, please indicate so. Please do not guess.

Continue »

### Q210

Please use the green arrows that will appear to the side of the screen to view three images of the products we would like to ask you about.



1 of 3

You will be able to continue after you have clicked the green arrows to view all three images for at least 10 seconds each.

Appendix C: Screenshots

Please use the green arrows that will appear to the side of the screen to view three images of the products we would like to ask you about.




**2 of 3**



*You will be able to continue after you have clicked the green arrows to view all three images for at least 10 seconds each.*

Appendix C: Screenshots

Please use the green arrows that will appear to the side of the screen to view three images of the products we would like to ask you about.

  

**3 of 3**



Before continuing with the survey, please indicate whether you have clearly viewed the product images.

○ I have clearly viewed the product images
○ I was unable to clearly view the product images

## Q220

What company or brand do you think makes or puts out the products we just showed you, if you have an opinion?

*Please be as specific as possible*

[                    ]

☐ No opinion/Don't know

Continue »

Appendix C: Screenshots

## Q230

What makes you think the products we showed you are made or put out by ----?

*Please be as specific as possible*

Continue »

## Q240

Do you think the company that makes or puts out the products we just showed you also offers any other products or services that you are aware of?

*Select one*

○ Yes, I do
○ No, I do not
○ Don't know/Unsure

Continue »

Appendix C: Screenshots

## Q250

Do you think the company that makes or puts out the products we just showed you also offers any <u>other</u> products or services that you are aware of?

*Select one*

- ● Yes, I do
- ○ No, I do not
- ○ Don't know/No opinion

What other products or services?

*Please identify the brand and type of any other product or service you are thinking of as specifically as possible.*

*If you are thinking of more than one product or service, please identify each in a separate row below. If you don't know, you may select that option.*

[ ]
[ ]
[ ]
[ ]
[ ]

☑ Don't Know

Continue »

Appendix C: Screenshots

## Q255

Any other product or service you identified is listed below. Next to each one, please tell us what makes you think the company that makes or puts out the products we showed you also offers the other product or service you identified.

*Please be as specific and detailed as possible.*



Continue »

## Q260

Do you think the products we showed you are affiliated with, or sponsored or approved by, any other company or brand?

*Select one*

○ Yes, I do
○ No, I do not
○ Don't know/No opinion

Continue »

Appendix C: Screenshots

## Q265

Do you think the products we showed you are affiliated with, or sponsored or approved by, any other company or brand?

*Select one*

- ● Yes, I do
- ○ No, I do not
- ○ Don't know/No opinion

What other company or brand?

*If you are thinking of more than one company or brand, please enter each one in a separate box below. Or if you don't know you may select that option.*

☑ Don't Know

Continue »

Appendix C: Screenshots

## Q270

Each company or brand you mentioned is listed below.

For each one, please tell us your reasons for thinking that the products we showed you are affiliated with, or sponsored or approved by, that company or brand.

*Please be as specific and detailed as possible.*

| | Reasons: |
|---|---|
| __ | |
| __ | |

Continue »

Appendix C: Screenshots

### CELL 3 – GENERICNESS (THERMOS) SURVEY

## Q300

For this survey, you will be asked about what word or words you would use to identify certain categories or types of products.

But first, please carefully read the examples on the next screens of what we mean when we ask about words you would use to identify a category or type of product.

Continue »

## Q310

For example, if we asked you what word or words you would use to identify the following type of product, you might answer that these products are...**BICYCLES** or **BIKES**.



Continue »

Appendix C: Screenshots

## Q320

As another example, if we asked you what word or words you would use to identify the following category or type of product, you might answer that these products are... **ACTION FIGURES** or **DOLLS**.



Continue »

Appendix C: Screenshots

## Q330

Now, please tell us what word or words you would use to identify the following <u>category or type</u> of product:



If you are thinking of more than one word, you may enter each in separate boxes below.

These products are...
*Please be as specific and detailed as possible.*

Continue »

## Q340

Now please take a few moments to think about what word or words you would use to identify the following <u>category or type</u> of product:

**Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.**

Continue »

Appendix C: Screenshots

## Q350

Now, please tell us what word or words you would use to identify the following category or type of product:

> **Cannabis-infused foods such as brownies, cookies, chocolates, gummies, chews, mints, and tarts.**

If you are thinking of more than one word, you may enter each in separate boxes below.

These products are...

*Please be as specific and detailed as possible.*

Continue »

Appendix C: Screenshots

## CELLS 4 & 5 – GENERICNESS TEFLON SURVEY

## VERSION 1 (CELL 4)

## Q410

This survey is about **brand** names and **common** names. In a few moments you will be asked about a number of terms that you may or may not have seen or heard before. But first, please read the next two screens about what we mean by a **_brand_** name and what we mean by a **_common_** name.

