# Exhibit F

Case: 1:20-cv-05840 Document #: 127-6 Filed: 03/27/23 Page 2 of 8 PageID #:1941
30(b)(6) Cristin Rudolph          January 20, 2022
Edible IP, LLC et al. v. MC Brands, LLC et al.

Page 1

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2
3    EDIBLE IP, LLC; and
     EDIBLE ARRANGEMENTS, LLC,
4                                    CIVIL ACTION
            Plaintiffs,       NO. 4:20-cv-05840
5
     v.
6
     MC BRANDS, LLC; and GREEN
7    THUMB INDUSTRIES, INC.,
8           Defendants.
     _____
9
     MC BRANDS, LLC; and GREEN
10   THUMB INDUSTRIES, INC.,
11       Counterclaim-Plaintiffs
12   v.
13   EDIBLE IP, LLC; and
     EDIBLE ARRANGEMENTS, LLC,
14
          Counterclaim-Defendants
15
16          DEPOSITION OF CRISTIN RUDOLPH
17    Individually and as 30(b)(6) Representative of
18   MC BRANDS, LLC and GREEN THUMB INDUSTRIES, INC.
19           Taken by Remote Video Conference
20                 January 20, 2022
21                  10:01 a.m. EST
22
23         Laura M. MacKay, RPR, CCR-B-1736
24
25

Case: 1:20-cv-05840 Document #: 127-6 Filed: 03/27/23 Page 3 of 8 PageID #:1942

30(b)(6) Cristin Rudolph January 20, 2022
Edible IP, LLC et al. v. MC Brands, LLC et al.

Page 22

 1  not providing a witness on.  We haven't covered them
 2  all.  I didn't know that you --
 3        MS. HENNER:  I'm asking what are the other
 4  ones that you believe we haven't covered.
 5        MR. NELSON:  We have served you our written
 6  responses and they speak for themselves.
 7        MS. HENNER:  And I believe that I have gone
 8  through all of them.  So I am asking you if there
 9  are any other ones that you believe we have not
10  talked about.
11        MR. NELSON:  Well, there's the ones that
12  Miss Rudolph isn't designated as a witness for, for
13  example.  There are other 30(b)(6) witnesses besides
14  Miss Rudolph.
15        MS. HENNER:  Is that the only caveat?
16        MR. NELSON:  Do you want me to sit here and
17  review all 40 pages of our objections on the record?
18        MS. HENNER:  You changed the scope of your
19  designations last night.  I am asking you if you
20  have anything else that you want to address before
21  we move forward.
22        MR. NELSON:  Well, then your question is
23  somewhat imprecise.
24        MS. HENNER:  My gosh.
25        MR. NELSON:  If your question is whether

Page 23

 1  there were any revisions to Miss Rudolph's
 2  designations besides Category 7 and 8, the answer is
 3  no.
 4        MS. HENNER:  Thank you for answering my
 5  question.
 6        MR. NELSON:  That wasn't your question.
 7        MS. HENNER:  It's going to be a long day.
 8  BY MS. HENNER:
 9     Q.  Okay, if you could take a look at the
10  Exhibit No. 3, please.  And if you could just let me
11  know if you have seen that document before.
12     A.  I've not directly seen this document.  I'm
13  currently reading it.
14        Okay, I have completed reading the
15  document.
16     Q.  And if you could look at page 2 for me in
17  the row that seems to identify you by name.  Do you
18  see that?
19     A.  Yes, I do.
20     Q.  All right.  And that row identifies you as
21  having information on "The development, use,
22  strength and consumer recognition of the incredibles
23  mark and advertising and marketing efforts related
24  thereto; sales of goods under the incredibles mark,
25  including revenue, profits, losses and expenses from

Page 24

 1  such sales; and the lack of any confusion between
 2  the parties' goods."
 3        Do you see that?
 4     A.  Yes, I do.
 5     Q.  Is that an accurate statement of things
 6  that you have knowledge of?
 7     A.  Yes, it is.
 8     Q.  How did you prepare for your deposition
 9  today?
10     A.  I have spent the last two days with counsel
11  reviewing documents and communicating with other
12  individuals associated with the incredibles business
13  to ensure that I have an accurate representation of
14  the information I am expected to present today.
15     Q.  Okay.  And prior to the last few days, had
16  you done any preparation for this deposition?
17     A.  I have worked on the incredibles business
18  directly since June of 2020, so I believe those
19  18 months would be appropriate preparation.
20     Q.  So prior to June of 2020, you had not
21  worked directly with the incredibles brand?
22     A.  That is true.
23     Q.  And how long has the incredibles brand been
24  in existence?
25     A.  Since 2010.