Continue »

## Q420

Brand names are names that companies use to identify who a product comes from. Brand names primarily let the consumer know that a product comes from one specific company.

For example, GENERAL MILLS, TOYOTA, NATURE MADE, and IPAD are all brand names. These terms primarily identify for a consumer who a product comes from.

Continue »

Common names are words used to identify a type of product – in other words, what the product is, not who makes it. Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.

For example, BREAKFAST CEREAL, CAR, VITAMINS, and TABLET COMPUTER are all common names. These terms primarily identify for the consumer what type of product a company is selling.

Continue »

Appendix C: Screenshots

## Q430

Do you understand the difference between a **brand** name and a **common** name?

*Select one*

○ Yes
○ No
○ Don't know

Continue »

## Q440

Which type of name would you say **MINUTE MAID** is?

*Select one*

○ Brand name
○ Common name
○ Don't know

Continue »

Which type of name would you say **ORANGE JUICE** is?

*Select one*

○ Brand name
○ Common name
○ Don't know

Continue »

Appendix C: Screenshots

## Q445

Correct:
MINUTE MAID is a brand name because it is a name a company uses to let the consumer know that the product comes from one specific source.

ORANGE JUICE is a common name because it lets the consumer know the type of product.

Continue »

## Q450

We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of cannabis/THC products.

For each term you are shown, please answer whether you think the term is a **_brand_** name or a **_common_** name in the context of cannabis/THC products.
Or if you don't know, you may select that option.

Continue »

Appendix C: Screenshots

Q460

## EDIBLES

Thinking about cannabis/THC products, do you think this is a …
*Select one*

○ Brand name
○ Common name
○ Don't know

Continue »

## EDIBLE

Thinking about cannabis/THC products, do you think this is a …
*Select one*

○ Brand name
○ Common name
○ Don't know

Continue »

Appendix C: Screenshots

## WANA

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

O Brand name
O Common name
O Don't know

Continue »

## KIVA

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

O Brand name
O Common name
O Don't know

Continue »

## RECREATIONAL

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

O Brand name
O Common name
O Don't know

Continue »

Appendix C: Screenshots

## INFUSED

Thinking about cannabis/THC products, do you think this is a …

*Select one*

○ Brand name
○ Common name
○ Don't know

Continue »

---

| VERSION 2 (CELL 5) |
|---|

## Q410

This survey is about **common** names and **brand** names. In a few moments you will be asked about a number of terms that you may or may not have seen or heard before. But first, please read the next two screens about what we mean by a **_common_** name and what we mean by a **_brand_** name.

Continue »

## Q420

Common names are words used to identify a type of product – in other words, what the product is, not who makes it. Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.

For example, BREAKFAST CEREAL, CAR, VITAMINS, and TABLET COMPUTER are all common names. These terms primarily identify for the consumer what type of product a company is selling.

Continue »

Appendix C: Screenshots

Brand names are names that companies use to identify who a product comes from. Brand names primarily let the consumer know that a product comes from one specific company.

For example, GENERAL MILLS, TOYOTA, NATURE MADE, and IPAD are all brand names. These terms primarily identify for a consumer who a product comes from.

Continue »

## Q430

Do you understand the difference between a **common** name and a **brand** name?

*Select one*

○ Yes
○ No
○ Don't know

Continue »

## Q440

Which type of name would you say **ORANGE JUICE** is?

*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

Appendix C: Screenshots

Which type of name would you say **MINUTE MAID** is?

*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

## Q445

Correct:
ORANGE JUICE is a common name because it lets the consumer know the type of product.

MINUTE MAID is a brand name because it is a name a company uses to let the consumer know that the product comes from one specific source.

Continue »

## Q450

We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of cannabis/THC products.

For each term you are shown, please answer whether you think the term is a ***common*** name or a ***brand*** name in the context of cannabis/THC products.
Or if you don't know, you may select that option.

Continue »

Appendix C: Screenshots

Q460

## EDIBLES

Thinking about cannabis/THC products, do you think this is a …

*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

## EDIBLE

Thinking about cannabis/THC products, do you think this is a …

*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

Appendix C: Screenshots

## WANA

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

## RECREATIONAL

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

Appendix C: Screenshots

## INFUSED

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

## KIVA

Thinking about cannabis/THC products, do you think this is a ...
*Select one*

○ Common name
○ Brand name
○ Don't know

Continue »

Appendix C: Screenshots

## POST SURVEY CLASSIFICATION FOR ALL CELLS

Q500

Do you or does anyone in your household work for any of the following?

*Select all that apply*

☐ A company that makes, distributes, or sells cannabis/THC products
☐ An advertising or market research company
☐ None of these

Continue »