Page 25

 1     Q.  And you mentioned that you had discussed
 2  the topics that you are testifying on today with
 3  other individuals.  Can you tell me who those other
 4  individuals are?
 5     A.  Jessica Benchetrit, Gianna Sutley, Armon
 6  Vakili, Brett Kravitz, Kayla Brown.
 7     Q.  Okay.  And I apologize, I don't know how to
 8  pronounce the last name correctly, but what did you
 9  speak to Jessica about?
10     A.  There were thousands of pages of documents,
11  so there were a number of topics spoken to all
12  individuals about in order to prepare in the
13  entirety for this case.
14     Q.  Okay.  And what did you speak to Jessica
15  about?
16        MR. NELSON:  Asked and answered.
17        MS. HENNER:  It wasn't answered.
18     A.  If you would like to go back to the list of
19  topics, I can read all of the topics that were --
20  BY MS. HENNER:
21     Q.  I'm just asking for what you recall.
22        MR. NELSON:  Hold on.  Please don't
23  interrupt the witness.  The witness was still
24  answering your question.
25     A.  A number of business topics, marketing

Page 102

1 information and I did not ask this question.
2     Q. Is there any reason why you would ask about
3 numerical information but not branding information
4 from Medically Correct?
5         MR. NELSON: Objection. I want to caution
6 you not to disclose any communications you had with
7 your counsel during your deposition preparation or
8 strategy, or really anything that would reflect a
9 communication with counsel.
10        If you can answer the question without
11 referencing communications with counsel, you are
12 free to do so. But if the only way you can answer
13 the question would be to reference communications
14 with counsel, then do not answer the question.
15    A. I did not communicate with anyone in
16 Medically Correct about the design structure of the
17 logo and why that decision was made for that logo to
18 be the logo.
19 BY MS. HENNER:
20    Q. And my question is, why would you ask them
21 about financial information but not branding
22 information that predates Green Thumb's acquisition
23 of the brand?
24        MR. NELSON: Same objection, same
25 instruction, and assumes facts not in evidence.

Page 103

1     A. I don't know. I asked about one thing. I
2 didn't ask about another.
3 BY MS. HENNER:
4     Q. Is there anyone currently employed by Green
5 Thumb who has knowledge of the incredibles brand
6 prior to the year 2019?
7         MR. NELSON: Objection, vague.
8     A. Intimate knowledge around specific
9 decisions related to design, I don't know.
10 BY MS. HENNER:
11    Q. Are you still thinking?
12    A. There was a period at the end of the
13 sentence. I don't know, period.
14    Q. Do you understand yourself to be designated
15 today to provide testimony on behalf of both Green
16 Thumb and MC Brands?
17        MR. NELSON: Objection to the extent it
18 calls for a legal conclusion.
19    A. I prepared accordingly against the list of
20 items that I had involving the incredibles brand.
21 BY MS. HENNER:
22    Q. And to your understanding, MC Brands
23 existed prior to the acquisition by Green Thumb.
24        MR. NELSON: Objection, outside the
25 witness's designation and mischaracterizes the

Page 104

1 facts.
2     A. Incredibles has existed since 2010.
3 BY MS. HENNER:
4     Q. And specifically the MC Brands entity
5 existed prior to Green Thumb's acquisition, correct?
6         MR. NELSON: Objection, beyond the scope of
7 this witness's designation and mischaracterizes the
8 facts.
9     A. MC Brands existed prior to the acquisition
10 of incredibles into Green Thumb.
11 BY MS. HENNER:
12    Q. Other than asking for financial information
13 from MC Brands, or from Medically Correct, did you
14 do any preparation to provide testimony about facts
15 that predate Green Thumb's acquisition of MC Brands?
16    A. I read information that I had access to.
17 However, as you know, I did not contact anyone else
18 at MC Brands beyond Kayla Brown for the purposes of
19 financial information I was seeking to understand.
20    Q. My question is a little bit broader than
21 that. Other than picking up the phone and calling
22 somebody, did you do any preparation to provide
23 testimony on facts related to MC Brands that predate
24 the acquisition by Green Thumb?
25    A. Yes.

Page 105

1         MR. NELSON: Objection, argumentative.
2 BY MS. HENNER:
3     Q. Can you tell me how you prepared?
4         MR. NELSON: Objection, asked and answered.
5     A. I have read information regarding the
6 incredibles brand prior to the acquisition in 2019.
7 BY MS. HENNER:
8     Q. Okay. What information?
9     A. Information around the story of the
10 founders. I have reviewed financial information
11 around the business performance and I have an
12 understanding of the portfolio that MC Brands had in
13 the market between 2010 and the acquisition in 2019.
14    Q. Other than the financial information that
15 you referenced, was the rest of the information that
16 you looked at publicly available information?
17        MR. NELSON: Objection, mischaracterizes.
18 Assumes facts not in evidence.
19    A. No. They were internal documents that I
20 referenced also.
21 BY MS. HENNER:
22    Q. Okay. What internal documents?
23    A. A document that highlighted the history and
24 the origination of the brand that was leveraged by
25 our team to strategize how the brand would fit into

Case: 1:20-cv-05840 Document #: 127-6 Filed: 03/27/23 Page 5 of 8 PageID #:1944

30(b)(6) Cristin Rudolph January 20, 2022
Edible IP, LLC et al. v. MC Brands, LLC et al.

Page 122

1 specific regulations around the number of colors and
2 things like that that can appear on packaging. So
3 there are some slight iterations of all packaging
4 across markets to accommodate that.
5     So, you know, if a market had a regulation
6 that said, okay, you can only have two colors or
7 something like that, you might see some tweaks where
8 there are elements of packaging that are removed in
9 those states to accommodate for the state-specific
10 regulations that exist across our markets.
11     But the incredibles market remains
12 consistent across all states that we are operating
13 in today.
14     Q. And what -- what issue was the Ohio Board
15 of Pharmacy raising about the incredibles --
16     A. My understanding is they had a question
17 around appeal to children that upon, you know,
18 consultation with the legal parties, their concerns
19 were alleviated and the brand has been in the market
20 since -- since 2020.
21     Q. And what parts of the branding were they
22 concerned appealed to children?
23         MR. NELSON: Objection, foundation.
24     A. You know, the Board of Pharmacy is going to
25 be reviewing the package in totality, so a

Page 123

1 combination of the name, the colors, all of the
2 written language around that packaging. So, you
3 know, the total package, no pun intended, certainly
4 raised a question for them of the brand existing in
5 the market since 2020.
6 BY MS. HENNER:
7     Q. Specifically with respect to the name
8 "incredibles," has there ever been any regulatory
9 pushback on using that name?
10         MR. NELSON: Objection, asked and answered.
11 Vague.
12     A. Other than the question that was brought by
13 the state of Ohio, I am not aware of any other
14 pushback on the name "incredibles," and incredibles
15 exist in the six markets that we reviewed earlier
16 and no complaints have been received to date to my
17 awareness.
18         MR. NELSON: Are we approaching a good time
19 for a lunch break, Lindsay?
20         MS. HENNER: Yeah, sure.
21         MR. NELSON: Is now good?
22         MS. HENNER: Yeah.
23         MR. NELSON: Okay. Try to be quick. I
24 don't know how much time you need, 30 minutes?
25         MS. HENNER: You guys call it.

Page 124

1         MR. NELSON: 30 minutes should be fine.
2         MS. HENNER: Okay, let's do that.
3         (Recess 1:55-2:43 p.m. EST)
4 BY MS. HENNER:
5     Q. Does Green Thumb have a target consumer
6 base for the incredibles brand of products?
7     A. Yes. We target edibles consumers either
8 currently using cannabis or interested in using
9 cannabis.
10     Q. Are there any other characteristics?
11     A. Within the broad consumer targeting, no.
12 We keep it pretty broad in terms of, again, cannabis
13 consumers willing to ingest or eat cannabis. We
14 tend to add a little color to that when we are
15 focused on the development of creative.
16         So sometimes if we are briefing a creative
17 agency, we might include a little bit of detail
18 there. We tend to think about the consumer. It's a
19 little bit of like a dartboard where if the whole
20 dartboard is edibles consumers, you know, we may go
21 all the way, when we're briefing creatives, we go
22 into the very center of that dartboard and say like
23 where would we get the reverberations across all of
24 those kind of different circles when we are actually
25 talking about the visual aesthetics of a product.

Page 125

1 If you would like me to get into any of those
2 details, I'm happy to.
3     Q. Sure. Let's back up to the earlier portion
4 of what you said. So you first said consumers
5 either currently using cannabis or interested in
6 using cannabis. I want to understand what you
7 consider to fall in the category of people who are
8 interested in using cannabis.
9     A. A person may be going to a dispensary for
10 the first time. So maybe somebody who lives in
11 Illinois, for example. They've never been in a
12 dispensary. It's their first time coming in. You
13 know, incredibles is a -- is a brand that is
14 certainly approachable enough for somebody new to
15 the category but has interest in it coming in.
16         There are definitely brands that exist
17 within the kind of spectrum of cannabis brands that
18 might be geared towards more of an experienced
19 consumer, someone who has past experience either on
20 the basis of dosing, things like that.
21         There's a product line called concentrates,
22 dabbable concentrates specifically. They're very
23 potent. Is not a good product for a new cannabis
24 user who has never tried for that to be their first
25 experience. It's just not very approachable versus

Page 126

1  the edibles category, very approachable for a
2  first-time consumer.
3      Q.  Is incredibles a brand targeted towards
4  experienced consumers?
5      A.  Incredibles is a brand targeted towards
6  consumers that want to ingest cannabis.  The product
7  line is, I would call it pretty like down the
8  middle.  It's not -- it's not dosed necessarily for,
9  you know, a super, super light user.  It's not dosed
10 necessarily for a super, super heavy user.  Most of
11 our products tend to have 10-milligram dosing.
12        We do have some products in the market that
13 are a little above that or a little below that.  But
14 there's flexibility in the dosing, certainly to
15 break a piece of chocolate in half or to cut a gummy
16 in half, things like that, which makes it something
17 that is adaptable across the spectrum.
18        And if you are somebody who likes to
19 consume a little bit more than 10 milligrams,
20 certainly there's the flexibility to consume more
21 than one piece of chocolate or more than one gummy,
22 according to personal preference.
23        So there's a lot of flexibility which,
24 again, gives us a pretty broad target.  As we think
25 about the brand, where it's priced in the market.

Page 127

1  In particular, again, that mainstream positioning
2  and, again, the critical factor being someone who is
3  wanting to ingest cannabis versus smoke it or put it
4  on their skin.
5      Q.  Are there any particular demographic
6  details like age, sex, income, personality type,
7  that you would associate as being a target consumer
8  for the incredibles brand?
9      A.  Again, the target for incredibles is,
10 broadly, people consuming cannabis that want to
11 ingest it.  Again, when we talk targeting, we talk
12 about our, our broad target, who are we trying to
13 capture in the market, and that's what I'm referring
14 to here.
15        We will, again, in a creative document
16 where we're actually looking to construct something
17 visually, you know, we'll think about who is going
18 to be almost the magnet for others to be attracted
19 to.  So we'll think about what consumer base do
20 other types of consumers tend to associate
21 themselves with so that we can develop the creative
22 that's going to appeal to the largest sort of
23 subsegment of those edible users that I'm talking
24 about here.
25      Q.  So what kind of person would be the magnet

Page 128

1  for the incredibles brand products?
2      A.  Again, when we are talking about creative,
3  we'll often put in details around having an element
4  of nostalgia, appreciating, you know, sort of like a
5  quirky tone, things like that, that, again, are
6  really designed to inform how the creative will
7  ultimately look to, again, appeal to the broader
8  group of consumers that we're looking to attract to
9  the brand.
10      Q.  Are you saying that the nostalgia and
11 quirky tone are the magnet?
12      A.  Yes.  And again, what I mean by that is,
13 like these are the things that we would focus on to
14 generate the creative and then that creative would
15 be leveraged against the broad base of consumers
16 that we talked about at the beginning.
17      Q.  So how does the nostalgia of theme attract
18 consumers to the incredibles brand?
19      A.  I think the idea there is that there are --
20 I think this is very, very trendy.  We see it across
21 brands in different categories.  But there's this
22 element of, you know, what's old is new again and
23 sort of tying into any sort of face, place or story,
24 that you might have on your brand to sort of
25 showcase the longevity of that brand as not

Page 129

1  something that was invented yesterday.
2         And for this brand that can mean
3  highlighting, for example, the story of
4  Grandma Noni, the story of the founders, things like
5  that.  It can mean emphasizing products that have
6  been around for a decade or more, sort of showcasing
7  that longevity and showing there's a bit of a story
8  behind the brand and routes that really inform how
9  it developed.  So that might be part of it.
10        Second part would be like nostalgic
11 flavors.  So, you know, like passion fruit probably
12 not so much a nostalgic flavor, but maybe grape a
13 nostalgic flavor.  Something that you remember from
14 a long time ago.  Peanut butter.  Things that might
15 serve up a memory for you because it's something
16 that you have eaten for a long time.
17      Q.  Is there a demographic of consumers that
18 you understand the nostalgia thematic elements to
19 attract?
20      A.  We've not conducted formal consumer
21 research to ask that question specifically.  So very
22 much a subjective point of view from our marketing
23 and creative team.
24      Q.  What is that subjective point of view on
25 what types of consumers the nostalgia element

Case: 1:20-cv-05840 Document #: 127-6 Filed: 03/27/23 Page 7 of 8 PageID #:1946

30(b)(6) Cristin Rudolph January 20, 2022
Edible IP, LLC et al. v. MC Brands, LLC et al.

Page 130

1 attracts?
2   A. I think, you know, our hypothesis is it's a
3 pretty broad base of, you know, call it from GenZ to
4 GenX plus. I think that's what we really enjoy
5 about it is that it certainly extends from consumers
6 just turning 21 certainly to consumers who are
7 closer to 50 or 60. And the goal for us is we can
8 kind of pinpoint something and then we've got those
9 reverberations across a broader mass of people.
10  Q. So in what way would a nostalgia element
11 appeal to, let's just take the 21-year-old as an
12 example?
13  A. If you are 21 and you, you know, have a lot
14 of -- I think a lot of our younger consumers are a
15 lot more informed about marketing, certainly than
16 even older consumers. They ask a lot of questions.
17 They want to know the history. They want to know
18 the story behind a brand.
19      You know, we've got certainly a brand
20 that's been in existence since 2010 to help them to
21 understand this was one of the first legal brands in
22 cannabis. It was born in Colorado. This is the
23 story behind that brand so that we can provide a
24 little bit of like this particular product and
25 brand, like is grounded in a story with actual

Page 131

1 humans who invented it. It comes from a natural
2 place and there is a story that really inspired what
3 the brand grew to be.
4       And so, you know, that would be like
5 something we would think about from an element of
6 nostalgia.
7   Q. And is there a different impact of the
8 nostalgia element on, let's shift to GenX?
9   A. Again, we're hypothesizing here because
10 there's no consumer research that we've done to
11 validate this.
12      But even if we make a broad-based
13 assumption that GenX doesn't really care about face,
14 place and story so much, but they really remember
15 what it was like sitting at their grandma's house in
16 the summer on the porch dipping pretzels in peanut
17 butter and it strikes a memory for them, when they
18 pick up the peanut butter Buddha bar, it's like,
19 hey, we've got a flavor palette here that's going to
20 be really reminiscent of an experience that you had.
21 It's going to kind of bring you back to the golden
22 days or a really positive experience in your life
23 with some really familiar flavors that we have
24 across our chocolate bars and our gummies and mints,
25 tarts, things like that.

Page 132

1   Q. Are there any marketing elements for the
2 incredibles brands that are directed specifically to
3 those people who are interested in using cannabis
4 but have never used it before?
5   A. I wouldn't say directly in that sense. I
6 think we do try to think about different products
7 within the incredibles portfolio if they kind of
8 lean towards more of a newer user versus not.
9       We have a product that just came to market
10 in Illinois late December of 2021 that is the same
11 flavors of chocolate bars that we already have.
12 It's not new flavors. It's a configuration that
13 allows the consumer more clear breaks for smaller
14 dosing, for example.
15      So that would be one product within the
16 broader portfolio that would be a more approachable
17 product for a new user to really enable them to
18 control their dosing. So that would be an example.
19  Q. Do you see any demographic trends as far as
20 the types of people that are newly interested in
21 consuming cannabis?
22  A. It varies across states greatly and your
23 more medically focused states, the consumer base
24 coming in tends to look a bit different than in a
25 recreational state. We don't have a ton of

Page 133

1 available research to really talk through the exact
2 demographic coming in.
3       So I think what you'll find is that
4 consumers across all age breaks, if you are speaking
5 about demographics, both men and women are coming
6 into the cannabis space and consuming edibles.
7   Q. Do you have any understanding of why that
8 is?
9   A. Regulations are enabling it. So what was
10 perhaps not available in markets ten years ago is
11 available in markets now. If you lived in Chicago
12 in 2015, you would not have had the ability to enter
13 into a dispensary as a recreational consumer
14 purchase legal cannabis. Certainly now you have the
15 opportunity to do that.
16      So I would say a lot of it is -- is driven,
17 probably not all, but a lot of it is driven by the
18 ability that there's the opportunity to do something
19 that is legal now, depending on what state you live,
20 that may not have been even a year or two or five
21 ago.
22  Q. How quickly is that legality landscape
23 changing?
24      MR. NELSON: Objection, vague.
25  A. It's driven state by state. Depending on

Case: 1:20-cv-05840 Document #: 127-6 Filed: 03/27/23 Page 8 of 8 PageID #:1947

30(b)(6) Cristin Rudolph January 20, 2022
Edible IP, LLC et al. v. MC Brands, LLC et al.

Page 134

1 what's on a state's agenda to change in terms of
2 regulations for the state on any basis, certainly
3 cannabis could potentially be a topic. So I would
4 say on a fairly regular basis for states that have
5 not yet entered into a legal -- a legal like state
6 as it pertains to THC and then states that are
7 approved for medical use, I would imagine that many
8 of them are evaluating proposals for recreational
9 use.
10     But until those laws get passed and the
11 regulations are at a point where we are able to
12 participate, we're not following, you know, every
13 single element of every single state agenda, at
14 least from my purview.
15 BY MS. HENNER:
16   Q. You mentioned there may be some demographic
17 differences between medical-focused states and
18 recreational-focused states; is that right?
19   A. Yeah. I would suspect that there may be
20 given that in order to participate in the cannabis
21 category in a medical state you must have a medical
22 card that is provided to you by a physician. So you
23 would certainly have to have, you know, one of the
24 medical conditions designated in order to obtain
25 that card that enables you to purchase cannabis.

Page 135

1     And, again, the demographic may look a bit
2 different on the basis of that requirement than in a
3 recreational market where the only requirement would
4 be that you must be at least 21 years of age.
5   Q. And how do you understand the medical
6 requirement to potentially impact the demographics?
7   A. Well, some medical states will allow for
8 use as young as 18 if a medical condition is
9 present. So that is certainly a factor that might
10 shift the demographic a little bit.
11     But if you have got an 18-year-old with a
12 seizure disorder that is able to purchase cannabis
13 certainly with the accompaniment of a parent or
14 other above-21 person with you, so that would be an
15 example of the difference.
16     I would also, you know, imagine that the
17 population could skew a tiny bit older on the basis
18 of what conditions are outlined per the state. Now
19 those conditions are going to look different for
20 every single state that is out there. A condition
21 that is deemed appropriate in one state may not be
22 deemed appropriate in another state.
23     So, again, a hypothesis based on the
24 medical conditions approved that the population of
25 consumers that are entering that dispensary may be a

Page 136

1 little bit older.
2   Q. Would it be accurate to say that consumer
3 perception of cannabis products has again somewhat
4 destigmatized over the last let's just say five
5 years?
6   A. I haven't specifically done any consumer
7 research that has asked to that question. But on
8 the basis of the number of incremental new cannabis
9 users and the number of new dispensaries opening in
10 markets, I would hypothesize that the level of
11 stigma that people understand in their minds has
12 lessened over time, but no primary research to
13 confirm that that's true.
14   Q. Would you understand cannabis to be
15 becoming more like a mainstream type of consumer
16 product?
17     MR. NELSON: Objection, beyond the scope.
18   A. How would you define "mainstream"?
19 BY MS. HENNER:
20   Q. Sure. I understand you used "mainstream"
21 earlier in the deposition I believe to indicate sort
22 of mid tier products; is that right?
23   A. Yes.
24   Q. I guess when I say "mainstream," I mean
25 more common, generally accepted, things like that.

Page 137

1   A. I think it is certainly more mainstream
2 today than it was in, you know, 1950. But
3 quantifying like whether the majority of the
4 population consider it to be mainstream versus not
5 mainstream, I'm not sure that I have an accurate
6 answer for that.
7     But I think adoption over time as more
8 states have increased, or I should say lessened the
9 regulatory requirements around the purchases has --
10 has led to the potential for more people to consume.
11   Q. Have you seen any increase in older
12 consumers being attracted to cannabis products?
13   A. Again, I am -- I am not privy to data that
14 is specifically calling out that fact. It may or
15 may not exist. It's difficult for me to answer with
16 a yes or no.
17   Q. Does Green Thumb plan at all for a time
18 when cannabis may be federally legal?
19     MR. NELSON: Objection, foundation, beyond
20 the scope.
21   A. Regulations are evolving often. We take
22 things day by day, month by month, you know, year by
23 year, as new, evolving regulations enable us to move
24 into more markets.
25     Now certainly as federal conversations are